1
2
3
4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON
CASE NUMBER: 2:22-CV-00026-DLB-CJS

5   MARIO KIRKENDALL               PLAINTIFF

6       vs.

7   BOONE COUNTY BOARD OF         DEFENDANT
     EDUCATION

8

9                        - - -

10      Deposition of MARIO KIRKENDALL, a Plaintiff

11  herein, taken by the Defendant as upon

12  cross-examination, pursuant to the Federal Rules of

13  Civil Procedure and pursuant to Notice to Take

14  Deposition and agreement by counsel as to the time

15  and place and stipulations hereinafter set forth, at

16  the offices of Freking Myers and Reul, 600 Vine

17  Street, Ninth Floor, Cincinnati, Ohio, at 10:00

18  A.M., on Friday, April 21, 2023, before Kelly

19  Steidle Brabender, a Court Reporter and Notary

20  Public within and for the Commonwealth of Kentucky.

21                        - - -

22
23
24
25

1    APPEARANCES:

2

3    On behalf of the Plaintiff:

4    JON B. ALLISON, ESQ.
      of
5    Freking Myers and Reul
     600 Vine Street, Ninth Floor
6    Cincinnati, Ohio  45202

7    On behalf of the Defendant:

8    OLIVIA AMLUNG, ESQ.
      of
9    Adams Law, PLLC
     40 West Pike Street
10   Covington, Kentucky  41011

11

     ALSO PRESENT:  Casmir Thornberry
12                  Eric McArtor

13                           - - -

14

15

16

17

18

19

20

21

22

23

24

25

1              S T I P U L A T I O N S

2

3        It is stipulated by counsel for the respective

4    parties that the deposition of MARIO KIRKENDALL, a

5    Plaintiff herein, may be taken at this time by the

6    Defendant as upon cross-examination and pursuant to

7    the Kentucky Rules of Civil Procedure and Notice to

8    Take Deposition; that the deposition may be taken in

9    stenotypy by the Notary Public-Court Reporter and

10   transcribed by her out of the presence of the

11   witness; that the transcribed deposition was

12   submitted to the witness for examination and

13   signature and that signature may be affixed out of

14   the presence of the Court Reporter.

15                            - - -

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2                                         PAGES

 3    Cross-Examination By Ms. Amlung:        5

 4

 5                 E X H I B I T S
```

```
 6    Defendant's Exhibit No. 1          31
      Defendant's Exhibit No. 2          37
 7    Defendant's Exhibit No. 3          40
      Defendant's Exhibit No. 4          43
 8    Defendant's Exhibit No. 5          44
      Defendant's Exhibit No. 6          45
 9    Defendant's Exhibit No. 7          47
      Defendant's Exhibit No. 8          49
10    Defendant's Exhibit No. 9          73
      Defendant's Exhibit No. 10         75
11    Defendant's Exhibit No. 11         78
      Defendant's Exhibit No. 12         84
12    Defendant's Exhibit No. 13         86
      Defendant's Exhibit No. 14         88
13    Defendant's Exhibit No. 15         89
      Defendant's Exhibit No. 16         91
14    Defendant's Exhibit No. 17        107
      Defendant's Exhibit No. 18        108
15    Defendant's Exhibit No. 19        111
      Defendant's Exhibit No. 20        117
16    Defendant's Exhibit No. 21        134
      Defendant's Exhibit No. 22        146
17    Defendant's Exhibit No. 23        189
      Defendant's Exhibit No. 24        207
18    Defendant's Exhibit No. 25        231
      Defendant's Exhibit No. 26        233
19    Defendant's Exhibit No. 27        237
      Defendant's Exhibit No. 28        258
20    Defendant's Exhibit No. 29        259
      Defendant's Exhibit No. 30        266
21    Defendant's Exhibit No. 31        278
      Defendant's Exhibit No. 32        278
22    Defendant's Exhibit No. 33        282
      Defendant's Exhibit No. 34        287
23    Defendant's Exhibit No. 35        295
```

```
24

25
```

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    MARIO KIRKENDALL

2     of lawful age, a Plaintiff herein, being first duly

3     sworn, as hereinafter certified, was examined and

4     deposed as follows:

5                    CROSS-EXAMINATION

6     BY MS. AMLUNG:

7          Q.   All right.  Good morning,

8     Mr. Kirkendall.  My name is Olivia Amlung.  I'm the

9     attorney for the Boone County School Board.  It's a

10    pleasure to meet you.  Thank you for being here this

11    morning.  I'm sure this is not how you wanted to

12    spend your Friday.

13                 So we're going to start off with just

14    something super easy.  Can you please give your full

15    name with spelling?

16         A.   Mario Antoine Kirkendall, M-A-R-I-O,

17    A-N-T-O-I-N-E, K-I-R-K-E-N-D-A-L-L.

18         Q.   Okay.  Thank you for that.

19    Mr. Kirkendall, have you ever been deposed before?

20         A.   Yes.

21         Q.   Okay.  How many times?

22         A.   I think just one other time.

23         Q.   Okay.

24         A.   By Princeton.

25         Q.   About when was that?

```
 1              A.   A few years ago.

 2              Q.   Okay.

 3              A.   Yeah.

 4              Q.   So a couple of ground rules for today

 5    since it's been a few years, just to go over.  So

 6    today's purpose is just I'm trying to know what you

 7    know.  I'm going to ask a lot of questions, maybe

 8    some follow-up things.  There may be some things

 9    that you think are pretty obvious that I'm going to

10    ask, it's not to insult, it's just because I'm

11    trying to get as much information as I possibly can.

12              Second ground rule is that I need

13    verbal answers.  A lot of times we want to uh-huh,

14    unh-unh, or just shake your head.  If I say what is

15    that, it's not trying to be rude, it's because

16    everything is being transcribed and so we need

17    audible yes, no, responses to put in the transcript.

18              If I ask a question that you don't

19    know or understand, just say so.  Sometimes my mouth

20    moves a heck of a lot faster than my brain does and

21    what comes out is just not a coherent question.  So

22    if you don't understand what I'm asking you, just

23    tell me and I can ask it better.

24              A.   Okay.

25              Q.   I don't want you to answer something
```

1    assuming that what I'm asking is what I'm really

2    asking, because it makes things look really weird in

3    the transcript we get at the end of the day, so

4    let's just both be on the same page.

5            A.   Okay.

6            Q.   The biggest one, because Kelly will

7    be very upset with us if we break this rule, let's

8    not talk over each other.  Let me finish my question

9    and I'll try to let you finish your answers as best

10   I can, just because it makes it really hard to put

11   everything in the transcript when two people are

12   talking at once.

13           A.   Okay.

14           Q.   The last question.  So you were just

15   placed under oath, do you understand what that

16   means?

17           A.   Yes.

18           Q.   Okay.  So what did you do to prepare

19   for your testimony today other than talking with

20   your attorneys?

21           A.   I went over all the facts that I have

22   or facts that I feel were pertinent, and went over

23   my contract -- or previous contract and, yeah,

24   looked over notes that I have.

25           Q.   Okay.  So other than your contract

1   and your notes, are there any specific documents

2   that you looked at and spent a lot of time with?

3           A.   No.

4           Q.   Okay.  Again, other than your

5   attorney, who did you talk to about your deposition

6   today?

7           A.   My mom, my wife.

8           Q.   What did you talk about?

9           A.   That my deposition is coming up and,

10  yeah, finally here.

11          Q.   Okay.  Anything of substance about

12  the allegations that you had conversations with them

13  about?

14          A.   No, that was a long time ago.

15          Q.   Okay.  So, in your own words, please

16  just explain why you're suing the Boone County

17  School District.

18          A.   I'm suing the Boone County School

19  District for breach of contract, FMLA violations,

20  retaliation that I received during it, as well as

21  some race issues that cropped up.

22          Q.   Okay.  So we'll get into more of the

23  specifics of that here in a minute, but we do have

24  to do some background information just to kind of

25  get a feel for who you are and some other things

1    that might come up.

2              So, first and foremost, other than

3    Mario Kirkendall, have you gone by any other names?

4         A.    No.

5         Q.    Okay.  What is your age?

6         A.    Thirty-seven.

7         Q.    Thirty-seven.  Where do you currently

8    live?  What's your current address?

9         A.    7492 Whitehall Circle, West Chester,

10    Ohio 45069.

11         Q.    How long have you lived at that

12    address?

13         A.    Since January.

14         Q.    Of this year?

15         A.    Uh-huh.

16         Q.    So about three months, that's

17    impressive you knew your address.  I don't think I

18    knew my address within that first year at all.

19              So where were you at before?

20         A.    Georgia.

21         Q.    How long were you in Georgia?

22         A.    For a year.

23         Q.    What took you to Georgia?

24         A.    My wife's job.

25         Q.    What does your wife do?

```
 1                    A.    She's a traveling nurse.

 2                    Q.    Where were you at before Georgia?

 3                    A.    Spent a couple months in Panama City.

 4                    Q.    So if you were a year in Georgia, so

 5       that would have been roughly all of 2022?

 6                    A.    No, we got there -- well -- yeah,

 7       you're right, yeah.  Moved there in January then

 8       moved, yeah, out in January.

 9                    Q.    Okay.  So then you were in Panama

10       City for the end half of 2021?

11                    A.    Uh-huh.  Yes.

12                    Q.    Where were you at before that?

13                    A.    Sharonville, Ohio.

14                    Q.    How long were you living in

15       Sharonville?

16                    A.    Over 10 years.

17                    Q.    Okay.  Do you remember what your

18       address was there?

19                    A.    Gosh.  I just drove by it, too.  I

20       don't off the top of my head.

21                    Q.    I can ask a better question.  Would

22       it be the same address that you were residing at

23       while you were employed at the Boone County Schools?

24                    A.    Correct, yes.

25                    Q.    So it would have been the same as on
```

1    all of your Boone County Schools paperwork?

2             A.   Correct.

3             Q.   Okay.  So you say you currently live

4    in West Chester on 7492 Whitehall Circle; who do you

5    live with currently?

6             A.   My wife and our three kids.

7             Q.   How old are your kids?

8             A.   Eight, six and three.

9             Q.   Okay.  So you live in West Chester,

10   but this case is currently pending in the Eastern

11   District of Kentucky.  So that's quite a few

12   counties in Kentucky that the Eastern District

13   covers, and the reason I'm going to ask the next

14   question is because if this goes to trial, you'll

15   get a jury of all of these individuals that could

16   come, your pool would come from the Eastern District

17   of Kentucky.

18            A.   Okay.

19            Q.   So do you have any family members --

20   and I'll limit that to immediate family, brothers,

21   sisters, cousins -- we'll keep it in that

22   parameters -- in the Eastern District of Kentucky?

23            A.   Not that I know of.

24            Q.   Okay.  Do you have any really close

25   friends that you think would not be able to fairly

1   sit on a jury?

2           A.   That live in Eastern Kentucky?

3           Q.   Yes?

4           A.   No.

5           Q.   Or in the Eastern District, so

6   Northern Kentucky would be included in that.

7           A.   No.

8           Q.   Okay.  So let's go through your

9   educational history.  Where did you graduate from

10  high school?

11          A.   Sycamore High School.

12          Q.   Where did you go after Sycamore?

13          A.   A year at University of Dayton, then,

14  what was it, Miami, and then University of

15  Cincinnati.

16          Q.   Where did you get your bachelor's

17  from?

18          A.   Miami.

19          Q.   Okay.  What is your bachelor's in?

20          A.   Physical education, K through 12.

21          Q.   So when you went to Cincinnati, was

22  that for your master's?

23          A.   Uh-huh.

24          Q.   What's your -- what degree do you

25  have from UC?

```
 1              A.   Master's in Educational Leadership,

 2    Administration.

 3              Q.   Okay.  Do you have any other

 4    certifications or educational experiences related to

 5    teaching?

 6              A.   No.

 7              Q.   Okay.  Any related to physical

 8    education or anything of that nature?

 9              A.   No.

10              Q.   Okay.  Do you currently hold any

11    professional licenses or certifications?

12              A.   Are you talking about the one in

13    Kentucky?

14              Q.   Anything.

15              A.   Yes, I mean Kentucky.

16              Q.   So a Kentucky teaching certificate?

17              A.   Yes, which was a step away from

18    administration.

19              Q.   Okay.  So you have a Kentucky

20    teaching certificate.  Do you hold any other

21    teaching certificates?

22              A.   No.

23              Q.   Have you previously?

24              A.   Yes.

25              Q.   Okay.  Where was that?
```

```
 1                    A.   Ohio.
 2                    Q.   Have you -- do you hold any other
 3       certificates or licenses, not your teaching
 4       certificate?
 5                    A.   No.
 6                    Q.   Okay.  So let's talk about those two
 7       licenses.  Have you ever had your license, either in
 8       Kentucky or Ohio, revoked or suspended?
 9                    A.   It was suspended in Ohio.
10                    Q.   Okay.  When was that?
11                    A.   I don't know.  I think it was 2017.
12                    Q.   Okay.
13                    A.   I believe.
14                    Q.   Why was it suspended?
15                    A.   Due to an incident with a student.
16                    Q.   What was that incident?
17                    A.   Well, a student said that I had,
18       yeah, put him in a choke hold, as well as talked
19       about his mother.
20                    Q.   Okay.  Did you go through the
21       disciplinary process in Ohio?
22                    A.   Yeah.
23                    Q.   Okay.  Was there a hearing?
24                    A.   There was.
25                    Q.   When was that?
```

1           A.    Again, I don't -- I don't know.

2    2018.

3           Q.    Okay.

4           A.    2019.

5           Q.    Okay.

6           A.    Sorry.

7           Q.    So the end of that was suspension,

8    correct?

9           A.    Until I did training to get it back.

10   So my license can be approved again in Ohio.

11          Q.    Okay.  So you just haven't pursued

12   it?

13          A.    No.

14          Q.    Okay.  Other than the incident in

15   Ohio in 2017, '18, have you ever been charged with

16   misconduct or disciplined by another professional

17   licensing entity?

18          A.    Are you talking about education or in

19   general?

20          Q.    Just in general.

21          A.    I don't believe so.

22          Q.    Okay.  Did Kentucky take up

23   reciprocity with whatever the Ohio disciplinary

24   issue was or did they just let it go?

25          A.    After speaking with the licensing

1   board, they stated that once I got the training done

2   and it was actually approved, that it would be -- I

3   mean, there was nothing on my record at all.

4           Q.   Okay.  So what was that training?

5           A.   I think it was like 20 hours of -- 20

6   or 30 hours of training in anything from, you know,

7   working with children to communication to -- yeah.

8           Q.   When did you do that training?

9           A.   It was in the summer, but I honestly

10  can't remember the date.

11          Q.   Do you remember about when you spoke

12  with the Kentucky licensing board about that?

13          A.   It was at the beginning of my -- when

14  I entered into Kentucky because I didn't want

15  anything hanging over my head.

16          Q.   So roughly summer of 2017 -- or I'm

17  sorry, 2019?

18          A.   So I was at Newport, so -- sorry --

19  I'm going to say 2018 is when I believe I registered

20  for my license, and then this issue popped up in

21  2019 where I guess -- I don't know if Ohio contacted

22  Kentucky, even after speaking to Kentucky about

23  licensing, and then, yeah, I took those classes, I

24  think it was that following summer.  So maybe like

25  2020, maybe.

```
 1              Q.   Okay.  So they let you retain your

 2    license while you were going through the training

 3    process?

 4              A.   Uh-huh.

 5              Q.   Okay.  So where are you currently

 6    employed?

 7              A.   Nowhere.

 8              Q.   Okay.  When is the last time you held

 9    a job?

10              A.   Boone County.

11              Q.   Okay.  So roughly beginning of 2021?

12              A.   Correct.

13              Q.   Have you applied to any other jobs?

14              A.   Yes.

15              Q.   Where have you applied?

16              A.   There's a Rolodex of places that I've

17    applied, only two interviews.

18              Q.   So you said your wife is a traveling

19    nurse?

20              A.   Yes.

21              Q.   So you've lived -- in the middle of

22    2021 you said that you moved to Panama City?

23              A.   Uh-huh.

24              Q.   So that was a few months after you

25    lost your job with the Boone County Schools?
```

19

1          A.   Correct.

2          Q.   Okay.  Being a teacher, does having

3    your wife be a traveling nurse make it difficult to

4    find employment?

5          A.   Can you ask that again?

6          Q.   So you move around a lot with your

7    wife being a traveling nurse; is that fair?

8          A.   We have had to because she's been the

9    only income.

10          Q.   Okay.  With the family moving from

11    Panama, then to Georgia, then to back here in Ohio,

12    has it been difficult to find employment with the

13    potential to move again?

14          A.   No.  The understanding between us has

15    always been that if there's a job that comes up in

16    Cincinnati or Kentucky, I would take it.  And, yeah,

17    she just happened to be covering both of our

18    salaries, mine that was lost and hers so, yeah.

19          Q.   Sure.  So I know that you said that

20    there have been a Rolodex of places that you've

21    applied, but can you just, as many as you can, let

22    me know.

23          A.   I have not looked at the list

24    anywhere -- I mean, from P&G to school districts.  I

25    had an interview with Hamilton City Schools, as well

1    as Dayton Public Schools, City of Cincinnati, yeah,

2    a lot of places.

3            Q.    Were you applying for teaching jobs,

4    administration; what were you applying for in

5    Hamilton, Dayton and City of Cincinnati?

6            A.    Athletic director positions within

7    those that have came up.  Typically not teaching

8    positions, unless it's been, like, a hybrid of both.

9            Q.    You do have a certificate to teach,

10   though, correct?

11           A.    Yeah, and I'm one step away from an

12   administration role, yeah, I just didn't take the

13   test.

14           Q.    Right.  But what I'm saying, though,

15   is that if a teaching position was open, you are

16   qualified to apply for it, correct?

17           A.    Yes.

18           Q.    Okay.  Anywhere else besides Hamilton

19   City Schools, Dayton Public Schools and/or City of

20   Cincinnati?

21           A.    I have Indeed set up on a tracker

22   that if there's a teaching position, typically it

23   goes -- it's like a one-step process but -- there

24   have been other school districts, but, yeah.

25           Q.    Okay.  Have you received any feedback

1    as to why you haven't gotten any of those positions?

2              A.   No.

3              Q.   Okay.

4              A.   Well, actually -- sorry.  I'm sorry.

5    Dayton Public Schools said I was in the finalist to

6    get it, but the person that they went with -- I

7    guess, just fit their system a little better, that

8    was the only feedback I got.

9              Q.   Other than P&G, are there any

10   non-teaching positions that you've applied for since

11   your termination from the Boone County Schools?

12             A.   Yeah, Amazon.  Like I said, City of

13   Cincinnati Parks and Recs positions, yeah.

14             Q.   Okay.  So when you said City of

15   Cincinnati, it wasn't Cincinnati Public Schools, you

16   applied to the actual city?

17             A.   City of Cincinnati, correct.

18             Q.   Have you definitively heard back from

19   any of these entities that you will not be employed

20   or the application is still pending?

21             A.   I've had a couple applications not

22   pending or still pending, but then nothing has came

23   back.  But, at this point, I've applied to over a

24   few hundred.

25             Q.   Okay.  Did you start applying for new

1    jobs right after your termination from Boone County;

2    did you wait?  What was the timeline of that?

3              A.   About a month within -- well, a month

4    after my termination was when I got called in for

5    Hamilton City Schools and didn't hear anything back.

6              Q.   Okay.  When did the opportunity to

7    move to Panama City come up?

8              A.   After we figured that without me

9    having a salary we needed to sell our house and

10   move, so I think we moved out in August and that's

11   when our house was sold.

12             Q.   Okay.  So let's go reverse a little

13   bit.  So you worked for the Boone County Schools

14   from 2019 until January '21 -- or January of 2021;

15   does that sound right?

16             A.   Uh-huh, yeah.

17             Q.   Okay.  So where were you at prior to

18   the Boone County School District?

19             A.   Newport.

20             Q.   Okay.  When were you at Newport?

21             A.   2018 to '19.

22             Q.   What did you do there?

23             A.   Athletic director.

24             Q.   Why did you leave?

25             A.   Because I saw this opportunity as a

1    much better one.  My goal of being an administrator.

2              Q.    What was your job description and

3    your job duties with AD at Newport Schools?

4              A.    I was -- sorry.  I think you asked me

5    a question and I was assuming -- athletic director

6    and teacher, so I did both, and then full

7    responsibility over all sports within the district.

8              Q.    So what -- I mean, what did the

9    teaching component of that entail?

10             A.    Teaching physical education.

11             Q.    How many classes a day did you have

12   to teach?

13             A.    Five, I think.

14             Q.    How large is their athletic program?

15             A.    Well, that's for the whole district,

16   so I don't --

17             Q.    Sure.

18             A.    I mean, that's all the way from

19   elementary all the way to high school, so it varies.

20             Q.    So let me -- I'm sorry, let me

21   clarify then.  You were athletic director for the

22   whole district?

23             A.    Yeah, in that title, you're athletic

24   director through their youth programs all the way

25   up.

24

1          Q.    Okay.  But you were only teaching at

2    the high school, correct?

3          A.    Correct.

4          Q.    Okay.  Was the AD position an extra

5    duty job?

6          A.    When I was hired, it was not supposed

7    to be.  They had a new principal came in and that's

8    when my schedule changed.

9          Q.    Okay.  So your schedule changed with

10   Newport halfway through?

11         A.    As soon as -- yeah, I was hired on,

12   that was the only job I was getting interviews for

13   so, yeah, I took it.

14         Q.    Okay.  So I just want to make sure

15   I'm understanding.  So you were hired on as a

16   teacher at Newport High School?

17         A.    When the first principal who was

18   there, the guy who hired me -- I think he's at Lloyd

19   now -- hired me, it was you teach, what, two or

20   three classes, and then you're athletic director.

21   My responsibility was athletic director.  If

22   something came up, athletic director with this

23   little component and -- yeah.  Does that make sense?

24   Sorry.

25         Q.    No, you're fine.  So you started off

1    teaching two to three PE classes?

2              A.    That's what was agreed upon, correct.

3              Q.    Okay.  And then eventually you were

4    asked to teach five PE classes?

5              A.    Yes.

6              Q.    When did that change happen?

7              A.    When the new principal came in.

8              Q.    Okay.  So did the new principal come

9    in like halfway through the year?  When was that?

10             A.    No, that was like literally a week

11   after.  So I was hired in the summer; a week after,

12   he's leaving and then a new principal is coming on.

13             Q.    Okay.  So then you taught most of the

14   year five periods a day of PE?

15             A.    Correct.

16             Q.    And then on top of that, you were

17   also hired to the extra duty position of athletic

18   director?

19             A.    Correct.

20             Q.    Okay.  So the AD position didn't

21   change or anything throughout the year; is that

22   fair?

23             A.    Correct.

24             Q.    When you were asked to take on more

25   classes at Newport, what did that conversation look

1    like?

2              A.    It was a direct conversation, and she

3    said, hey -- I don't know what was happening with

4    Newport, I think they lost a bunch of teachers, and,

5    hey, if you want to, you can, like, look at it and

6    take it, if not, then potentially we have to look at

7    another route, and I was like, okay, I'll take them

8    all.

9              Q.    So it was either teach the additional

10   two classes or you wouldn't be able to take the

11   position that you had been hired on to, or was it,

12   take it or leave it, do you want these extra two

13   classes?

14             A.    Can you ask that again?  Sorry.

15             Q.    Sure.  I just want to make sure I'm

16   understanding.

17             A.    Correct.

18             Q.    So you're hired on at Newport to

19   teach three PE classes a day?

20             A.    With the first principal, correct.

21             Q.    Right.  So school starts and then a

22   week later --

23             A.    No, this was in the summer.  School

24   had not started yet.

25             Q.    Okay.  So it was before school even

1    started?

2            A.    Yeah, there were no students at all.

3            Q.    Okay.  I understand now.  So then the

4    conversation you were referencing, where she said

5    take it or leave it, does that mean that you either

6    had to take the two classes or you would not be

7    hired to the position to start the beginning of the

8    year, or was she actually giving you the option,

9    hey, do you want to teach these two classes?

10           A.    I don't know from her reference of

11   what she was using it as.  I just said, hey, I mean,

12   I have a certification, I'm working towards

13   administration, yeah.

14           Q.    So you just went along with it?

15           A.    Yeah.

16           Q.    Okay.  So the school year starts,

17   you're teaching five PE classes a day, running the

18   district's AD -- or running the district's athletic

19   program as AD?

20           A.    Uh-huh.

21           Q.    And then about what time does the job

22   posting with Boone come up?

23           A.    I think it was in the summer.  I

24   mean, like, May or June, I believe.

25           Q.    Okay.  So if you had not gotten the

1    position at Boone, would you have stayed at Newport?

2            A.   No, I had already left.  I had

3    decided that's not what I -- again, it was too much,

4    too taxing.  My goal of being an administrator did

5    not, I don't think, constitute me having to teach

6    that heavy load.  And I was like, yeah, I want to

7    find a position that allows me to not do that.

8            Q.   So you left Newport.  I assume you

9    just didn't ask them to renew your contract?

10           A.   I don't think I turned in the paper.

11           Q.   Okay.  Did you apply to multiple

12   places, then, at the time, or was it just Boone

13   County?

14           A.   There were a few that I applied to in

15   Ohio as well, but didn't get anything.  I think I

16   got called in for Cincinnati Public Schools to

17   interview, and then a position in Lakota Schools at

18   the time and, yeah, didn't get it.

19           Q.   Okay.  So you get the interview with

20   Boone then and you're hired on there.

21           A.   Uh-huh.

22           Q.   We'll talk about that in a minute.

23   So other than Boone County Schools, did you have any

24   other employment at the time or sources of income?

25           A.   No.

1          Q.   Okay.  Other than this lawsuit, as

2     well as the separate one that's been filed in the

3     Boone Circuit Court, have you ever been a part of a

4     lawsuit?

5          A.   I mean, does the one in Ohio count as

6     a lawsuit?

7          Q.   Aside from that one then, too.

8          A.   Not that I know of, no.

9          Q.   Okay.  I don't want to know anything

10    about conversations that you've had with either

11    Mr. Allison or Mr. Shipp.

12         A.   Uh-huh.

13         Q.   But can you explain to me kind of the

14    breakdown of what happened with filing a suit in

15    circuit court versus bringing a whole new one here?

16         A.   I don't -- I don't think I understand

17    the question.  I'm sorry.

18         Q.   Okay.  So let's walk through this.

19    You are terminated in January of '21?

20         A.   Correct.

21         Q.   And did you avail yourself of the

22    tribunal process, so you appealed it and had a nice

23    hearing in front of two or three individuals with

24    the Kentucky Department of Education?

25         A.   No, I never had a hearing.

30

```
 1              Q.   Okay.  So you just went straight to
 2     circuit court in Boone?
 3              A.   I believe we filed it and then I
 4     don't know what happened.  And then, yeah, I think
 5     it's still pending, I think.
 6              Q.   Sure.  So at some point, did you just
 7     decide to get another attorney to sue the district
 8     again?
 9              A.   From my understanding when working
10     with, I guess, JSB Attorneys, they were unable --
11     they were not able to go after the termination piece
12     as well as the retaliation piece from FMLA.
13              Q.   Okay.
14              A.   It had to be filed separately, I
15     believe.
16              Q.   Okay.  So those two cases, though,
17     the one in circuit, as well as this one, are the
18     only two cases that you're currently involved in?
19              A.   Against Boone County or just in
20     general?
21              Q.   In general.
22              A.   I believe so.
23              Q.   Okay.  You've never filed another
24     lawsuit against a former employer?
25              A.   No.
```

1    Q.   Okay.  Have you ever filed

2  bankruptcy?

3    A.   I don't believe so.

4    Q.   You would know if you did.

5    A.   Yeah, like, no.

6    Q.   Have you ever filed for Social

7  Security Disability?

8    A.   No.

9    Q.   Have you ever been charged with a

10  crime?

11    A.   No.

12    Q.   Have you ever been treated for

13  alcohol or drug abuse?

14    A.   No.

15    Q.   Do you have social media accounts?

16    A.   I do.

17    Q.   Okay.  Where do you have social media

18  accounts?

19    A.   Twitter, Instagram, and I guess if

20  you want to count LinkedIn as one, then LinkedIn.

21    Q.   I never know if I want to count

22  LinkedIn as a social media.  I don't feel like it's

23  social at all.  I hear what you're saying.

24         What is your Twitter handle?

25    A.   I think it's Kirkendall_Mario, maybe.

1              Q.    Okay.  And your Instagram?

2              A.    I believe it's the same thing.

3              Q.    Okay.  And then LinkedIn is just

4    Mario Kirkendall?

5              A.    That's correct.

6              Q.    Okay.  So let's talk more

7    specifically about your employment at the Boone

8    County Schools.

9              A.    Yeah.

10             Q.    So you were employed at the Boone

11   County Schools during the '19 and '20 and then

12   '20-'21 school years; is that correct?

13             A.    Correct.

14             Q.    So you submitted an application prior

15   to the '19 to '20 school year, correct?

16             A.    Correct.

17             Q.    Okay.  So I'm going to hand you

18   what's been marked as Exhibit 1.

19                  (WHEREUPON, Defendant's Exhibit No.

20   1 was marked for identification.)

21             Q.    Have you seen this document before?

22             A.    Do you want me to look through the

23   whole thing?

24             Q.    If you want to.  I will tell you that

25   this is a copy of your application to the Boone

1    County School District.

2            A.   Okay.

3            Q.   Do you have any reason to believe

4    that -- let me make sure.  I just had something

5    stuck to it.  You're good.  Sorry.

6                 So we talked a little bit what led

7    you to Boone, and you said that the opportunity was

8    just very intriguing to you, correct?

9            A.   It was much better than the situation

10   I was currently in at Newport.

11           Q.   Okay.  So you mentioned earlier a

12   little bit about an issue with the Ohio Department

13   of Education and your license over there.

14           A.   Uh-huh.

15           Q.   So at the time that you applied to

16   Boone County Schools, you were still living in Ohio,

17   correct?

18           A.   Correct.

19           Q.   About how long did it take you to get

20   to Ryle High School every morning?

21           A.   Close to 45 minutes.

22           Q.   Okay.  So why go so far?  Was it

23   because of the licensing issue or did you just

24   really want to work at Ryle High School?

25           A.   Ryle High School was a school that

1    was modeled after my old high school, at Sycamore,

2    so I felt very comfortable there, and knew about the

3    sports that they had there.  And, yeah, it's a great

4    district.

5        Q.    Okay.

6        A.    Sorry.

7        Q.    Oh, you're fine.  Did you have

8    something else?

9        A.    No, I was going to say, if I believe

10    correctly, I don't believe there were any real

11    positions, like, between the distance of me and

12    where Ryle were.  I mean, I even applied to Indiana

13    at the time, school districts in Indiana.

14        Q.    Did the pending disciplinary issues

15    have anything to do with your decision to find a job

16    in Kentucky versus Ohio?

17        A.    No.  I told them I wanted the

18    disciplinary in Ohio to be completely done and

19    resolved because I felt that I was wronged and,

20    yeah, they stated at the time I could still look for

21    employment at other places and go from there.  And

22    it wasn't pending at the time, I don't believe, or

23    the decision wasn't made at the time, so --

24        Q.    Okay.  So let's look at -- down at

25    the bottom there are these Bates stamped numbers.

1          A.    Uh-huh.

2          Q.    So if you look at Page BCSD149.

3          A.    Okay.

4          Q.    So in your application, on the last,

5     like, fillable paragraph, I believe the prompt was

6     something along the lines of, you know, why are you

7     a good fit.  So your answer is, I'm a good fit

8     because I'm something different, but in a good way.

9     What did you mean by that?  It's about the middle of

10    the page.

11         A.    Sorry.  Yeah.  I believe because not

12    only coaching and being at different schools, on the

13    spectrum I was able to work with many different

14    students and speak to stakeholders of many different

15    backgrounds, and to believe that the job that I was

16    doing was, you know, a different take on working.

17         Q.    A different take how?

18         A.    Because there's not too many African

19    American males that are in teaching, let alone an

20    athletic director or administration.  Not only just

21    in Kentucky, but I think that's a national number.

22    And I felt that, you know, my background of the

23    spectrum of places that I had been led me to being

24    different, where most teachers try to stay in the

25    same similar system.

1          Q.   So you felt that the moving around

2     from district to district was beneficial to give you

3     a unique perspective from multiple different places;

4     is that what I'm hearing you say?

5          A.   Yes.

6          Q.   I'm not trying to put words in your

7     mouth.

8          A.   No, no.  I was trying to -- yeah,

9     you're fine.

10         Q.   Okay.  So on Page 144, so we're going

11    to jump the other direction a little bit, towards

12    the front, it's the third page.

13         A.   Okay.

14         Q.   So this section asks you to list your

15    recent experience.  You start with Phoenix Community

16    Learning Center, and then you list St. Theresa?

17         A.   Uh-huh.

18         Q.   Loveland Schools, Shepherd Color

19    Company.

20         A.   Uh-huh.

21         Q.   And then Sport Chiro Fitness.

22         A.   Uh-huh.

23         Q.   And then Children's Home of

24    Cincinnati on that last page.

25         A.   Uh-huh.

37

1           Q.   Why didn't you list any of your

2    recent actual school district experience, such as

3    Princeton, Mariemont or Newport on this application?

4           A.   I don't know why.  That's a glaring

5    omission.  Because I believe in Newport I did, and

6    those are the sources that I had to cite.  Yeah,

7    that's just a mistake on my part.

8           Q.   Okay.  So on Page 143, so the second

9    page of this application.

10          A.   Uh-huh.

11          Q.   In your certification.

12          A.   Hold on one second.

13          Q.   You're fine.  I know it's tricky with

14   it not being stapled together, but I do that so that

15   Kelly doesn't have to pull out a hundred staples at

16   the end of the day when they get scanned in.

17          A.   You're fine.

18          Q.   So on the second page, 143.  One page

19   before.

20          A.   Sorry.

21          Q.   You're fine.  Do you see the section

22   titled Certification?

23          A.   Yes.

24          Q.   So do you hold or anticipate a

25   Kentucky certificate, and you put certificate is

1   held, correct?

2          A.   Are you looking at the same part I'm

3   looking at?  Okay.  Yes.  Sorry.

4          Q.   You're fine.  Hey, there's a lot of

5   things to look at.

6          A.   Yeah, I'm like -- okay.

7          Q.   So on the boxes below that, you

8   indicate that you have an Ohio certificate and that

9   it is current; do you see that?

10         A.   Yeah.  Wow.

11         Q.   That wasn't necessarily true at the

12  time, was it?

13         A.   Yeah, because literally before I had

14  said 2016, the date was different, so I think it was

15  just an accident.

16         Q.   Sure.  But isn't it also fair that at

17  the time of your application, you had tried to renew

18  your Ohio, but the suspension occurred instead?

19         A.   Did I?

20         Q.   I'm going to hand you what's been

21  marked as Exhibit 2.

22              (WHEREUPON, Defendant's Exhibit No.

23  2 was marked for identification.)

24         Q.   Have you seen this document before?

25         A.   I have not, but that seems about

1    what -- yeah, what happened.

2          Q.   Okay.  On the back page of this, can

3    you tell me what date this opinion and

4    recommendation was entered?  It's the very last page

5    of the file.  Next page.

6          A.   Next page?

7          Q.   Last page.  Down at the very bottom

8    there.

9          A.   May 2019.

10          Q.   So is it your understanding that the

11   hearing officer from the Ohio Department of

12   Education -- or I apologize, the Ohio State Board of

13   Education proceeding, that as of May 28, 2019, your

14   Ohio license and teaching certificate was

15   recommended to be suspended?

16          A.   It says that, yes.

17          Q.   So May 28, 2019, would have been two

18   months before you completed the Boone County Schools

19   application for employment, correct?

20          A.   Correct.

21          Q.   So when you put on your application

22   that said that it had just expired in 2016, or that

23   it was current, neither of those statements are

24   necessarily correct or accurate, are they?

25          A.   So this goes back to when I spoke

1    with the -- I guess I don't know if she was an

2    attorney or member of the board, they stated that I

3    could actually still apply, that even though it was

4    pending during this time and that there was not a

5    decision made, I could still apply as if they were

6    current.  I can't remember the lady's name, I can

7    give it to you after.  And that's when I said that

8    doesn't really make any sense, I'd much rather have

9    this cleared up.  And yeah, so you're right.  I

10    apologize for marking current but, I mean, the date

11    doesn't even -- on the 2016, it was already expired.

12            Q.    Sure.  So even though you were

13    allowed, according to the Ohio board attorney, did

14    you think it was not important to even let Boone

15    County Schools know of this other pending action

16    against your certificate?

17            A.    The information that I received from

18    Ohio and Kentucky stated that because there was

19    nothing actually a matter -- I don't want to say a

20    matter of fact -- but because I could show that this

21    was actually dealt with -- I know it came up at

22    Newport and I spoke with them, and I know that Kelly

23    Middleton was friends with, at the time, the

24    superintendent of -- I guess Poe, Randy Poe, that

25    that was -- you know, they had spoken about it.

1    And, yeah, I didn't believe I actually needed to

2    state it because it wasn't actually done yet or

3    completed.

4             Q.   Mr. Kirkendall, have you read a

5    transcript of the hearing before the Ohio Board of

6    Education before?

7             A.   No.

8             Q.   So I've provided to you what's been

9    marked as Exhibit 3.

10            (WHEREUPON, Defendant's Exhibit No.

11   3 was marked for identification.)

12            Q.   This is a transcript of the hearing

13   in your disciplinary matter that was provided to us

14   last week by the Board Of Education.  So I want you

15   to look on this first page about halfway down.

16            A.   Are you talking about Q -- or sorry,

17   which one?

18            Q.   The first page that's got 1379 down

19   at the bottom.

20            A.   Okay.

21            Q.   So about halfway down you are asked,

22   "And finding a job in Ohio did not happen; is that

23   correct?"  Your answer is, "I didn't seek employment

24   in Ohio.  I didn't want this to be -- I wanted this

25   to be cleared up before finding a job."

42

```
 1              A.    Correct.
 2              Q.    And then you were asked the question,
 3     "And you would have been truthful on an application
 4     about this issue?"  And you said, "Uh-huh.  Yeah."
 5              Do you see that?
 6              A.    Yes.
 7              Q.    On the second page, the very bottom
 8     question and answer.  Again, you were asked, "And
 9     you'd be honest on an application as to pending
10     discipline?"  And you answered, "correct."
11              A.    Uh-huh.
12              Q.    Do you think that these two
13     statements held true when you applied to the Boone
14     County Schools?
15              A.    If I'm being honest, I don't remember
16     there being a question of is there pending action.
17     I believe there was had you been -- or, you know,
18     concrete statements.  There was nothing that said,
19     is there anything pending.  And if there was then,
20     it's been a long time since looking at the
21     application, but --
22              Q.    So do you think that this transcript
23     is incorrect?
24              A.    No.  I believe that the question I
25     was asked is that -- like you just stated pending --
```

43

1    sorry.  And I'd be honest on an application as to

2    pending discipline.  I don't think -- I've not seen

3    too many questions of is this pending, or do you

4    have anything pending or outstanding or anything

5    else.  It's typically, has this happened or -- does

6    that make sense?

7         Q.   Sure.  So if I'm understanding

8    correctly, you felt that because the Boone County

9    Schools didn't specifically ask, do you have pending

10   discipline, you didn't feel the need to disclose it?

11        A.   And I believe that's the same as

12   Newport as well.

13        Q.   Okay.

14        A.   Am I moving this?

15        Q.   Yeah.  You can flip that -- if you

16   want, it might be easier to flip them upside down so

17   they stay in order.

18        A.   I did ask.

19        Q.   I'm sorry.  I try to make your life

20   more difficult so that, you know, Kelly doesn't get

21   upset with me at the end of the depo.  Thanks,

22   Mr. Kirkendall.

23             So you start at the 2019-'20 school

24   year and you're hired on at the Boone County

25   Schools.  So I'm going to hand you what's been

1    marked as Exhibit 4.

2              (WHEREUPON, Defendant's Exhibit No.

3    4 was marked for identification.)

4              Q.    Do you recognize this document?

5              A.    Yes.

6              Q.    Okay.  So is this a copy of the

7    limited contract you were given for a teaching

8    position in the Boone County Schools in 2019?

9              A.    Yes.

10              Q.    So you had -- what is your

11    understanding of the dynamic between being a teacher

12    and being an athletic director?

13              A.    Do you want it from their perspective

14    or what I was told from Boone County?

15              Q.    I want to know what your

16    understanding is when you started in 2019.

17              A.    Okay.  My understanding was that I

18    was hired in as a teacher, but I would assume only

19    athletic director duties.

20              Q.    Okay.  Does that say that anywhere in

21    this contract?

22              A.    No.  It only talks about being a

23    teacher.

24              Q.    Okay.  So I'm going to hand you

25    what's been marked as Exhibit 5.

45

1          (WHEREUPON, Defendant's Exhibit No.

2     5 was marked for identification.)

3          Q.   Do you recognize this document?

4          A.   Yes, I've seen this.

5          Q.   What is that?

6          A.   It is the teacher, I guess -- yeah,

7     job description for being a teacher within Boone

8     County Schools.

9          Q.   Okay.  So regardless of what your

10    understanding about what you would be doing on the

11    day to day, would you agree that that limited

12    contract that you had signed that we just looked at

13    was for a teaching position in the Boone County

14    School District?

15         A.   If that's what you were hired in to

16    do, yes.

17         Q.   Okay.  But you have a contract for a

18    teaching position in the Boone County Schools as of

19    2019, correct?

20         A.   As I believe I stated, from my

21    information that was given to me, as well as being

22    hired, I was hired under a teacher contract.

23         Q.   Sure.

24         A.   But I was the athletic director.

25         Q.   That's not what I asked though.

1          A.    I apologize.  Go on.

2          Q.    What I asked is:  Did you have a

3    teaching contract with the Boone County Schools at

4    the beginning of the 2019 school year?

5          A.    Yes.

6          Q.    If you want to put that one to the

7    side because we'll look at that one again.

8          A.    Okay.

9          Q.    So I'm going to hand you what's been

10   marked Exhibit 6.

11              (WHEREUPON, Defendant's Exhibit No.

12   6 was marked for identification.)

13         Q.    Do you recognize this document?

14         A.    Yes.

15         Q.    So what is this?

16         A.    This is the agreement for extra duty

17   for the athletic director position.

18         Q.    Okay.  So is it fair to say that the

19   agreement that you had with the Boone County Schools

20   for athletic director is a separate contract and

21   position than the teaching contract that you had

22   with the Boone County Schools?

23         A.    Yeah.  Yes.

24         Q.    So up at the top of that it says,

25   Employee Agreement for Extra Duty Assignment.  What

1    does extra duty mean?

2            A.    On this paper it means that you're

3    taking on another position.  But, again, under my

4    understanding from being hired in, that was my

5    overall title; it wasn't to be a teacher.

6            Q.    Okay.  So looking at this extra duty

7    assignment, the third paragraph, where it says

8    Compensation and Duties.

9            A.    Uh-huh.

10            Q.    The last two sentences say, "The

11    employee's duties shall be performed in accordance

12    with the School Board policy applicable thereto and

13    subject to the terms, statutes and regulations.  The

14    employee shall be responsible to his/her immediate

15    supervisor, and perform his/her duties responsibly

16    and efficiently according to instructions."

17            Do you see that?

18            A.    Yes.

19            Q.    Did you sign this document down at

20    the bottom?

21            A.    Yes.

22            Q.    Okay.  So based on this agreement, as

23    well as the teaching contract that we just looked at

24    before, you're beholden to a supervisor; do you know

25    who that supervisor was?

48

1          A.   At the time, it was Matt Turner.

2          Q.   Matt Turner?

3          A.   Yes.  And then it was Matt Shafer the

4     next year.

5          Q.   Okay.  So Matt Turner was the

6     principal of Ryle High School during the 2019 year?

7          A.   Correct.

8          Q.   Okay.  So I'm going to hand you

9     what's been marked as Exhibit 7.

10              (WHEREUPON, Defendant's Exhibit No.

11    7 was marked for identification.)

12         Q.   All right.  Have you seen this

13    document before?

14         A.   Wasn't this just the same one as the

15    last one?

16         Q.   No.  So up at the top it's the job

17    description for --

18         A.   Yes, okay, athletic director.

19         Q.   So this is different than the other

20    job description for a teacher, correct?

21         A.   Can I look at them?

22         Q.   Oh, yeah, you can look at them.

23         A.   With a couple changes, but, yes, it's

24    similar.

25         Q.   Okay.  So according to this document,

1    you also report to the principal; is that correct?

2              A.    Correct.  But I mean, there's other

3    people that I reported to as well.

4              Q.    Sure.  But according to the Boone

5    County Schools job description you have in front of

6    you, the reporting person is principal, right?

7              A.    Correct.

8              Q.    Okay.  So I want you to look on the

9    second page of that job description, I believe

10   there's a little star by it.

11             A.    Uh-huh.

12             Q.    Can you read Section 21 for me?

13             A.    "Perform other duties consistent with

14   the position assigned as may be requested by the

15   supervisor."

16             Q.    Okay.  So I want you to flip back

17   real quick to Exhibit 5 with the job description for

18   a teacher.

19             A.    Okay.

20             Q.    The very last paragraph of that one

21   as well, can you read it to me?  With the little

22   star by it.

23             A.    "Perform other duties consistent with

24   the position assigned as may be requested by the

25   supervisor."

1          Q.   So both of the job descriptions

2     related to the contracts that you signed for the

3     beginning of the 2019-'20 school year, both have a

4     caveat that you are subject to additional assignment

5     consistent with your position as requested by your

6     supervisor; is that fair?

7          A.   Yes.

8          Q.   Okay.  Have you read the certified

9     employee handbook?

10          A.   Only some of it.

11          Q.   Okay.  I'm going to hand you what's

12     been marked as Exhibit 8.

13          (WHEREUPON, Defendant's Exhibit No.

14     8 was marked for identification.)

15          Q.   You can keep those to the side.

16          Have you seen this particular page of

17     the certified employee handbook?

18          A.   Yes.

19          Q.   I want you to look down at the

20     supervision section.

21          A.   Uh-huh.

22          Q.   Have you read that before?

23          A.   Not particularly, but, yeah, I see it

24     now.

25          Q.   Okay.  Can you read that for me?

1           A.    "Supervision shall be provided for

2    all certified employees.  Employees shall be

3    informed as to whom their immediate supervisor is

4    and to whom they will be responsible."

5           Q.    All right.  So what's the next one

6    say, too?

7           A.    The job description piece?

8           Q.    Yeah.

9           A.    "Each employee shall be provided a

10   job description, which shall delineate all essential

11   functions and the general duties and

12   responsibilities of the position held by the

13   employee.  Job descriptions shall not be considered

14   all-inclusive descriptions of the job, but shall

15   indicate the general parameters of the duties and

16   responsibilities of the position.  The immediate

17   supervisor may, as needed, assign other reasonable

18   duties to the employee."

19          Q.    Okay.  So at this point, when you

20   were hired at the Boone County Schools, between the

21   two job descriptions that applied to your role that

22   we just looked at, as well as the certified employee

23   handbook, would you say that it's fair that you were

24   subject to the assignment of additional duties at

25   all times?

52

1          A.   I mean, through their description.

2          Q.   Okay.

3          A.   Reasonable duties.  But, yes, through

4    the descriptions, yeah.

5          Q.   Sure.  So let's talk about 2019-'20.

6          A.   Okay.

7          Q.   Let's break it down the first half of

8    the school year.  So let's talk about the first half

9    of the 2019-'20 school year.  What did the day to

10   day look like for you?

11         A.   Typically, I would come in about 9:50

12   to relieve the in-school suspension teacher after

13   dropping off my kids.  And after that it was, I

14   mean, e-mails and working through the day.  And then

15   I would have a, what, a lunch duty, where I would

16   stand in the doorway and -- yeah.  I mean, I think

17   there was, like, on a Wednesday, I would supervise a

18   study hall typically after that second period class.

19   And the rest was just athletic duties, I didn't have

20   any teaching responsibilities at all.

21         Q.   Okay.  So you said you would come in

22   about 9:50?

23         A.   About, yeah, around.

24         Q.   Okay.  When did the schoolday start

25   for students?

1          A.   I think 7:15, 7:30.

2          Q.   So you were coming in about an hour

3     and a half or more after students had already been

4     in the classrooms?

5          A.   Yes.

6          Q.   Okay.  When you came in, you said you

7     would relieve in-school suspension; what does that

8     mean?

9          A.   The teacher that was in in-school

10    suspension.  I guess it was an in-school suspension

11    class, but also students who were coming from, I

12    guess, satellite schools would come in and wait in

13    there until the bell, the period rang.

14         Q.   So what did that classroom setting

15    look like?

16         A.   A bunch of computers and me sitting

17    at a desk.

18         Q.   I'm sorry, I didn't mean like

19    physically looked like.  Like, what was your role?

20    What did you do to facilitate that class?

21         A.   I didn't do anything.  Literally sat

22    at a desk and checked --

23         Q.   Just supervised?

24         A.   I mean, if you want to call it that,

25    but just -- yeah, sat there.

1          Q.   Make sure kids weren't drawing on the

2   walls, things like that?

3          A.   They typically weren't bad kids.  I

4   mean, I think they said they started in-school

5   suspension two years prior, just they never had

6   really any issues, though.  I mean, only have a few

7   kids in there every once in a while.

8          Q.   Okay.  So then if you weren't

9   supervising them or making sure they weren't doing

10   bad things, why did you need to be in the room?

11          A.   That's what I was assigned to do.

12          Q.   Okay.  You also said you had some

13   lunch duty; what was that?

14          A.   Literally standing at a door and

15   making sure students didn't go down the hallway.

16          Q.   Okay.  And then you also mentioned a

17   study skills class?

18          A.   No, it was a -- I don't know if you

19   want to call it -- I forget what they call it.  I

20   guess it's study hall or -- I don't -- something to

21   that effect.

22          Q.   Okay.  What was that?

23          A.   It was in the auditorium, and it was

24   me with about 40, 50 kids.

25          Q.   What were you doing?

55

1          A.    Standing there making sure students

2     were in, if there was a message that got brought in,

3     then making sure that student was, you know, there.

4     But I think they had a system where they checked in

5     or got scanned in.

6          Q.    Okay.

7          A.    So I held the scanner.

8          Q.    Did you have any complaints with

9     respect to the job duties that you were assigned

10    that first half of the year?

11         A.    Not that I remember.

12         Q.    Was it your understanding that you

13    would be interacting with students outside of the AD

14    capacity when you started your employment with the

15    Boone County Schools?

16         A.    Like was that actually told to me; is

17    that what you're asking me?

18         Q.    Sure.  Was it actually told to you?

19         A.    I mean, outside of sitting in

20    classes, yeah, I mean, not really.  I mean, it

21    wasn't really a discussion that we had.  I just

22    assumed, because of the position and where they were

23    telling me to go, that there would be students

24    there.

25         Q.    Sure.  So did you have any complaints

1    about those assignments?

2             A.    I just thought they were -- I mean, I

3    didn't really feel like I needed to be needed there,

4    but Matt Turner and I never really spoke about that,

5    no.

6             Q.    What did you mean, you don't feel

7    like you really needed to be there?

8             A.    I didn't really interact with the

9    kids.  I mean, I was scanning in their code or their

10   book cards, but I sort of feel like -- yeah, sort of

11   a monotonous, mind-numbing job.

12            Q.    So when you say that you felt like

13   you didn't really need to be there, do you mean you

14   specifically or that an adult, period, didn't need

15   to be there?

16            A.    No, I believe an adult needed to be

17   there, but I felt that, yeah, I mean --

18            Q.    Why not you?

19            A.    I felt I could probably be doing

20   other stuff.  But, again, I never made -- I don't

21   think I documented that, hey, this is an issue

22   that -- yeah.

23            Q.    So what did the rest of your time

24   look like with respect to the AD duties?

25            A.    From -- I mean, well, after second

1    period, I was, you know, either e-mailing or setting

2    things up, or getting things together, you know,

3    making payments, making, you know, calls to other

4    schools, having AD meetings, district as well as, I

5    guess the whole area, I guess, Northern Kentucky

6    area.  But, yeah, I don't know if you want to say

7    typical, but yeah.

8            Q.   So when you're doing e-mail, making

9    payments, things of that nature, are all those

10   things that you do from a computer?

11           A.   Or my phone.

12           Q.   Are those things that you could have

13   done while supervising the students in the study

14   skills class or whatever it was called, or the

15   second period ISS that you covered?

16           A.   I would say in ISS, yes, but not with

17   40 or 50 kids essentially coming in and out.

18           Q.   Okay.  So in ISS, when you're sitting

19   in the classroom just being present because an adult

20   needs to be present, could you have done those

21   athletic director duties?

22           A.   I mean, I guess, yes.

23           Q.   Did you do those athletic director

24   duties?

25           A.   Every once in a while, yeah.

1          Q.   Okay.  About what time did you leave

2     every day?

3          A.   School?

4          Q.   Yes.

5          A.   Depending on if I had a game, if I

6     had a game, it would be, I mean, anywhere from

7     10:00 to 11:00.  If not, I would say the end of the

8     schoolday, about 3:00-ish -- after finishing up,

9     around 3:00-ish.

10          Q.   Okay.  Did you go to all of the

11     athletic events or just some?  If you could explain

12     the breakdown of what you went to, what you needed

13     to be at, that would be helpful.

14          A.   The majority of the athletic events I

15     went to.  Typically, football that first year, I

16     didn't really stay through the whole game because,

17     you know, we had four other administrators, that's

18     what was voiced to me.  I mean, I'm overseeing, I'm

19     not really in the capacity to -- you know, I have to

20     call an administrator if something happens.

21               But, yeah, the majority of the

22     events, from wrestling to -- well, all the sports,

23     yeah, they had, or the majority of them, yeah.

24          Q.   Did you oversee all of the coaches of

25     those teams?

1          A.    Yes.

2          Q.    Okay.  So as long as they were there,

3     you didn't necessarily need to stay for the entirety

4     of the game, or is it because there was another

5     administrator of the school there?  Let me ask a

6     better question.  That was a terrible question.  See

7     this will happen.

8               You said that you didn't stay through

9     all of the games because there was another

10    administrator there.

11         A.    Uh-huh.

12         Q.    So was it school policy that there

13    had to be an administrator from the school at every

14    game, or when you say administrator, did you just

15    mean there are other adults, there are coaches there

16    to supervise instead?

17         A.    To my understanding, there was

18    supposed to be an administrator there.

19         Q.    Okay.  I understand.

20         A.    A school administrator, yes.

21         Q.    Sure.

22               Okay.  So that's the first half of

23    the 2019-'20 year, so that would have been fall.

24    What sports were going on at that time?

25         A.    Wait, what was that?  Sorry.

60

1          Q.   So the first half of the 2019-'20

2    year, so that would have been fall of 2019; what are

3    the fall sports that were ongoing at the time?

4          A.   Cross country, football, soccer,

5    golf.  What am I missing?  Obviously, we would have

6    training for basketball in there.  I might be

7    missing some.  I mean, those were typically the

8    bigger ones.

9          Q.   So there was a lot going on?

10         A.   Yeah.

11         Q.   Okay.  So let's switch gears then.

12         A.   Volleyball.  Did I say volleyball?

13         Q.   Volleyball.  Okay.  That's one too.

14   There are too many for me to keep track of, and I'm

15   also not athletic, so I would have nothing to

16   contribute to what sports were going when.

17         A.   That happens.

18         Q.   So the second half of the 2019-'20

19   school year, that particular semester got a little

20   weird toward the end; would you agree?

21         A.   Yeah, about March-ish.

22         Q.   So what did the first half of that

23   spring semester look like?  Pretty much the same day

24   to day as what you were doing the first half of the

25   year?

```
 1                    A.    Sorry.   If I'm hearing your question,
 2       you said what did the first half of the second
 3       semester look like?
 4                    Q.    Right, so before COVID.
 5                    A.    Okay.   Yeah, there's really no change
 6       to my schedule.
 7                    Q.    Okay.   So COVID hits mid-March 2020.
 8                    A.    Uh-huh.
 9                    Q.    How did that affect your job?
10                    A.    I wasn't coming down to school as
11       much.   Yeah, it was more informative, getting
12       information on what, you know, the governor was
13       saying, as well as athletics and what was happening
14       from -- you know, I don't think we really did -- I
15       know the girls were down state and they canceled it.
16       But, yeah, everything was about the same for me,
17       typically.
18                    Q.    Were there any athletic events going
19       on from March through May of 2020 or were they all
20       pretty well canceled?
21                    A.    So we would have teams still
22       practicing as if the season was going to come back,
23       and so I did typically stick around for that.   But,
24       no, it was pretty much done by the end of the year.
25                    Q.    So aside from the very optimistic
```

1    people that we now know in hindsight was not

2    merited, there were no more games necessarily to

3    coordinate?

4            A.    No.

5            Q.    Okay.  Since you weren't coming to

6    school, did you have any, I guess, more teaching

7    responsibilities, such as supervising ISS or

8    anything of that nature?

9            A.    No, because kids weren't in school.

10           Q.    Sure.  Did you do anything remotely?

11           A.    Outside of checking in on meetings

12    and e-mailing parents about awards and everything

13    else, no.

14           Q.    Okay.  So aside from COVID, which

15    completely up-ended education for that March through

16    May period of 2020, how would you describe the work

17    environment at Ryle High School during that 2019-'20

18    school year?

19           A.    It was okay.  I mean, for me

20    personally, I had challenges but --

21           Q.    Challenges like what?

22           A.    Dealing with community members even,

23    you know, assumptions about myself and the job

24    and -- yeah.

25           Q.    What do you mean by that?

1          A.    Do you want the examples?

2          Q.    Sure.

3          A.    I mean, having a coach come into my

4     office and state -- you know, curse me out and then

5     tell the principal that, hey, you were mean to me.

6     And having Matt Turner, at the time, say that, you

7     know, you came across very mean, and then me stating

8     what actually happened.  So being assumed that, hey,

9     you're the angry black guy, was not fun.

10               Had a community member that was

11     making, you know, statements and, you know, running

12     their mouth and making my job difficult.  Bringing

13     it up to Matt Turner and saying, hey, at what job

14     can the person come in that's not assigned or within

15     the school district and make statements and make you

16     feel bad about your job.  And coming to find out, I

17     guess, they were friends.  That wasn't really fun

18     for me.  But other than that, I mean, I saw it as an

19     opportunity.  And then means of what my goal was to

20     be, a principal at the time.

21          Q.    So a couple of follow-up questions to

22     that.  The first one, you mentioned being assumed

23     the angry black man, did anyone ever explicitly say

24     to you, you're an angry black man, in the

25     administration at Ryle High School?

64

1          A.   Not specifically, but you can

2     typically tell the tone.

3          Q.   Okay.  So these complaints that you

4     have, I want to make sure I'm understanding who they

5     were coming from, where they were going, and how

6     they were being responded to.

7               So they were community members or

8     coaches that would go to the principal, who would

9     then come to you to talk about them, right?

10         A.   The community member would go to

11    either coaches or to even myself, and that's when I

12    would go to Matt Turner about it, regarding it,

13    right.

14              The coach that, for instance, this

15    incident, she came into my office, she went up to

16    him, he stopped me in the hallway, and that's how

17    that conversation was.  And literally, I think it

18    was the next morning that that person apologized for

19    their actions, yeah.

20         Q.   Okay.  What were these -- you've

21    referenced two specifically, so one a community

22    member, and the other one a coach at Ryle?

23         A.   Said she wanted to be a coach at

24    Ryle.  She used to be, I guess, prior to me even

25    being there, things happened, yeah.  We had an open

1    track position at that time and then -- yeah, she

2    wanted the position.

3              Q.    Who was that?

4              A.    Charity Ehrenberg.

5              Q.    Is she just a parent, a teacher?

6              A.    No, she's a teacher.

7              Q.    A teacher at Ryle?

8              A.    Yeah.

9              Q.    What happened with that one?  Like,

10   why was she mad?

11             A.    Because she wanted the position and

12   felt like I was not talking to her about the

13   position.  And my response was, I don't have a

14   meeting with you at this time, please leave my

15   office.  She started cursing, there were students

16   walking by.  I'm like, I don't think this is really

17   professional.  She went upstairs and, I guess, said

18   that I was being mean to her and yelling at her and

19   overbearing, were the words that were referenced

20   with Matt Turner.  I was in the hallway, and I told

21   him, that's not true, I believe there's a camera

22   that shows that hallway.  We went through the

23   images.  And literally the next morning I was -- she

24   sent me an e-mail where she stated that, hey --

25   basically apologizing for her actions.  And I was

1    like, you know, people are human but that was not

2    okay.

3                Q.    Sure.  What would you say about the

4    overall -- during this period of time 2019-'20, is

5    it a fair statement that Ryle High School has a

6    pretty competitive athletic program?

7                A.    Yes.

8                Q.    Ryle High School has usually

9    performed pretty well across the state; is that

10   fair?

11               A.    Yeah.

12               Q.    Would you agree that some of the

13   parents in the Ryle High district are very

14   passionate about their children's performance in

15   those athletic programs?

16               A.    Yes, that's fair to say.

17               Q.    Was it difficult dealing with

18   parents, you know, when little Johnny doesn't get

19   enough playing time; did you ever have to field

20   community complaints about that?

21               A.    I fielded complaints, but, yeah, I

22   call back on my experience of working in multitudes

23   of places to be able to communicate with them.

24               Q.    Sure.  So that's actually a perfect

25   segue.  Do you feel that the, I guess, difficulties

1    that you faced, that you just mentioned, working at

2    Ryle High School, were those different than the

3    run-of-the-mill difficulties that you faced working

4    in other places?

5            A.   Do I think the difficulties at Ryle

6    were different than other places?

7            Q.   Yes.

8            A.   I think it was just on a grander

9    school, but I don't think it was typically any

10   different.  I mean, parents want their kids to

11   succeed, and, you know, sports happens to be, you

12   know, the great, I guess, equalizer for getting

13   ahead.

14           Q.   What about dealing with coaches;

15   prior to your experience with Ryle High School, have

16   you had to deal with coaches in other capacities,

17   for example, when you were AD at Newport?

18           A.   I mean, I dealt with coaches, but I

19   didn't deal with the same similar issues.

20           Q.   Okay.  So what made the issues at

21   Ryle different?

22           A.   They're usually shrouded in race or,

23   I mean, of those issues or dealing with, you know,

24   statements made or whatever else.  I didn't -- at

25   Newport, because it's a predominantly black school,

1   I didn't really have to deal with that, or at least

2   not in front of my face, yeah.

3          Q.   So you say that the coach/AD dynamic

4   at Ryle, a lot of those complaints were shrouded in

5   race.  What makes you think that?

6          A.   I don't want to say they're

7   complaints of race.  I'm saying typically -- sorry

8   if I misspoke on that.  What I was dealing with --

9   for instance, I had a football coach who, you know,

10  I had to deal with a race issue.  And Matt Turner

11  specifically asked me do I feel like he's racist at

12  the end of the conversation, right.  After gathering

13  all of this information, I made my statement and,

14  you know, that was that.  I'm still working with the

15  guy, so it wasn't anything of that nature.  But,

16  yeah, I think, again, where we want kids -- or in

17  that situation, where kids wanted to get ahead or

18  parents wanted to get ahead, that was typically

19  facilitated to the coach, and I would deal with it.

20         Q.   So what specifically was that

21  football example that you just gave the example of,

22  what happened?

23         A.   I had a few of the parents who -- I

24  don't want to say -- I'm trying to think.  It was

25  between the freshman and varsity teams that stated,

1    you know, they felt that their students were being

2    treated differently by a coach.  Matt Turner saying

3    that these issues had popped up prior.

4              Q.   Being treated differently how?

5              A.   Because of their race.  They felt

6    that they were being treated differently because of

7    their race and, you know, had to go and investigate

8    and, you know, speak to parents, speak to students,

9    speak to the coach at the time and -- yeah.

10             Q.   So it wasn't necessarily an

11   allegation made against you, it's just a racially

12   related issue that you had to deal with in your

13   capacity?

14             A.   Yeah, correct.

15             Q.   Okay.  What was the outcome of that

16   investigation and issue?

17             A.   I mean, he's still coaching there

18   today, so --

19             Q.   Do you know if Mr. Turner had any

20   conversations or any --

21             A.   I don't, no.  Yeah, we had the

22   meeting and then -- I want to say, yeah, we were

23   having the meetings in the spring, everything was

24   dropped because of COVID.  And then, honestly, that

25   was one of my first conversations with Matt Shafer

1    coming in, it was, hey, I dealt with that issue.

2    I'm like, okay.  I don't know if you have all the

3    information about it, but okay, you know.  He felt

4    that he could, I guess, nullify what had happened

5    and -- yeah.

6         Q.    With the dynamic of, you know,

7    coaches reporting, did they report to you?

8         A.    They were supposed to, yes.

9         Q.    Okay.  Do you or did you, in your

10   role as athletic director, hold the sole ability to

11   hire and fire coaches?

12        A.    I hired -- well, I would interview

13   them, I would hire them, and typically through a

14   committee we would come up with a conclusion, and

15   then I'd pass it on to -- I was supposed to pass it

16   on to the principal.

17        Q.    Okay.  So you didn't have the ability

18   to terminate people?

19        A.    I could give facts as to why, but,

20   yeah, no, I didn't have the authority.  I would sit

21   in if there was ever a termination, but I don't

22   think there ever was one while I was there.  I don't

23   believe there was.

24        Q.    Okay.  So aside from the two issues,

25   the one with -- the coaching issue and then the

1    other one from the community issue that you said you

2    had -- and let me clarify, make sure I'm

3    understanding.  So the coaching issue that you said

4    you had during the 2019-'20 year was with Charity

5    and her not getting the track and field coach

6    position?

7              A.   Yes.

8              Q.   Okay.  She was very unprofessional

9    with you and then apologized the next day?

10             A.   Correct.

11             Q.   Did anything happen after that?

12             A.   Not that I know of.

13             Q.   Okay.  The other issue, when you said

14   that there was a community issue, was that the

15   football issue that we just talked about?

16             A.   No, that was with Pete Coleman, who

17   was a member of the community.

18             Q.   Okay.  What was that one?

19             A.   It was a multitude of things.  Very

20   demanding person.  He had worked with a couple of

21   other schools and told not to come back because of

22   how he was.  I don't really judge people based off

23   of that so I gave an open opportunity and, you know,

24   then it was him making statements about me to the

25   principal, him making statements about me to the

1    assistant principals.  Obviously me hearing about

2    it.  And, you know, he never -- I mean, there's only

3    a couple of times where he would actually directly

4    talk to me.

5                   But, you know, if this guy is going

6    to be around, that's when I stated, hey, if he's

7    coming to you as a person, are you actually going to

8    work with me on this and everything else.  Yeah.

9              Q.   So who is he?

10             A.   He's an announcer for a couple of the

11   teams, but he's also, I mean -- I don't want to say

12   a prominent, but he's a member of the community at

13   Ryle.

14             Q.   So he wasn't a Ryle employee?

15             A.   No.  His wife is; he's not.

16             Q.   Okay.  So he was just a guy that was

17   around causing problems?

18             A.   I classified them as problems, yeah,

19   for me, yeah.

20             Q.   Sure.  During the 2019-'20 school

21   year, other than the incident with Charity

22   Ehrenberg --

23             A.   Uh-huh.

24             Q.   -- we'll figure out the spelling for

25   that one later because I do not know offhand.  Aside

1    from the issue with her, did you generally get along

2    and work well with the others at Ryle High School?

3            A.   For the ones I came in contact with,

4    yes.

5            Q.   Okay.  Do you feel that you did a

6    good job in your role as athletic director during

7    the 2019-'20 year?

8            A.   I thought so.

9            Q.   Okay.  Do you, upon self-reflection,

10   feel like there was any room for improvement?  Or I

11   guess a better question was:  Did you have any goals

12   for improvement going into the '20-'21 year?

13           A.   Yes.  I mean, some of the things that

14   I was hired upon was, you know, to work with more

15   students to be in the capacity out there.  Matt

16   Turner specifically told me that, you know,

17   interacting with students, the coaches may not like

18   that and see that as an issue, and I stated that

19   it's kind of weird that an athletic director is

20   hired in to not really interact with student

21   athletes, but I sort of washed that away when he

22   said that.  I mean, I wanted to be better

23   professionally, right, because again, my goal was

24   not to just be an athletic director.

25           Q.   Okay.  At the end of the 2019-'20

1    school year, did you ask the district to renew the

2    contract?

3              A.   I did not ask the district; they

4    renewed it.  Well, they -- it's kind of weird how

5    you asked that.

6              They send you a paper and then if --

7    or if you, I guess, aren't going to be rehired, they

8    don't send it to you.

9              Q.   Sure.  Okay.  So did you complete the

10   paperwork seeking renewal of your contract?

11             A.   Right.

12             Q.   So I'm going to hand you what's been

13   marked as Exhibit 9.

14             (WHEREUPON, Defendant's Exhibit No.

15   9 was marked for identification.)

16             Q.   Do you recognize this document?

17             A.   Yes.

18             Q.   Okay.  So is this the limited

19   contract of employment for the 2020-'21 school year?

20             A.   Yes.

21             Q.   Okay.  This is -- I will tell you

22   that it's identical.

23             A.   Okay.

24             Q.   It's identical to the one we just

25   looked at from 2019-'20, correct?

1          A.   Uh-huh.

2          Q.   So in Subparagraph 1 of that contract

3     it says, "The services to be performed by said

4     teacher shall be such as are required by the

5     Kentucky Revised Statutes, by the lawful rules and

6     regulations of the State Board for Elementary and

7     Secondary Education, and the lawful rules and

8     regulations of the district."

9               Do you see where it says that?

10         A.   Uh-huh.

11         Q.   So, "The services to be performed by

12    said teacher," this is a teaching contract, correct?

13         A.   Yes.

14         Q.   Okay.  Is that your signature down at

15    the bottom?

16         A.   Yes.

17         Q.   Okay.  Earlier we looked at what's

18    been marked as Exhibit 5, that is the job

19    description for teachers.

20         A.   Uh-huh.

21         Q.   Would you agree that the same job

22    description applied to this contract as did the

23    '19-'20 school year?

24         A.   If you were used in that capacity,

25    yes.

1          Q.   Okay.  But that is the job

2     description for a teacher, correct?

3          A.   Yes, correct.

4          Q.   Okay.  So I'm going to hand you

5     what's been marked as Exhibit 10.

6          (WHEREUPON, Defendant's Exhibit No.

7     10 was marked for identification.)

8          Q.   Do you recognize this document?

9          A.   Yes.

10         Q.   What is this?

11         A.   This was the -- what is it, extra

12    duty assignment piece and -- I guess it was the

13    contract I got, yeah, the renewal contract.

14         Q.   Okay.  And this one -- I'm not sure

15    if the other one did and I just didn't have it, but

16    the Code of Ethics is attached on the back of this

17    document as well, correct?

18         A.   Yes.

19         Q.   Okay.  So on that first page, the

20    actual extra duty assignment contract itself --

21         A.   Uh-huh.

22         Q.   -- you see in Section 3, that

23    provision that we read in your other AD extra duty

24    contract, "The employee's duties shall be performed

25    in accordance with the school board policy

1    applicable thereto and subject to the terms,

2    statutes, and regulations.  The employee shall be

3    responsible to his/her immediate supervisor and

4    perform his/her duties responsibly and efficiently

5    according to instructions."

6                    Do you see that?

7            A.    Correct.

8            Q.    Earlier, again, we looked at what was

9    marked as Exhibit 7, I believe, and that was the job

10   description for athletic director in Boone County

11   Schools.  Do you remember reviewing that?

12           A.    Yes.

13           Q.    Would you agree that that same job

14   description is what's going to be attached and

15   applicable to this extra duty assignment for

16   athletic director?

17           A.    Uh-huh.

18           Q.    Okay.

19           A.    Or yes.  Sorry.

20           Q.    2020-'21 started off kind of a weird

21   year coming off the post-COVID wave; is that fair?

22           A.    Yes.

23           Q.    Okay.  Did you start off the year in

24   person?

25           A.    I think there was -- was there a

1    hybrid?  I can't remember.

2             Q.   Okay.

3             A.   I want to say there was a hybrid.

4             Q.   I know it went hybrid at some point,

5    but I genuinely don't remember if it started off

6    that way.

7             A.   Yeah.  I'm sorry, I can't remember.

8             Q.   Oh, you're fine.  Hey, that was two

9    years ago at this point.

10            A.   Yeah, it was a while.

11            Q.   So started off the year either in

12   person or hybrid or something?

13            A.   Uh-huh.  Correct.

14            Q.   Do you have any recollection about

15   what the staffing situation looked like at Ryle High

16   School that year?

17            A.   From my understanding, we were fully

18   staffed.

19            Q.   Okay.  Was everyone there and

20   working?

21            A.   I do not have that information.

22            Q.   Okay.  Were you aware of any other

23   staff members that maybe were elderly, high-risk,

24   and maybe had some health concerns about being there

25   in person?

```
 1              A.   I know there were elderly staff
 2    members, but I don't know about them.
 3              Q.   Okay.  Do you know of any of your
 4    colleagues who had children who may have had child
 5    care issues?
 6              A.   I know that people had kids; I don't
 7    know what their issues were.
 8              Q.   Okay.
 9              A.   I never really talked to anybody
10    about --
11              Q.   So I'm going to hand you what's been
12    marked as Exhibit 11.
13              (WHEREUPON, Defendant's Exhibit No.
14    11 was marked for identification.)
15              A.   Yes.
16              Q.   Do you recognize this document?
17              A.   It was the e-mail transcript that I
18    had with Eric Ball, who was over the FMLA piece.
19              Q.   Okay.  So on that second page that's
20    238 down at the bottom, I apologize that the e-mails
21    go in reverse order.
22              A.   Okay.
23              Q.   So you get an e-mail on July 30th of
24    2020, so that was right before the school year
25    started, correct?
```

1           A.   Yes.

2           Q.   Okay.  You received a copy of this

3    e-mail in -- to your e-mail; is that fair?

4           A.   To my school e-mail, yes, correct.

5           Q.   Okay.  So let's go through this

6    particular e-mail from Eric Ball.  So, first, who is

7    Eric Ball?

8           A.   At the time, he was the assistant HR

9    director, I believe.

10           Q.   Okay.  So he was the assistant

11    director for human resources.  He sends an e-mail

12    July 30th; do you remember receiving this e-mail and

13    what it was about?

14           A.   It was regarding leave.

15           Q.   Okay.  So if you'll see in the first

16    paragraph of his e-mail to you, or to everyone --

17           A.   Okay.

18           Q.   -- he provides options for leave,

19    understanding that certain people in the district

20    are probably going to have to make some

21    accommodations based on their family situation or

22    health situation; is that fair?

23           A.   Correct.

24           Q.   Okay.  So in that first paragraph he

25    says, here are the leave options for both certified

1  and classified.  "Keep in mind that all employees

2  are required to report to campus when school reopens

3  unless you have received confirmation of a remote

4  teaching assignment or an approved leave of

5  absence."

6              Do you remember what those two leave

7  of absence options were?

8              A.   I know it was FMLA.  I don't

9  remember --

10              Q.   Okay.  So --

11              A.   -- like the specific names of them,

12  no.

13              Q.   So I want to make sure that we're all

14  on the same page though, too, about FMLA versus the

15  other types of leave.

16              A.   Okay.

17              Q.   So if you look down in that

18  paragraph, or in that e-mail, the first paragraph

19  talks about if you believe you're unable to report

20  to work due to a health issue, and discusses what

21  I'm just going to say we're going to call the FMLA

22  health concern leave, okay?

23              A.   Okay.

24              Q.   So the second paragraph, if your

25  child care will be impacted by Covid-19, you may be

1    eligible for EPSLA and EFMLEA.  Do you see that?

2              A.   Yes.

3              Q.   At the time you received this e-mail,

4    did you have any idea what EPSLA or EFMLEA leave

5    was?

6              A.   I didn't know what either one of them

7    was at the time, no.

8              Q.   Okay.  So then you respond to the

9    e-mail on August 26th, saying just that, that you

10   wanted to talk about what those options were; is

11   that correct?

12             A.   Correct.

13             Q.   Did you have a conversation with Eric

14   about what your options were?

15             A.   Yes.

16             Q.   Okay.  What specifically were you

17   looking -- I don't want to say what was your issue

18   at the time, but what were the logistical issues you

19   were experiencing with your family that required you

20   to seek leave?

21             A.   My wife being a nurse at Children's

22   at the time, she was not able to just take off

23   because if -- yeah.  And we did need both incomes.

24   And we found out shortly that pretty much every

25   school and district around was closing around us,

1    and I don't have family members to take care of my

2    kids, so I had to make the decision of potentially

3    -- yeah -- step away for a little bit.

4            Q.    Sure.  So your wife was an essential

5    worker at the time?

6            A.    Yes.

7            Q.    I would say one of the more essential

8    of the workers at the time.  What was her schedule

9    like?

10           A.    It varied because they were dealing

11   with staffing things, and so she would get called

12   sometimes the day of a shift or, I mean, a day or

13   the night of -- I guess, sorry, the night before.

14   It would vary.

15           Q.    Okay.  But regardless, it was

16   unpredictable to the point that if you had to go to

17   school, you would have child care issues with that?

18           A.    Issues, correct.

19           Q.    Okay.  So did you end up having a

20   telephone conversation with Eric Ball?

21           A.    I did.

22           Q.    Okay.  Do you remember the content

23   and substance of that conversation?

24           A.    Are you talking about in regards from

25   when I talked to him from this issue?

84

1        Q.   Yes.

2        A.   Yeah, he explained the two different

3    types, or I guess, the few types, and what the

4    overall umbrella of FMLA was and what was going on.

5    And then said if it's -- you know, left it and said,

6    if there's something that you want to discuss

7    further, you can reach out to me, or if you want the

8    information about it, I can send it over to you.

9        Q.   Sure.  So at the time that you had

10   this call with Eric, was it your understanding that

11   you basically had two options?  One, you could take

12   the medical FMLA leave, or you could take the EFMLEA

13   leave, which was an expansion pack that included

14   child care as a reason to claim leave from your

15   employer.

16       A.   I understood the child care one, I

17   didn't understand the rest of it.  Yeah.  It was

18   kind of a quick -- yeah.

19       Q.   Sure.  That's fair.  And I understand

20   it's a very, like, technical-legal area as well.

21       A.   Yeah, not my job.  Sorry.

22       Q.   So let me ask it this way:  Is it

23   your understanding after those conversations that if

24   you needed to take leave because of the child care

25   inconsistencies, federal law now allowed you to do

1   that?

2            A.   Correct.

3            Q.   Okay.  Did you eventually make the

4   decision to take that leave time?

5            A.   I did.

6            Q.   Okay.  So I'm going to hand you

7   what's been marked as Exhibit 12.

8                (WHEREUPON, Defendant's Exhibit No.

9   12 was marked for identification.)

10           Q.   Do you recognize this string of

11  e-mails?

12           A.   Yes.

13           Q.   Okay.  So on August 31st, is it fair

14  to say that as of that date you were still trying to

15  learn more about these leave times?

16           A.   I do.

17           Q.   So in your e-mail to Eric on

18  August 31st, you're thanking him for taking the time

19  to chat.  I'm assuming that's the conversation you

20  said you had with him just a moment ago?

21           A.   Correct.

22           Q.   So, "After trying to learn more on my

23  own with the two-thirds, I wanted to ask if I am

24  able to exhaust my sick balance combination of my

25  absence balances to make my pay whole."  What

1    prompted that question?

2         A.   Because I was only getting paid

3    two-thirds of my normal pay, and I had time in

4    there, and I didn't know if that was actually a

5    thing to be able to do.  Again, I didn't understand

6    fully what was going on, so I'm like, yeah, if

7    you're only paying me two-thirds, am I able to

8    supplement that.

9         Q.   And what did Eric respond to you

10   with?

11        A.   He said, "We are not offering that

12   opportunity to use sick days to make an individual's

13   pay whole if they're using" -- yeah.

14        Q.   Okay.  So then as of that

15   September 1st e-mail, the district had told you, if

16   you were going to take the EFMLEA leave, you were

17   only going to be receiving two-thirds compensation?

18        A.   Correct.

19        Q.   Okay.  Did you ever -- I'm sorry, did

20   you ever respond to the e-mail to Eric?

21        A.   I think I did call him in between,

22   but I called him a couple times and even spoke to, I

23   guess, the secretary, Tina.

24        Q.   Okay.  Tina Hebert, Herbert?

25        A.   Herbert, I believe, yes.

1          Q.   Okay.  So I'm going to hand you

2     what's been marked as Exhibit 13.  Sorry.  I just

3     want to make sure which packet I'm handing you for

4     the moment.

5               (WHEREUPON, Defendant's Exhibit No.

6     13 was marked for identification.)

7          Q.   Okay.  So I'm going to hand you

8     what's been marked as Exhibit 13.  So this should be

9     a couple of e-mails put together with Pages 257,

10    258, and then an e-mail, 262 and 263; is that

11    included in there?  I apologize.  I don't think I

12    organized this one very well.

13         A.   You said what number?  252?

14         Q.   Can you just read to me which ones

15    you have there?

16         A.   All right.  250, 251, 252, 53, 254,

17    55, 56, 57, 58, 59.

18         Q.   Okay.  So beginning on about

19    September 10th or so, is it fair that you started

20    going through the process to claim the EFMLEA leave

21    time?

22         A.   Correct.

23         Q.   Okay.  So it looks like on Page 250

24    you e-mailed Mr. Ball, forwarded him a copy of the

25    letter from Princeton City Schools; is that where

1   your children attended?

2           A.   My son was there, and my daughter was

3   at a church preschool.

4           Q.   Okay.  So the third page, 252 and

5   253, the MCC Preschool; is that where your other

6   child went?

7           A.   Uh-huh.

8           Q.   Okay.  So you forward those.

9           A.   Uh-huh.

10          Q.   And then on those last pages, in 257

11  to 259, you forwarded an e-mail and Mr. Ball

12  responds saying that they have received your EPSLA

13  request.

14          A.   Yes.

15          Q.   So on September 11th, that is when

16  you first submitted your application; is that

17  correct?

18          A.   I believe -- well, I was getting the

19  e-mails done, but, yeah, it was around that time.

20          Q.   Okay.  So at the bottom of 257 -- and

21  I apologize for jumping around on this one -- before

22  Mr. Ball responds and says that they've received

23  your EPSLA request and the start for EFMLEA, so

24  those were two different things, correct, the EPSLA

25  and the EFMLEA time?

```
 1                    A.   Correct.

 2                    Q.   So he instructed you to put the date

 3       of the 10 sick days to run coinciding with -- they

 4       were both just the same, correct?

 5                    A.   Say that again.

 6                    Q.   That was a terrible question.  I

 7       don't think I can say it again.

 8                         So you filled out the form to get

 9       both of them; they just kind of worked together, but

10       regardless, you were about to start that leave time?

11                    A.   Correct.

12                    Q.   Okay.  So I'm now going to hand you

13       what's been marked as Exhibit 14.

14                         (WHEREUPON, Defendant's Exhibit No.

15       14 was marked for identification.)

16                    Q.   Do you recognize this document?

17                    A.   Yes.

18                    Q.   What is this?

19                    A.   I think it was when I -- well, it was

20       when I sent it back to Eric Ball, when my start date

21       would be, and -- yeah.  And that Tina would be -- I

22       guess, she would be e-mailing me back to let me

23       know, I guess, the dates or whatever.

24                    Q.   Sure.  Okay.  So on Page 233, is that

25       a copy of your actual request form?
```

1          A.   Yes.

2          Q.   So I see -- did you write

3     intermittent; is that your handwriting there?

4          A.   No, it's not.

5          Q.   Well, then that takes care of those

6     questions.

7          A.   I believe -- yeah, it's the same pen

8     that Tina used.

9          Q.   So did you have a discussion with the

10    Boone County Schools at some point about taking that

11    leave intermittently?

12         A.   My first two weeks would be

13    intermittent because I wanted to help with the

14    transition of me leaving, and me knowing how

15    valuable sports are, and after that, it would be,

16    yeah, I guess regular leave.

17         Q.   Okay.  So that transition piece, so

18    you helped with that.  I'm going to hand you what's

19    been marked as Exhibit 15.

20              (WHEREUPON, Defendant's Exhibit No.

21    15 was marked for identification.)

22         Q.   Do you recognize this?

23         A.   Yes, it was the e-mail that Matt

24    Shafer told me to send out to all the coaches.

25         Q.   Okay.  So this was sent on

1    September 16th, and in it you send an e-mail to your

2    coaches that beginning 9/21/2020 you'll be taking

3    leave, and you give a point of contact for your

4    absence.

5           A.   Yes.

6           Q.   Who is Jon Erickson?

7           A.   He's the guy that filled in for me.

8           Q.   Was he a teacher, an assistant AD;

9    what was his position?

10          A.   He was a teacher, or he may still be.

11   So, yeah, he was a teacher at the time at Boone

12   County -- or, well, Ryle.

13          Q.   Okay.  So he was just going to fill

14   in for you while you were on leave; is that correct?

15          A.   Correct.

16          Q.   Okay.  What did you do to help him

17   prepare to take on that role while you were on

18   leave?

19          A.   Made a few notes for him; walked him

20   through a few things; told him, you know, keys and

21   exchanges and -- yeah, that was about it really.

22          Q.   Did you have any conversations with

23   him, such as, you know, contact me if you have

24   questions, or how did you leave it with him?

25          A.   Yeah, I said if you need anything,

1    let me know.  He said he felt he could do it and --

2    yeah, he wouldn't need to contact me.

3            Q.   Okay.  So you started leave on

4    September 21st, 2020, correct?

5            A.   Correct.

6            Q.   Did you actually start your leave on

7    that date?

8            A.   Yeah, because I believe I was coming

9    in Tuesday, Thursday for the next -- Tuesday,

10   Thursday, Saturday for the next two weeks.  Yeah,

11   Monday was my first day.

12           Q.   Okay.  So I'm going to hand you

13   what's been marked as Exhibit 16.

14               (WHEREUPON, Defendant's Exhibit No.

15   16 was marked for identification.)

16           Q.   Do you recognize this document?

17           A.   Correct.  Yes.

18           Q.   Okay.  So it looks like on

19   October 15th you send an e-mail to Eric Ball.

20           A.   Uh-huh.

21           Q.   What was that e-mail about?

22           A.   Can I read through it?

23           Q.   Sure.  Yeah, any document that I give

24   you, you can take as much time as you want to look

25   through it.

1          A.    Yeah, I was asking -- for the math

2     that I did, two-thirds was not the right amount that

3     was coming up in the paycheck.  And then that's when

4     I reached out to Carrie Brannan.  Or that's when he

5     told me to reach out to Carrie Brannan and ask about

6     the two-thirds.  And then he gave me some facts.

7     Yeah.

8          And I also spoke to him about, you

9     know, I'm receiving a bunch of text messages and a

10    lot of things that I'm considering -- that I believe

11    are harassment and what to do with them.

12         Q.    What do you mean, harassment?

13         A.    From my understanding on being on

14    FMLA leave, you are not to be contacted, you're not

15    to be, you know, asked to come into work, you're not

16    to be doing work unless that's been discussed, and

17    nothing had been discussed prior to that.

18         Q.    Okay.  So who was asking you to

19    actively work at that time?

20         A.    Mr. Shafer was asking for things,

21    typically him.  Most of the coaches I didn't really,

22    you know, speak to.  Every once in a while, you

23    know, hope you're doing well.

24         But for the most part, Mr. Shafer,

25    you know -- for instance, Jon was going on his

94

1    honeymoon and he asked, hey, can you cover that week

2    because he's going on his honeymoon, and I thought

3    that was very weird.  It was the beginning of

4    October.  Hey, can you come in on Saturdays to work,

5    knowing that I wouldn't get paid on Saturdays.

6    Like, I'm not filling in, from what my understanding

7    was, to not do that, yeah.

8            Q.   So when we looked at your actual

9    EFMLEA request form, and you said it was not your

10   handwriting, but somebody had written intermittent

11   across the top of it; do you remember that?

12           A.   Yes.

13           Q.   So do you have any idea where that

14   came from?  And what I mean is, had there been a

15   discussion about maybe you coming in to fill in some

16   days?  What was the plan?

17           A.   Discussion was that for those first

18   two weeks, I would come in on Tuesday, Thursday, and

19   Saturday.  After that it was, from my understanding

20   with Eric Ball, was unless it was discussed, you're

21   on leave and not to be contacted.

22           Q.   Okay.  So unless it was discussed;

23   what does that mean?

24           A.   I believe either through e-mail or,

25   like, phone call.

1          Q.    Sure.  So I guess what I'm getting at

2     then, is when you say that you were upset that

3     Mr. Shafer reached out to you and asked if you would

4     be willing to come in for certain days, do you think

5     that that was inappropriate even though the door, at

6     least as I understand, had been left open for

7     intermittent leave?

8          A.    For those two weeks, I didn't have an

9     issue with it, but for the weeks after, getting

10    called on Sunday at 9:00 and 10:00 p.m. was becoming

11    an issue, yes.

12         Q.    Okay.  So what was the substance of

13    those calls?  What was he asking for from you?

14         A.    Are you coming in this week?  Again,

15    would you fill in for Mr. Erickson while he was

16    taking his honeymoon?  We have an event here on

17    Saturday, are you able to come down?  It would vary.

18    And then, you know, as it progressed on, it was,

19    hey, we need help with this, do you have information

20    on this?  Can you fill out this information on --

21    can you put the soccer tournament together with, you

22    know, the other schools, and so on and so forth,

23    through that fall, in the winter.

24         Q.    Okay.  So at any point while you were

25    having those conversations with Mr. Shafer, did you

1    think to just ask, can we come to some kind of

2    arrangement where I get paid for partial time or

3    you're on partial leave?

4              A.    I'm sorry.  Can you --

5              Q.    So when you start leave on

6    September 21st --

7              A.    Correct.

8              Q.    -- at any time before October 15th,

9    in between that almost month-long period --

10             A.    Uh-huh.

11             Q.    -- did you reach out to HR and say,

12   hey, I'm on leave and I want these people to leave

13   me alone?

14             A.    Again, from my e-mail that I wrote

15   him, I stated, you know, being contacted -- and it

16   was a -- yeah, from our conversation, he said, do

17   not feel obligated about, you know, people reaching

18   out and so on and so forth.  It was kind of weird to

19   not respond to that piece, yeah.

20             Q.    So were people reaching out via

21   e-mail or text; how were they reaching you?

22             A.    Text, e-mail, phone call.

23             Q.    Okay.  And at any point, I mean,

24   again, did you tell Mr. Shafer, I'm on leave, please

25   don't talk to me?

1          A.   I didn't feel I needed to.

2          Q.   Okay.  So when he would reach out to

3    you and say, hey, can you do this, what would your

4    response look like?

5          A.   Typically look -- I mean, it would

6    vary depending on the week.  I mean, it eventually

7    died down.  I don't know if it was after this e-mail

8    or not but -- sorry.  Yeah, it would vary on

9    responses, or sometimes I didn't respond.

10         Q.   Okay.  So when you say in your

11   e-mail, I've been doing work, have came in a few

12   days, responding to e-mails and text messages from

13   coaches and schools while on leave, what did that

14   work actually look like?  Was it just a few texts a

15   day?  Was it, you know, seven hours of work?  What

16   did it look like?

17         A.   I mean, it would vary.  It would fall

18   within my athletic director duty.  If it was getting

19   information out to coaches, if it was sitting in on,

20   you know, meetings that he asked, like from the

21   Kentucky High School Athletic Association, like,

22   hey, could you watch over this and whatever else.

23   Can you respond back to this parent; can you, you

24   know, get ticket information together; can you --

25   yeah, it would vary.  Like I said, the tournament

1    for soccer was being held at Ryle that year so can

2    you work with the school district and get that

3    together.

4          Q.   Do you have any way to now -- and I

5    understand this is years later -- any idea to go

6    back and definitively say this is how much time I

7    was spending each day?

8          A.   I did send him an e-mail regarding --

9    no, not the day.  I sent the days, I didn't send the

10   times.

11         Q.   Okay.  Were there any days that you

12   were working or answering texts or e-mails more than

13   an hour at a time?

14         A.   Just -- I mean, if there were issues

15   with setting up, you know, venues or things, or

16   logistics of things typically, or on the phone and

17   going back and forth.

18         Q.   So the substance of what you were

19   being asked to do, what specifically did that look

20   like?  And I can ask a more pointed question to give

21   you some examples of, you know, the spectrum of

22   things I'm looking for.

23              Was it things like, hey, you have the

24   password to this, I need it to get into something?

25   Or was it more, hi, we're having this tournament, I

1    need you to take the lead and do it?

2           A.    It was more towards I need you to do

3    the tournament logistics.  All my passwords were

4    given the day -- or actually, I mean, I guess around

5    the time I was leaving on leave.  So everything as

6    far as payments, everything as far as ticket setup,

7    even my e-mail, were given over to Mr. Shafer and

8    Mr. Erickson.

9           Q.    Okay.  So you send this e-mail to

10   Eric on October 15th, 2020, you say, "With my pay

11   coming up drastically shorter than it normally

12   would," what do you mean by that?

13          A.    So I took my pay and divided by

14   two-thirds, you know, it's simple math, and figured

15   it would come up a little shorter, but I believe it

16   was coming up even less than the two-thirds after

17   speaking with Carrie.

18          Q.    So at that point you were unaware

19   that the federal law also had a $200 a day cap on

20   what pay you were permitted to take?

21          A.    Yeah, I didn't know about that, no.

22          Q.    Okay.  But Eric informed you about

23   that in his response?

24          A.    Yes.

25          Q.    Okay.  So when you reached out

1    talking about the two -- or when you reached out

2    saying that, you know, your pay is coming up, you

3    want that fixed --

4              A.    I didn't say it like that, but --

5              Q.    I'm paraphrasing, I know.  What was

6    your end objective here?  Was it to recalculate so

7    that you were getting actually two-thirds of your

8    standard paycheck, or was it that you wanted people

9    to leave you alone?  What was the objective of this

10   e-mail that you sent on October 15th?

11             A.    It was both, that's why I broke it

12   up.  It was like -- yeah, it was like, hey, if I'm

13   doing work, I'm being asked to do work, that was --

14   sorry, let me go back.

15             Yeah, I was being asked to do work,

16   and I felt like on the days, at least from what my

17   understanding was, if you were to work, you were to

18   get full pay, that was -- there was really no other

19   explanation that I received from that.  That was my

20   understanding.  So if I'm being asked to do work and

21   I am completing it, and it's documented that it's on

22   there, that those days need to be calculated.

23             So, again, I don't know if those

24   would have counted as intermittent or what, but I

25   was being asked on those days to do work and that's

1    what I -- the pay would have been different.

2                    Does that make sense?

3           Q.    Sure.  So how were you tracking those

4    days and notifying the district of the days that you

5    felt you were entitled to compensation prior to

6    October 15th?

7           A.    I had text messages and e-mails

8    and -- I mean, there -- I was never discussed with

9    about, hey, you need to submit this form on the days

10   that you work.  I tracked them myself.

11          Q.    Sure.  Let me ask a better question

12   to really what I'm getting at.  So you have a time

13   sheet; you go in and you submit your time with the

14   Boone County Schools?

15          A.    I didn't have a time sheet.

16          Q.    Okay.  Maybe not a time sheet, but is

17   there a portal that you go in, for example, on a

18   standard schoolday, a portal you go into if you need

19   sub coverage or do something in that way, you go in

20   and you fill out a form, and you let the district

21   know, hey, I'm going to be out this day, correct?

22          A.    So during my leave, I didn't have to

23   do that.  But, yes, there is a portal that they

24   have.

25          Q.    Okay.  So you didn't have to do that

1    while you were on leave because everyone was

2    supposed to be on the understanding you were on

3    leave, correct?

4         A.   Correct.

5         Q.   So I'm asking, before October 15th,

6    how did you expect the district, as in the central

7    office payroll people that are metering out those

8    paychecks, how did you expect them to know the days

9    that you felt you were entitled to compensation and

10   the days that you said that you weren't on leave?

11        A.   How was I -- are you asking me how

12   are they supposed to know?

13        Q.   Yeah, if you don't tell them.

14        A.   That's a great question.  I don't

15   know how to answer that.  Again, you're asking me

16   how am I supposed to let the district know that I

17   worked on those days.

18        Q.   It's actually a little bit different

19   than that, so let me try to reask.

20        A.   Okay.

21        Q.   So you say you submit a form to

22   central office -- let me ask a more fundamental

23   question.

24             Matt Shafer does not process payroll

25   in Boone County, correct?

1          A.   Correct.

2          Q.   None of the administrators at Ryle

3    High School are processing payroll for Boone County

4    Schools, correct?

5          A.   I don't believe so, no.

6          Q.   Okay.  There's Eric Ball and other

7    HR, Tina Herbert, that are overseeing HR and the

8    payroll process; is that fair?

9          A.   Yes.

10         Q.   Okay.  So if you have an issue with

11   your check, you go to HR, which I would assume, you

12   know, since you e-mailed Eric Ball directly at that

13   time?

14         A.   Honestly, yeah, he e-mailed me and

15   said Carrie Brannan is over it, correct.

16         Q.   Okay.  So you had an issue with your

17   payroll?

18         A.   From my understanding, correct.

19         Q.   From your understanding of it.  So

20   there are two components to this e-mail that you

21   sent, the first, that you felt you were entitled to

22   the two-thirds and you wanted to get that cleared

23   up, right?

24         A.   Uh-huh.

25         Q.   So Eric responded to that with a,

1    hey, it's a $200 a day cap, right?

2              A.    Correct.

3              Q.    So the other component that you

4    said -- it was two separate things.  You said the

5    other component is that you've been doing work,

6    responding to e-mails and text messages from coaches

7    and school while on leave.

8              A.    Uh-huh.

9              Q.    So what was your objective of that

10   request?  Did you want people to leave you alone or

11   were you looking for backpay?

12             A.    My only thing was to not feel

13   obligated, and I stated that, to not feel obligated

14   that I actually am supposed to be working.

15             Q.    Okay.  So you just wanted people to

16   leave you alone in so few words?

17             A.    Yes.

18             Q.    Okay.  So did Eric respond to that

19   component in his e-mail?

20             A.    He did.

21             Q.    What did he say?

22             A.    He said, "Please notify Mr. Shafer of

23   the individuals who are sending you e-mails and text

24   so that he can address with those individuals.  If

25   you're receiving e-mails/text from Mr. Shafter, you

1    will need to schedule an appointment with him so

2    that the next time you are on campus you can give

3    him all of the information he may need to access the

4    programs/systems that are needed to fulfill the AD

5    duties."

6             Q.    Okay.

7             A.    Athletic director duties.

8             Q.    So what was your understanding of the

9    action items that needed to happen in response to

10   this e-mail?

11            A.    That I needed to reach out to

12   Mr. Shafer and give him access to everything that I

13   had for him to not contact me.

14            Q.    Sure.  So then he would leave you

15   alone, and Eric is agreeing that you should not feel

16   obligated to respond to him at any time because

17   you're on leave, correct?

18            A.    Correct.

19            Q.    Okay.  Do you have any understanding,

20   or I guess, what was your impression of the dynamic

21   between human resources and the administration of

22   Ryle High School?  And by that, I mean, do you think

23   that Eric Ball could call up Mr. Shafer and say,

24   hey, I'm in charge of HR or I'm the assistant

25   director, please leave the employee on leave, don't

1    do that?  Or did you think that -- you know what,

2    that was a terrible question, let me ask it better.

3            You were having an HR-related problem

4    and you went to Eric Ball; why didn't you go to

5    Mr. Shafer instead?

6        A.    Because from what I had read in, I

7    guess it was the Boone County contract, you're

8    supposed to go to the person above -- at least that

9    was my understanding of the BECA contract.  So I

10   went to Eric, being in HR, and, obviously, dealing

11   with the issue of not understanding the whole

12   two-thirds pay piece, I submitted the e-mail to him.

13            I didn't know who else to really

14   bring that up to, because Mr. Turner had been over

15   Mr. Shafer, and they have a close relationship, so I

16   don't want to -- you know, it wasn't necessarily to

17   get him in trouble, but at the same time, I'm

18   feeling pulled and torn of, hey, I'm getting

19   contacted on Sunday to come in and work, and I

20   didn't feel that was right.

21        Q.    Sure.  So you went to human resources

22   because you knew that human resources was the avenue

23   to accomplish your objective of please leave me

24   alone in a more professional way?

25        A.    Correct.

1          Q.   Okay.  Do you know if Eric Ball had

2     any conversations with Mr. Shafer or any of the

3     administration at Ryle High School about not

4     reaching out to you while you were on leave?

5          A.   I don't know.

6          Q.   Okay.  In Mr. Ball's instruction to,

7     you know, talk to Mr. Shafer about people leaving

8     you be on leave, did you ever have that conversation

9     with Mr. Shafer?

10          A.   I can't remember if we had a phone

11     conversation after this or not.  I'm sorry.

12          Q.   Okay.

13          A.   I don't believe I e-mailed him about

14     it.  But the other piece of this, stating about the

15     access, I had already given them access to

16     everything, so they already had everything that they

17     needed to do my job successfully and wholeheartedly

18     or completely, so I was getting contacted outside of

19     that.

20          Q.   Okay.  But, again, did you ever have

21     a conversation with Mr. Shafer after this

22     October 15th e-mail specifically saying, hey, I'm on

23     leave, can you ask Mr. Erickson to do this, or can

24     you find someone else to do this?

25          A.   I don't believe we did.

1          Q.   Okay.  So then what happens between

2    October 15th and, let's say, the end of Thanksgiving

3    break?  Are you continuing to be contacted?

4          A.   Every once in a while I was.  I can't

5    remember, honestly, e-mails, off the top of my head,

6    if I was or if I was responding to them or not.

7          Q.   Okay.  Do you recall sending any

8    other follow-up information to HR specifically

9    about, you know, please, ask Mr. Shafer not to

10   contact me while I'm on leave?

11         A.   I don't remember sending that, no.

12         Q.   Okay.  So after October 15th you

13   continue on leave.

14              I'm going to hand you what's been

15   marked as Exhibit 17.

16              (WHEREUPON, Defendant's Exhibit No.

17   17 was marked for identification.)

18              (Off-the-record discussion.)

19   BY MS. AMLUNG:

20         Q.   I'm going to hand you what's been

21   marked as Exhibit 17.  So this is an e-mail from

22   Ms. Herbert to a variety of administrators, "Mario

23   will end his EFMLEA as of December 4th."  I know

24   that you are not copied on this e-mail --

25         A.   No.

1    Q.    -- but does that sound about accurate

2    when you came back to work?

3    A.    It was about around the time.

4    Q.    Okay.  So now I'm going to hand you

5    what's been marked as Exhibit 18.

6    (WHEREUPON, Defendant's Exhibit No.

7    18 was marked for identification.)

8    Q.    Do you recognize this document?

9    A.    I had seen it in the documents that

10   were sent over, but I had not seen that prior.

11   Q.    Okay.  So this is a printout of

12   what's called the absence history.  So earlier when

13   I was telling you -- or we were discussing, you

14   know, what happens if you need a substitute, you go

15   into the portal and you type in to say, hey, I need

16   a substitute and it goes into the magic ether of

17   requests.

18   A.    Uh-huh.

19   Q.    So this is what it looks like from

20   central office's perspective of your absence

21   history.

22   A.    Okay.

23   Q.    So if we'll take a look at this log.

24   It looks like starting -- at the very bottom,

25   starting September 21st, EPSLA, so two-thirds hour

1    only, and you claimed 10 days of that.

2                   A.    Okay.

3                   Q.    So it's five and then the individual

4    days, there are five of those.

5                   A.    Okay.

6                   Q.    If you look in the third column from

7    the right, it's the day column?

8                   A.    Okay.

9                   Q.    So it shows you how many, like,

10   credits or days of that particular leave time that

11   you took.

12                  A.    Okay.

13                  Q.    Does 10 days EPSLA sound about right?

14                  A.    Yes.

15                  Q.    Okay.  Because we saw in the e-mail

16   earlier that you get the 10 days of EPSLA and then

17   it kicks into the EFMLEA time, right?

18                  A.    Correct.

19                  Q.    Okay.  So then that continues through

20   October 7th.  And then October 8th is when your

21   EFMLEA begins.  And it looks like you have two of

22   those days.  And then there's something called an

23   exchange day.  Do you know what that means?

24                  A.    No.

25                  Q.    On the school calendar, when you have

1    those P days that you can, you know, exchange --

2    come in for professional development, or not come

3    in, depending on what you mean, are you aware of

4    that dynamic of the calendar?

5              A.   I never really followed it, so no.

6    But, I mean, it makes sense.

7              Q.   Okay.  Regardless, after that

8    exchange day, for whatever reason, kicks in

9    October 14th through November 30th, there are 34

10   additional EFMLEA days; do you see that?  I'm

11   telling you that I counted this four times and I got

12   34 plus the two, so that's 36 total EFMLEA.

13             A.   Okay.

14             Q.   So after that November 30, 2020, the

15   following week would have been December 4th, when

16   you came back.

17             A.   Okay.

18             Q.   So can you confirm, then, that

19   December 4th is when you came back from leave?

20             A.   Yeah.

21             Q.   Okay.  So we may look at this again

22   at some point, so if you just want to put that on

23   your maybe-look-at-again pile.

24             A.   All right.

25             Q.   So you continue through the

112

1    Thanksgiving holiday on leave and you come back

2    beginning of December.  What happens when you come

3    back to school?  What is it like transitioning back

4    into that?

5            A.   Like you've been off for about three

6    months and every once in a while doing work.

7            Q.   Okay.  Were things a bit crazy?

8            A.   I wouldn't say necessarily crazy.  I

9    felt a little uninformed about things that happened

10   and changed and moved around.

11           Q.   Okay.  So I'm going to hand you

12   what's been marked as Exhibit 19.

13             (WHEREUPON, Defendant's Exhibit No.

14   19 was marked for identification.)

15           A.   Okay.

16           Q.   This is a string of e-mails.  Do you

17   recall these e-mails with Principal Shafer?  And

18   you'll see the first one was sent on November 30th,

19   which was a Monday.

20           A.   Yeah.

21           Q.   Checking in.  So this was right

22   before you came back from leave.

23           A.   Uh-huh.

24           Q.   So you ask him, how would you like me

25   to proceed.

113

1          A.    Uh-huh.

2          Q.    What did you mean by that?

3          A.    With getting things turned back over

4    and me assuming my job.

5          Q.    Okay.

6          A.    Coming back the 4th.

7          Q.    So what does Mr. Shafer say back to

8    you?

9          A.    "I can fulfill the AD while at home,

10   that is fine with me.  Please communicate this to

11   all our coaches."

12         Q.    Okay.  So we've looked at quite a few

13   e-mails today.

14         A.    Sorry.  Do you want me to keep

15   reading?

16         Q.    We'll get to that point in a minute.

17   I just want to break it down in a couple of

18   different components.

19         A.    Okay.

20         Q.    So if you can -- if you believe you

21   can fulfill the AD duties while working remotely,

22   he's now giving you the green light to do so.

23         A.    Uh-huh.

24         Q.    Is it your understanding that as of

25   November 30th, when you came back, you were going to

1    be able to do some of your job at home, working

2    remotely?

3              A.    That was my understanding, correct.

4              Q.    Okay.  So that's specifically with

5    respect to the AD duties.

6              A.    Uh-huh.

7              Q.    So as you pointed out, that e-mail is

8    not done.  So there's a secondary component of it,

9    specifically with respect to your teaching

10   obligations.  Do you see that?

11             A.    Correct.

12             Q.    What were you asked to do at that

13   time with respect to teaching?

14             A.    "I need your help with a handful of

15   students that are being placed online.  The students

16   will be in Edgenuity, so you need not to prepare

17   curriculum, just to be in communication with them

18   and track progress.  As you can probably imagine, we

19   have a large amount of students that are falling

20   behind and I need all hands on deck.  If that sounds

21   good to you, let me know and I will have Katie Parks

22   get in touch with you about it."

23             Q.    Okay.  So as of November 30th,

24   Mr. Shafer has outlined how you can make this work

25   while not taking leave, still getting your pay, but

1  working at least partially at home; is that your

2  understanding of what this e-mail is relaying to

3  you?

4          A.   Correct.

5          Q.   And you respond December 1st, "This

6  will work.  Just let me know what you need me to

7  do."  Correct?

8          A.   I believe we had a phone conversation

9  in between then, and that was the response.  He

10  said, send me an e-mail saying that that was okay,

11  but yeah.

12         Q.   Sure.  So was the e-mail before or

13  after the December 1st response from him at 8:32

14  saying, "Let me know when you can talk tomorrow and

15  we will set some things up"?

16         A.   That would have been the secondary

17  call.  Yeah, I mean, well, leading to the call,

18  correct.

19         Q.   So what was your understanding of

20  what you were going to be -- what your workday and

21  your work schedule was going to look like as of

22  December 4th when you came back, moving forward?

23         A.   That I'd be taking AD duties and, you

24  know, facilitating what was going on there, as well

25  as checking in with a few students about how he

116

1    worded it, just, yeah, making sure that they are

2    doing their work on this program called Edgenuity.

3           Q.   Okay.  What's Edgenuity?

4           A.   It's a program for tracking students,

5    I believe.  I was never trained in it so I don't

6    really know all the ins and outs of it.  But I think

7    it's student performance to get them back up to

8    grade, I believe.

9           Q.   Okay.  So you weren't asked to

10   administer the Edgenuity, you just needed to be in

11   communication with these students to make sure they

12   weren't falling through the cracks, I guess for lack

13   of a better term?

14          A.   Sure.  Yes.

15          Q.   Okay.  On the first page -- so,

16   again, I apologize, it goes in reverse chronological

17   order.  So it looks like you and Mr. Shafer set up

18   another call between 11:30 and 1:00 or after 1:30.

19   Do you remember ever having that call?

20          A.   I believe we did, yeah.

21          Q.   So that was on Wednesday,

22   December 2nd.  The following day, Mr. Shafer sends

23   you a follow-up e-mail that says, "Let me know when

24   you would like to talk."  Did you -- were you unable

25   to call him on December 2nd?

117

```
 1              A.   I can't remember.

 2              Q.   Okay.

 3              A.   I can't remember if we spoke or not

 4    in between.

 5              Q.   So the second sentence of that e-mail

 6    says, "I would need you to be more accessible via

 7    e-mail if this is going to work out, which I hope it

 8    can."  Do you know what he's referencing there?

 9              A.   I don't remember, and I can't

10    remember if this was in regards to a conversation we

11    had or what.  But -- I mean, I see it written down

12    there, but I can't remember what the context of it

13    was.

14              Q.   Okay.  But regardless, would you

15    agree that as of December 3rd, he's telling you that

16    if you're going to work from home --

17              A.   I need you to be more accessible,

18    correct.

19              Q.   You need to be accessible, we need to

20    make this work, and then he finishes it off with,

21    "Let me know when you can talk so we can get this

22    ball rolling."

23              A.   Uh-huh.

24              Q.   So moving forward, would you agree

25    that Mr. Shafer was on board with you working at
```

1    home when you needed, just as long as you were a

2    little more accessible via e-mail?

3           A.    Correct.

4           Q.    Okay.  So that conversation ended on

5    December 3rd, was the last of that e-mail exchange

6    date.  The following week -- I'm going to hand you

7    what's been marked as Exhibit 20.

8                 (WHEREUPON, Defendant's Exhibit No.

9    20 was marked for identification.)

10          Q.    The following week you send an e-mail

11   to Eric Ball dated December 8th.  Do you remember

12   this particular exchange?

13          A.    Yes.  This was talking -- well, I

14   think there should be another page to this, but

15   where I highlight the days that I was contacted and

16   asked to work.  This was in regards to pay -- or I

17   don't know if you'd say backpay, but pay in regards

18   to this.

19          Q.    Okay.  So you sent an e-mail to Eric

20   Ball at 10:57 in the morning, on Tuesday,

21   December 8th, saying, "I had not received

22   confirmation on this, but I had e-mailed you

23   regarding my working from home the dates of 9/21

24   through 10/29, my last e-mail from home.  What steps

25   do I need to take to receive full pay at that time?"

```
1                A.    Uh-huh.

2                Q.    So is it fair to say that as of

3    December 8th, there were a couple of days that you

4    felt that you were working from home to the point

5    that you were entitled to full compensation for

6    those days?

7                A.    I believe there was more than a

8    couple, but yes, yeah.

9                Q.    Okay.

10               A.    Because I highlighted the days

11   somewhere.

12               Q.    It's next.  We'll get there.

13               A.    All right.

14               Q.    So at the bottom -- you start off

15   this e-mail with "I had not received confirmation

16   on this."

17               A.    Uh-huh.

18               Q.    What do you mean by that?

19               A.    I believe I was referencing the

20   two-thirds pay piece where he said, you know -- I

21   don't know if I'm able to go back and look at them.

22               Q.    Yeah.

23               A.    Regarding the e-mails, from the

24   conversation that I had with him, as well as Carrie

25   Brannan, once I spoke to her it was, if you're being
```

120

1    asked to work, then those are considered days

2    worked.

3         Q.   So you were told -- are you saying

4    that you were told, oh, yeah, if you work, you get

5    full compensation for that?

6         A.   Yes, correct.  If someone was asking

7    you to work and you completed the work, right, to --

8    I mean, I don't know if you want to say under their

9    discretion, but you would be getting compensation

10   for that.

11        Q.   Sure.  Who told you that?

12        A.   Eric Ball, as well as Carrie Brannan.

13        Q.   So the e-mail that we looked at with

14   Eric Ball said you should not feel obligated to

15   respond to those?

16        A.   Uh-huh.

17        Q.   Is that the e-mail you're

18   referencing?

19        A.   I believe so.

20        Q.   So can you point to me -- that's

21   Exhibit 16.

22        A.   All right.

23        Q.   Okay.  So it says -- I see where

24   you're -- the first e-mail, at the top of the page,

25   which is the very last sentence of the first

121

1    paragraph, you would receive full pay for the days

2    that you were to fulfill the duties of the teaching

3    and athletic director positions, correct?

4            A.   Okay.

5            Q.   So this kind of goes back to my

6    question from earlier.  Did you ever have a

7    conversation with Mr. Shafer about working from home

8    at that time?

9            A.   No.

10           Q.   So were you doing full-time -- full

11   day of activities, full-time working on those days?

12   What did those look like?  Because earlier you said

13   that it would vary.

14           A.   It would vary.

15           Q.   Okay.  So why didn't you have a

16   conversation with Mr. Shafer that, hey, I'm working

17   basically full-time these days, can we schedule a

18   work-from-home type of dynamic here?

19           A.   Again, I didn't feel that I needed

20   to.  I don't think it's my responsibility to let him

21   know about what he's asking me to do.

22           Q.   So then why did you feel that you

23   should have that conversation that we just looked at

24   with Mr. Shafer about working from home that we just

25   looked at for December?

1          A.   Because I was coming back.  I had

2    received a call from Tina Herbert stating -- prior

3    to that, and I know we didn't reference it, but Tina

4    Herbert asked, "Are you even coming to back to

5    work?"  I stated, "Yes, I was planning to at the end

6    of my leave, what did I need to do."

7               She specifically called me and asked

8    me again, are you coming back.  And that was in

9    reference to, you need to reach out to, I believe,

10   Eric Ball, as well as Mr. Shafer, on your intentions

11   to come back.

12          Q.   Sure.  I understand that, that you

13   were coming back.  But clearly, you were coming back

14   with the intention to at least partially work from

15   home, correct?

16          A.   And that's what I'm saying, I don't

17   believe that -- I'm sorry, I'm going to have to go

18   back.  From this conversation -- my understanding, I

19   guess, the procedure of coming back into my job, I

20   didn't know if I -- and I believe I asked it --

21   yeah, from our conversation, it was what would you,

22   yeah, like me to do.  I didn't know if I was coming

23   in.  I didn't know if I needed to be at home.  I

24   didn't know what was going to actually happen, or if

25   I -- specifically, hey, you had to work from home or

```
 1    what.  If that makes any sense.
 2              Q.    Okay.  So let's look back at the
 3    e-mail we were just looking at.  That's Exhibit --
 4              A.    Are we able to take a break?
 5              Q.    Oh, yeah, if you need to take a break
 6    at any time, by all means, let me know.
 7              A.    Can we take one?
 8              Q.    Sure, by all means.
 9              (A brief recess was taken.)
10    BY MS. AMLUNG:
11              Q.    All right.  So we are back on the
12    record.  I'm going to try to get myself reacquainted
13    with what we were doing here.
14              So we had just reviewed some e-mails
15    between you and Mr. Shafer about coming back to work
16    in December and what the work-from-home dynamic
17    would look like; does that sound right, in
18    Exhibit 20?
19              A.    I think it was 19.
20              Q.    19?
21              A.    Yes.
22              Q.    Okay.  All right.  So we were looking
23    at Exhibit 20, the December 9th and 8th e-mail
24    exchange between you and Eric Ball; is that Exhibit
25    20?
```

124

1          A.   Yes.

2          Q.   Okay.  So looking back at Exhibit 20,

3    so you send an e-mail to Mr. Ball, didn't receive

4    confirmation, but want to know the 9/21 through

5    10/29 times you were working from home, correct?

6          A.   Correct.

7          Q.   Okay.  So Eric Ball responds back;

8    what does he tell you needed to happen and needs to

9    happen?

10          A.   I will need documentation showing

11    that Mr. Shafer approved a remote work request for

12    you.

13          Q.   Okay.  So Mr. Ball tells you that in

14    order to receive compensation for the days you were

15    working from home, you needed to actually have a

16    conversation with Mr. Shafer showing that, yeah, you

17    were approved to work from home, because as far as

18    central office was concerned, you were on leave at

19    those times; is that fair?

20          A.   I'm sorry.  I was reading that while

21    you were talking.  Could you reask that?

22          Q.   Sure.  So Eric tells you that to

23    receive pay from the times that you were on leave

24    but you're claiming that you were working, you had

25    to show that you had been approved to work from home

1    on those days, correct?

2              A.    Yes, that's what he's asking.

3              Q.    Okay.  You don't need to dig through

4    because I'll pull it up.  But earlier we looked at

5    that initial July 30th e-mail from Eric Ball, where

6    he was providing everyone with the information about

7    working from home, remote leave, all of those

8    different options; do you remember that?

9              A.    Correct, yes.

10             Q.    This was Exhibit 11.  In that first

11   e-mail, Eric says, "Keep in mind that all employees

12   are required to report to campus when school reopens

13   unless you have received confirmation of a remote

14   teaching assignment or an approved leave of

15   absence."  So you elected to take the approved leave

16   of absence, correct?

17             A.    Correct.

18             Q.    So you did have an option, as of

19   July 30, 2020, to work from home and receive a

20   remote teaching assignment, per this e-mail,

21   correct?

22             A.    Correct.

23             Q.    Unless you have received confirmation

24   of a remote teaching assignment.  Prior to

25   November 30th, 2020, did you ever receive

126

1    confirmation from Mr. Shafer of a remote teaching

2    assignment?

3                A.    No.

4                Q.    So then these days that you want to

5    be paid for were days that you just decided to work

6    from home without approval from Mr. Shafer; is that

7    fair?

8                A.    Honestly, I didn't, one, look back,

9    but I believe that if Mr. Shafer was contacting me

10   with all of the information that I had given him

11   about doing my job successfully as an athletic

12   director, that he would be honest in the fact that

13   he did ask me to work.

14               Q.    I don't think this is a question of

15   honesty.  Mr. Ball is just asking you, did you

16   receive confirmation of a remote teaching

17   assignment?

18               A.    I thought his question was saying,

19   can you confirm?

20               Q.    Sure.  You're right.

21               A.    In order to receive full pay, I would

22   need documentation showing that Mr. Shafer approved

23   a remote work request for you.

24               Q.    Okay.  So you would agree, though, as

25   of this time, you had never received confirmation of

1    that remote request, correct?

2            A.    I thought the confirmation needed to

3    go into -- like to HR.  Mr. Shafer is saying,

4    basically, hey, Mr. Kirkendall worked on these days,

5    I'm sending it over to you as confirmation.  Because

6    that was my conversation with Carrie.  Carrie stated

7    that she didn't need information from me, she needed

8    it from the principal who was assigning the work.

9    That's referencing --

10            Q.    Sure.

11            A.    I'll go back.

12            Q.    I just want to make sure I'm

13    understanding.  So you knew at this time you needed

14    to get confirmation from Mr. Shafer that you had

15    received a remote teaching assignment?

16            A.    Ask your question one more time

17    because I'm reading it differently.

18            Q.    Okay.  So as of Wednesday,

19    December 9th.

20            A.    Correct.

21            Q.    Mr. Ball tells you, you need

22    confirmation that you had a remote teaching

23    assignment, fair?

24            A.    I think we're looking at this

25    differently.  I will need documentation showing that

1    Mr. Shafer approved the remote work.  I don't

2    necessarily think that needs to come from me.  And

3    that's why I believe in my follow-up e-mail, I gave

4    the dates, as well as the times -- well, not times,

5    the dates that Mr. Shafer had reached out to me and

6    asked me to work.

7              Q.   Right.  So as of December 9th,

8    2020 --

9              A.   As of that day, yes.

10             Q.   Sure.  Okay.  So we just looked at

11   some other e-mails where you had reached out to

12   Mr. Shafer specifically about remote work and being

13   able to work from home moving forward when you

14   returned, right?

15             A.   If you're responding to -- what

16   exhibit was that?

17             Q.   Exhibit 19.

18             A.   Okay.

19             Q.   Those are your exchanges with

20   Mr. Shafer about what the work-from-home logistics

21   would look like, correct?

22             A.   Correct.

23             Q.   So on December 1st, when you respond

24   to him and you say, "This will work, just let me

25   know what you need me to do," and then he responds,

1    "Let me know when you can talk tomorrow and we will

2    set some things up," that is prospective language,

3    it's going to work in the future, you're going to

4    set it up so that you can work from home.  If you

5    were already under the impression that you were

6    working from home during times, what is there left

7    to set up?

8              A.    I believe that was his language,

9    correct?

10             Q.    Well, you started it with the "just

11   let me know what you need me to do."

12             A.    And that was in reference to our

13   phone call that we would be having.

14             Q.    Okay.  So if you are setting up the

15   logistics for work from home, but you're telling me

16   that you were already working from home, why have

17   this conversation about what's left to do?

18             A.    Because I didn't know.  So, again --

19   and I believe in his e-mail, he asked, as part of

20   teacher duties -- again, had not been a teacher

21   prior, that's why I was asking, let me know what I

22   need to do.  And if I'm being correct, you're asking

23   about the "sum things up," that's his language,

24   that's not mine.  That's from Matt Shafer.

25             Q.    So I want to talk about something you

130

1    just said.

2              A.    Okay.

3              Q.    You said you had not been doing

4    teacher duties prior.

5              A.    Correct.

6              Q.    While you were on leave you were not

7    doing teaching duties, correct?

8              A.    The school year of '19-'20?

9              Q.    The school year of '19-'20 you were

10   doing teaching duties though.

11             A.    What are you considering teacher

12   duties?

13             Q.    Anything that's not AD.

14             A.    I look at that differently.  Sorry.

15             Q.    Okay.  So --

16             A.    My understanding is a little

17   different.

18             Q.    This is more fundamental, I guess,

19   difference of understanding then.  So when you are

20   asked to do the ISS supervision during the '19 and

21   '20 school year, what job description do you believe

22   that falls under?

23             A.    It can fall under an aide; it can

24   fall under an adult that has been approved by the

25   board to work in the capacity of a school.  It

1    doesn't have any teacher implications.  I wasn't

2    writing anything up on the board for the students to

3    follow.  They have their information, I sat in the

4    classroom.

5              Q.  Okay.

6              A.  I don't believe that's --

7              Q.  So then under the job description for

8    athletic director, where it says, "Other duties as

9    may be required," is that where you feel that it

10   fell into your wheelhouse as an athletic director?

11             A.  To be in that classroom?

12             Q.  Sure.

13             A.  I was following the schedule that I

14   was given.  I don't necessarily believe it falls in

15   the wheelhouse.  Again, it wasn't like I was doing

16   any real work in there.  Does that make sense?

17             I think as a teacher you're actually

18   informing a student, right, you're informing the

19   students.  But sorry, go on.  If I'm not answering

20   the question, please ask.

21             Q.  Okay.  So you're saying that you're

22   not doing any teacher duties during '19-'20, so I'm

23   asking, you went through that you supervised an ISS,

24   you supervised a study skills or whatever we called

25   it, auditorium full of students; do you think that

1    was appropriately in your job description?

2          A.    I think it was not in the norm of the

3    job description.  I don't understand where you're

4    asking that it's falling.  Maybe that's me.  I don't

5    know what you're asking.  Ask it a different way,

6    please.  You're asking if you set up the schedule or

7    what we needed to talk about more, that's from him.

8          Q.    No, I'm sorry.  I wanted to clarify

9    something else that there's clearly a

10   misunderstanding about.

11         A.    Okay.

12         Q.    So you just said that prior to

13   Mr. Shafer's November 30th, December 1st exchange

14   you had never done teaching duties in your capacity

15   with the Boone County Schools.

16         A.    In my mind, I don't believe that

17   sitting in an ISS room supervising one class a week

18   of a study skills where I'm not actually

19   interacting -- I'm not teaching them anything.  I

20   don't understand if that's hard to do.  I feel like

21   that you're having an adult that is capable of

22   watching kids in a room.  That has nothing to do

23   with me sending out e-mails or homework or

24   assignments and them coming back to me.

25         Q.    So then I guess my question back to

1    you is:  You were responsible for performing those

2    duties, under what umbrella do you think that that

3    is part of your role as athletic director, those

4    assignments?

5            A.   I just think they were a part of me

6    being hired into the school district.  I don't --

7    they didn't have anything to do with athletics so

8    they weren't athletically.  I don't believe they had

9    anything to do with being a teacher, they were just,

10   hey, we need a body in here, sit in here.

11           Q.   Sure.  So you said that because

12   there's no actual teaching component to it, you

13   don't believe that was part of the teacher job

14   description umbrella of, I guess, tasks; is that

15   fair?

16           A.   Yes.

17           Q.   Okay.  So then what Mr. Shafer asked

18   you to do with just reaching out to students who are

19   falling behind, do you consider that teaching?

20           A.   I believe you don't need a teacher to

21   do it.

22           Q.   So is that still part of your role as

23   athletic director, being asked to do these extra

24   assignments?

25           A.   From my conversation, which I know

1    it's not here, he stated that it was contingent upon

2    me agreeing to what he changed, that was our phone

3    call.  It was contingent upon -- me coming back --

4    to actually do what he assigned, that was when that

5    e-mail came out.  I believe I have phone records

6    that can show when we spoke.  I don't know if

7    Verizon goes back that far.  But it states -- or he

8    stated, you are contingent upon that.  I didn't

9    understand that language, hence, why we had a

10   follow-up conversation.

11            Q.   Okay.  So the virtual, I guess,

12   interactions with students that you were instructed

13   to have upon your return in December, do you feel

14   that that was something you should not have been

15   asked to do?

16            A.   I thought it was weird to be asked to

17   do it.

18            Q.   Okay.

19            A.   But I also feel that anyone else

20   could have done that that had, at least, I mean, I

21   don't know, what is it, at least an associate's

22   degree.

23            Q.   Sure.  All right.  We'll come back to

24   that then.  So I'm going to hand you what's been

25   marked as Exhibit 21.

1          (WHEREUPON, Defendant's Exhibit No.

2     21 was marked for identification.)

3          Q.   So let's switch gears back to your

4     conversation with Mr. Ball.  He says you need

5     confirmation from Principal Shafer.  So what do you

6     do in response?

7          A.   Which e-mail is which?  Sorry.  Okay.

8     I copied Matt Shafer, as well as Mr. Ball, because

9     that's the e-mail he said I needed confirmation for

10    those days.  I sent him the e-mails of the days that

11    I was contacted.  And, again, basing it off if I'm

12    only getting paid two-thirds on the days I'm not

13    working, but I was told from Mr. Ball, who was

14    acting as the FMLA director at the time, or the

15    head, the person to talk to, I wrote down the days I

16    was contacted, as well as the work that I did.

17         Q.   Okay.

18         A.   Whether it be from home or wherever I

19    was, that's what -- he was asking me to do work on

20    those days.

21         Q.   All right.  So these particular dates

22    that you have identified, so the first one,

23    September 21st through 24th, did you do some kind of

24    work for the Boone County Schools every one of those

25    days of that week listed?

1          A.    I want to say that was the start of

2    my leave and that was -- I was coming in on Tuesday,

3    Thursday and Saturday.

4          Q.    Coming into Ryle High School?

5          A.    Ryle High School, correct.  That was

6    the beginning of my intermittent leave.

7          Q.    Okay.

8          A.    And that was, again, going back to

9    the understanding that on those days that I was at

10   home, if I were to be contacted, which I was

11   contacted, any work asked to be done, because they

12   had all the access to my documents and e-mails and

13   everything.

14         Q.    Who is "they"?

15         A.    What, our finance director, Tammy

16   Hahn, Matt Shafer, Eric -- what's Eric's last name?

17         Q.    Ball.

18         A.    No, the guy who took over for me.

19   Eric -- is it Eric?  Jon Erickson.  Sorry.

20         Q.    Oh, Erickson.  Okay.

21         A.    Yes.  They had access to e-mails as

22   well as my work, so, again, they wouldn't need to

23   contact me and ask me to do any work.  I was still

24   being contacted and asked to do work.

25         Q.    Okay.  So let's take it week by week.

1   This first week, September 21st through 24th, how

2   much work did you do on September 21st?  Was it a

3   couple of e-mails?  Was it a whole full six-,

4   seven-hour workday's worth?

5           A.   I think in my position of being

6   athletic director, I can't really gauge it off of

7   time necessarily, but I was being asked to complete

8   things.  Send out tickets.  Send out information.

9   Send out -- correspond with the other athletic

10  directors that are coming in to -- whether it be

11  Ryle or if we're going to their places.  If games

12  are being canceled if weather is inclement.  So, I

13  can't really give you the specific, hey, I did eight

14  hours because that's not how my job was detailed.

15          Q.   Sure.  Well, I kind of need to

16  understand what exactly it is you're claiming here.

17  Because there's a difference between sending a few

18  e-mails and then doing an actual full day of work.

19          A.   There was not -- that note was not

20  made to me from Eric Ball when I asked about work.

21  He stated, if you're being asked to work -- and this

22  is the source that I'm going to -- if you're being

23  asked to work, you are getting compensated for the

24  work.  I don't know what the breakdown would be,

25  but, again, being an athletic director is not the

138

1    same as being a teacher, or where I'm in the

2    classroom between these periods, I'm taking a lunch

3    break and then I have other periods.  My work never

4    really revolved around necessarily a clock.  Again,

5    I was there at 9:50 and leaving at 11:00 p.m.

6              Q.   Well, didn't you testify earlier that

7    sometimes you were getting there at 9:50 and leaving

8    at the normal school hours of, like, 3:00?

9              A.   If we didn't have games, yeah.

10   Correct.

11             Q.   Sure.  So I guess a better question

12   then to ask is:  Regardless of how many e-mails you

13   responded to on those particular days, do you feel

14   that whether it was one or a hundred, you are

15   entitled to a full day of compensation?

16             A.   On the days where I was asked

17   specifically if I am doing work, or can I do this,

18   or can I complete this task, yes.

19             Q.   So let's say that this is not leave

20   consideration, let's say that this is a normal day

21   of work at the Boone County Schools during the 2019

22   school year.  You come to work at 9:50 in the

23   morning and you have a doctor's appointment, and you

24   have to take an hour to leave the premises and then

25   come back to continue working in the schoolday.  Do

1    you take an hour of leave for that, or do you take

2    the whole day off, or do you just say, my time is

3    flexible, I'm going to go do that and then come

4    back?

5              A.   Are you asking which I would use?

6              Q.   Sure.

7              A.   I don't know if you're actually

8    allowed to use an hour of leave, and if you were,

9    then I potentially would use an hour leave and come

10   back, or whatever time span I would need to.  I

11   don't know.  I can't remember if it was a four-hour

12   breakdown or what but --

13             Q.   So you can take partial sick days as

14   a Boone County Schools employee, correct?

15             A.   I believe so.  I don't know if I ever

16   used it or not.

17             Q.   Sure.  But I guess that's really what

18   I'm getting at with this question of you have dates

19   listed.  There's a difference between working a full

20   day and maybe working for an hour and what kind of

21   compensation that you would be paid for.

22                  If you're taking intermittent leave,

23   which means, by definition, it is intermittent.

24   There are some times you're working and some times

25   you're not.  So these dates that are listed here on

1    272, are you answering one e-mail and spending an

2    hour, or are you doing a full day's worth of work on

3    these days?

4            A.    And, again, I would have to say I

5    don't remember.  But I remember those are the days

6    that I was contacted and asked to do work and I did

7    the work that needed to be done on those days.

8            Q.    Okay.  So you just can't say one way

9    or the other whether on, for example, October 12th

10   you answered one e-mail or a hundred that day?

11           A.    No, I can't.

12           Q.    Okay.  But you feel that you're

13   entitled to a full day's compensation regardless?

14           A.    From my understanding, I believe that

15   what I was told was that if someone asked you to do

16   work, you do the work, then you are compensated for

17   the full day.  Those are the words from Carrie

18   Brannan; those are the words from Eric Ball.

19           Q.    Where are the words from Eric Ball,

20   that if you work for one hour a day you are entitled

21   to --

22           A.    He didn't specifically give me an

23   hour.

24           Q.    Okay.  So he just said, if you do

25   work, you'll be compensated, correct?

1          A.   If you are asked to do work --

2          Q.   Sure.

3          A.   -- and you complete the work --

4          Q.   Sure.

5          A.   -- that is someone asking you to do

6     the work, is it not?  I'm not trying to be funny.  I

7     mean, does that sound right?

8          Q.   I don't think you're understanding my

9     question.

10         A.   Okay.

11         Q.   So Eric Ball told you if you do work,

12    you are compensated for it.  We looked at that

13    e-mail.

14         A.   Uh-huh.

15         Q.   I'm asking you something different.

16    Do you believe that you should be compensated for a

17    full day's worth of work when you have only answered

18    e-mails for, let's say, 20 minutes?

19         A.   I don't know.

20         Q.   Well, you haven't specified how much

21    work you were doing on these days, but you've made a

22    demand of the Boone County Schools, as of

23    December 9th, that you should be fully compensated

24    for these however many days it is, right?

25         A.   Yeah, and I believe I do have text

1    messages as well as e-mails from those days still

2    that I can go back and I can count them up for you

3    if you need it.

4              Q.   Sure.

5              MS. AMLUNG:   Then I will make a

6    formal request to your attorney then that in

7    response to my damages question in Interrogatory, I

8    believe it's 16 or 17 maybe, for a full breakdown of

9    how much work you were doing on the specific days

10   listed, and what the correlation of your damages

11   calculation would look like in response.

12   BY MS. AMLUNG:

13             Q.   Okay.  So you make this e-mail

14   request to Mr. Shafer; how does he respond?

15             A.   Is this the one from him?

16             Q.   It's the same one.  It's Exhibit 21.

17             A.   The first page?  He says, "I do know

18   that you came in three days in early October.  Those

19   other days, I assumed you were on EFMLEA, as we had

20   never discussed you working remotely, and the AD

21   duties at the time were being handled by

22   Mr. Erickson and myself."

23             Q.   So then how do you respond to that?

24             A.   Above?

25             Q.   Uh-huh.

1    A.    "Yes, this is correct, I was on FMLA,

2    and you had advised me that Mr. Erickson and you

3    would handle my duties.  Outside of the few meetings

4    we had prior where there was not a conclusive answer

5    to working from home during this time, it did end up

6    being conclusive that it could happen.  As well, you

7    are correct in that this was not discussed with the

8    inclusion of Mr. Ball because the e-mails/text that

9    required my immediate attention, they required me to

10   work.  I am seeking compensation for the duties

11   which I had performed."

12       Q.    Okay.  So when you say that you're

13   seeking compensation for the duties which you had

14   performed, you're seeking compensation for the full

15   day, correct?

16       A.    From my understanding, correct, is

17   that if you were asked to work, yes, seeking full

18   compensation.

19       Q.    Okay.  So let's break down this

20   response back.  "This is correct, I was on FMLA."

21   So you agree that during that period, from

22   September 21st, 2020, through, I guess your return

23   back was December 4th, so before that time, whatever

24   the last schoolday would have been, that you were on

25   EFMLEA leave, correct?

1              A.    Correct.

2              Q.    You also agree that Mr. Erickson and

3    Mr. Shafer had informed you they would perform your

4    duties while you were on leave, correct?

5              A.    Correct.  So there would not be a

6    reason to contact me to do work.

7              Q.    "So outside of the few meetings we

8    had prior, where there was not a conclusive answer

9    to me working from home, you were -- it was

10   conclusive that it could happen."  So, again, prior

11   to November 30, 2020, when you e-mailed Mr. Shafer

12   and received confirmation, yes, this is the

13   work-from-home plan, you never received confirmation

14   from Mr. Shafer that a work-from-home plan was going

15   to be in place from the period of September 21st

16   through November 30th; is that accurate?

17             A.    That was a long-winded --

18             Q.    I know.  I can break it down.

19             A.    Yes, please.

20             Q.    So you have your conversation with

21   Mr. Shafer on November 30th, that moving forward,

22   here's the work-from-home plan, correct?  I guess

23   his e-mail back was on December 1st.  Regardless, it

24   was that chain of e-mails that we just looked at.

25             A.    Yes.

1          Q.    Okay.  You did not have a

2     conversation like that via e-mail with Mr. Shafer

3     confirming that you could work from home at any

4     point before then; is that accurate?

5          A.    Regarding the not conclusive, we

6     spoke in person regarding -- he did not understand

7     what it would look like, me being an athletic

8     director working from home.  That was where the not

9     conclusive and conclusive comes in.  He was still

10    asking me to do work and I was completing it.  And

11    then that's when, yeah, reference to it ended up

12    being conclusive, that it could happen.

13         Q.    That it could happen?

14         A.    Correct.

15         Q.    Could is a possibility, right?

16         A.    Isn't could not as well?

17         Q.    Right.  That's what I'm saying,

18    though.  Is that right there you're saying that,

19    yeah, it could happen, but you're not saying that it

20    did, in fact, happen.

21         A.    It did end up being conclusive that

22    it could happen.

23         Q.    Right.  That it could happen.

24         A.    I believe if we go back -- go on.

25         Q.    So this whole e-mail is talking about

```
 1    how you had discussed with Mr. Shafer there was the

 2    possibility to work from home, correct?

 3                 A.    And be fully compensated, right.

 4                 Q.    Right.  There's a possibility for it,

 5    but I don't see anything in this e-mail that says

 6    that you and Mr. Shafer had definitively come to an

 7    agreement this is what work from home looks like?

 8                 A.    Within this e-mail, it is fair, but

 9    go on.

10                 Q.    So what happens after this, this

11    e-mail exchange?

12                 A.    I don't remember.

13                 Q.    Okay.

14                 A.    Do you have other e-mails?

15                 Q.    I do.  So we're going to take a brief

16    detour just to try and keep things in timeline

17    perspective.

18                       So while you are having a

19    conversation with Mr. Shafer about what it looks

20    like to come back, there's also some, I guess,

21    midst-of-COVID restructuring going on.  Would you

22    agree that's a fair, I guess, description of what it

23    is?

24                 A.    Yes.

25                       (WHEREUPON, Defendant's Exhibit No.
```

1    22 was marked for identification.)

2              Q.   So in the second page of that, on

3    896, it looks like you get an e-mail from Andrew

4    Dusing.  Who is Mr. Dusing?

5              MS. AMLUNG:  And for the record, this

6    is Exhibit 22.  I'm sorry.

7              A.   He is the assistant principal.

8              Q.   Okay.  So on December 3rd, so this is

9    right before you come back from leave, there's an

10   e-mail from Andrew Dusing to a variety of

11   individuals.  Go ahead and review this as you need,

12   I'm going to -- so we don't have to read it all into

13   the record because it's going to be attached.

14              My understanding, basically, is that

15   Principal Dusing -- or Assistant Principal Dusing

16   sends out an e-mail saying, look, we've got a lot of

17   kids falling behind so we need to make a concerted

18   effort to try and keep these kids on pace, divides

19   up into teams, to just try and connect with these

20   students and keep them on track.  Does that sound

21   about right?

22              A.   Yeah.

23              Q.   Okay.  So even in the end of his

24   e-mail he says, "It is up to each team to get

25   together and set the next steps."  You know,

148

1    Rockstar Status to All.  This is team effort.  So he

2    has broken down teams as follows.  So Team 1,

3    Coleman, Brendel, Medious --

4              A.    Medious, I think.

5              Q.    -- Medious, Bush and Mann.  Who are

6    those individuals?

7              A.    What, two -- I guess two assistant

8    principals, I guess a counselor, a front desk

9    worker, and a librarian.

10             Q.    Okay.  So Coleman is a counselor;

11   Brendel is an assistant principal; Medious is a vice

12   principal; and then Bush and Mann.  One, is a front

13   desk office worker and the other is the librarian?

14             A.    I believe it's Mann that was in the

15   library but -- it seems all right.

16             Q.    Okay.  So someone that's just in the

17   school; is that fair?

18             A.    Correct.

19             Q.    I don't know who that person is, so

20   I'm asking.

21             A.    Yeah.  Someone that doesn't have any

22   teaching responsibility.

23             Q.    Okay.  So Team 2, Arkenberg, Ryan,

24   Kirkendall, Hanser and Vonderlage.  Arkenberg is a

25   counselor as far as I'm aware; Ryan is an assistant

1   principal; you are, of course, the athletic

2   director.  And then, do you know who Hanser and

3   Vonderlage are?

4           A.   I don't.

5           Q.   Okay.  Do you know if they're

6   teachers or other staff members at the school?

7           A.   I'm assuming -- I mean, I would

8   assume that they're staff members, but I don't know

9   if they're aides or where they worked at.

10          Q.   Okay.  Why do you say you assume that

11  they're staff members or aides, but not teachers?

12          A.   Because I didn't really interact with

13  a lot of teachers or aides.  I never had heard their

14  names up until, I guess, the beginning of my second

15  year.

16          Q.   Okay.  So Team 3, Dusing, Schilling,

17  Pastura, Weiss and Miller.  So Dusing is an

18  assistant principal; Schilling is a counselor,

19  Pastura is an assistant principal.  Do you know who

20  Weiss and Miller are?

21          A.   Weiss worked up at the front desk.  I

22  don't know if she was Pastura's secretary or not

23  but -- and I don't remember Miller.

24          Q.   Okay.  So is it fair to say that from

25  what you recall of these individuals, these teams

1    were people working either in front office or in

2    other supervisory roles throughout the school that

3    were going to be assisting and helping this

4    concerted effort to make sure students aren't

5    falling behind?

6              Or I guess a better question would

7    be:  From your understanding, what were the purpose

8    of these teams?

9         A.   To contact people.

10        Q.   Why?

11        A.   Because -- communicate with students

12   and their parents, to getting them back on track.

13        Q.   Okay.

14        A.   But -- yeah.

15        Q.   So there's a follow-up e-mail on

16   December 3rd in response to this from a Mr. Cody.

17   Do you remember receiving this e-mail?  Or I'm

18   sorry, Mr. Ryan.

19        A.   Yes.  I think your question was a yes

20   or no question.  Yes.

21        Q.   Okay.

22        A.   It's from Cody, yes.

23        Q.   Who is Cody Ryan?

24        A.   The assistant principal.

25        Q.   And he was on your team as designated

1    by Mr. Dusing?

2              A.    Yes.

3              Q.    Okay.  What was the purpose of this

4    team and these communications?

5              A.    To contact parents and students to

6    get them back on track.

7              Q.    Okay.

8              A.    Right?

9              Q.    It's not a trick question, I'm just

10   asking.

11             A.    No, I mean, if he's following up on

12   Andy's e-mail -- or sorry, on -- yes, Andy's

13   e-mail -- you were asking what Cody e-mails about,

14   right?

15             Q.    Yes.

16             A.    Yeah, just the breakdown of who you

17   need to contact and, you know, who's failing.

18             Q.    Great.  So Mr. Ryan responds -- or

19   you and him have a small exchange where you just say

20   you're checking in, and you're going to start

21   e-mailing today for times to talk this week, right?

22             A.    Yes.

23             Q.    Okay.  So it looks like you took the

24   juniors on whatever the list of students is that was

25   in the Google doc?

1      A.    I was assigned the juniors, yes.

2      Q.    Did you complete this task and start

3   checking in with these students?

4      A.    I believe I sent an e-mail out as a

5   group.  I think it was introducing myself, and I'd

6   be in contact with, you know, the kids and their

7   parents.

8      Q.    So at this time, do you recall -- I

9   mean, I believe at some point -- I'm not sure if

10  it's actually in this e-mail -- but they had

11  referenced this -- oh, here it is.

12         Okay.  December 3rd, the e-mail from

13  Cody Ryan, they're calling this the failure list.

14  This is a list of all the students failing at Ryle

15  High School as a result of the COVID pandemic.  Do

16  you recall seeing that list?

17     A.    I do.

18     Q.    Was it pretty extensive?  What did it

19  look like?

20     A.    I know I had a lot of kids, yeah.  I

21  mean, I don't really -- on this specific list from

22  Cody, I had a lot of kids, but I don't remember

23  really checking anything else.  There was another

24  list that I checked that had quite more.

25     Q.    Sure.  So on this list, you were

1    asked to reach out to students specifically who were

2    failing as just -- what was your understanding of

3    the purpose of that interaction and reaching out?

4              A.    I don't really remember because I

5    didn't -- I remember making -- or questioning Matt

6    Shafer as to what am I to do with this in his

7    office, because, yeah, I had never really contacted

8    any of these kids.  I believe a parent actually

9    responded back and asked who I actually was and if I

10   was a teacher, after I got to speak to her on the

11   phone.

12             But, yeah, I mean, there's not

13   really -- I mean, outside of just reaching out,

14   right.  Again, I'm not -- I wasn't a counselor, I

15   wasn't -- yeah.

16             Q.    Do you know if students were on

17   virtual learning at the time of December 2020?

18             A.    I believe they -- gosh, I can't

19   remember if they were coming in or not.

20             Q.    Is it possible that at least some of

21   the students were on hybrid?

22             A.    Yeah, I would think either hybrid or

23   virtual.

24             Q.    Do you recall any discussion amongst

25   administration or amongst the school in general

1    about students that just weren't going to check in

2    online and fall behind because they weren't "coming

3    to class."

4            A.    Are you asking me did I receive an

5    e-mail or did I talk to somebody about it?

6            Q.    Do you just have any recollection of

7    whether or not that was something that had been told

8    to you, you observed?

9            A.    Well, I didn't observe it because I

10   wasn't really in contact with any kids, but from

11   this e-mail, it says that kids are failing.

12           Q.    Okay.  Would you agree that at this

13   point, there was a divide and conquer mentality,

14   that students needed to be talked to, and they were

15   just going to find a person from Ryle High School to

16   do that?

17           A.    I feel like they were finding anyone

18   that wasn't a teacher to do it.

19           Q.    Okay.  Why do you think that not

20   being a teacher would be important?

21           A.    Because they weren't teaching any

22   classes, didn't have any responsibility, they didn't

23   have students, or hadn't been used in that capacity.

24           Q.    Okay.  Did you give any kind of

25   pushback to the administration about being asked to

1    perform this task?

2         A.   Matt Shafer and I had met regarding

3    this.  And, again, my question was, what exactly am

4    I supposed to do, because I had not had any

5    interaction -- typically, if a kid was failing

6    prior, I would contact the coach, or if they were in

7    any, you know, issues, I would contact the coach

8    or -- I never interacted with parents typically to

9    contact them about failing students or anything

10   else, unless they had a question about why their kid

11   couldn't play.  But, yeah, I remember talking to

12   Matt and asking him, as well as asking Tony Pastura

13   exactly, I'm coming back from leave, what am I

14   supposed to do with this list.

15        Q.   Okay.  So is it, what am I supposed

16   to do as in give me more instruction, or what am I

17   supposed to do, this isn't my job, I'm not doing it?

18        A.   It was both.  It had both in there.

19        Q.   Okay.  Do you feel it was

20   inappropriate for you to be asked to do this?

21        A.   You say inappropriate how?  Like

22   inappropriate as it's not in my job description or

23   inappropriate -- I'm not understanding the question.

24        Q.   Both, inappropriate for whatever

25   reason.

156

1          A.   I didn't have as much information as

2   I needed to actually just contact these kids.  Where

3   I think assistant principals, as well as, I mean, I

4   guess, the office aides, they had more interaction

5   with most of these kids that were typically failing.

6   I didn't know what I needed to do, right?  Me

7   sending an e-mail stating, hi, I'm Mr. Kirkendall,

8   I'm making sure you aren't failing.  I don't think

9   that's personable and really reasonable for someone

10  who's never spoke to most of these parents.

11          Q.   So it was uncomfortable for you, but

12  not necessarily something that you felt was outside

13  of your job description?

14          A.   I did feel it was outside as well,

15  yeah.

16          Q.   Okay.  Do you think that when we

17  looked at your job descriptions earlier, as both

18  teacher and athletic director, pursuant to those

19  contracts, do you think that this particular

20  assignment fell outside of the job description?

21          A.   Can I go back and look at them?

22          Q.   The job descriptions, I think, are in

23  that pile.

24          A.   Do I think it's outside of performing

25  other duties consistent with the position assigned,

1    I do.

2                Q.    Okay.  Why?

3                A.    Because, again, me being an athletic

4    director, I was contacting coaches.  I was -- again,

5    every once in a while I would contact parents, but

6    never to the complexity of, hey, you're failing.

7    Not typically I would think -- I mean, even me as a

8    parent wouldn't want to hear from somebody that I've

9    never had any interaction with.  Right?  If it was

10    coming outside of my teacher who interacts with my

11    student, it's kind of a weird introduction of, hey,

12    I'm being assigned to your kid because they're

13    failing.

14                Q.    Sure.  But you also had a teaching

15    contract.  Do you think that this falls outside of

16    the scope of what you were expected to do within the

17    teaching contract?

18                A.    In referencing that from one of the

19    final meetings with Matt Shafer, he said everyone is

20    hired in as a teacher, even though that may not be

21    the job title that they're given.  Just because

22    they're hired in as a teacher and never used as a

23    teacher -- again, I was not putting anything up on a

24    board.  I was not acting in the capacity as a

25    teacher.  Just because you're hired in as a teacher

1    doesn't mean that you're fulfilling those duties.

2            Q.   So let me ask you more of a question

3    about your opinion then.  What is the point of

4    having an athletic director be required to have a

5    teaching certificate if he or she has no business

6    interacting with students in that kind of capacity?

7            Why do you think it's important to

8    have -- okay, let me ask actually a more fundamental

9    question.  As a part of the job description and job

10   eligibility for athletic director, you have to

11   possess a Kentucky teaching certificate, correct?

12           A.   To be the athletic director?

13           Q.   Yes.

14           A.   I don't believe so.

15           Q.   Okay.  Let's take a look.  When you

16   applied for Boone County Schools, that very first

17   exhibit we looked at, one of the requirements, you

18   have to have a teaching certificate, correct?

19           A.   Let me go back.  On their paperwork

20   it says that, but I know of people who had not had

21   teaching certificates and still applied.  They had

22   the -- what is it -- the minimum threshold of a 2.4

23   GPA as well as a -- I guess the 60 hours or the

24   minimum associate's degree, but weren't acting in

25   the capacity of a teacher.  And that's within the

1    state of Kentucky, I believe.

2                Again, from what my understanding

3    was, is that, hey, you were hired in as a teacher,

4    but you do your duties as athletic director because

5    that is the title that you have.

6         Q.    But I'm not asking about other school

7    districts.  I'm asking about Boone County Schools.

8         A.    Then I can't answer the question of

9    what everyone else has in that, I only know about me

10   specifically.  I was never acting in the capacity of

11   a teacher, even though I was hired in as a teacher.

12        Q.    I don't think you're understanding

13   what specifically I'm asking.  So you're looking at

14   the athletic director job description, the very

15   first requirement for qualification, holds a valid

16   Kentucky teaching certificate.

17        A.    Uh-huh.

18        Q.    Your testimony -- and correct me if

19   I'm misunderstanding -- but your testimony is that

20   being hired as the athletic director, you have no

21   business interacting with these students in this

22   way?

23        A.    That's not what I said.

24        Q.    Okay.  So then what would be an

25   example of a duty that is not specifically related

1    to athletics that you think would be appropriate

2    under your contract and under this athletic director

3    title?

4              A.    Are you asking me just to come up

5    with something?

6              Q.    Sure.

7              A.    So you're asking me what is something

8    that I think would be -- I'm sorry.  Ask me one more

9    time.

10             Q.    Okay.  Let's break it down a little

11   better because I want to make sure that we're on the

12   same page here.

13             So you testified that asking you to

14   reach out to students and checking in on them, which

15   is what you were asked to do by Principal Dusing,

16   you felt that that was outside of your job

17   description, correct?

18             A.    Correct.

19             Q.    Okay.  So I want to understand what

20   you believe the bounds of your job description to

21   be.  Because we looked earlier at the athletic

22   director job description and it says that you are

23   required to perform other duties consistent with the

24   position signed as may be requested by the

25   supervisor.  So that's a pretty broad --

1          A.    Broad term, umbrella.

2          Q.    Yeah.  So what do you think is the

3    bounds of that?  Is it if it doesn't touch

4    athletics, it's not something you're required to do?

5    I'm trying to get a feeling for what you believed

6    your job specifically to entail.

7          A.    My job was to cover athletics.

8    That's what I was hired in as.

9          Q.    But you were also hired in with a

10   teaching contract, correct?

11         A.    And going back to it, when I was

12   hired in, it stated you're hired in on a teaching

13   contract, you are performing duties, however, as an

14   athletic director.  Those two never were

15   intertwined.  It was never, hey, on this day to day

16   you're going to be a teacher, it never had anything

17   to do with that.

18              It had, Mr. Kirkendall, you're hired

19   in as athletic director.  It was reiterated by

20   Mr. Shafer, he stated, even as a principal I'm hired

21   in as a teacher, but my duties are I am the

22   principal.  And I believe that would be true for all

23   assistants and everyone down the line as well.

24         Q.    Okay.  So during the 2019-'20 year,

25   when you were asked to supervise the ISS class and

1    to go look at study skills, do you believe that that

2    task was specifically something enumerated in this

3    athletic director job description?

4             A.   Again, I was not acting in the

5    capacity of a teacher, though.

6             Q.   That's not what I asked.

7             A.   Sorry.

8             Q.   I asked, do you think that that falls

9    squarely in your role as athletic director?

10             A.   I don't know.

11             Q.   So let's talk about that first month

12    back.

13             A.   Are you talking about December or are

14    you talking about January?

15             Q.   December.  I apologize.

16                  What's your work-life balance look

17    like?  Is your wife still working as a traveling

18    nurse?  Is she still an essential worker?  How are

19    things going, I guess, on a work-life balance

20    perspective?

21             A.   To correct, my wife was not a travel

22    nurse until we actually needed to sell our house.

23             Q.   I apologize.

24             A.   My work-life balance, it had opened

25    up a little bit, but, I mean, they're still dealing

1    with school being open only some days and certain

2    days, some certain days.

3           Q.   So were you home some days with your

4    kids because their school wasn't open for whatever

5    reason?

6           A.   I can't remember what happened.  Are

7    you talking about in January or December?

8           Q.   December.

9           A.   Their school was out, and every once

10   in a while I was home.

11          Q.   Okay.  So is that what then prompted

12   the discussion about the work from home and giving

13   you the ability to do so from your home?

14          A.   From coming back?

15          Q.   Yes.

16          A.   Correct.

17          Q.   Okay.  So during December, there were

18   days that you were working at home for child care

19   issues or whatever; is that accurate?

20          A.   Yes.  Because I don't believe --

21   yeah, I want to say we were out of -- the school was

22   actually not open, so yeah.

23          Q.   And by "the school," you mean your

24   kids' schools?

25          A.   No, I think Boone County, I believe

1    kids were at home then.  I know we talked about was

2    it hybrid or whatever else, but there were no

3    athletic contests going on during that time so,

4    yeah, at home.

5               Q.   Okay.  Were athletics entirely shut

6    down during the month of December?

7               A.   To my understanding, I believe so.

8    I'd have to go back and look at the calendar, what

9    happened.

10              Q.   Okay.  So then what were you doing in

11   the day to day with Boone County Schools?

12              A.   It varied, whether it be meetings

13   with our -- we would still have our AD meetings.

14   We'd have meetings with Mr. Turner about what's

15   going to happen when we do go back to sports, and

16   all the ADs were involved.  I can't remember

17   everything, but meetings, e-mails, getting

18   information out.

19              Q.   Okay.  About how much time each day

20   were you spending on athletic director duties with

21   those e-mails and meetings?

22              A.   It varied.  I don't know.

23              Q.   Varied from what to what?

24              A.   I mean, if we were getting -- I mean,

25   if it was a meeting from athletic directors it was,

165

1   you know, an hour or two.  And then going to e-mails

2   and setting up logistics with our, I guess, trainer,

3   athletic trainer, so that could be, I mean, a whole

4   day piece, or multiple days.  It could be setting up

5   the logistics for games coming in, where parents

6   weren't allowed to sit, and going to the gym and

7   marking off bleachers, so it just varied.  It wasn't

8   anything -- I mean, I can't give you an exact number

9   on that.

10         Q.   What kind of things were you going in

11   and marking off bleachers for parents if there were

12   no athletics?

13         A.   For coming back in January.

14         Q.   Okay.  So I'm talking specifically

15   about the month of December.

16         A.   I know, but we found out the

17   information in December regarding school being open

18   and contests being held in January.

19         Q.   Okay.  So those are logistics

20   meetings in anticipation of those activities in the

21   future?

22         A.   Yes.

23         Q.   Okay.  So you can't quantify about

24   how many hours per day you were spending on those

25   things?

1          A.    No.

2          Q.    Okay.  So about how many hours per

3    day were you spending on the assignment of reaching

4    out to students?

5          A.    I mean, it varied.  I checked the

6    list, and I also had another list of students that I

7    was checking in with, I was supposed to be watching

8    over.  So between e-mailing and whether calling or

9    reaching out to parents.  And a lot of parents

10   weren't answering, or I'd call a different number,

11   so it would vary.

12         Q.    Were you still, in those

13   November 30/December 1 e-mail exchanges with

14   Mr. Shafer, and he said that you would also need to

15   supervise a certain amount of the students that were

16   on Edgenuity; do you recall that?  You can look if

17   you need, it's Exhibit 19.

18         A.    What was the question?

19         Q.    On Page 886.

20         A.    Yeah, but I was trying to remember

21   what your question was.

22         Q.    Sure.  So where Mr. Shafer instructs

23   that, you know, you'll need to be in contact with

24   students who are on Edgenuity, you don't need to

25   prepare a curriculum, but you just need to be in

1    communication and track progress, were you

2    completing those tasks during December as well?

3            A.    I don't believe I had access to

4    Edgenuity at the time when he sent this.  I know he

5    had to get me contact.  But, again, those are two

6    separate lists.  So Cody Ryan had a list of

7    students, and then I had 41-plus students in the

8    Edgenuity box, or vice versa.  But, yeah, I did

9    reach out to those kids and call them and, yeah,

10   that's where I got -- I believe it was in the

11   e-mails, of who you are and who are you and so on

12   and so forth.

13           Q.    So the second list that you've been

14   referencing, that's in response to this other

15   Edgenuity component?

16           A.    Yeah.  I had more kids as well.

17           Q.    Okay.  All right.  So how were things

18   going during December of 2020?  I can ask a more

19   pointed question.

20               How did you feel your job performance

21   was during December 2020?

22           A.    I felt that if I had the information,

23   it was going well.  If I didn't, I don't think it

24   was going as well.

25           Q.    Okay.  What do you mean, if you

1    didn't have information, it wasn't going as well?

2         A.    Because I was coming back from leave

3    and I know Mr. Shafer had sent an e-mail regarding,

4    you know -- he had something, I can't remember, I'm

5    pretty sure you have it.  But I had told him in

6    person, as well as on the phone, if I -- he had made

7    a statement about, hey, you're not contacting

8    certain people on certain times.  If I don't have

9    the information to contact them, I can't do it.  I

10   didn't even have access back to all of my pieces of

11   information that I had sent out, as far as payments,

12   and so on and so forth.  So I felt overall it was

13   going well, but I think there were things that I was

14   being -- that were being held against me that I had

15   no control over.

16        Q.    What do you mean, you didn't have

17   access to previous things?

18        A.    So I had sent out my passwords and so

19   on and so forth.

20        Q.    Sure.

21        A.    To get those back, they had changed

22   them, I had to now get the access back and I didn't

23   always have access.  I know we had like a new

24   company come in that was going to review games, I

25   was not in that meeting, my job was to contact this

1    person and figure out exactly what we're going to do

2    with the games and so on and so forth, and setting

3    things up, so --

4            Q.   So you weren't in that meeting

5    because you were on leave, right?

6            A.   Correct.

7            Q.   Are you upset that you weren't a part

8    of the meeting?

9            A.   I wouldn't say upset.  I didn't have

10   the information from the meeting.

11           Q.   When were you given the information

12   then?

13           A.   I had to call this person and get

14   information, or some of the information.  I guess, I

15   don't know if he did like a live whatever with the

16   other schools, and so on and so forth, but I was not

17   there.  I got it eventually though.

18           Q.   So when you're saying that it was

19   difficult and things weren't going well when you

20   weren't provided information, are you suggesting

21   that the district was actively withholding

22   information from you or it was just a difficult

23   transition back?

24           A.   I think it's 50/50.  I think on

25   certain things that I wasn't having information on

1    and then being questioned about, I didn't have

2    information, and that was typically from Mr. Shafer.

3    But then I would think, I mean, being off three

4    months and coming back would be -- I would assume

5    would be difficult for most people.

6              Q.   So with the things that you're saying

7    were being held against you, what do you mean by

8    that?

9              A.   Like you want examples; is that what

10   you're saying?

11             Q.   Yes.

12             A.   Yeah.  So, for instance, right, there

13   was a question of, hey, the coaches are saying that

14   you aren't communicating effectively, right?  Prior

15   to this I had never had any issues with

16   communicating.  I never had a coach complain, from

17   Matt Turner to Matt Shafer.

18                  Coming back it was, I don't have the

19   information of what exactly I'm supposed to say

20   outside of, hey, you need to send your e-mail to the

21   coaches saying exactly what you're doing.  Even for

22   the students.  I don't have the information to give

23   them of whether it be their grades or so on and so

24   forth, and typically sending a, you know,

25   blind-copied e-mail to these people, it's generally

1    pretty basic, but then sending follow-up e-mails.

2    But if I don't have the information, I can't do my

3    job successfully.  I mean, those are just two

4    examples.

5                   But, I mean, the pay then came up

6    with the officials later.  I had given all of that

7    information about paying, I didn't have access to

8    that account anymore, so when I did put my old

9    e-mail and sign-in in, I was unable to actually

10   access that.  I had to go and access it.  But it

11   came up of, hey, you're not paying the officials.

12   If I don't have access to it, I can't do it.  Right?

13   Those are three examples, but there are more.

14        Q.   Okay.  So, for example, with the pay

15   issue, you didn't have access to it; how long did it

16   take after you said, hey, I don't have access to

17   this, for someone to give it to you?

18        A.   That was within my last week of

19   working at Boone County, so January, because we

20   didn't have games.  It was, I mean, for the games

21   that had happened prior as well.  So I want to

22   says -- well, we had -- there was still soccer going

23   on; there was still football going on.

24                   Once we hit December, practices were

25   either being canceled or shuffled around, so on and

1   so forth, but yeah.  It was used as a piece in

2   January of you're not contacting these people or

3   getting them paid.  Or they're coming back and

4   complaining that they're not being paid.

5           Q.   Sure.  So when you came from leave in

6   early December, did you sit down and have a

7   conversation with Mr. Shafer saying, hey, these are

8   the accounts I have, I need you to give me access

9   back to these?

10          A.   No.

11          Q.   Okay.  Then what active steps did you

12  take to make sure that you had the information that

13  you had missed to be able to do your job

14  effectively?

15          A.   Are you regarding the payment piece

16  or are you regarding other things as well?

17          Q.   Payment piece and anything.  What

18  proactive steps did you take to make sure you were

19  able to do your job when you returned from leave?

20          A.   Okay.  From my understanding, it is

21  not on me to go and funnel through the information

22  that I missed while I was out on leave, right?  At

23  least, again, I don't know if that's true or not,

24  but at least at the time, from FMLA, and reading all

25  this fun stuff of your job is supposed to be done.

173

1    And then I thought it was the transition of, okay,

2    you get all your stuff back on this day, just like I

3    had given them my stuff on, was it 9/21, or around

4    that time, about that time, from all these payment

5    accounts.

6              I did go back and look at, you know,

7    what previous meetings that I could look at from the

8    KHSAA, which is the governing body for sports.  I

9    didn't look at much else because I didn't have

10   access to much else.

11             Q.   Did you ask for access to anything

12   else?

13             A.   Once it did come up, I stated that I

14   needed the information for my account, but that

15   was -- yeah, again, that was around January, because

16   Tammy Hahn, who was the financial person, she was

17   the one handling it up until -- I believe she sent

18   me an e-mail stating, do you want these accounts

19   back since you're here and actually, you know,

20   around, and I said, yes, unless you want to keep

21   making the payments.

22             Q.   So you didn't take any active steps

23   to recoup and re-get control over those previous job

24   duties that you had; you waited for people to

25   contact you and say, hey, please do your job?

1    A.    I'm not understanding.

2    Q.    Okay.  Let me make sure I'm

3  understanding this correctly.  So with respect to

4  the payments, because no one specifically handed

5  back the account to you the minute that you started,

6  you didn't take it upon yourself to go actively get

7  control of those accounts to make those payments

8  again?

9    A.    Go back and get the accounts back

10  from the people that I gave the access to?

11    Q.    Right.

12    A.    I can't remember the conversation, if

13  Mr. Shafer and I actually did have the conversation

14  in December about getting the access back.

15    Q.    Well, you just told me that you

16  didn't do anything until someone reached out to you

17  in January --

18    A.    That was the payments, but there were

19  other accounts as well.  There were setting up

20  games.  He actually references setting up games and

21  so on and so forth in his e-mail, so --

22    Q.    So let's talk specifically then with

23  this pay issue.  Is that a part of your job

24  description as athletic director, to make these

25  payments?

1          A.    After games are played, yes.

2          Q.    So then in December, when you came

3     back, what steps did you do to make sure that you

4     were fulfilling that role?

5          A.    Again, that issue doesn't come back

6     up until January.  I don't believe we had any games

7     in December at Ryle, and I can't remember if we did,

8     I can go and look at schedules.  But that issue

9     didn't come -- that was one of the things he had

10    highlighted in our meeting, him and I, between

11    you're making payments, you're doing such and such.

12    That does not come back up until, hey, the officials

13    are complaining that you aren't making payments.

14    Right?  Like, there's a whole host of other things

15    that I need to get up to speed on if we don't have

16    games that are happening then.

17         Q.    Okay.  So I asked you what kinds of

18    things -- what proactive steps that you took when

19    you came back from leave to get caught up.  Your

20    response to me was that you didn't feel like you

21    needed to go back and kind of see what had been done

22    in your absence.  So what active steps were you

23    taking to catch up and make sure that you were able

24    to fulfill your role as athletic director when you

25    came back as of December 4?

1    A.    And maybe I'm hearing this question

2    in a multitude of ways.  Are you saying prior to my

3    December 4th date did I look into the work that I

4    was going to be doing going forward?

5    Q.    No, that's not what I'm asking.

6    A.    Okay.  So then you're saying, from

7    December 4th, after that date did I -- I would talk

8    to Mr. Shafer.  I would talk and get e-mails from

9    people.  I would actually talk to the coaches.  I

10   would have meetings with the coaches, from the

11   trainers as well.  Like, I would get information to

12   do my job.  But that's -- I don't know if I'm even,

13   again, answering the question.

14   Q.    Okay.  So then you're having

15   conversations with people to get information to

16   catch back up; is that what you're saying?

17   A.    Correct.

18   Q.    So what information that you

19   mentioned earlier, that you said you were not given

20   and was held against you, what information were you

21   not given but you asked for?

22   A.    Are you talking about when I was

23   terminated?

24   Q.    No, when you're coming back to work

25   as of December 4th.

1              A.   I was referencing when my termination

2    happened.

3              Q.   Okay.  So that's, I think, where the

4    disconnect is here then.

5                   So we're talking right now

6    specifically as of December 4th in December of 2020.

7    When you came back, I asked you how did you feel

8    that went, and you said when you were given

9    information, it was good, but when you weren't, it

10   wasn't good.  Do you remember that conversation that

11   we had?

12             A.   Correct.

13             Q.   Okay.  I asked you then, what

14   information were you not given and how was that held

15   against you?

16             A.   Okay.  You want me to answer?

17             Q.   In December of 2020, yes.

18             A.   December, right, so an incident was,

19   hey, a coach was hired while I was out on leave,

20   right.  Typically, I'm the athletic director, I'm

21   supposed to be in the meeting, didn't happen.  I

22   didn't find out until the coach actually sent me an

23   e-mail and said, hey, I'm such and such, I'm

24   supposed to be contacting you.

25                   I drew that as a question of, if I'm

1    the athletic director and acting as the athletic

2    director, what happened?

3            Q.    Hold on.  I want to stop you right

4    there.  So you're upset that you weren't contacted

5    while you were on leave and they hired a new coach?

6            A.    I wouldn't say upset.  I was, again,

7    trying to get information as to what had happened.

8    When someone contacts you out of the blue and you

9    have no information as to what happened, right?  I

10   received an e-mail from this person, I didn't know

11   what was going on.  I wasn't upset about not being

12   contacted.  I was trying to figure out what exactly

13   is my job if I'm the athletic director.

14           Q.    Right.  I guess here's my confusion

15   with you referencing this:  So this person was hired

16   by the acting AD at the time, I assume, so Matt

17   Shafer and/or Mr. Erickson?

18           A.    I don't want to say acting, he was

19   just filling in for me.

20           Q.    Right.  So acting AD would mean

21   filling in while you're on leave.

22           A.    Okay.

23           Q.    So the purposes of this conversation,

24   you can understand that is what I'm saying by acting

25   AD?

1           A.    Right.  Go on.

2           Q.    So this particular coach -- what was

3    the coach's name?

4           A.    Jon Erickson.

5           Q.    The coach?

6           A.    The coach that got hired?

7           Q.    Yes.

8           A.    I don't know if it was Brian Runyon

9    or Eric Runyon.

10          Q.    Runyon.  Okay.  So Mr. Runyon was

11   hired while you were on leave, correct?

12          A.    Uh-huh.

13          Q.    So he contacts you once you've

14   returned?

15          A.    Around the time I returned.

16          Q.    Okay.  And he said, hey, I'm the

17   coach now, and then I assume that he just has

18   logistics to discuss with you?

19          A.    He said he -- I believe he was

20   introducing himself.  I was hired, you know, while

21   you were out, so on and so forth.  And the next

22   follow-up step was me talking to Matt Shafer,

23   e-mailing Matt Shafer.

24          Q.    So what do you find inappropriate

25   about that process of him being hired and then

1    reaching out to you to introduce himself when you've

2    returned?

3         A.    About hiring a coach when you're the

4    athletic director?

5         Q.    Right.

6         A.    I believe it states that if I'm the

7    athletic director, I'm coming back to this job, so

8    if I do not get that information, seems a little, I

9    guess, misleading for the job.

10        Q.    Sure.  So I want to make sure you

11   really understand my question, though.  Because he

12   was hired while you were on leave, and a very large

13   portion of your claims here against the school

14   district is that they contacted you while you were

15   on leave and you felt that was inappropriate.  So

16   what is the problem for the school district hiring

17   this individual and not including you while you were

18   on leave?

19        A.    So can I break that down?

20        Q.    Sure.

21        A.    If you're saying that they were

22   contacting me anyway and they don't contact me about

23   that, I feel like that's withholding information

24   from the school district.  If you're saying that

25   they're contacting me -- they're asking me to do

1    work anyway, but they don't contact me about a

2    person getting hired, I feel like that -- at least

3    from my understanding, my job is to be on the hiring

4    portion of it, right.  And I believe at the time --

5    there was a coach that wasn't even hired for girls'

6    softball potentially, or tennis, that that sport was

7    actually coming up next.

8                    When we then go to, okay, this person

9    is hired in your absence, I'm going back to you and

10   saying, I technically don't have -- I wasn't upset

11   about it, but what I'm hearing, okay, this person --

12   again, this person contacted me out of the blue

13   saying, hey, I'm the new person.  I then asked

14   Mr. Shafer, what is going on.  I'm out and who was

15   on the hiring team, what happened.  Because I had

16   just hired, I believe it was the baseball coach,

17   prior in the fall.  That's where I'm saying I didn't

18   have the information.

19                    But to state that, okay, I would

20   think you're contacting me anyway, why couldn't you

21   have just gone and given me the information about

22   this person.  I don't use the word that I was upset.

23   I was not upset.  I didn't understand what was going

24   on.

25                    If those duties are taking away from

1    me, and that is my job of, okay, you're supposed to

2    be hiring -- because they could have easily said,

3    hey, we want this person to be the baseball coach

4    and I not be part of the hiring.  Hey, we want this

5    coach to be the softball coach, you need to

6    interview them.  I could have not been a part of the

7    hiring.  But typically I was because, again, that

8    was the capacity -- those coaches report to me.

9                 This is a temporary position -- or

10   the person who was -- sorry -- Jon Erickson taking

11   over for me, that was a temporary position.

12   Typically I don't believe you would make a move --

13   and this is me speaking of the generality of I would

14   assume that if someone is being hired and they're

15   supposed to be reporting to somebody, you usually

16   include that person in the reporting, unless there's

17   something else that's going on.

18                 Q.   But you were on leave.  They were not

19   supposed to be contacting you.

20                 A.   But they still were, though.

21                 Q.   So am I correctly understanding that

22   you were upset or that you felt -- I'm sorry -- you

23   felt it inappropriate that they were contacting you

24   about whatever it is that they were contacting you

25   before, logistics of tournaments and other things,

1    but while that was inappropriate, they should have

2    contacted you about this?

3         A.    I would say that I don't understand

4    as to why that stopped then.  Right?  Like, if

5    you're already doing it, and then you're just

6    deciding, okay -- and, again, I had met and spoke

7    with Mr. Shafer a few times prior to me being

8    contacted by this coach, and we're talking about

9    information not being told to me, we had spoken a

10   few times, whether through e-mail or in person or

11   him coming to my office or on the phone.

12              Nothing was mentioned until this

13   coach came up.  Right?  Like so, again, me not

14   having that information -- how exactly do I -- okay,

15   I don't -- you don't even know who I am at all, and

16   I don't even think we even met, to be completely --

17   I may have met him in passing.  Right?  That's what

18   I'm saying.  They had already been contacting me,

19   what made this situation different?

20        Q.    So earlier in your testimony, when we

21   were talking about that, I believe, mid-October,

22   October 15 e-mail that you sent to Eric Ball?

23        A.    Was that in regards to the pay?

24        Q.    In regards to the pay.  And he said,

25   you know, you shouldn't feel obligated to respond to

184

1    any of these texts or e-mails, and your testimony

2    was that you think it might have slowed down after

3    that, that people were at least leaving you a little

4    bit more alone after that time.  Do you know when

5    Mr. Runyon was hired?

6            A.   Let's see, I believe I turned that

7    e-mail over as to when he was hired.  Sorry.

8            Q.   If you're looking for an e-mail about

9    Mr. Runyon, it's not in there.

10           A.   Okay.  So he contacted me I know --

11   it was around December, the beginning of December.

12   It was after, I guess -- yeah, around that time,

13   December.

14           Q.   Sure.  So do you know when he was

15   hired by Mr. Shafer or Mr. Erickson?

16           A.   It would have been around that time.

17           Q.   Around what time?

18           A.   I mean, November, December.

19           Q.   Okay.  So earlier you testified that

20   a large part of the, you know, you were working and

21   being contacted, was before October 15th.  If

22   Mr. Runyon was hired after that time, didn't you

23   testify earlier that they were maybe not entirely,

24   but largely leaving you alone by that point?

25           A.   One second.  I want to go back to

1   when the exact dates were that I sent.  And I stated

2   that coaches were not contacting me.  Mr. Shafer

3   was, I believe.  And if I was wrong -- let's see.

4        Q.   Here, we can actually look at a much

5   easier way to look at this.  So if Mr. Runyon was

6   hired in November or December, around that time, on

7   Exhibit 21, Page 272, you have designated the dates,

8   the last date you say you should be compensated for

9   is October 29th.

10       A.   Okay.  That was after the harassment

11  e-mail sent by Mr. Ball, as well as, yeah, the

12  e-mails that I sent to Mr. Shafer regarding it.

13       Q.   So if Mr. Runyon was hired in the

14  period which the district was not contacting you, as

15  you said was appropriate for them not to do, again,

16  I'm going to ask, why do you think it was

17  inappropriate that they left you out of that hiring

18  process?

19       A.   Why do I think, again, that I was not

20  contacted about a person being -- even an e-mail

21  saying, okay, we're going through these soccer

22  position hires, right, was not even to me.  Finding

23  out from the person that was hired when, again,

24  you're the person that he's supposed to report to,

25  he or she, is supposed to report to, I'm in the

1    capacity as an athletic director, I'm not

2    understanding how that is hard to understand.  I'm

3    not saying that you wouldn't, but it just seems

4    like, okay, if I'm the person who is over these

5    coaches, right, I'm the person that's in these

6    hiring meetings, but you don't include that person,

7    I mean, to me, it seems like they took a duty away

8    from me that maybe --

9           Q.   So earlier I asked you if you were

10   asked -- or a large part of this lawsuit that you

11   have claimed against the Boone County Schools is

12   that you should not have been contacted while you

13   were on leave.  You were not contacted about

14   Mr. Runyon and you're saying that that was

15   inappropriate.

16           So earlier when I asked you why was

17   that inappropriate, you said, well, they were

18   contacting me anyway, so why not let me know about

19   that.  But we just looked at the dates and the

20   district was not contacting you anymore at that

21   time.  So, again, I'll ask you:  Why did you feel it

22   was inappropriate, because you were on leave, that

23   the district did not contact you about Mr. Runyon's

24   hiring as a coach?

25           A.   I would say that I don't know if

1    inappropriate is the right word.  What I am saying

2    is -- you said I was upset about this, I'm not

3    upset.  The thing is that when someone is being

4    hired, you would think -- and, again, I did say that

5    I was going back and checking e-mails and speaking

6    to people and getting information about my job when

7    I was not there.

8                     I would think that that would be a

9    big piece to say, this guy was hired while you were

10   out.  I would think that anyone that would be in the

11   position of, okay, a teacher was hired while you

12   were out, a janitor was hired.  A person is walking

13   around the building and you have no clue who that

14   is, I would think that there would be some

15   information other than the person -- and I haven't

16   worked in too many other capacities, but I would

17   think that someone would say, this is your duty that

18   you normally would have, this is information from

19   that duty or from that position.

20        Q.    So you said that Mr. Runyon reached

21   out to you, said, hi, I was hired as a coach, I want

22   to introduce myself, right, that's how you first

23   learned about this?

24        A.    Yeah.

25        Q.    Okay.  Are you aware of whether or

1    not Mr. Shafer told Mr. Runyon to do that?

2              A.   Did he tell me to contact --

3              Q.   No, told Mr. Runyon to contact you

4    when you returned from leave?

5              A.   I don't know.

6              Q.   You don't know.  So that notification

7    that you feel like you should have been given, is it

8    fair that that notification from Mr. Runyon could

9    have served that purpose?

10             A.   That the person being hired is

11   introducing themself to the person that they're

12   working under?

13             Q.   Yes.

14             A.   And you're asking me do I think that

15   could have served as the purpose of the

16   communication?

17             Q.   Let me ask a little bit better.

18             A.   Okay.

19             Q.   So I asked you what was inappropriate

20   about this process, and once we get through the

21   communication piece of you being on leave, you then

22   stated something to the effect of -- and I'm not

23   trying to put words in your mouth, so if I

24   misunderstood, please correct me.  You said

25   something to the effect of, well, you know, they

1   should have let him know -- or, I'm sorry,

2   Mr. Shafer should have let you know when you

3   returned from leave; is that a fair representation

4   of what you say was inappropriate?

5          A.   Again, I think you keep using the

6   word inappropriate.  I'm not necessarily stating

7   that it was inappropriate.  I think when I'm saying

8   that I'm not having the information to do my job

9   successfully, this being just a small piece of --

10  your typical duty was to be over these coaches, to

11  be hire/rehire into that whole process.  You're now

12  taken out of that process.  Whether you're on leave

13  or not, that decision was made.  You have no

14  information that would fundamentally let you do your

15  job successfully, or me do that job successfully.

16  And then you're contacted by the person that was out

17  -- or the person that was hired in to do the job.

18          I don't understand if it's him or

19  not, I didn't have the information to do that.

20  Right?  So then I have to go and -- I don't know if

21  I have the e-mail from when I spoke with Mr. Shafer,

22  or e-mailed him back.  I just got this e-mail, I

23  don't even know what's going on, can I please be

24  informed, and that's the gist of that e-mail.

25          Q.   Okay.  And so then what was

1    Mr. Shafer's response?

2            A.   I don't remember his response.  I

3    don't know if you have it or not.

4            Q.   I'm sure I do somewhere but there are

5    2000 pages of documents; I cannot pull that right

6    now.

7            A.   Yeah, a lot of information.

8            Q.   All right.  So let's just move past

9    that for now.

10            So I'm going to hand to you what's

11    been marked as Exhibit 23.

12            (WHEREUPON, Defendant's Exhibit No.

13    23 was marked for identification.)

14            Q.   Do you recognize this document?

15            A.   Yes.  Yes, I do.

16            Q.   Okay.  Tell me about this exchange.

17    What happened and what was the result of it?

18            A.   Let's see.  So this was Mr. Shafer

19    changing what my duties would be in the school.  He

20    highlights the athletic director duties as well.

21    But makes sure to highlight the teaching duties with

22    the influx of failing seniors.  Speaking of the

23    study skills class.  Speaking of, obviously, the

24    athletic director and the schedule.  Yeah, and about

25    the communication piece.  Making sure that we were

1    on the same page.

2           Q.    Okay.  So let's look at that initial

3    e-mail from December 18th from Mr. Shafer.

4           A.    What part are we looking at?

5           Q.    So at the bottom of Page 954, we're

6    going to start at the beginning and work our way

7    through.

8           A.    Okay.

9           Q.    So, "Wanted to relay my expectations

10   when we return to school on January 4th."  So this

11   was sent on Friday, December 19th.  Would it sound

12   right that this was right before winter break?

13          A.    Yeah.  Yes, it does.

14          Q.    Okay.  So it says Friday, so I assume

15   that this was the last day before winter break, or

16   maybe it was the first day, I really don't know.

17          A.    Uh-huh.

18          Q.    So you're about to go on winter

19   break, and Mr. Shafer reaches out to you about

20   what's going to happen next semester on the return.

21          A.    Uh-huh.

22          Q.    So Teaching Duties, "Due to an influx

23   of failing seniors, I'll need you to teach three

24   study skills classes which will run fourth through

25   fifth and sixth period.  The main duty of this class

1    is to help students with organization and keep them

2    on track in Edgenuity."

3                    So Edgenuity is that same program

4    that we talked about earlier, right?

5            A.    Uh-huh.

6            Q.    So it's not anything curriculum-based

7    that you are responsible for actively developing

8    curriculum and teaching, right?

9            A.    Again, I don't know.  I never was

10   trained on Edgenuity and still don't know much about

11   it, but that's the system that the students have

12   their grades in.

13           Q.    Okay.  So, "The main duty of this

14   class is to help students with organization and

15   keeping them on track."

16                   Earlier we talked about your duties

17   for the December -- or I'm sorry -- through the 2019

18   through '20 school year where you had the ISS, a

19   study skills class, and then also that class from

20   the beginning of the 2020 year, where you had to

21   monitor children on Edgenuity.  How is this

22   different than what you were doing before?

23           A.    So bringing that back down, I never

24   had -- again, even coming back, I didn't have access

25   to Edgenuity.

1        Q.    Right.

2        A.    I didn't know anything about

3    Edgenuity.  And I believe I referenced when I spoke

4    to Mr. Shafer, I'm not responsible for children that

5    are under my name of me helping them and I have no

6    clue what I'm supposed to do in this classroom.

7    Right?

8              If it's different -- in ISS, I had

9    never, again, interacted with the students.  I

10   didn't e-mail the students.  I didn't e-mail their

11   parents.  I didn't speak with them out in --

12   typically, unless they're just checking in, and

13   taking roll for them coming in the classroom.

14             As far as this -- you keep saying the

15   study skills class.  I understood it as it was just

16   a class for -- I mean, I guess if you want to call

17   it study hall or whatever, study skills.  But,

18   again, typically I was checking IDs.  I never

19   interacted with them.

20             This is actually saying, you now have

21   a hands-on approach of helping these kids get back

22   on track, but I had not been in that capacity

23   before.  I had never been used as a teacher and I

24   wanted -- and I didn't really understand what was

25   going on as to why I was needed to be in this role.

194

1              It was changing what I was, again,

2    normally doing the years before, going back to the

3    fact that now I'm a teacher in the system and hired

4    as a teacher, that this has to change.

5              So was it different, me having a

6    hands-on role and actually speaking to these

7    students and making sure they're on task, I think

8    that is a little different than me sitting at a

9    computer waiting for 45 minutes to come up, or me

10   standing in a hallway making sure students don't

11   walk down the hallway and disrupt behavior.

12        Q.   So am I correct in understanding that

13   you believe that a study skills class would be a

14   hands-on teaching experience?

15        A.   Are you saying study skills and

16   Edgenuity are the same; is that what you're saying?

17        Q.   Well, this says, "I'll need you to be

18   the teacher for three study skills classes.  The

19   main duty of this class is to help students'

20   organization and keeping them on track in

21   Edgenuity."

22        A.   And your question was, do I feel that

23   this was more hands-on?

24        Q.   No, let me ask a better question.

25   What did you feel your role with Edgenuity would

1    have been?  And by that I mean, are you developing

2    curriculum and actually providing instruction, or

3    are you supervising students to make sure they click

4    the appropriate boxes through this curriculum

5    program?

6              A.   Again, not knowing what Edgenuity was

7    at the time and, again, still not knowing what it

8    is, I believed it was more hands-on than just as

9    Mr. McCartor said during my last meeting, just

10   turning on a computer and making sure they're in

11   front of it.

12             Q.   Okay.  Do you now know that Edgenuity

13   program just to be turning on the computer and

14   making sure a student is sitting in front of it?

15             A.   Do I now know that it is?

16             Q.   Yes.

17             A.   That was the terminology used.  I

18   actually ended up calling Edgenuity and figuring out

19   that typically they do have a training component.

20   So, no, I was not trained on it, but I would assume

21   that, yes, it is just as simple as doing

22   something -- yeah.

23             Q.   Okay.  So you said that you were

24   never trained on Edgenuity.

25             A.   Correct.

1          Q.   So this e-mail went out December 18,

2     when you were instructed that you were going to be

3     administering a study skills class.

4          A.   Uh-huh.

5          Q.   And then by the time that you came

6     back -- and we'll get to this in a little bit -- but

7     isn't it fair that you refused to teach the class,

8     so training probably would have not been appropriate

9     since you weren't interested in teaching it anyway?

10         A.   I don't want to say I refused the

11    class.  I brought up the fact that coming back from

12    FMLA, I didn't believe that my job duties needed to

13    change or were supposed to change.

14              I don't want to say refusal, but from

15    my understanding, I was allowed to actually bring

16    that up and state that if there is a change, we

17    needed to discuss it.

18         Q.   Okay.  Athletic Director Duties,

19    which is the next point of this, the number one

20    goal, taking a load off of coaches.  Set up, tear

21    down, and running the schedule.  And then other AD

22    duties as listed in the job description.

23              Was there anything with this

24    particular section that you took issue with or felt

25    was not within your job description?

1          A.   I don't want to say not within the
2    job description, but how Ryle had ran previously
3    with the previous athletic directors, other than
4    myself, we didn't really have hands-on in setup,
5    right?  The janitors were not under my box of people
6    to speak with, but that was a "you're the principal,
7    like, you need to speak with them," sort of thing,
8    in my head.
9              So when we talked about setup, he had
10   made mention of Matt -- and this was in, I believe,
11   a phone call -- no, it was in his office -- you need
12   to make sure you're the one breaking down.  It's me
13   versus, I think, what, potentially on the team, 20,
14   30 kids, right?  And, again, they had done this
15   prior to me even being there.  And my statement back
16   to him was -- and this was especially about not
17   having enough information -- that's typically a call
18   from the principal.  I never overstepped, I would
19   say, the janitors, unless there was, hey, there's a
20   bathroom issue, or, hey, there's such and such.  And
21   while I was gone, what was being done while I was
22   not there to communicate with the janitors.
23              But other than that, I mean, yeah,
24   again, even the tear-down piece.  When I coached, my
25   athletes typically would pick up cups and fold up

1   chairs.  So I didn't see what the issue was.  And,

2   again, that's where we referenced back to speaking.

3   As far as the athletic calendar, those are things

4   that were already being done.  And then I know he

5   made mention of the other AD's -- as listed in our

6   other AD duties, as listed in the job description.

7           But, I mean, outside of those,

8   questioning the setup and the tear-down piece, yeah,

9   I mean, those are glaring changes.  I know they seem

10  small, but setting up a gym and breaking down a gym

11  where it doesn't actually say, you're going to be

12  helped doing this, is a little different than my job

13  had been prior to going on leave.

14          Q.   Okay.  So when he said, I need you to

15  take care of those things, you interpreted that to

16  mean that you personally needed to be the one doing

17  it?

18          A.   I need you to take care of game day

19  setup, yeah.

20          Q.   Okay.  You did not construe that to

21  mean, I need you to facilitate or have someone else,

22  it's just that you personally needed to go do that?

23          A.   That's how he put it, that's how I

24  took it.

25          Q.   That's how you took it.  Okay.  So in

1    the general ones, "As with anyone in our school, I

2    need to make sure that you are responding to e-mails

3    within a 24-hour period."

4              Had there been issues with

5    responsiveness to e-mails?

6              A.    I can think of a couple of e-mails

7    that weren't directed towards me, that were directed

8    towards Matt, that may have been the athletic

9    director's that he sent to me and said you need to

10   take care of it.  I don't really remember.  I know I

11   copied a bunch of e-mails where I showed time that I

12   would respond within typically an hour to 30

13   minutes.  So I don't remember there really being the

14   24-hour period where I needed to -- that needed to

15   be put there.

16             Q.    So the other general component is, "I

17   expect you to be at school every day to fulfill your

18   teaching and athletic director supervisory duties.

19   If you cannot fulfill this, then you will have to

20   use some sort of absence day."

21             Was this different than before?

22             A.    How he put this and how I was told

23   are two different things.  He stated that I needed

24   to be at the school by 7:30 in the morning.  Most

25   athletic directors, I would say, are not coming in

1    that early, and especially with the child care

2    issues that I was dropping my kids off, that's why I

3    was coming in at 9:50.

4              So that's why I did take exception on

5    this, because later on he would state that if you're

6    not here at 7:30, you will have to start taking your

7    own time out of the day to, I guess, supplement your

8    income, would be the best word to say, and making

9    sure that whatever time I came in, I'd have to

10   supplement it.  That is a different thing.

11             I don't know if anyone else in the

12   district had to deal with that, but yeah.  If I was

13   absent, I could see me needing a sub or someone to

14   fulfill it, or communicate that, but that was a

15   loaded -- that's not just what was here.  That was

16   him actually stating that you need to be here at

17   7:30, which I had not had to be prior.  Because

18   again, if I'm leaving at 11:00 and then turning

19   around to be there at 7:30, and this is a big school

20   and I'm running games six days a week, that's a

21   pretty heavy schedule where I'm not seeing my kids.

22   And I would have never agreed to that.

23             Q.   But you testified earlier, you

24   weren't staying at school every night until 11:00;

25   there were days that you left at 3:00, right?

1      A.   But if I'm correct, the schedule that

2   was coming out because Ryle has the bigger facility

3   at the time, we were running on a -- potentially

4   running on a six-day-a-week schedule.  So that would

5   have changed, yes.

6      Q.   Where you would have been at school

7   every day until 11:00 p.m.?

8      A.   Not necessarily 11:00.  But from the

9   days -- usually Monday through Friday, yeah, if

10  there were games going on.  Depending on, obviously,

11  you know, if games were going extra.  But from

12  tearing down to breaking down, yeah, I'd probably be

13  leaving between 10:00 and 11:00.  And then on

14  Saturdays, yeah, I'd be there early for whether it

15  be a freshman or JV game and then a varsity game.

16  So, yeah, a six-day schedule.

17     Q.   All right.  So the last paragraph of

18  this e-mail says, "I know these have been trying

19  times and I appreciate your work the past two

20  weeks."

21          Do you have any idea what he meant by

22  trying times?

23     A.   I don't.  The only thing I can think

24  of would be me coming back to work potentially.

25     Q.   COVID pandemic was still going on at

1    this time, right?

2              A.    I don't know if he's referencing that

3    or not.

4              Q.    I'm not asking specifically about

5    that.  But you would agree --

6              A.    Yeah, COVID was going on.

7              Q.    Okay.  Did COVID change a lot about

8    the day to day of what school looked like at that

9    point?

10             A.    Yes.

11             Q.    There was a list of failing students

12   that was sent to you and asked to be -- for you to,

13   you know, chip in, all hands on deck, right?

14             A.    Yes.

15             Q.    Okay.  Athletics, would you agree,

16   were a little bit complex because of, you know, the

17   back and forth with shutting down, when were we

18   having school, when were we having athletics, when

19   were we not?

20             A.    Yes.

21             Q.    Things were a bit hectic; would you

22   agree?

23             A.    I don't know if hectic would be -- I

24   think it was a change.

25             Q.    It was a change?

1          A.    Uh-huh.

2          Q.    Athletics and education were

3    changing, so why did you feel that you didn't need

4    to?

5          A.    I don't necessarily classify it as me

6    feeling I needed to change.  My understanding was,

7    is that I was returning to the exact same -- whether

8    there's games canceled or not, it's still me getting

9    the information out and facilitating that

10   information, right, on games.  I was always

11   considered an athletic director until this change

12   happened, me being a teacher.

13           I can't control what's happening out

14   in the world, but I can control the fact that if it

15   states that I'm coming back to the exact same

16   position, that doesn't seem to change, right.  Like,

17   I was never in control of failing students.  Even

18   when I was in the classroom of ISS students, their

19   names are on a computer, I looked at the names, I

20   made sure they were there.  That's it.  I didn't

21   control their grades.  I didn't control contacting

22   them.  So I think that is a glaring change of what

23   my job duties were.

24           And, again, I can't make sure that,

25   you know, because someone has a cough, that they're

1   not there, I was not in control of that.  At the

2   same time, I can only control what I was told, and

3   it was to come back to the normal position that I

4   had already, supposed normal position.

5          Q.   Mr. Kirkendall, you've made multiple

6   references throughout the course of the deposition

7   thus far that your end objective was to be an

8   administrator, whether it's Boone County Schools or

9   otherwise, correct?

10         A.   Yeah, correct.

11         Q.   When we looked at Exhibit 23 and the

12  list of -- or I apologize, Exhibit 22, and the list

13  of the teams for people reaching out to failing

14  students, you see Team 1, there's two assistant and

15  vice principals; Team 2, an assistant principal;

16  Team 3, two assistant principals.

17              Would you agree that administrators

18  were pulling extra duty at this time by reaching out

19  to failing students that they would not otherwise

20  have the direct contact with?

21         A.   I believe that within -- when you're

22  looking at -- those administrators were typically

23  over that band of students anyway and they would

24  already have a relationship with them.  So I don't

25  know if that's necessarily extra.  But they're doing

1    what they normally would do.  Right?

2                    I would assume that in their job,

3    right -- at least I can't remember if Ryle was grade

4    based or last name based or whatever letter, they

5    would already have, typically, a relationship with

6    those students that they were talking to.  Same

7    thing about counselors as well that were in that

8    piece.

9            Q.    Okay.  So as far as you're concerned,

10   the fail list responses, that was something those

11   administrators had to do regardless, so you don't

12   consider that necessarily pulling any extra weight?

13           A.    I don't think their job really

14   changes, and I don't know much about if their job

15   changed or not.  I see their names on there but I

16   don't know what they actually did.  My understanding

17   is that they typically would reach out to students,

18   that's why there's four of them, I guess five maybe,

19   four or five assistants.  I can't control what they

20   did.  I don't really know because I wasn't in their

21   position.

22           Q.    So then your position or your opinion

23   is that because you were the athletic director, you

24   didn't need to reach out to these students because

25   it's not your problem?

1        A.    I wouldn't say not my problem.

2        Q.    Okay.  Then why did you think that

3    you shouldn't have to reach out to these students?

4        A.    Because I had not reached out to

5    students before.  I had not been used in that

6    capacity before.  This was clearly a change of I'm

7    coming back and this is what's being changed by your

8    position, now you're doing this.  I had not done

9    that before so, again, me having the information to

10   say, hey, this is exactly how this is going to run,

11   or, hey, you're failing in such and such, I had not

12   done that before.  I had not been used in that

13   capacity before.  I wouldn't say, again, that I'm

14   saying I don't want to work with these kids.  It's

15   stating, that has not been my job up until I'm

16   coming back and changing -- or my role being

17   changed.

18       Q.    So at this time, when you received

19   this e-mail, is it fair to say you did not

20   understand what Edgenuity was?

21       A.    Correct.  Sorry.  Are you talking

22   about Exhibit 23?

23       Q.    Yes.

24       A.    Yes, I was asking him exactly what it

25   was, because I believe I referenced, prior I didn't

1    have access to Edgenuity.  I had a list of kids and

2    two programs that I didn't have to log into, that

3    literally showed me, okay, Mario, you have 41 kids

4    you have to contact, or you have juniors, I believe,

5    Cody Ryan stated.  I didn't have any other

6    information as far as like, okay, log in to

7    Edgenuity and see this, this and this.

8             Q.   You were later informed, though, that

9    Edgenuity was -- I believe you said that you were

10   told --

11            A.   Yeah, turning on the computer and

12   checking in.  But I believe that making sure they

13   were turning on the computers was what I stated.  I

14   don't know the component of what the teacher was

15   actually doing.  Right?  I didn't know if I could

16   e-mail students through that program.  I didn't know

17   if I could reach out to the parents and state, okay,

18   these are the classes that you're failing.  I didn't

19   know what models I -- like, I didn't know if it was

20   ran by what my -- I didn't know much about the

21   background of Edgenuity.

22            I knew again, hey, you're just

23   turning on the computer and watching these kids do

24   whatever else.  So then what is the purpose of me

25   being in there?  I don't understand what's the

1    purpose of me being in there.  What I actually

2    needed to do.  Right?

3          Q.  Okay.  So did you actually have a

4    conversation with Mr. Shafer about what is Edgenuity

5    and what will be my role in that program?

6          A.  That's what I was trying to get at

7    when I spoke to or reached out to him at the

8    follow-up.

9          Q.  Okay.  So let's take a look -- I'm

10   going to hand you what's been marked as Exhibit 24.

11          (WHEREUPON, Defendant's Exhibit No.

12   24 was marked for identification.)

13          Q.  So this is -- the first page, which

14   is 968, is a calendar invite, where Mr. Shafer sent

15   you a calendar invite on January 4th to discuss

16   athletic needs and coverages.  Also discuss study

17   skills class.  Do you recall this meeting with

18   Mr. Shafer?

19          A.  Yes, that was in -- I believe that

20   was in his office, and I can't remember -- yes.

21          Q.  Okay.  Do you remember the substance

22   of what you discussed?

23          A.  I believe we discussed these things,

24   but there was a teacher that came in --

25   teacher/coach that was coming in, and we never got

1   to discuss this e-mail and my responsibilities in

2   this meeting.

3           Q.   Okay.  So that prompted you to send a

4   follow-up e-mail the next day, on January 5th.  Is

5   that a copy of that in front of you, as a part of

6   Exhibit 24?

7           A.   Yes.  Because then the second line

8   was, "Since we were unable to get to the e-mail that

9   you sent on 12/18 regarding expectations for second

10  semester, these points I felt needed to be

11  addressed."  Yes.

12          Q.   Okay.  So let's go through a couple

13  of these points in your e-mail.

14          A.   Okay.

15          Q.   When you were hired it was understood

16  that you would have one class relieving Mr. Carr

17  during an ISS only thing superseding this was

18  conflicting AD duties.  So I know we've talked about

19  this a lot, and I'm really not trying to beat a dead

20  horse here.  But the ISS relief, you have considered

21  that outside -- you don't think that's a teaching

22  job, right?

23          A.   I don't feel that it needed to be --

24  again, this is me speaking of the position of what I

25  was doing, I don't feel that a teacher -- or there

1   necessarily needed to be a person with a degree

2   doing that job, no.

3          Q.   Okay.  So did you ever raise any

4   concerns -- when you were first told that you would

5   be handling an ISS class, did you ever raise any

6   issues with administration or anyone at the district

7   that you didn't feel like that needed to be a part

8   of your job?

9          A.   Are you talking about in the first

10  year that I was doing this?

11         Q.   Yeah, let's start with the first

12  year.

13         A.   I don't remember if Matt Turner and I

14  had spoke about this.  I honestly don't remember.

15         Q.   Okay.  Did you raise any concerns

16  with it during -- well, I suppose you didn't

17  necessarily have to do that the 2020 year because of

18  COVID, correct?

19         A.   Only -- well, the only thing that I

20  remember being prior to the school year was Tony

21  Pastura, from Matt Shafer, coming to my office and

22  saying, hey, would you agree to relieving Jack at

23  the end of the schoolday, in sixth period, instead

24  of the beginning, and everything else would stay

25  virtually the same unless there's a conflict of my

1    athletic director duties.  And I stated that would

2    be fine.  But that was the only change or really, I

3    guess -- I don't want to say issue, but thing

4    brought up about it.

5            Q.    Okay.  In the e-mails that we looked

6    at earlier with your exchange with Mr. Shafer on

7    November 30th and December 1st, when he instructed

8    that you would be handling some students online, you

9    didn't give any pushback to that, did you?

10           A.    He said, from our call, it was

11   contingent upon me coming back to do this.

12           Q.    Okay.

13           A.    My understanding of contingent means

14   if you don't do it, you're not going to be able to

15   come back.

16           Q.    Okay.

17           A.    And that was the change.  And then

18   again, found out that I wasn't supposed to be

19   getting changed, or shouldn't have been changed,

20   but, yes.  Outside of our phone call, I did not.

21   And the only phone call that I had with him was me

22   asking as to why I had so many students and --

23   actually, and speaking with Tony Pastura about it in

24   my office.

25           Q.    So you think that the addition of

212

1    these classes was not appropriate given your job

2    description?

3              A.    Sorry.  Are you talking about the

4    change in 2021, correct?

5              Q.    Yes.

6              A.    And you're asking me do I think it

7    was appropriate?

8              Q.    Do you think that the district had

9    the ability to tell you you're taking on these two

10   additional classes?

11             A.    From my understanding, coming back

12   from leave, I didn't think my schedule was supposed

13   to be changed.

14             Q.    Why do you think that?

15             A.    Because it states it in the FMLA,

16   like or similar job.

17             Q.    Okay.

18             A.    And using whatever, I guess -- I

19   forget whatever it's called, I don't remember the

20   whole definition.

21             Q.    So you remember earlier we looked at

22   what's been marked as Exhibit 9, you have a limited

23   contract of employment with the Boone County School

24   District for the teaching position, correct?

25             A.    Hold on.  Exhibit 9.  Sorry.

213

1          Q.    I mean, I can just show you.

2          A.    That's fine.

3          Q.    You have a limited contract of

4    employment with Boone County Schools for a teaching

5    position at that time, correct?

6          A.    Hired in under a teacher contract but

7    acting as an athletic director.

8          Q.    That is not what I asked.

9                You had a limited contract of

10   employment for a teaching position with the Boone

11   County Schools for the 2020-'21 academic year; is

12   that correct?

13         A.    Correct.

14         Q.    Okay.  As a part of the teacher job

15   description it says you are to perform other duties

16   consistent with the position assigned as may be

17   requested by the supervisor.  Is that what that says

18   in Paragraph 23 of the teacher job description?

19         A.    Yes.

20         Q.    Okay.  You are hired as a teacher and

21   the athletic director contract is considered an

22   extra duty assignment, correct?

23         A.    On the surface, yes.

24         Q.    The top of the contract, and we can

25   look at it, says extra duty assignment.

1                A.   It does say extra duty, correct.

2                Q.   The word "extra" implies it is in

3      addition to; is that fair?

4                A.   And that's what I said, on the

5      surface, yes.  I think extra -- extra means -- can

6      mean extra.

7                Q.   So you were hired first and foremost

8      as a teacher in the Boone County School District for

9      the 2020-'21 year?

10                A.   From my understanding from what

11      Mr. Shafer said, everyone is hired in as a teacher,

12      regardless of their other position.

13                Q.   Sure.

14                A.   They're hired in as a teacher on a

15      teacher contract.

16                Q.   So you were hired in as a teacher for

17      the 2020-'21 academic year, correct?

18                A.   Correct.

19                Q.   Okay.  Supervising a study skills

20      class would be an extra duty as assigned by your

21      principal, correct?  This little paragraph that we

22      read that's in both your athletic director and

23      teacher contract -- or I'm sorry, the job

24      descriptions, that say, perform other duties

25      consistent with the position assigned as may be

215

1  requested by the supervisor.  The extra study skills

2  class, that was consistent with your position and

3  assigned by your supervisor, Mr. Pastura, correct?

4          A.   By who?

5          Q.   I'm sorry, Mr. Shafer.

6          A.   That was an extra thing.  It was a

7  change in my -- what I was assigned to and agreed

8  to, yes.  When I came in, I was not doing any of

9  that work, and then he changed this after I came

10 back from leave, correct.

11         Q.   You were hired -- okay.  Your

12 contract of employment, can you tell me where in

13 this contract of employment it specifically says

14 that you will only be doing athletic director

15 duties?

16         A.   Again, it doesn't have to say that.

17         Q.   I asked, where in that contract does

18 it say that?

19         A.   It doesn't say that.

20         Q.   Okay.  Where in that contract does it

21 say you will never be subjected to more class

22 teaching?

23         A.   I don't think it has to.  I believe

24 in the BCEA --

25         Q.   Where in the contract does it say it?

```
1              A.    Hold on.  On that contract, it

2      doesn't say it.

3              Q.    Okay.

4              A.    On the BCEA contract, it does state

5      that if you come back from leave, you are to be

6      returned to your exact position.

7              Q.    See, I find it very interesting that

8      you keep referencing the BCEA contract when that is

9      a contract specifically for teachers.

10             A.    I'm hired in as a teacher.

11             Q.    Right.  So why don't you want to

12     teach class?

13             A.    That's not true.  I'm sorry.

14             Q.    Okay.

15             A.    That was a change in what my duties

16     were prior to leaving.  I sent this out and said,

17     this is a change in my duties.  He knew of it as a

18     change in my duties.  Again, if you never had

19     interaction with any of those kids before, and

20     again, whether it's looking at a computer to turn it

21     on and just make sure they're doing it, or speaking

22     to their parents, I believe in that capacity I have

23     nothing I can actually contribute as Mr. Kirkendall

24     doing this because Mr. Kirkendall hadn't done that

25     before.
```

1          Q.   So let me ask then, to make sure I'm

2    really understanding, are you -- I'm going to use

3    the term upset because I just can't think of a

4    better one.  But are you mad, upset -- you can pick

5    the adjective if you'd like -- are you upset that

6    you were asked to take on two new classes because it

7    was a change or because of the actual assignment

8    itself?

9          A.   I don't think that adjective was

10   what -- I'm not mad or upset.  I brought the

11   conversation up regarding FMLA leave, me

12   understanding that I was actually supposed to be

13   coming back to my same position.  I didn't know what

14   was going on as to why he was changing my job.

15         Q.   But you were coming back as the

16   athletic director, correct?

17         A.   Yes.

18         Q.   And you're still hired on as a

19   teacher, correct?

20         A.   Through the contract, yes.

21         Q.   Okay.  In that contract, does it say

22   how many class periods you are expected to teach a

23   day?

24         A.   I don't know if it does or not.  Are

25   you talking about that contract?

218

1          Q.   Yes.

2          A.   No, I don't believe it does.

3          Q.   Okay.  Earlier when we were talking

4    about your prior employment as an athletic director

5    with the Newport Schools, you discussed that prior

6    to your employment with Newport you were initially

7    under the impression you were going to teach three

8    classes, and before the start of the school year

9    they said, look, actually you're going to have to

10   teach five, you can come do that or you don't have a

11   job.  Do you recall that?

12         A.   I don't believe I said either or,

13   but, yeah, go on.

14         Q.   Okay.  Well, then, if I'm incorrect,

15   please explain.

16         A.   I don't believe I said that you don't

17   have a job.  I was hired in, the principal stated --

18   he, at the time, stated, these are the classes

19   you're going to teach, this is going to be your

20   hiring.  Right?  I get hired.  He leaves the next

21   week.  There's a search.  This person comes in and

22   says, okay, we need you to cover these.  That's

23   where that was.  No students were in.  I could

24   agree.  I believe, I mean, those words of you're

25   either hired or fired were not used.

1          Q.   Well, earlier you said it was

2     contingent.

3          A.   No, it was contingent -- Matt Shafer

4     said it was contingent, I don't believe -- and if I

5     did, then I used it, but I don't believe I did.

6          Q.   Okay.  So my question, then, is:  Why

7     was it acceptable for Newport Schools to add two

8     classes or two supervisory classes, whatever they

9     specifically were, why was it okay for Newport

10    Schools to add two to your caseload and your course

11    load, but not Boone County Schools?

12         A.   I don't know.  I think those are two

13    separate issues.

14         Q.   How?

15         A.   Because they're two separate schools.

16    I think what we're dealing with with one is, okay,

17    you're coming back to what was assigned to you prior

18    to the year, versus school hadn't even started with

19    Newport.  School was out.  I hadn't even signed my

20    contract.  I was hired in.  I had not signed my

21    contract until the new principal had came in.

22              But I had already signed a contract

23    with Boone County, and my schedule was -- outside of

24    the change of switching between Jack Carr's third

25    period and his -- second or third period -- but his

1  sixth period, those are completely different.  You

2  took leave -- and my understanding, again, if I'm

3  wrong, I'm wrong.  You took leave, you're supposed

4  to return back to your same position.  That is

5  different than school hasn't started, new principal

6  coming on, this is your role.  Those two are

7  completely different things.

8              Q.   So let me ask you this:  If you had

9  never taken leave, do you think Mr. Shafer could

10  have still come to you at the end of the first

11  semester and said, hey, coming back in the middle of

12  the year, when school starts again in January,

13  you're going to have two more study skills classes?

14             A.   Do I think he would come back and say

15  that?  I can't think for him.  I don't --

16             Q.   No, that's not what I asked.

17                  If you had not taken leave and

18  Mr. Shafer had come to you with this same e-mail

19  saying when we come back from break, you're going to

20  have two more study skills classes, would you have

21  fought that?

22             A.   I don't know if fighting would be the

23  word.  I would ask as to what's going on and why.

24             Q.   You have made it clear from these

25  e-mails that you don't think it was appropriate that

221

1   you were asked to teach those -- or instructed to

2   teach those two classes; is that fair?

3              A.   Sorry.  You said two other classes,

4   right?

5              Q.   Right.

6              A.   But when we're talking about me

7   coming back, we're not only just talking about the

8   two classes.  We're also talking about the complete

9   change of me coming in at 7:30 in the morning.  So

10  there's not just the host of just, okay, these

11  classes.

12             Q.   That's not what we're talking about

13  right now.  We're talking specifically about

14  education.

15             A.   Specifically about the Edgenuity

16  piece?

17             Q.   Yes.

18             A.   Right?  And you're saying would I

19  have caused an issue about it?

20             Q.   Yes.

21             A.   I probably would have brought it up

22  as to why I'm being changed, but I don't know.  I

23  don't know if I would have.

24             Q.   So even if you had not taken leave,

25  you still would have raised this concern with

1   Mr. Shafer about being asked to take on two more

2   classes?

3               A.   I don't know.

4               Q.   Okay.  So during this exchange, you

5   send an e-mail back to Mr. Shafer and say, "Before

6   you assume the tone" --

7               A.   You're going back to a different

8   e-mail.

9               Q.   Oh, I apologize.  You're right.  I

10  don't want to look at that e-mail.  I'm so sorry.

11              So let's look back again at

12  Exhibit 24, so this follow-up to the January 4th

13  meeting.  So let's keep going through that.

14              So we went through, you know, you do

15  not understand the reason for adding the additional

16  classes.  So you also discussed the AD duties.

17              A.   Uh-huh.

18              Q.   So while you were out on leave,

19  finding out with no information or trail of

20  conversations at all about -- the first one being

21  the girls' soccer coach.  Was this Runyon?

22              A.   Correct.

23              Q.   Okay.  "Games being changed without

24  discussion, in addition to coaches seeking you out

25  and then telling me."  What does that reference?

1          A.    That was in reference to the -- it

2     was in reference to his 24-hour rule.  Where he

3     stated that you're not getting information out.  And

4     I said, I don't even know what's going on because

5     coaches are able to change their schedules without

6     even running it through the athletic director, which

7     the chain of command would have ran through me.  So

8     I could actually inform their parents or the school

9     of what is was going on.  They were going straight

10    to Mr. Shafer.  I'm assuming it was because I was --

11    I don't know if that's how he was telling them to do

12    it or what.  But I was finding out after, and then

13    in the position of I have no clue of what's going

14    on.  And that was not how it was prior to me going

15    on leave.

16          Q.    So there was just a communication

17    breakdown or do you think someone was actively

18    trying to keep you out of the loop?

19          A.    I don't know.  I mean, it was brought

20    as far as my 24-hour rule that had never been

21    brought up before.  I don't know if it was actively

22    or not.

23          Q.    Okay.  So, "Yesterday finding out

24    from Jon Erickson that a conversation was had

25    between you and him regarding holding back grade

1    checks."  What does that mean?

2             A.   Grade checks are something that the

3    state has to implement for sports.  And for some

4    reason he was telling Jon to come and find me and

5    say that grades have to be held back.  And that is

6    something you actually can't do.  Well, you're not

7    supposed to do.  And that's why I felt that it was a

8    big enough issue, why am I finding out from Jon, who

9    was substituted behind me, and making sure going

10   forward what the rule would be.

11            Q.   Okay.

12            A.   You can't really -- I mean, that's

13   something that's supposed to happen weekly, to hold

14   it back seemed a little different.

15            Q.   So this e-mail happened on

16   January 5th.  Let's assume that the last day of

17   school before winter break was the 18th, that Friday

18   that the e-mail was sent.  I actually don't know if

19   that's true, but can we agree that it was probably

20   sometime around the 18th, so the Friday before

21   Christmas?

22            A.   Uh-huh.

23            Q.   Does that sound about right?

24            A.   I'm sorry.  You're asking when the

25   last day of break was?

225

```
 1              Q.   Right.

 2              A.   Yeah, it was the 18th, I believe.

 3              Q.   Okay.  So you started back on

 4    December 4th.

 5              A.   Back in school.

 6              Q.   Yes.

 7              A.   Correct.

 8              Q.   From your leave.

 9              A.   I can't remember if school was in or

10    not.

11              Q.   So that first full week of December

12    would have been about when you came back?

13              A.   Yeah, around the 4th, I believe,

14    yeah, 12/4.

15              Q.   So then you had about two and a half,

16    three weeks back at school from being off leave

17    before you left again for winter break; is that

18    accurate?

19              A.   I don't believe I was there for two

20    or three weeks, because that was actually

21    referencing me working from home.  Are you saying

22    was I back working just for the school or working at

23    the school or what?

24              Q.   You were back from leave working

25    somewhere for about three weeks, so between
```

1    December 4th and the 18th?

2            A.    Yeah, about.

3            Q.    Okay.  Were you still, during that

4    time, trying to play catch-up from being out on

5    leave?

6            A.    I would say so.

7            Q.    So is it understandable that there

8    might still be some communication breakdowns that

9    need to be addressed?

10            A.    If there were, I didn't believe they

11    would come from me.

12            Q.    Right.  I'm not necessarily saying

13    that they do.  But, I mean, Ryle High School is a

14    pretty big school, right?

15            A.    Yeah.

16            Q.    Do you know about how many students?

17            A.    Now I don't.  I'd say like close to

18    2,000, about the same, yeah.

19            Q.    Okay.  So it's a pretty big school.

20    And there's quite a bit of staff there you would

21    agree as well, right?

22            A.    Uh-huh.

23            Q.    With coaches.  Do you know about how

24    many coaches you oversaw?

25            A.    Including assistants, I would say no

```
1   short of, you know, 50, 70.
2           Q.   Okay.  Do you know about how many --
3   about how many vendors you were communicating with
4   on a regular basis?
5           A.   No.
6           Q.   Like ballpark, more than 50, more
7   than a hundred?
8           A.   I don't think it was that high, but I
9   don't know the number.
10          Q.   Big number though?  I guess it's what
11  you define as big, right?
12          A.   Yeah, right.  I honestly don't know.
13          Q.   Okay.  Regardless, you were
14  communicating with quite a few people in your role
15  as athletic director; is that fair?
16          A.   Correct.
17          Q.   And you were still trying to get back
18  into the swing of things throughout the month of
19  December with, one, catching up and, two,
20  streamlining who was communicating with who?
21          A.   Communication typically -- or at
22  least from my vantage, did not really break down up
23  until we got into January.  So, I mean, there wasn't
24  really much going on, so the communication
25  necessarily didn't have to happen.
```

1          Q.    Okay.

2          A.    Or to the extent of when we started

3    playing sports.

4          Q.    So let's look back at Exhibit 24, the

5    same e-mail that we've been looking at.  So we've

6    already covered the gym setup and the coaches, you

7    know, being responsible for that.  So there's a

8    section titled Questions I have.

9          A.    Uh-huh.

10          Q.    This is where you bring up the issue

11    of the report to school; is that what this is about?

12          A.    Yes, the second paragraph.

13          Q.    Okay.  What time does the schoolday

14    actually start at Ryle High School during the

15    2020-'21 year?

16          A.    I would assume, what, up to 7:30,

17    between 7:15, 7:30, 7:45.

18          Q.    Okay.  When you gave pushback about

19    the 7:30 report time, how was that met by

20    Mr. Shafer?  What did he say in response?

21          A.    I don't believe -- well, that wasn't

22    brought up until our last meeting again, and that

23    was because kids weren't in school yet.  And are you

24    referencing this e-mail part of like when -- what

25    was his response to this part?

229

1          Q.   Sure.  Well, I guess actually a

2    better way to ask this would be, you know, what was

3    that conversation like?  Because I haven't

4    necessarily seen an e-mail -- and if I just missed

5    it, please let me know -- where he specifically says

6    you need to report to school at 7:30 a.m. now.

7          A.   That was -- I actually recorded that

8    conversation.  It was on -- we had it recorded, and,

9    yeah, he states that you will need to come in at

10   7:30, and that's where he made the reference of, if

11   you're not here when school -- I believe like the

12   schoolday opens, you have to use your, I guess,

13   whatever, to supplement your pay from not being in

14   there.

15         Q.   You recorded that conversation?

16         A.   We did.  Yeah, I did.

17         Q.   I have not been provided a copy of

18   that recording, can you please get it to your

19   attorney and provide it to us?

20         A.   Uh-huh.

21         Q.   Was Mr. Shafer aware that you were

22   recording that conversation?

23         A.   No.

24         Q.   Are you aware that it is contrary to

25   board policy to record those conversations without

230

1    letting the other party know?

2            A.    I didn't.  I heard it as it's a

3    one-consent state.

4            Q.    Are you aware that it's against board

5    policy?

6            A.    No.

7            Q.    Okay.  So if you could provide a copy

8    of that recording to your counsel and he can get

9    that to us.

10            MS. AMLUNG:  I would appreciate that,

11    Mr. Allison.

12    BY MS. AMLUNG:

13            Q.    So that conversation about the 7:30

14    start time, did that happen, I'm assuming then,

15    before this e-mail was sent?

16            A.    He had referenced it before, and that

17    was in conversation.  He had referenced it again in

18    my last meeting with him, and that was when Cody

19    Ryan was in there.

20            Q.    Okay.  So it says, "I'm reading from

21    your e-mail the expectation is that I'm here at

22    7:30."  It wasn't in regard to an e-mail, it was a

23    conversation?

24            A.    It was both, because he says it at

25    the beginning.  He says in his e-mail, his exhibit.

231

1    Sorry.  Let me go back.  Yes, I also expect you to

2    be at school every day -- and this is Exhibit 23 --

3    to fulfill your teaching and athletic supervisory

4    duties.  If you cannot fulfill this then you would

5    have to use some sort of absence day.

6              Q.    Okay.  Where does it say you have to

7    be there at 7:30 in the morning?

8              A.    Again, that was in combination of the

9    e-mail and the conversation that we had.

10             Q.    Okay.

11             A.    Can we take a break?  Are we able to?

12             Q.    Yeah.  Sure.

13                   (A lunch recess was taken.)

14   BY MS. AMLUNG:

15             Q.    All right.  So we are back on the

16   record.  So before we went off we were discussing

17   Exhibit 24 and the e-mail that was sent as a

18   follow-up to your first meeting with Mr. Shafer on

19   January 4th.

20                   So we were about ready to talk about

21   the -- I guess we had already started talking about

22   the report at 7:30 component of this change.

23             A.    Uh-huh.

24             Q.    At the very end of your e-mails, on

25   Page 970, you say, "I believe my schedule needs to

1    be further discussed."  It says, "At the end of the

2    e-mail it was stated that if I can't be at school

3    fulfilling my duties, then I would need to use

4    leave.  I believe my schedule needs to be further

5    discussed."  So was that schedule ever further

6    discussed?

7            A.   This was -- the next meeting that we

8    had was, I believe, in relation to that, where he

9    states you're a teacher first, and this is what your

10   schedule is, I believe.

11           Q.   Okay.  So I'm going to hand you what

12   has been marked then as Exhibit 25.

13           (WHEREUPON, Defendant's Exhibit No.

14   25 was marked for identification.)

15           Q.   This is a calendar entry from the

16   following day, January 6th.  Is this the meeting you

17   were referencing?

18           A.   Then there might have been another

19   one in between.  Is this from him?

20           Q.   Yeah.  So it says from Mr. Matt

21   Shafer to Mario Kirkendall.  So it looks like there

22   was an invite sent the following day.  So you sent

23   this e-mail from Exhibit 24 on January 5th at

24   8:00 p.m.

25           A.   Uh-huh.

```
 1              Q.   So then the following morning,
 2    Mr. Shafer sends this calendar invite.  Does that
 3    sound right then?  So when you say that you met with
 4    him, would this have been that invite?
 5              A.   I believe so.
 6              Q.   Okay.  So this is just a calendar
 7    invite.  Did you end up meeting with Mr. Shafer on
 8    the 6th?
 9              A.   I forget what happened.  I can't
10    remember if we did or not.  I can't remember the
11    days.  Sorry.
12              Q.   Okay.  Did you meet, though, at some
13    point after that?
14              A.   We did speak, but I can't remember if
15    that came up or not.
16              Q.   Okay.  So my understanding is that on
17    January 12th, you ended up taking a sick day.
18              A.   Uh-huh.
19              Q.   Do you know if the meeting with
20    Mr. Shafer happened before or after that?
21              A.   I honestly can't remember.
22              Q.   Okay.  So December 12th --
23              A.   January 12th?
24              Q.   I'm sorry, you're right.
25    January 12th.  I'm going to hand you what's been
```

234

1    mark as Exhibit 26.

2              (WHEREUPON, Defendant's Exhibit No.

3    26 was marked for identification.)

4              Q.   Do you recognize this e-mail?

5              A.   Yes.

6              Q.   Okay.  So on the second page --

7    again, I'm sorry, it goes in reverse order.  So it

8    looks like on January 11th, around noon, someone

9    named Tina from Holmes High School reached out to

10   you and asked, will there be an admin pass list for

11   tomorrow evening.  What is that in reference to?

12             A.   How many administrators from the

13   visiting school can get in for free.

14             Q.   Okay.  So was this an event at Ryle

15   High School?

16             A.   Correct.

17             Q.   So you responded, "You get 10 on the

18   pass list.  Sorry, I'm playing catch-up."  What were

19   you playing catch-up from?

20             A.   It was getting the logistics together

21   for the next day because I was going to be out.

22             Q.   Okay.

23             A.   The 12th.

24             Q.   So you were going to be out the next

25   day.

235

1          A.    Uh-huh.

2          Q.    So what were you catching up from on

3    the 11th?

4          A.    Getting the logistics ready for the

5    game the following day.

6          Q.    Okay.  So you weren't catching up

7    from something that had happened before, you were

8    preparing to be out?

9          A.    Yes.

10          Q.    Okay.  Mr. Shafer responds to this

11    e-mail after you forward him the Holmes pass list.

12    It starts off, "Thanks.  I hope everything went

13    well."  So my understanding is that on the 12th,

14    were you out from your son's surgery?

15          A.    Correct.

16          Q.    Okay.  Three things that were not

17    handled, can you kind of go through those three

18    things and tell me what specifically the context was

19    for those particular identified incidents?

20          A.    One was entering a code into the

21    setup for our -- what is it -- the video to be

22    broadcast; Holmes High School needed their ticket

23    link; and spoke to the officials and set them up per

24    the e-mail I sent you.  Yeah.  And then lastly, the

25    custodians and I set up the gym, and I didn't want

1    our teams to do it.

2            Q.   Okay.  So the three things that were

3    not handled, so there was no game scheduled on the

4    streaming website, and then a subcomponent A, I

5    called BlueFrame and got it set up.  I just want to

6    make sure I understand the context of this.

7            So is it your understanding that

8    Mr. Shafer was listing the things that were not

9    handled and then what he did to respond, or is this

10   something that you did?

11           A.   He's listing what didn't get done,

12   but he's -- I don't know -- yeah, I guess he's

13   saying that he did it all.  I don't know.

14           Q.   Okay.  So the game scheduled on the

15   streaming website, is that something that normally

16   falls in your duties as athletic director?

17           A.   That was something that was added

18   when I was out on leave.  They contracted with the

19   company, BlueFrame, because of COVID going on, they

20   allowed access to games.  And that was when I

21   referenced earlier about not having the information

22   and me having to go meet with someone and speaking

23   about it.  But, yeah, that was -- BlueFrame was the

24   company that they contracted out with to live stream

25   sport events -- sporting events.

1          Q.    Okay.  So Holmes called and needed

2    the ticket link.  What's the ticket link?

3          A.    The ticket link is what you send to

4    the other schools for them to buy tickets.

5          Q.    Okay.  Who is Heather?

6          A.    The secretary in the front office.

7          Q.    At Ryle?

8          A.    Heather Bush.

9          Q.    Okay.  And then the one that's

10   labeled, again, 2, but it's the third, "I spoke with

11   officials and set them up per the e-mail I sent to

12   you, use the locker room."  Officials for the game

13   itself?

14         A.    Correct.

15         Q.    Okay.  How does that process work?

16         A.    What do you mean?

17         Q.    Like, how do you get the people to

18   come and officiate the games?

19         A.    All the officials that are in the

20   state have an assigner that they submit their names

21   to, and the assigner assigns them games.  I mean,

22   there's typically not any interaction with the

23   athletic director at all, outside of during COVID

24   they were just being asked what is the procedure to

25   come in.

```
 1              Q.   Okay.

 2              A.   Which I spoke with, yeah, their head

 3    official because I knew them really well then.

 4              Q.   So while you were out on leave,

 5    Mr. Shafer has indicated that he handled those

 6    things.  Was there any follow-up to this e-mail?

 7    And I'm not trying to trick you, like, I didn't see

 8    a responsive e-mail to this.  So was there a voice

 9    conversation?

10              A.   I can't remember.

11              Q.   Okay.

12              A.   Yeah.  Because, I mean, the next week

13    was my last meeting with him, I believe, the 19th.

14              Q.   Okay.  So I'm going to hand you

15    what's been marked as Exhibit 27.

16              (WHEREUPON, Defendant's Exhibit No.

17    27 was marked for identification.)

18              Q.   Do you recognize this e-mail?

19              A.   Uh-huh.

20              Q.   So it looks like at 2:29 p.m. on

21    January 15th you send an e-mail to Mr. Shafer

22    discussing some concerns and things that need to be

23    clarified going into the next week.

24              A.   Yes.

25              Q.   So let's walk through this e-mail.
```

239

1    So that second paragraph, "Since I have been back

2    from leave, it seems as though my work is being

3    scrutinized increasingly through text and e-mail."

4    What made you feel this way?

5            A.    Because, I mean, prior, looking at

6    the e-mail before, he's saying all the things that

7    he did, as well as he had made mention, you're not

8    communicating effectively, you're not informing

9    people, and that had never been an issue prior, as

10   well as -- yeah, it felt like -- I mean, he has a

11   couple e-mails where he says these are the things

12   that you're not doing or haven't done.  And I felt

13   like they were being done and handled.  And prior to

14   this, it had never happened.

15           Q.    Okay.  So the second paragraph, "I do

16   not feel my job performance has been an issue prior

17   to leave, and coming back from leave there have been

18   multiple issues in my performance."  What did you

19   mean by that?

20           A.    The third paragraph?

21           Q.    Yes.  I'm sorry.

22           A.    Things that I had not or we had not

23   discussed prior -- again, it was, hey, you're

24   setting up the gym.  I hadn't talked to the janitors

25   at all.  That is something that if he would have

1   called us into the meeting, hey, this is what's

2   going to happen -- they have an understanding that

3   their responsibility is also to cover setting up the

4   gym, that was one of the pieces.  As well as, I

5   mean, performance, in my mind, was also you're

6   communicating with coaches in the timely manner,

7   you're communicating with other miscellaneous things

8   that came in regards to athletics.

9           Q.   So these issues in your performance

10  that you reference, do you believe those are things

11  that were things that you could have worked to

12  improve or were they things out of your control?

13          A.   I believe if I was informed and had,

14  again, the information to do them successfully, I

15  would have been perfectly fine, or even talked to

16  prior to, I mean, even an e-mail stating.

17          Q.   So this goes back, would you agree

18  then, what we talked about earlier in December with

19  the communication issues?

20          A.   Pointedly at that time, in

21  December -- in December, I don't feel that it was

22  necessary to point out any performance issues

23  because there hadn't really been any.

24               This e-mail coming back, we were in

25  school, games were happening, again, son had

1    surgery, I'm not around to set up the gym, whatever

2    was described, this felt more like, okay, I'm now

3    tracking.  Where before there weren't examples of it

4    to really be called upon, now it's seeming that,

5    okay, in order, this is what's happening.  I mean,

6    he highlights that on his e-mails.  These are the

7    things that happened and I needed to take care of

8    them.  And that felt like a slight towards me that

9    had not happened, so --

10             Q.   So you had been back in school

11   working for about, I'd say, probably five weeks

12   collectively at that point; is that fair?  So three

13   in December and two in January?

14             A.   Talking from leave?

15             Q.   Yes.

16             A.   Correct.

17             Q.   Do you think that it was progressive

18   that these performance issues were coming up, or was

19   it just you came back in January and boom, there was

20   everything?

21             A.   What are you saying, progressive from

22   December?

23             Q.   Yes, from when you returned in the

24   beginning of December.

25             A.   And, again, you're saying do I feel

```
 1    like they were progressive or do I think just like,

 2    hey, they just started happening?  I don't know.

 3              Q.   Okay.

 4              A.   Can you ask it -- because you

 5    referenced, you said January, but then you said

 6    December.  Are you saying when school was back in

 7    session in January, correct?

 8              Q.   Yes.

 9              A.   Do I think that they were

10    progressively like being documented or --

11              Q.   No.  So you testified earlier, just a

12    few moments ago, that, you know, you felt like that

13    your work was being increasingly scrutinized

14    recently, and that all of these issues that weren't

15    there before now are there.

16              A.   Uh-huh.

17              Q.   So I'm trying to figure out at what

18    point you feel that like these started cropping up?

19              A.   I would say when games started

20    happening and coming back from, you know -- I would

21    say the beginning of January they started to happen

22    more readily.  Hey, so and so is complaining

23    about -- I'm like, they never came to me.  Right?

24    And typically we're talking about people that would

25    normally come to me are not speaking to me anymore,
```

1    or not giving me information, and then it's being

2    used against me it felt like.

3              Q.   Why do you think that people were not

4    giving you information?

5              A.   Well, I referenced, you know, coaches

6    going straight to him for games or whatever else.  I

7    don't know.  I was back for five weeks.  I don't

8    know what was changed.  I had made the e-mail that,

9    hey, I'm back into the position, so communication

10   came and it still seemed like it was going around

11   me, or not even being in the loop.  I don't know

12   why.  I can't speak for anybody else, as far as

13   what's happening.  I just felt that that's what was

14   happening in that situation.

15             Q.   Okay.  So there was a communication

16   breakdown where people were just going around you

17   straight to the principal?

18             A.   Yeah.  I mean, typically, as far as

19   my performance, that's what it seemed like, and I

20   referenced that.  As far as, you know, coaches going

21   to you, or I'm getting in trouble for not saying

22   certain things that I don't even know what I'm

23   supposed to be doing, but yeah.

24             Q.   What do you mean getting in trouble

25   for saying things?

244

1          A.   I would think that him referencing it

2     in an e-mail is him stating, okay, you've been doing

3     these things and, you know -- I'm trying to figure

4     out where it was.

5          Q.   What things are you getting in

6     trouble for saying?

7          A.   I mean, they're being documented that

8     these are performance issues.  I would assume,

9     right?  Him stating and saying, on Exhibit 26 -- I

10    mean, just, yeah, even his, I guess, three points of

11    there's no games scheduled, I did that, so and so

12    did that.  Lastly, I set up the gym.  And those are

13    all references to what he had said are changing from

14    when I'm coming back from leave.  So I don't know if

15    he was just documenting them or what.

16         Q.   Well, you said you got in trouble for

17    saying things; I'm trying to figure out what you

18    said.

19         A.   Well, I'm saying things in reference

20    to, okay, if I don't have the information, then how

21    am I going to get this out.  If I'm not saying

22    anything or responding to an e-mail or whatever

23    else, that's what I was referencing saying.

24         Q.   Okay.

25         A.   Not anything else, not any more.

1          Q.   Okay.  So later on in this -- we're

2     still looking at Exhibit 27.

3          A.   Uh-huh.

4          Q.   Later on in this e-mail the, I guess,

5     third paragraph from the bottom, it says, "I already

6     responded to the e-mail" -- I'm sorry.  Then the

7     next one, "Starting 1/19, you stated I have three

8     classes, two being added to my original agreed upon

9     one.  Adding classes on top of being an athletic

10    director, which I was hired for, conflicts with my

11    athletic director duties."  Can you explain what you

12    mean by that?

13         A.   As games were starting to pick up and

14    looking at the schedule, yeah, I felt that I was

15    hired in to be an athletic director.  And, again, I

16    know the reference that, hey, you were hired in as a

17    teacher but that was extra duty, wasn't relevant at

18    the time, in my mind, because I was hired in to be

19    an athletic director.  And without any background

20    knowledge of the Edgenuity program of, okay, this is

21    what you're supposed to be doing.  Because the only

22    thing, at that time, had been referenced was

23    Edgenuity and the e-mail.

24              We had not been able to speak about

25    his e-mail that was sent, I believe, in around

1    December, end of December, so I was, again,

2    reiterating what I said before, I'm like, I don't

3    know why my schedule was being changed, me coming

4    back.

5              Q.    So January 15th, when this e-mail was

6    sent, school was already back in session for about

7    two weeks; is that correct?

8              A.    I thought -- I think if the 19th was

9    the Monday, I believe the students were coming back

10   in the building then.

11             Q.    On the 19th?

12             A.    Yeah, I believe.

13             Q.    So they were out on break until that

14   time?

15             A.    They were on break, but then they

16   were on hybrid schedule.

17             Q.    Okay.

18             A.    I believe that's what happened.

19             Q.    So students were back, you know, "in

20   class," but just not physically in the building?

21             A.    In the building, correct.

22             Q.    Okay.  So they didn't come back

23   physically in the building until January 19th?

24             A.    If I'm remembering that correctly,

25   yes.

1          Q.    Okay.  So then after this e-mail was

2     sent?

3          A.    Correct.

4          Q.    So when you say that adding classes

5     on top of being an athletic director, specifically

6     the two classes being added on top of the original

7     one, conflicts with your athletic director duties,

8     at that point in time, on January 15th, did you

9     actually have any firsthand experience of what would

10    be entailed with your job responsibilities in those

11    classes?  I can ask a better question.  That was a

12    terrible one.

13              So you're adding two classes onto the

14    initial agreed upon one, and I'm assuming that's

15    starting January 19th, right?

16         A.    Correct, fourth and fifth and

17    sixth period.

18         Q.    So you already knew that you were

19    going to be asked to handle one.  The additional two

20    classes, how did those conflict with your AD duties?

21         A.    I felt like at the time, again, me

22    now being -- with us moving -- I'm sorry.  So many

23    different moving parts, as far as, you know, parents

24    being allowed in, and games, and so on and so forth,

25    and still me not understanding exactly what was

1    going on, that was going to be a bigger load, that

2    I'm now responsible for kids that are failing, or in

3    this classroom, on top of just being an athletic

4    director.

5           So I believe, yeah, my workload was

6    increasing and that I wouldn't actually be able to

7    do my job successfully.  I already supposedly wasn't

8    doing it successfully and now it was changing.

9           Q.   So when you say it conflicts with

10   your AD duties, is it a concern for you that it

11   conflicts with it as in literally the timing of

12   these things overlaps, that you need to be somewhere

13   doing AD things during fourth and fifth period, or

14   fifth and sixth, or is it just that this is too

15   much, it's too much to ask of me?

16          A.   I felt like coming back from leave,

17   this was a change in my schedule, and I felt like

18   this was different than what I had actually agreed

19   upon, and that is why I referenced the athletic

20   director piece.  It wasn't a conflict of could I be

21   there at those times.  It was, this is what I was

22   hired in to and this is what you're changing it to.

23          Q.   So then would you agree that it's not

24   actually a conflict with those two competing duties,

25   it's just that you didn't feel that those two

1      classes were a part of your job description?

2              A.    I don't know if "feel" was the right

3      word.  My understanding from coming back from FMLA,

4      it was not to be changed.

5              Q.    That's not what I asked.

6              A.    Then I don't know.

7              Q.    There's nothing in the AD job

8      description or how you were doing the athletic

9      director job duties that specifically required you

10     to be somewhere in the building doing something

11     specific fourth, fifth or sixth period, correct?

12             A.    Correct.

13             Q.    Okay.  So then when you say that

14     those two additional classes conflict with your AD

15     duties, are you saying that it's just adding those

16     two classes make the workload in total too much?

17             A.    What I was stating was that I agreed

18     upon sixth period.  Him adding more classes is him

19     adding more classes to that workload.  I don't know

20     if you're saying in totality is that more, yes, it's

21     more.  More than I had agreed upon with him.

22             Q.    Well, you've specifically said in

23     this e-mail that those two classes conflict with

24     your AD duties.  And I'm trying to reconcile where

25     does that conflict come from?

1          A.   I may have misspoken then.

2          Q.   Okay.

3          A.   In my head I was trying to state that

4    we agreed upon me covering Jack Carr for

5    sixth period, me being in the hallway monitoring

6    those students, and then when I'm coming back, it's

7    now you are in control of these kids that are

8    failing.

9          Q.   Okay.  So when you come back, you're

10   responsible for the three study skills classes, as

11   in when you're coming back -- let me back up for a

12   minute.

13          So you were given the fail list for

14   that month of December, but I'm talking about the

15   actual study skills classes that were occurring that

16   second half of the year post January 19th.

17          A.   Okay.

18          Q.   So those two new classes, are you

19   saying that it didn't necessarily conflict with your

20   AD duties as in you could not do the two together,

21   or that you just didn't think you were supposed to

22   be asked to do that, period?

23          A.   I didn't think I was supposed to be

24   asked to do that, period.

25          Q.   Okay.  That last paragraph, "As I

1  referenced in our meeting" -- we're still on

2  Exhibit 27.

3           A.   Okay.

4           Q.   "As I referenced in our meeting, if I

5  have the correct information, I can successfully do

6  my job."

7                So is that referencing, again, what

8  we've discussed with the lack of communication,

9  people going around you, so on and so forth?

10          A.   And then being held to the standard

11  of you're not doing -- yes, correct.

12          Q.   Sure.  So then the second part, "At

13  this point, going back and forth and being

14  scrutinized daily seems like it is directed solely

15  at me, and I have never been in a position where

16  this was the case."

17               Have you never been provided with

18  criticism in your place of employment before?

19          A.   I mean, not that I can think of to

20  this extent, no.

21          Q.   You wouldn't consider the underlying

22  issues that led to your discipline in Ohio criticism

23  from your place of employment?

24          A.   I don't -- I guess I view that

25  differently.

1          Q.    How is it different?

2          A.    Because I was acting in the capacity

3    of a teacher, specifically a teacher, not an

4    administrator, not anything else, and even the

5    information from, like, what happened with that, if

6    you have looked upon it, I don't think that actually

7    highlighted me -- I don't know if scrutinize

8    necessarily would be the word.  But, yeah, I mean, I

9    believe if you even go back to what was said about

10   that, that had nothing to do with me as this bad --

11   I don't want to say bad person -- but, yeah, the

12   write-up from there was not me being scrutinized, I

13   don't believe.

14          Q.    So the three bullet points from the

15   e-mail that we looked at, as well as, you know, just

16   the totality of these e-mails with Mr. Shafer, where

17   he's saying, I need you to do these things in your

18   job, or these are the things we need to work on,

19   what would you consider that to be?  Is it

20   unnecessary scrutiny or is it just trying to work

21   towards being better moving forward?

22          A.    Are you talking about in relation to

23   the athletic director position?  Because his e-mail

24   had nothing to do with -- this is about athletic

25   director.  You're talking about the three bullet

1    points, correct, or just in general?

2            Q.    I'm talking about in general.  And

3    this particular comment on Exhibit 27 about the back

4    and forth being scrutinized, I guess the preliminary

5    question would be:  Was that directed at your AD

6    duties or the study skills classes?

7            A.    I had not even done the study skills

8    classes so everything that was being sent was in

9    relation to my athletic director duties.  I know

10   obviously there are points where he makes -- says

11   that you're doing these things.  Plus, this e-mail

12   that precedes it, with 26, that has nothing to do

13   with being a teacher.

14           Q.    Okay.  So then when you're saying

15   that you're being scrutinized because Mr. Shafer has

16   provided some feedback to you on areas of

17   improvement, I guess my question is that you said

18   you've never been in a position where this is the

19   case, have you never been provided criticism by a

20   superior in the place of work on how to do your job

21   better?

22           A.    I can't really speak for the other

23   jobs.

24           Q.    You can't speak for your other jobs

25   about whether a supervisor has ever asked you to

254

1    improve somewhere?

2            A.   I'm trying to think.  Yeah, I don't

3    know.  Do you have something I need to look at?

4            Q.   No.

5                 So prior to working in the Boone

6    County Public School System, you worked at Newport

7    Independent, and you said that you left because the

8    opportunity at Boone was more appealing to you.

9            A.   Uh-huh.

10           Q.   I apologize, that's actually not what

11   you said.  What you said is that you left because

12   you didn't think it was a good fit or what you

13   wanted to do.

14           A.   I didn't believe for me continuing on

15   and wanting to be an administrator someday or to

16   work in a better situation, like what was going to

17   be at Newport Schools.

18           Q.   Okay.  Prior to leaving Newport

19   Schools, did you ever receive feedback from your

20   supervisors about areas of improvement in your job?

21           A.   If I did, I don't remember it.

22           Q.   Okay.  So prior to the year that you

23   spent at Newport Independent, you worked with Norris

24   Products Corporation --

25           A.   Uh-huh.

1          Q.   -- for two years as a sale rep.

2          A.   Uh-huh.

3          Q.   You listed in here in your discovery

4    responses that your supervisor was Mark Glassmaker?

5          A.   Glassmeyer, yeah.

6          Q.   Okay.  Glassmeyer?

7          A.   Uh-huh.

8          Q.   During the two years that you were a

9    sales rep, did Mr. Glassmeyer ever provide you

10   constructive criticism or feedback on areas of

11   improvement in your job?

12         A.   I mean, we talked but I don't -- when

13   I'm saying scrutinized, I don't believe that's the

14   same as, okay, like, do you want to work towards

15   this.  Or, again, having a conversation of, hey,

16   we're figuring something out, versus, okay, I did

17   this for you.  I didn't do this for you.  I guess

18   that makes sense.  I guess that was my -- maybe the

19   work was different, but yeah.

20         Q.   Okay.  So you also worked for two

21   years at Mariemont City Schools, for two years as a

22   basketball coach.

23         A.   Uh-huh.

24         Q.   During your time with Mariemont, did

25   you ever receive feedback from a supervisor about

1    how you can improve or things that you need to

2    improve in the course of your job?

3            A.    Not that I can remember, being a

4    coach there, no.

5            Q.    And Princeton City Schools, aside

6    from the disciplinary issue, did you receive

7    feedback from administrators about how you could

8    improve in your job or areas that need improvement?

9            A.    And, again, I don't remember.

10           Q.    Okay.  Seven Hills, you worked for, I

11   guess, one school year, from 2012 to 2013, as a

12   basketball and baseball coach.

13           A.    Uh-huh.

14           Q.    During that time, did you ever

15   receive feedback about areas of improvement?

16           A.    No, I don't believe I did.

17           Q.    Okay.  And then before that you

18   worked for a year at Phoenix Community Learning

19   Center as a PE teacher and director of early

20   learning and reading.

21           A.    Uh-huh.

22           Q.    Did you receive any feedback from

23   supervisors there about ways that you can improve

24   your job?

25           A.    I don't remember.  I remember I was

257

1    rated an excellent teacher at the end of it, or

2    something, or excelling teacher, so I don't think

3    there was anything written up after that.

4            Q.    So you were with Phoenix from

5    2013-'14, Seven Hills from 2012-'13, Princeton

6    School, I believe I saw somewhere from '14 to '15.

7            A.    I actually can't remember.  I can't

8    remember when I was there.  I was hired in, I

9    believe in -- I don't remember for sure.

10           Q.    So Mariemont Schools was from '15 to

11   '17.  So would Princeton have been in between

12   Phoenix and Mariemont?

13           A.    Yes, I went to Princeton after

14   Phoenix.

15           Q.    Okay.  So then according to this

16   timeline, '14 to '15 would have been your year at

17   Princeton?

18           A.    Yeah, '14 to '16 or '14 to -- yeah,

19   about that time.

20           Q.    Okay.  Oh, I apologize, it is right

21   here, it's '14 to '16.  Okay.  So Mariemont City

22   Schools then from '15 to '17, and then Norris

23   Products Corporation from '16 to '18.

24           A.    Uh-huh.

25           Q.    Newport from '18 to '19.  Have you

1    held a job for longer than two years?

2            A.    I can't remember if I have.  I don't

3    remember.  I think about -- I can't remember how

4    long I was at Children's Home, if I was there for

5    two or three years, but, typically, yeah, trying to

6    move up.

7            Q.    Okay.  Only being employed at these

8    places for roughly one to two years, have you ever

9    undergone some kind of substantive evaluation of

10   your job performance?

11           A.    As in by the end of the year they

12   accumulate like what I've done?

13           Q.    Well, I mean, whether it's a formal

14   process or even just sitting down?

15           A.    Yeah, I've been in -- yeah.

16           Q.    Okay.  During any of those evaluation

17   processes, have there ever been identified areas of

18   improvement for you?

19           A.    Not that I can remember.

20           Q.    Okay.  So when you're saying that you

21   are being scrutinized daily by Mr. Shafer, I'm

22   really trying to understand what you mean by that.

23   Because what I'm hearing from your testimony is

24   just -- I'm a little confused.

25                 Are you suggesting that it was a very

1    pointed, targeted, these are the things that you're

2    doing wrong and I'm coming for you because of it, or

3    is it just you did not like the tone and the words

4    used that made you feel like you were being treated

5    unfairly?

6              A.    I felt that they were very targeted

7    towards me.

8              Q.    Okay.  Do you have any firsthand

9    knowledge of communications that he has had with

10   other employees at Ryle High School about whether or

11   not they were specifically identified you need to do

12   this, this and this moving forward?

13             A.    I do not.

14             Q.    Okay.  So this e-mail happened or was

15   sent at roughly 2:29 p.m. on January 15th.  I'm

16   going to hand you what's been marked as Exhibit 28.

17             (WHEREUPON, Defendant's Exhibit No.

18   28 was marked for identification.)

19             Q.    Do you recognize this document?

20             A.    I can't remember but, I mean, he sent

21   it.

22             Q.    Okay.  So according to this document,

23   roughly two hours after you sent your e-mail to

24   Mr. Shafer, he sends you a calendar invite to

25   discuss expectations going forward in your e-mail.

1          A.    Uh-huh.

2          Q.    Did you ever have this meeting with

3   Mr. Shafer?

4          A.    I can't remember if that was my last

5   meeting with him or what.  I can't remember.

6          Q.    So I'm going to hand you what's been

7   marked as Exhibit 29.

8              (WHEREUPON, Defendant's Exhibit No.

9   29 was marked for identification.)

10          Q.    Do you recognize this string of

11   e-mails?

12          A.    Is this before this e-mail?  So 29 is

13   the e-mail before?

14          Q.    Oh, you're right.  I'm sorry.  I

15   handed those to you in the wrong order.

16          A.    I do remember this e-mail, yes.

17          Q.    So this e-mail, on January 15th, so

18   at 3:16, so this was before the calendar invite was

19   sent out --

20          A.    Do you want that one back?  It's the

21   e-mail from what he sent me.  Sorry.  It's the same

22   one you already gave me.

23          Q.    Oh, I apologize.  So I'm looking

24   specifically at Page 1043.

25          A.    Uh-huh.

261

1          Q.   So Mr. Shafer, after you sent your

2    e-mail at about 2:30 or so, sent you an e-mail

3    saying, hey, stopped by your office and couldn't

4    find you.  You're in charge of athletics per this

5    e-mail, so when athletic questions or conversations

6    arise, he wants to include you.

7               At this point, do you think it's fair

8    to say that Mr. Shafer was trying to address those

9    communication issues that you talked about earlier?

10         A.   What part are you on, the second

11   paragraph?

12         Q.   Yeah.  Well, I guess that's

13   technically the third.  So, "As I said prior, you

14   are in charge of all things athletics, so when

15   athletic questions or conversations arise, I want to

16   include you."

17              So at this point, do you think it's

18   fair to say that Mr. Shafer was either actively

19   doing or going to help address those conversation

20   and communication issues that you testified about

21   earlier?

22         A.   Yes.

23         Q.   Okay.  So the paragraph immediately

24   before, "I do not want you to feel that any of this

25   is directed at you.  It has been more as giving you

1    information.  I apologize if it took you any other

2    way."

3                    As of January 15th, with this e-mail,

4    did you still feel that even after this e-mail had

5    been sent, that Mr. Shafer was specifically

6    targeting you for any reason?

7                    A.    I mean, from everything that came up

8    before this, I did feel I was still being targeted.

9                    Q.    Okay.  So skipping down, "As for the

10   teaching duty, this is non-negotiable, your contract

11   is for being a teacher first.  There was no issue

12   with this when we met last week.  You will be

13   responsible for students fourth through

14   sixth period."

15                   So that final paragraph, "The fourth

16   and fifth period classes are small, both have less

17   than three students in person total, so you can take

18   them to your office once you establish a routine."

19                   Do you recall receiving this e-mail?

20                   A.    I remember receiving this e-mail,

21   yes.

22                   Q.    So this was before the Edgenuity,

23   teaching the study skills classes had even started,

24   and you were provided with information that there

25   were maybe six students total that you would be

263

1    adding to your caseload.  How does that conflict

2    with your responsibilities as athletic director?

3              A.   Again, being responsible for kids

4    that I had not been responsible for before.  I think

5    when you have kids in your room, regardless of him

6    stating this or not -- and this also brings in

7    coming in at 7:30, this also brings in, you know,

8    all that other -- those things that are not being

9    talked about.

10              But to have responsibility over three

11   kids, which I didn't think was appropriate anyway of

12   bringing them to my office, I am now -- their names

13   are under, at least my understanding was, in

14   Edgenuity, because I didn't know much about it at

15   the time, they're under your roster load.  You have

16   to make sure that these kids get brought up to

17   speed.  I had not been in that teaching capacity.

18              Going back to it, I don't know if

19   Jack Carr was in that teaching capacity when he was

20   in Edgenuity, but clearly had more access than I

21   did, because he was in there, that was his room.

22              To be responsible for these students,

23   whether it's three, whether it's 10 or not, they're

24   still under my discretion.  So if they're in my

25   office and they're not doing their work, I don't

1   have any rapport with them, I had not been the

2   teacher.  I didn't even know what I was supposed to

3   be doing.  Again, not until we discussed this later.

4           Did I think this would have impacted

5   my job, yes, because now you're being, again,

6   responsible for something else.  It is a change of

7   what I had been doing.

8           Q.   So where in this e-mail does it say,

9   again, that you have to be at school at 7:30?

10          A.   We spoke about that.  Matt and I had

11  not only spoke about it, but he, again, references

12  the piece of if you're not in or you're not able to,

13  he puts it as that, but we spoke and I think you had

14  asked Jon to provide you with that.

15          Q.   Right, the recording you haven't

16  provided to us.

17          A.   Uh-huh.

18          Q.   So my question, though, was:  Where

19  in this e-mail does it say you have to be there at

20  7:30?  Because the e-mail that we looked at before

21  says you have to be there for these teaching duties.

22  Does fourth period start at 7:30 in the morning?

23          A.   No.  But, again, if I agree to this,

24  which I didn't agree prior at all, what does that

25  have to do if it's not in this e-mail?  I'm not

1    understanding.

2              Q.    That's not my question.  My question

3    is:  Where in this e-mail --

4              A.    It's not in this e-mail.

5              Q.    Where in the e-mails that we've

6    looked at does it say you have to be at work at 7:30

7    in the morning?

8              A.    Let's do this.  You asked before.

9    Again, my reference in this, and this is after

10   talking to him, even though it's not in the e-mail,

11   it was on his general, it says, "I also expect you

12   to be at school every day to fulfill your teaching

13   and athletic supervisory duties.  If you cannot

14   fulfill this, then you would have to use some sort

15   of absence day."

16              We spoke, he stated that you have to

17   be here at 7:30, that's where he stated it.  I don't

18   have it in these documents.  He stated that I had to

19   be there at 7:30, when the teachers are expected to

20   be there.

21              Q.    Mr. Kirkendall, I asked you a

22   question and this will go a lot easier if you will

23   just answer the question I'm asking you.

24              A.    Okay.

25              Q.    Where in these e-mails does it say

1    you have to be at school at 7:30 in the morning?

2              A.    It doesn't in those e-mails.

3              Q.    Thank you.

4                    So the fourth and fifth period

5    classes are small, three students, or less than, for

6    each of them, so that's six additional students.

7                    So earlier when we were talking about

8    those -- so specifically let's talk about 2019-'20,

9    the ISS class, where you supervised students and you

10   said you didn't even know why you needed to be in

11   there because you were just there, correct?

12             A.    Correct.

13             Q.    Okay.  How do you know that this

14   class is going to be any different than that?

15             A.    I don't.

16             Q.    Right.  So what makes you assume that

17   this is going to so greatly burden your teaching and

18   your athletic duties that you will not be able to do

19   both jobs?

20             A.    I don't know.

21             Q.    Okay.  So after 1/15, did you ever

22   get the chance to meet with Mr. Shafer?

23             A.    I believe -- I don't know if that was

24   our final meeting or not, because I want to say

25   maybe 1/15 -- I don't know, I can't remember.

267

1          Q.   Okay.  So I'm going to hand you

2     what's been marked as Exhibit 30.

3              (WHEREUPON, Defendant's Exhibit No.

4     30 was marked for identification.)

5          Q.   This is dated 1/19.  It starts off

6     from Mr. Shafer, "Thank you for meeting with me this

7     morning to discuss expectations."

8              Could there have been another meeting

9     before the 1/19 meeting, or do you just not remember

10    either way?

11         A.   I believe this might have been his

12    last e-mail to me, so I think the meeting happened

13    at 1/19 and then -- yeah.

14         Q.   Okay.  Do you remember about when and

15    where this e-mail took place?

16         A.   When or where the e-mail took place?

17         Q.   I'm sorry.  The meeting took place.

18         A.   In his office.

19         Q.   Okay.  Do you know about when?  Was

20    it first thing?

21         A.   No, it was after dropping off my

22    kids, so it was around, like, 9:40, 9:50.  I believe

23    I texted him and said I was en route, I believe, if

24    that's the right day.  I can't remember.

25         Q.   So it starts off with, "Your contract

268

1    is as a teacher first and foremost, this is the same

2    for me as well."

3            A.    Uh-huh.

4            Q.    You've referenced this a lot in your

5    testimony that, yeah, well, this is what Mr. Shafer

6    told me, well, according to Mr. Shafer.  So when

7    you've said those comments, is this what you're

8    referring to, the conversation on 1/19?

9            A.    He stated it in the e-mail, but he

10   also said it in his office.

11           Q.    Okay.  We've looked at your contract

12   pretty extensively today, and you would agree,

13   again, you have a teaching contract with the Boone

14   County Schools?

15           A.    Correct.

16           Q.    You've said before that you only

17   agreed to teach one class.  Do you feel that it is

18   your prerogative to decide how many classes you

19   agree to teach at Ryle High School?

20           A.    Can you ask that again?

21           Q.    Sure.  When you say that you agreed

22   to teach a class, the way I understand the word

23   "agreed," it usually means that both parties say,

24   yes, that's fine, we're agreeing on this.

25                 So my question is:  When you say you

269

1    only agreed to take on one class, do you believe

2    that you had the sole ability to decide whether or

3    not you were to teach more than one class at Ryle

4    High School?

5              A.   I did not say that I taught a class.

6    I agreed to take the ISS room sixth period from Jack

7    Carr.  That's not a teaching position.

8              Q.   I'm going to agree to disagree on

9    that one.

10             A.   Okay.  That's fine.

11             Q.   Okay.  So you agreed to take on the

12   ISS class?

13             A.   Correct.

14             Q.   Do you think it is up to you to

15   solely decide how many classes you are supervising,

16   teaching, whatever you want to call it?

17             A.   Do I believe that an agreement states

18   what's going to happen?

19             Q.   No.  Do you believe that it is up to

20   you to decide how many classes you are taking on?

21             A.   No.  I believe that's an agreement

22   between me and the other person, who happened to be

23   my supervisor.

24             Q.   So then if you think that it is

25   something that must be an agreement, why isn't it in

270

1    your contract?

2              A.    I don't know.

3              Q.    Well, you would agree that your

4    contract doesn't say how many classes you are or are

5    not supposed to have, correct?

6              A.    Correct.

7              Q.    So --

8              A.    Would that also --

9              Q.    Go ahead.

10             A.    Wouldn't that also mean that I could

11   have eight classes, then, if that's my contract?

12             Q.    Yeah.  Sure.

13             A.    Or I could have one.

14             Q.    I think that's kind of the point.

15             A.    Okay.

16             Q.    You could have eight, you could have

17   one, per the contract, right?

18             A.    Okay.  Just making sure.  Yeah.

19             Q.    And per the teaching job description

20   that we look at earlier, you are subjected to

21   additional duties as instructed by your supervisor,

22   correct?

23             A.    Correct.

24             Q.    And per that same AD job description,

25   you are subjected to additional duties as needed by

1    your supervisor, correct?

2              A.    Correct.

3              Q.    Okay.  So what happened after this

4    e-mail?

5              A.    Honestly, I can't remember the days,

6    if this is when I stated, that coming back from

7    leave -- to Tony Pastura in my office -- I was under

8    the impression that FMLA, my job was not supposed to

9    be changing.  And I can't remember, was this -- I

10   can't remember if this was the meeting where Cody

11   Ryan was also in there.  The meeting wasn't

12   supposed -- in my mind, wasn't supposed to be

13   disciplinary because Matt and I were just talking.

14              And then, yeah, he came down to my

15   office and said, are you going to take over the

16   class, and I said -- stated that it was a change in

17   my duties that I had agreed upon, and then, yeah --

18   prior to leave, I was told -- I think -- I can't

19   remember if this is the day or not, but if this is

20   the 19th, then it might have been when I was told to

21   be put on leave or put on leave.

22              Q.    Okay.  So you have this meeting and

23   you are told by Mr. Shafer that the study skills

24   classes are non-negotiable, correct?

25              A.    Correct.

1          Q.    And you respond that you're not going

2     to teach them, correct?

3          A.    I didn't respond like that, but --

4          Q.    Okay.  So 1/19, this is the day that

5     your study skills supervision was supposed to begin;

6     did you show up to your supervisory duties in fourth

7     period?

8          A.    There was a break, the class period

9     hadn't started, but I told them -- I told Mr.

10    Pastura that I would not be going because my

11    understanding is that you cannot change my duties.

12         Q.    So you refused to go?

13         A.    I don't want to say refused but --

14         Q.    What else do you call that?

15         A.    My understanding is that on FMLA, if

16    you come back from leave, you're not supposed to

17    change.

18         Q.    So you refused to go?

19         A.    Again, I don't know if you would call

20    it --

21         Q.    Did you say, I am not going to go to

22    fourth period?

23         A.    Not in those words.

24         Q.    What did you say then?

25         A.    I said, from FMLA, it's my

1    understanding that I'm not supposed to go.  If I'm

2    remembering right, Tony Pastura asked, then, do you

3    need me to go down there.  I'm like, I think that

4    might be best.

5            Q.  So you refused to go to your class?

6            A.  Again, I don't know what other way

7    you can put it, but --

8            Q.  I'm really having a hard time

9    understanding why you won't just say -- okay.  Let

10   me ask it different.

11           You did not go to your fourth period

12   class?

13           A.  I did not make it to the fourth

14   period class.

15           Q.  You were told to be in fourth period

16   class, correct?

17           A.  I was told, correct.

18           Q.  So you refused to go?

19           A.  Again, there was a break, like all

20   schools have between bells.

21           Q.  Sure.

22           A.  I was at my desk, Tony Pastura came

23   in, he said, are you going.  I said, because of

24   FMLA, I believe that I do not need to go, so.

25   That's what I understood.

274

1    Q.   So you said you weren't going?

2    A.   I didn't say I was not going.

3    Q.   You may not have said directly, I'm

4    not going, but you very clearly made it apparent to

5    Mr. Pastura that you were not going to fourth

6    period, correct?

7    A.   I don't agree with that.  From what

8    my understanding was, again, referencing the FMLA, I

9    was allowed to question me coming back from leave.

10    Q.   There's a difference between

11    questioning coming back from leave and saying you're

12    not going.

13    A.   I agree.

14    Q.   Sure.  So you didn't go to fourth

15    period, which we --

16    A.   I did not make it to fourth period,

17    correct.

18    Q.   What do you mean, you did not make it

19    to fourth period?

20    A.   Because Matt Shafer, prior to fourth

21    period, came into my office, he said, are you going,

22    and I said, I have issue with what we've talked

23    about.  He said, well, then you're terminated -- or

24    not terminated.  At that time he said, you are put

25    on leave, and hand me your keys.

1          Q.   Okay.  So in this e-mail from

2    Mr. Shafer at 10:00 in the morning, so right after

3    your meeting, he finishes out the e-mail with, "I

4    know there's apprehension on your end about the

5    study skills courses, but during this pandemic time,

6    we have a need that has arisen due to the amount of

7    failures that we have.  As an allocated teacher

8    position, I am using you to help with this via the

9    study skills classes fourth and fifth period."

10          Do you recall having that

11   conversation with Mr. Shafer when you met the

12   morning of January 19th?

13          A.   He may have referenced it.

14          Q.   Okay.  Mr. Kirkendall, do you

15   consider yourself a team player?

16          A.   What?

17          Q.   Do you consider yourself a team

18   player?

19          A.   Some days, yes.

20          Q.   Okay.  Do you think it is in line

21   with someone who is a team player to refuse to take

22   on additional assistance and additional duties when

23   a school is struggling?

24          A.   To take on additional assistances?

25          Q.   And duties.  I apologize.  I misspoke

1    with assistance.

2             A.    Yeah.

3             Q.    You can keep rolling your eyes at me

4    all you want like that.

5             A.    I'm not.  I'm actually trying to

6    think, but please don't.

7                  I think if you have questions, you're

8    allowed to ask them without there being any issues.

9             Q.    But you've been talking about this

10   for two weeks at this point.

11            A.    Okay.

12            Q.    So did you not feel that the repeated

13   discussions about how this was just a non-negotiable

14   part of your contract, did that not sink in at all

15   or resonate?

16            A.    I don't believe he brought up

17   non-negotiable really until this language that's

18   here, it seems like, yeah.  Especially referencing

19   the pandemic time and the arisen amount of failures

20   that we have.  Are you done with this?

21            Q.    Yeah, you can be done with it.

22                  We talked about this a little bit

23   earlier.  Your end goal here was to be an

24   administrator, correct?

25            A.    Eventually, yes.

1    Q.    Did you talk with anyone at the Boone

2    County Schools about what it would take for you to

3    be an administrator?

4    A.    I believe Jenny Watson knew.  I

5    believe Chad Simms.  Mr. Turner, Mr. Shafer.  I

6    mean, we talked, but I don't know necessarily if

7    you're saying what it would take to be one.

8    Q.    Okay.  What did you talk about with

9    those people?

10    A.    A variety of things of, you know,

11    being an administrator and going through the process

12    of it, and, yeah, what it entails.

13    Q.    Okay.  What does it entail?

14    A.    There's, I mean, a lot of things.

15    Q.    It's a big task, isn't it?

16    A.    Yes.

17    Q.    Requires a lot of work?

18    A.    Yeah.

19    Q.    A lot of hours put in?

20    A.    Yes.

21    Q.    Does it require flexibility in

22    responding to emergencies and crises in school?

23    A.    Does it require emergency --

24    Q.    Does it require flexibility in

25    responding to, let's say, the unique needs that

1    arise in schools?

2            A.    If that is what's in the description,

3    then yes.

4            Q.    COVID created a huge problem in

5    school districts; do you agree or disagree?

6            A.    From my vantage point, I don't know.

7            Q.    You don't know if COVID created a

8    huge problem in school?

9            A.    I think something -- yeah, I mean,

10   sure.  Yes.

11           Q.    Okay.  You're at least aware that a

12   large portion of students were failing and more

13   people were required to be pulling weight to help

14   these students?

15           A.    I don't know necessarily if more

16   people were failing or -- yeah, I saw the kids that

17   I was supposed to contact, and they were failing,

18   and that's what I referenced.

19           Q.    Okay.  Is it your understanding that

20   the administration was trying to get an

21   all-hands-on-deck approach to getting these students

22   back on track?

23           A.    Yes.  From Andy Dusing's e-mail, yes.

24           Q.    Okay.  But you didn't feel like you

25   needed to be a part of that approach; is that what

1  I'm understanding from your testimony today?

2          A.    I felt like me coming back from

3  leave, I did not require a job change or

4  responsibility added on, you're correct.

5          Q.    Okay.  So Mr. Shafer comes into your

6  office, what does that conversation entail?

7          A.    I believe, yeah, we just spoke about

8  it.  He came in and asked if I was going, and I

9  referenced the FMLA leave piece.  And he said, well,

10 then you're put on paid leave.

11         Q.    Okay.  So I'm going to hand you

12 what's been marked as Exhibits 31 and 32.

13              (WHEREUPON, Defendant's Exhibit No.

14 31 was marked for identification.)

15              (WHEREUPON, Defendant's Exhibit No.

16 32 was marked for identification.)

17         Q.    Have you seen these documents before?

18         A.    I have, yes.

19         Q.    What are these documents?

20         A.    The write-up from Mr. Shafer, as well

21 as Mr. Ryan.

22         Q.    Have you had the opportunity to read

23 through both of these documents?  And if you would

24 like to do so now --

25         A.    I'll read them now.

1              Q.    Well, I'm going to ask you:  Do you

2    take any issue with any of the recollections

3    reflected therein?

4              A.    I mean, one of the recollections or

5    the issues that I had was that this meeting was

6    supposed to be between Mr. Shafer and I, and I was

7    not given -- I didn't realize this would be a

8    disciplinary meeting, which I should have had

9    representation, I believe, from the school at that

10   time, and if it was, it was not alluded to.

11             I mean, outside of missing a few

12   points that we talked about, I mean, those issues I

13   do have, yeah, I mean.  Yeah, I don't remember the

14   recollection from the second paragraph from Cody

15   Ryan, how that happened.  He said he was unaware.  I

16   don't remember the constituted abandonment of duties

17   and would subsequently result in a hearing at all,

18   but if that happened, then, yeah.

19             Okay.  What am I looking at?

20             Q.    So in Mr. Shafer's -- so that would

21   be Exhibit 31 -- Mr. Shafer's letter, in that last

22   full paragraph, about midway through, it says, "When

23   fourth period began, Mr. Kirkendall was not in his

24   assigned classroom.  I went to Mr. Kirkendall's

25   office and asked him to report to his fourth period

1    class.  He told me that he would not be going."  Is

2    that accurate?

3            A.    Not how it's written, no.  He came to

4    me after third period, it was class change, and,

5    yeah, to say that I would not be going was not --

6    that was further -- like I said, I referenced me

7    coming back from leave and I didn't think that the

8    change was needed -- or was warranted.  And, yeah,

9    that's when I was terminated.  But I don't know how

10   he's writing it, but that's how I remembered it.

11           Q.    But where it says, you know, he was

12   under the impression that you were not going to be

13   going to that fourth period class, do you think it

14   was fair for him to take away that understanding

15   regardless of what it is that you said?

16           A.    Sure.  Yes.

17           Q.    Okay.  So at that time, I suspended

18   Mr. Kirkendall with pay until a hearing with your

19   office, as in with Mr. McCartor's office, could

20   occur.  He collected keys and badge without

21   incident.

22                Was January 19th your last day of

23   being employed in Ryle High School?  Like, was it

24   the last day you were in Ryle?

25           A.    In Ryle, yes.

```
 1              Q.   Okay.  What happened after this
 2    letter?
 3              A.   Met with -- I guess with the lawyers
 4    in regards to the termination.
 5              Q.   Okay.  I don't want to hear about
 6    anything that you met specifically with regard to
 7    Mr. Allison or Mr. Shipp.
 8              A.   Then what are you asking?
 9              Q.   I'm about to ask a question.  I'm
10    just clarifying, I don't want to know any
11    discussions that you had with Mr. Allison or
12    Mr. Shipp.
13              A.   Okay.
14              Q.   Did you meet with anyone else about
15    your termination?
16              A.   I can't remember.
17              Q.   Did you discuss it with anyone at the
18    BCEA?
19              A.   Yes.
20              Q.   Okay.  Who did you talk to at the
21    BCEA?
22              A.   I can't remember her name.  Well, I
23    think it was a teacher representative, and then I
24    think it was whoever the president was, and then I
25    stated that she didn't -- I didn't feel like she was
```

283

1    taking my situation seriously, and then I got moved

2    to whoever the representative from UniServ was.

3            Q.    Okay.  So does the name Mary Wilson

4    and Scott LeCates ring a bell?

5            A.    Yes.  Yes.

6            Q.    I'm going to hand you what's been

7    marked as Exhibit 33.

8            (WHEREUPON, Defendant's Exhibit No.

9    33 was marked for identification.)

10           Q.    Do you recognize this exchange of

11   e-mails?

12           A.    Am I starting from the back again?

13           Q.    Yeah.

14           A.    Okay.  I'm supposed to be -- are you

15   saying is this familiar to me?

16           Q.    Yeah, just do you recognize that

17   exchange of e-mails?

18           A.    Yes.

19           Q.    Okay.  So I want you to look on the

20   third page of that document, it's labeled 94 down at

21   the bottom right-hand corner.

22           A.    Uh-huh.

23           Q.    So it's a little tricky to look at

24   because of the way that this e-mail is embedded, but

25   there's a paragraph about halfway through that

1    starts off, to answer the insubordination question.

2    Do you see that?

3                    A.    Uh-huh.

4                    Q.    Did you ask Mary Wilson, the

5    president of the teachers' union, about the

6    insubordination charge and whether or not she

7    thought there was any merit to it?

8                    A.    I believe on the next page, it says,

9    I guess the first one, "With it not being my

10   intention on agreeing to the insubordination, what

11   remedies do I need to take," I can't remember even

12   asking her about -- what if -- well, let me see.

13   Sorry, I thought this all ran together.

14                   What was your question again?

15                   Q.    I just asked if you had asked her

16   about the insubordination charge?

17                   A.    I mean, outside of this piece about

18   me not agreeing to it, I can't remember if I

19   actually, like, said -- yeah, I guess, yes.

20                   Q.    So did you talk to her on the phone

21   is, I guess, a better way to ask it?

22                   A.    We did speak on the phone.

23                   Q.    Okay.  Do you remember the substance

24   of that conversation?

25                   A.    It was not long.  It was just about

1    what was going on and -- yeah, I think it happened,

2    like, on a Saturday.

3            Q.    Okay.  So in her e-mail to you on

4    January 22nd, "To answer the insubordination

5    question, in your teaching position description, you

6    have to keep in mind that there is the 'other duties

7    as assigned' portion of the description.  Every

8    certified position in the district is paid and

9    contracted on the basis of a teaching position.

10   Even Matt Turner or Eric McCartor are paid first as

11   a teacher, but then indexed to accommodate this

12   title.  Regardless of your AD position, you are

13   still a teacher first and can be assigned other

14   duties.  The claim of insubordination will stand

15   from the district's standpoint."

16            Do you recall being told this by the

17   president of the teachers' union?

18            A.    Through this e-mail, yes.

19            Q.    Okay.  Do you disagree with her

20   assessment of the insubordination claim?

21            A.    What do you mean, disagree, how?

22            Q.    Well, she is telling you that

23   insubordination will stand because you're paid and

24   treated first as a teacher, you can't say no to

25   classes.

1          A.    Then, I mean, she said it, yes.  I do

2     disagree with how it was posed, yeah.

3          Q.    Okay.  So on the page before that, so

4     it's a later communication.

5          A.    Page 2?

6          Q.    Yes.  On Monday, January 25th, she

7     sends you another e-mail specifically in response to

8     your question, "Can an employer change your job

9     duties."  And she responds, "Generally, unless an

10    employment contract or a collective bargaining

11    agreement states otherwise, an employer may change

12    an employee's job duties, schedule, or work location

13    without the employee's consent."  And then she goes

14    on to clarify, "Our bargained contract" -- which is

15    the BCEA contract we referenced earlier -- "does not

16    state job duties.  Board policy and job descriptions

17    will."

18               After you received this e-mail from

19    Ms. Wilson, did you go back and take a look at the

20    job descriptions and/or board policies?

21          A.    Not at the time, no.

22          Q.    Okay.  Based on your review of the

23    board policies and teaching descriptions, as well as

24    the president of the teaching union's directives, do

25    you feel that you were in the right by declining to

1    take on the additional two study skills courses?

2              A.    Do I personally feel that I was in

3    the right?

4              Q.    Yeah.

5              A.    Yes, I do feel like to be able to

6    decline the change in schedule, yes, I still do feel

7    that I was in the right.

8              Q.    Even though the head of the teachers'

9    union told you you are not?

10             A.    I still felt and still feel like I

11   am.

12             Q.    Okay.  So you go on to discuss that

13   there is an upcoming disciplinary hearing.  Who

14   attended that hearing with you?

15             A.    Scott LeCates.

16             Q.    Who is Scott LeCates?

17             A.    I guess he was the director of

18   UniServe.

19             Q.    Okay.  Mr. LeCates is not an

20   attorney, correct?

21             A.    No.

22             Q.    Okay.  Did you have -- was Mr. Shipp

23   present at that one with you?

24             A.    No, he was not.

25             Q.    Okay.  And so you and Mr. LeCates

1    attend a hearing.  When was that hearing?

2            A.    I don't know if it was -- I can't

3    remember.  I think it might have been a week after

4    the 19th, around.

5            Q.    Okay.  Before that hearing, did the

6    district conduct any kind of investigation into the

7    disciplinary actions?

8            A.    I don't know.

9            Q.    Okay.  I'm going to hand you what's

10   been marked as Exhibit 34.

11            (WHEREUPON, Defendant's Exhibit No.

12   34 was marked for identification.)

13            Q.    Have you ever seen this document

14   before?

15            A.    I did see it; it was sent to me the

16   other day and I did see it.

17            Q.    If you would like to take some time

18   to review it, you're welcome to do that.

19            A.    Okay.

20            Q.    So on the second page of that report,

21   Conclusions and Recommendations.  So, first of all,

22   who is Matt Rigg?

23            A.    Was he the head of HR at the time?

24            Q.    Okay.  So, yes, he was the director

25   of HR, and he completed an interview, and this is a

1    copy of his report.

2              A.   Okay.

3              Q.   Did you see this report at all during

4    the disciplinary process?

5              A.   No.

6              Q.   Were you made aware at any point that

7    there were documents at central office that you

8    could go pick up?

9              A.   Not until after, I believe.  I can't

10   remember if they were sent to me or sent to Scott

11   LeCates.  This is after my hearing then.

12             Q.   So on Page 4 of the exhibit that we

13   just looked at, or Exhibit 33, you say, on

14   January 22nd, "Hello, Mary.  Thank you for the

15   information, after reviewing Matt Shafer's documents

16   and reading over the process."

17             A.   Uh-huh.

18             Q.   What documents then did you review?

19             A.   It was the -- I believe it was these

20   two letters.

21             Q.   Okay.  I guess a better question

22   would be, after this disciplinary report was

23   rendered, was Matt Rigg at your disciplinary

24   hearing?

25             A.   He was.

1          Q.    Okay.  Do you recall his testimony

2    and recommendations at the hearing?

3          A.    No.

4          Q.    Okay.  So at the bottom of Page 2 of

5    3 of this investigatory report --

6          A.    Where?

7          Q.    Page 123.

8          A.    Okay.

9          Q.    Where it says, "It is the

10   recommendation of Human Resources Department that

11   Mr. Kirkendall receive a public reprimand for

12   insubordinate behavior and then be placed on

13   probation."  Do you recall Mr. Rigg's testimony to

14   that effect?

15         A.    No, I do not remember.

16         Q.    Okay.  During -- tell me about the

17   hearing.  What happened and who was there?

18         A.    Scott LeCates, myself, Mr. McCartor,

19   Matt Shafer and Mr. Rigg.

20         Q.    Okay.  How did it go, as in, you

21   know, what happened?

22         A.    I came away feeling I didn't get to

23   discuss all the issues that were actually out there.

24   That's what I had heard was the process of that.

25         Q.    Okay.  Sorry.  Let me ask a better

1    question.

2                    A.    Okay.

3                    Q.    I was trying to be specific.  So you

4    go to the hearing, where is it at?

5                    A.    It's at central office.

6                    Q.    Okay.  So you go into central office.

7    Did you go into one of the conference rooms there?

8                    A.    Yes.

9                    Q.    Okay.  So Mr. McCartor is there; is

10   he presiding over the hearing?

11                   A.    I believe so, I'm assuming, yeah,

12   unless Matt Rigg was.

13                   Q.    Okay.  So the beginning of the

14   hearing, did Matt Rigg kind of read through this is

15   what's being alleged, this is what we're seeking?

16   Him and Mr. Shafer, what did they have to say?

17                   A.    Gosh, I can't -- I believe he did

18   talk about why we're here, but I can't remember

19   everything he said at all.  And then I believe Matt

20   Shafer spoke next about it, or maybe there was like,

21   do you understand, something along those lines.

22                   Q.    Okay.  Were you given the opportunity

23   or was Mr. LeCates given the opportunity to speak in

24   response?

25                   A.    At the very end, we spoke, I remember

1    that.  But I can't remember really in -- I was asked

2    a few questions of, you know, why didn't you just

3    agree to it, or why don't you just do, I mean, what

4    your supervisor tells you, and so on and so forth,

5    but we didn't speak much.

6              Q.   Okay.  Do you recall what

7    Mr. McCartor had said during the hearing?  Did he

8    say anything and what was that?

9              A.   Well, I remember in reference to the

10   Edgenuity classes of just, you know, it's monitoring

11   students and making sure that the computer is on.  I

12   know asking about, you know, being -- what is it

13   called -- why didn't you agree to what your

14   supervisor said, stated that we had a great rapport

15   with each other, and not too much else.  I can't

16   really remember.

17             Q.   Okay.  How did the hearing conclude?

18   How did you all leave it?  Did Mr. McCartor indicate

19   whether or not he was going to recommend discipline?

20   What happened at the end?  What did you walk away

21   feeling was going to happen?

22             A.   I didn't know what was going to

23   happen.  I felt that -- I know I made the statement

24   that I felt that we didn't get to discuss everything

25   that should have been -- that I felt I should have

293

1  been brought up at the time.  And I can't remember

2  if I said I didn't agree with, you know, the changes

3  or something along those lines.  And then I can't

4  remember if Matt Rigg said then -- or we're going to

5  take your findings, or something along those lines,

6  and make a decision.

7          Q.   Okay.  You said that you felt like

8  you didn't get to say all that you needed to say.

9          A.   Uh-huh.

10          Q.   You were given the opportunity to

11  speak at the hearing, correct?

12          A.   Not like an open forum.  There was

13  never a question posed of how do you feel about this

14  or anything.  It was typically -- I mean, I remember

15  Matt Shafer speaking, I remember -- yeah, there was

16  not really much for me to say.  It was pretty much

17  pointedly Matt Shafer, yeah, speaking about his

18  changes and his thoughts of what was going on.  But

19  I don't really recall being like, hey,

20  Mr. Kirkendall, give your side of what's going on.

21          Q.   Did Mr. LeCates have the opportunity

22  to speak on your behalf?

23          A.   He spoke at the end on my behalf.

24          Q.   Okay.  He was there as your

25  representative, correct?

1          A.   Yes.

2          Q.   Okay.  Why didn't you ask him to make

3    additional statements for you on your behalf?

4          A.   We went to -- if I can remember

5    right, we went to the breakout room, and I told him

6    that I didn't feel like this was right.  I felt like

7    things were loaded up against me, that if I were to

8    come back, I was potentially going to be terminated

9    because of the list of things that Matt Shafer had

10   said at that meeting.  And, honestly, I didn't know

11   what the process was to actually ask him to speak up

12   for me if he was allowed.

13         Q.   Mr. LeCates was there on behalf of

14   the teachers' union, correct?

15         A.   Correct, I guess, if that's what

16   UniServ is.

17         Q.   Sure.  Well, you were put into

18   contact with him by Mary Wilson, correct?

19         A.   Correct.

20         Q.   So was it your understanding that

21   Mr. LeCates would have at least known the process?

22         A.   I figured somebody needed to.

23         Q.   Okay.  At the end of the hearing, do

24   you recall any discussion from Mr. McCartor about

25   how they would only suspend you if you would just --

1    or not suspend, I apologize -- that they would just

2    reprimand you if you would just agree to go back and

3    teach the classes?

4             A.   I do remember him saying that.

5             Q.   Okay.  I'm assuming you declined?

6             A.   Correct.

7             Q.   Why?

8             A.   Because, again, I felt like that

9    meeting should have highlighted all the things that

10   were going on from me being on leave to coming up,

11   and I didn't feel like those things were.  Sorry.

12            Q.   You're fine.  Do you want to take a

13   break?

14            A.   No, I'm good.

15                 I felt like, yeah, from all the

16   e-mails to the exchanges from when I was on leave to

17   whatever else were not being discussed at that time,

18   so I did not agree.

19            Q.   Okay.  So what happened after that,

20   after that hearing?

21            A.   I want to say it was shortly after I

22   was sent the letter of termination.

23            Q.   Okay.  I'm going to hand you what's

24   been marked as Exhibit 35.

25                 (WHEREUPON, Defendant's Exhibit No.

1    35 was marked for identification.)

2            Q.    I apologize.  I handed you the wrong

3    one.

4            A.    Yes.

5            Q.    Before you left the hearing with

6    Mr. McCartor, prior to, of course, this letter

7    coming out, you just said that you were offered the

8    opportunity to go back to Ryle High School, correct?

9            A.    Yes.

10           Q.    But you would have to take on those

11   additional two study skills classes, correct?

12           A.    Yeah.

13           Q.    And you said you were not taking on

14   those two classes?

15           A.    Wait.  Are you asking what I said at

16   the meeting?

17           Q.    Sure.

18           A.    No.  Well, I also, like I said,

19   wanted to highlight the fact that being called in

20   early and disregarding what I had agreed upon early

21   on was not spoken of.  But I did say I was not

22   agreeing to the changes in my schedule.

23           Q.    Okay.  So was the termination

24   necessarily a surprise then?

25           A.    I don't know if it would necessarily

1    be a surprise, but, yeah, I was taken aback by it,

2    yeah, not being able to actually speak about it.  I

3    know there's a line of -- well, yeah, "At this

4    meeting, you were given due process where you were

5    allowed to respond to these charges and where you

6    indicated that you understood."

7                     I didn't come across feeling any

8    better because I couldn't actually -- I didn't

9    really speak.  So, yeah, I was a little surprised

10   that that's how the disciplinary actions were held.

11           Q.    But, again, you had Mr. LeCates there

12   with you as your representative and advocate,

13   correct?

14           A.    Yeah, if you want to say that, yeah.

15           Q.    Okay.  And he did speak on your

16   behalf at the end of the hearing?

17           A.    I don't --

18           Q.    You just said that he spoke at the

19   end.

20           A.    I mean, he spoke at the end, but,

21   again, I don't remember him saying, like, oh, this

22   is what Mario says.  I don't believe that happened,

23   and I can't remember what it -- yeah.  But he was

24   there as my representative, correct.

25           Q.    Okay.  And Mr. LeCates was given the

1    opportunity to speak on your behalf at the end,

2    correct?

3              A.   Again, I can't remember the end of

4    it.  I know we went into the room, we came back, I

5    said I'm not agreeing to the changes in the

6    schedule, amongst other things.  I cannot remember

7    what he said because it was -- yeah.

8              Q.   Okay.

9              A.   I don't remember him saying, hey,

10   Mr. Kirkendall said this, this and this, and these

11   things are -- I don't remember him stating those

12   things or saying those things.  I know he spoke

13   after me and then, yeah, I was leaving.

14             Q.   Okay.  After you received the

15   termination letter on January 28th, what did you do

16   after that?

17             A.   I can't remember if I had a call or I

18   met with Mr. LeCates to get information on finding

19   representation.

20             Q.   What did Mr. LeCates advise you to

21   do?

22             A.   To contact Mr. Shipp's office.

23             Q.   Okay.

24             A.   JSB.

25             Q.   And, again, I don't want to know any

1    of the conversations that you had with Mr. Shipp

2    because those are privileged.

3              A.    Yeah.

4              Q.    Is that when you then filed a lawsuit

5    in Boone Circuit Court?

6              A.    I can't remember if that was after

7    the hearing or whatever, the tribunal.

8              Q.    Okay.  So you had a tribunal?

9              A.    No, I did not.  I'm saying that was

10   like -- it was submitted for a tribunal and then I

11   was unable to have one, and then I don't remember.

12   But, yeah, eventually it got filed.

13             Q.    Okay.  So hopefully the next few

14   components of this will be rather quick and

15   painless.  We don't have any more documents to hand

16   to you with the exception of -- if you would like to

17   see them because we're going to walk through them --

18   your discovery responses.

19             A.    Okay.

20             Q.    I'm not going to make these an

21   exhibit, but these are here for your reference if

22   you'd like to look through them.

23             A.    Okay.

24             Q.    So you have in front of you a copy of

25   your discovery responses.  Do you recall seeing

1    these and participating in creating the responses?

2              A.    Yes.

3              Q.    Okay.  So we're going to skip ahead

4    because we've gone through some of these already.

5    We're going to skip ahead to Interrogatory No. 6.  I

6    apologize, it's kind of hard to follow because there

7    are no page numbers on the responses.  Do you see

8    No. 6?

9              A.    Yes.

10             Q.    Okay.  So you were asked, "With

11   respect to the allegation in Paragraph 12 of the

12   complaint, you were subjected to racially

13   discriminatory comments."

14             A.    Uh-huh.

15             Q.    Your counsel objected because they

16   required a lengthy response and would be better

17   suited to deposition, so here we are, sir.

18             A.    Okay.

19             Q.    You've identified three specific

20   instances where you felt that you were racially

21   discriminated against in your employment with the

22   Boone County Schools.

23                   The first is that Mr. Shafer made a

24   comment to you, "Mr. Kirkendall looks like he went

25   to Princeton and I went to Sycamore."

301

```
 1                    A.    Uh-huh.

 2                    Q.    When was that comment made?

 3                    A.    That was made at a coaches meeting in

 4      front of coaches, so I don't --

 5                    Q.    When?

 6                    A.    I mean, he was principal at the time,

 7      head principal at the time, so maybe August of 2020.

 8                    Q.    Okay.

 9                    A.    Around that time.

10                    Q.    What was the context of that comment?

11                    A.    We were changing between me speaking

12      in front of the coaches and him coming up, and that

13      was the first statement he made to the other people.

14                    Q.    You'll have to forgive my ignorance,

15      but what does that mean?

16                    A.    Sycamore is a predominantly white

17      school.  Princeton is a predominantly black school.

18                    Q.    Are those Cincinnati schools?

19                    A.    Correct.

20                    Q.    Okay.  What was your response to that

21      statement?

22                    A.    I didn't like it.

23                    Q.    Okay.

24                    A.    I felt it was not needed, especially

25      when I'm -- I mean, I think there's maybe one or two
```

1    other minority coaches from Kentucky, I'm assuming.

2    I had no clue what that context was and I did not

3    like it.

4              Q.   Okay.  So the second one, "I want

5    Mr. Kirkendall to be partnered up with his boy

6    Mr. Pastura."

7              A.   Uh-huh.

8              Q.   Again, forgive my ignorance if

9    there's something here, but what -- where is the

10   racially discriminatory component to this comment?

11             A.   I believe in a capacity of

12   professionalism, you don't typically use the words

13   "up with his boy" or "partnered up with his boy," in

14   reference to -- instead of colleague or friend or --

15   there's other ways to say that, and I believe that's

16   pretty -- I mean, from my vantage point, it's

17   offensive.

18             Q.   Okay.  What was the context of that

19   statement?

20             A.   I believe it was when I was coming

21   back and Mr. Pastura was supposed to be my direct

22   contact.  That was during my hearing.

23             Q.   Okay.

24             A.   And then he -- yeah.

25             Q.   During your hearing?

303

1          A.   My hearing with Mr. McCartor,

2     Mr. Rigg, Mr. Shafer, and Scott LeCates.

3          Q.   So Mr. Shafer said this, "I want

4     Mr. Kirkendall to be partnered up with his boy, Mr.

5     Pastura," during the hearing?

6          A.   That was during my hearing, yeah.  I

7     don't know if you call it a hearing.  Sorry.  My

8     kids' alarm.

9               That was during that meeting.  And

10     then I forget what he said after because I sort of

11     tuned it out.

12          Q.   So that comment was said during the

13     disciplinary hearing in January in central office?

14          A.   Correct.

15          Q.   And I know I just asked you this, but

16     now I don't understand.  What was the context of

17     that; coming back from what?  I thought you were not

18     agreeing to come back.

19          A.   Wait.  What?  No, this was in my last

20     meeting with them, he stated that "I put

21     Mr. Kirkendall under his boy Mr. Pastura," as like a

22     report to him.  That was in that meeting.  I guess

23     he was explaining his processes of things.

24          Q.   Okay.  So he was explaining that he

25     partnered him up with his boy, Mr. Pastura, not I

1    want prospectively, in the future, to be partnered

2    up?

3           A.   Yes.

4           Q.   I apologize.  I was having a hard

5    time tracking the timeline there.

6           A.   You're fine.

7           Q.   What was your relationship like with

8    Mr. Pastura at that point?

9           A.   I mean, we were fine.  I don't --

10   yeah, I think we're fine.  I would text him every

11   once in a while when I was on leave.  He reached out

12   to me after my termination, so I didn't have any bad

13   rapport with him at all.

14          Q.   My impressions of Mr. Pastura is he

15   seems to get along with everyone.  Have you ever had

16   any conflict with him?

17          A.   No, not that I know of.

18          Q.   Okay.  When you were working at Ryle,

19   he was a vice principal or assistant principal

20   maybe, is that --

21          A.   One of the -- yeah.  Yes.

22          Q.   Okay.  Did you have any direct report

23   or any kind of, you know, I guess chain of command

24   relationship with him at Ryle?

25          A.   No.  Being in an athletic director

1    position, I reported straight to Mr. Shafer or Mr.

2    Turner.

3                Q.    Okay.

4                A.    So no, we never.

5                Q.    Other than those two statements, has

6    Mr. Shafer ever made any racially, insensitive, or

7    discriminatory comments to you?

8                A.    Not that I can remember, no.

9                Q.    Okay.  So the second sentence, or I

10   guess the sentence after that, you say, "In

11   September, Matt Turner explained to plaintiff that

12   he learned how to talk to black and nonwhite

13   students from his friend."  When was that

14   conversation?

15               A.    That was a meeting in his office.

16   And he was -- I guess he was referencing a black

17   principal within the district, and I thought it was

18   very weird that that happened.  But he made the

19   comment -- I can't remember his name, I'm trying to

20   think of it -- he's within -- his kids had gone to

21   Ryle, and yeah, he started listing off statements on

22   how to talk to black students, which I thought was

23   very weird that I was in the middle of this

24   conversation.

25               Q.    What was the conversation about?  How

306

```
 1    did this come up?
 2              A.   Again, it was just dropped in the
 3    middle of a conversation.  It was -- yeah.
 4              Q.   Okay.  It says in September, was that
 5    September of 2019 or '20?
 6              A.   '19.
 7              Q.   So right when you started?
 8              A.   Yes.
 9              Q.   So this would have been when
10    Mr. Turner was the principal?
11              A.   Correct.
12              Q.   Okay.  You also have listed in here,
13    "Please refer to Interrogatory 11."  So let's switch
14    on over to that.  Are you there?  It's like three
15    pages.
16              A.   Yes.
17              Q.   Okay.  So in this one you're, again,
18    asked to identify each and every instance of racial
19    discrimination upon which you base Counts II and III
20    of your complaint.  So in addition to the three
21    comments that were listed in response to
22    Interrogatory No. 6, you've listed a few more.
23                   So you state that "On December 3 Matt
24    Turner questioned plaintiff regarding an incident
25    with Charity Ehrenberg."
```

1          A.    Correct.

2          Q.    "Mr. Turner's tone suggested to

3     plaintiff that he was being accused of being an

4     angry black man."

5               So we discussed this exchange a

6     little earlier, and isn't it true that you testified

7     no one ever accused you of being an angry black man?

8          A.    Not in words, but by you're bigger

9     than her, you have a deeper voice, you come across,

10    you know, as angry.  That's what he specifically

11    told me in the hallway, correct.  So I think those

12    are -- I mean, outside of -- yeah, being the only

13    black male -- outside of me being the only black

14    male in the athletic director position within the

15    school, I thought that was interesting, or weird.

16         Q.    Has he ever, to the best of your

17    knowledge, had a conversation with other men in the

18    school about, you know, you're bigger with a deeper

19    voice?

20         A.    No, not in the context of her running

21    up to the office saying that I cursed her out and

22    was mean to her.  I don't believe so, I don't know.

23         Q.    You don't believe so as you know that

24    he hasn't or you don't know?

25         A.    I just don't know if he's had any

1    other conversations with that dynamic.

2              Q.    Okay.  So he never mentioned race and

3    he didn't use the words "angry black man," but the

4    other things that you mentioned are what led you to

5    believe that he was accusing you of being an angry

6    black man?

7              A.    Yeah, I believe that those biases

8    played out within this piece from Charity.

9              Q.    So after Charity went and accused you

10   of being mean to her and Mr. Turner came and spoke

11   with you about it, did any disciplinary action

12   resolve?

13             A.    Towards me?

14             Q.    Yes.

15             A.    No.  He just talked to me about, you

16   know, being kinder and nicer to people, and I stated

17   I was as kind as I thought I needed to be because

18   when someone is coming and screaming in your office,

19   then it was very off-putting.  But there was nothing

20   that I know of that was disciplinary behind the

21   scenes, no.

22             Q.    Okay.  So the response continues,

23   "Around the same time, Mr. Turner again accused

24   plaintiff of being 'mean' to an employee."  Who was

25   that in reference to?

1          A.    I'm trying to think back.  I can't

2     remember off the top of my head who that was in

3     reference to.

4          Q.    Okay.  Regardless of who it was you

5     were accused of being mean to, again, was there any

6     discussion that specifically identified your race as

7     having some kind of contributing factor as to

8     whether or not you were mean?

9          A.    No.

10          Q.    The next sentence says, "Throughout

11     his tenure, plaintiff was subjected to heightened

12     scrutiny."  So we've discussed the scrutiny

13     component a lot, and I'm not trying to re-bring all

14     of that up, but what about the comments that were

15     made and the scrutiny that you feel you were put

16     under leads you to believe that that scrutiny was a

17     direct response to your race?

18          A.    Around the time of taking leave, it

19     felt as -- slighted as like, hey, you don't actually

20     want to work or, I mean -- and I know it's been

21     referenced of, hey, you don't actually want to work

22     with kids.  But it seems that race had an issue with

23     me coming back.

24               I mean, I can't speak of it being

25     directly put in front of me, but I feel that, hey,

1    you're taking leave to go take care of your kids is

2    actually, hey, you just don't want to work here.

3    And, again, combined with the mean comments and

4    then, you know, the scrutiny pieces that we had

5    already talked about to not bring up, I felt that,

6    yeah, it was shrouded and maybe not blatant racism

7    or -- it felt that, yeah, it was directed solely

8    towards me, and that I don't -- again, you've asked

9    the question has anyone else spoke or been spoken to

10   like this, I don't know.

11          Q.    Okay.  So the next sentence says,

12   "Other employees, including Jenna Weyer" -- however

13   you say that -- "would consistently go over

14   plaintiff's head in the chain of command."

15          What specifically leads you to

16   believe that that is due to a race-related problem,

17   or a race-related reason?  I apologize.

18          A.    Where someone's going above you or

19   around you?

20          Q.    Yes.

21          A.    Because it seems as though, yeah, I'm

22   in this position of, you know -- I don't know if you

23   want to say authority or not, but the athletic

24   director position, and my direct reports are going

25   completely around me.  And then I'm getting told on

1    as to you're not communicating or you're not

2    available for them, felt like, okay, yeah, this

3    seems to be happening to me, and it seems to be,

4    again, from the examples being brought up, but yeah,

5    that -- yeah.  Sorry.

6             Q.   But what specifically makes you think

7    that people were going around you because of your

8    race?

9             A.   I felt at the time it was.

10            Q.   Okay.  Other than the instances that

11   were referenced in both your Interrogatory No. 6 and

12   response to 11, which we just looked at, can you

13   think of anything else, any other conversations or

14   comments that occurred that lead you to believe that

15   you were subject to race discrimination during your

16   employment with the Boone County Schools?

17            A.    I felt like it was weighed upon,

18   again, me coming and taking leave.  I made mention

19   of the football coach that had, you know, we had

20   spoke about race and my overall observations that

21   happened there.

22                 And there were, I mean, obviously the

23   incidents with, you know, the -- I don't want to say

24   as respected, but bringing up the Pete Coleman thing

25   and speaking about, hey, this is happening to me on

1    the job and it's not feeling like it's being taken

2    seriously.  All right.  Or -- I would say those -- I

3    would leave it there.  Sorry.

4            Q.   Okay.  So the football incident that

5    we talked about was not a race issue necessarily

6    aimed at you though, that was about students on the

7    team, correct?

8            A.   How it was worded was aimed at -- as

9    far as, hey, you, as a black man, do you feel that

10   this coach is racist.  I'm like, that's weird that

11   I'm put in that position.  Or, you know, to be, I

12   guess, looking at it through that lens.  But, yeah,

13   I don't think that's a typical question of like,

14   you, as a white woman, do you think this is

15   happening because of this, right?  That's a pointed

16   question of not necessarily, oh, you, as this

17   professional, or you, as this person who is doing

18   this thing, it's shrouded to look through that lens.

19   Where I'm trying to be, you know, accepted more so

20   than not.  I don't know if that's the right word.

21           Q.   So earlier when we discussed the

22   issue with the students on the football team, you

23   testified that Mr. Turner came to you and said, you

24   know, do you think racism is occurring.  Did he

25   specifically come to you and say, oh, you're a black

1    man, what do you think about this?  Or did he come

2    to you and just say, can you look into this?

3              A.   Did I look into this, yes.  His last

4    concluding statement was, you as -- like, don't give

5    me, I guess, the -- I can't remember the words he

6    said, but pretty much don't give him a clouded

7    answer, you, as a black man, do you feel that this

8    is racism.  Yes, that question was in his office, so

9    I came to him, I guess, more so than I'm coming --

10             Q.   Okay.  As the athletic director, do

11   you feel that it was appropriate for you to have

12   involvement in potential issues that were arising on

13   the football team?

14             A.   Do I believe that I should have been,

15   like, investigating it and going about it; is that

16   what you're asking?

17             Q.   Involved in any way?

18             A.   Yes, I do, yeah.

19             Q.   Okay.  So then the specific issue is

20   that you're saying Mr. Turner specifically said,

21   you're a black man, so you're in a better position

22   to decide whether or not this is racism or not?

23             A.   The lens of it, yes.  Sorry.  Are we

24   done with this?

25             Q.   We're going to keep going through.

1          A.    Sorry.

2          Q.    You're fine.

3                With respect to -- I cannot remember

4     what you said his last name was, Pete?

5          A.    Coleman, yes.

6          Q.    Pete Coleman.  He's not a Boone

7     County Schools employee, correct?

8          A.    No, but his wife does work at Ryle.

9          Q.    Right.  But he's just a community

10    member?

11         A.    Uh-huh.

12         Q.    Other than that one issue, and then

13    the football team issue, has anyone directly come to

14    you and made race-related comments?

15         A.    No.

16         Q.    Okay.  So let's look at Interrogatory

17    7.  So in Interrogatory No. 7 you were asked about

18    your allegation that you were not paid correctly

19    while on FMLA leave.  In your response -- and we've

20    talked about this pretty extensively so I will not

21    beat a dead horse, I promise -- I actually don't

22    promise that, but I'll do my best.  You state you

23    were informed by defendant that you would be paid

24    full salary while on leave.  When were you told you

25    would be paid full salary while on leave?

1          A.    That should have been -- in looking

2     at this, it should have been stated, if I did work

3     on those days.

4          Q.    Okay.

5          A.    That should not have been -- yeah,

6     that's -- I mean, I know that it's two-thirds on the

7     days that I did not work.

8          Q.    Okay.  So then you would still stand

9     by everything else we've discussed today instead of

10    this, you would have been paid --

11         A.    Yeah, that statement, correct.

12         Q.    Okay.  On Interrogatory No. 8, so the

13    next page, you're asked to list every change to your

14    job that you were subjected to during the '20-'21

15    school year, so changes to your work schedule,

16    duties, and responsibilities.

17              So going through these particular

18    items that you've identified.  So, "Plaintiff was

19    told to move an in-school suspension period to the

20    end of the day at the beginning of the school year."

21    Do you believe that this was an inappropriate change

22    in your job duties?

23         A.    No, that's what I agreed to.  That's

24    what I agreed to, so that wasn't --

25         Q.    I'm just asking.

1          A.    Yeah, no, it was a change, but I

2    don't think that was a -- I'm sorry.  Can you

3    ask the question again?

4          Q.    Okay.  So it was a change but not --

5    do you think it was inappropriate, your answer is

6    no, it was agreed to?

7          A.    No, that's what I agreed to.

8          Q.    Okay.  So the second one, "Plaintiff

9    was told to arrive at the school by 7:30 a.m. or use

10   PTO in December."

11           From the testimony today, didn't you

12   say that that happened in January?

13         A.    It was talked about in January, and I

14   referenced that he didn't put the 7:30 time in

15   there, but that was in his e-mail, I want to say in

16   the middle of December.

17         Q.    Okay.  So the e-mail that --

18         A.    Yes.

19         Q.    Okay.  I know I already know the

20   answer to this question, but do you believe that

21   that was an inappropriate change in your job roles

22   and responsibilities?

23         A.    Yes.

24         Q.    The next one, "Plaintiff was told to

25   be responsible for three new periods in and around

1    December."

2                 So instead of doing ISS you were

3    asked to take on a study skills class, but then you

4    were also asked to take on two additional study

5    skill classes.  We talked about this earlier.  Is

6    that correct?

7                 A.    Correct.

8                 Q.    Do you think that -- because there

9    are kind of two components to this -- do you think

10   that asking you to -- instead of covering the ISS

11   class, to instead cover a study skills class, was

12   that an inappropriate change?

13                A.    Are you saying supplement the one for

14   the other?

15                Q.    Sure.

16                A.    No, because it's the same thing.

17                Q.    Okay.  So then the other two periods

18   referenced here, do you think that asking you to

19   take on those classes was an inappropriate change in

20   your job duties?

21                A.    Yes.

22                Q.    Okay.  "Plaintiff was told to be

23   responsible for new technology."  What is this

24   referencing?

25                A.    I think we had spoke about Mr. Shafer

1    setting up the game for -- I think for streaming at

2    the time.  There was a game issue that had gone down

3    because of technology.  I'm not a technology

4    teacher, I've never been one.  I don't even claim to

5    be that savvy at home.  We stated, yeah, that it

6    falls on me to make sure the games are up and

7    running, and so on and so forth.  And I believe that

8    was a new system at the time.  After leaving, I know

9    that they -- the technology teacher now runs that.

10   So, yes, I thought that was a change that shouldn't

11   have fell on my responsibility.

12          Q.   Okay.  The final one, "Plaintiff was

13   told to call failing students in December."  Do you

14   feel that that was an inappropriate change in your

15   job duties?

16          A.   Yes.

17          Q.   Okay.  So it says, "Each of these

18   changes was improper, discriminatory and/or

19   retaliatory."  That first bullet point, where you

20   were told to move ISS to the end of the day, you

21   would agree, based on your testimony you just gave,

22   that that's not necessarily something that you're

23   taking issue with here, right?

24          A.   Correct.

25          Q.   Okay.  So then the other four points,

1    arriving to school early, being responsible for two

2    new periods instead of three, the new technology,

3    and the call failing students, are those the four

4    items that you believe were improper, discriminatory

5    and/or retaliatory?

6              A.   What was the question again?  What

7    was the question again?  Do I believe all -- sorry,

8    go on.

9              Q.   So the remaining four points, so if

10   you were told to arrive to school by 7:30, do you

11   believe that that change in your duty was in

12   response -- or in retaliation to taking leave?

13             A.   Yes.

14             Q.   Do you believe that that was in

15   response and retaliatory to your race?  Or I'm

16   sorry, I guess discriminatory would have been a much

17   more reasonable way to phrase that.  So let me ask

18   again.

19             Do you believe that being asked to

20   report to school by 7:30 midway through the year was

21   discriminatory, based on your race?

22             A.   I think that played a part in it,

23   yes.

24             Q.   Okay.  So that third bullet point,

25   that you were responsible for three new periods, you

1    testified that swapping that one ISS for the new

2    period wasn't necessarily an issue for you, right?

3                A.    Yeah.

4                Q.    So then when I say you being told to

5    be responsible for two new periods in and around

6    December, is that what you felt was improper?

7                A.    Yes.

8                Q.    Okay.  So being responsible for two

9    new class periods in and around December, do you

10   feel that that request or that change in your duties

11   was in retaliation for you taking leave?

12               A.    Yes.

13               Q.    Do you believe that that request was

14   discriminatory, based on your race?

15               A.    I feel like there were elements of

16   that combined, both, yes.

17               Q.    Okay.  You were told to be

18   responsible for new technology.  Do you believe that

19   was retaliatory for taking leave?

20               A.    Yes.  Sorry.  My eye is, like,

21   bothering me.

22               Q.    Do you need to take a break?

23               A.    No, I'm good.  I think it's going to

24   keep on going.

25               Q.    Do you believe that asking you to be

1    responsible for new technology was discriminatory,

2    based on your race?

3              A.    Not that piece, no.

4              Q.    Okay.  You were told to call failing

5    students in December.  Do you believe that that was

6    retaliatory for taking leave?

7              A.    Yes.

8              Q.    Do you believe that asking you to

9    call those failing students was discriminatory based

10   on your race?

11             A.    Yes.

12             Q.    Okay.  Of the three things that you

13   just said were discriminatory, what evidence can you

14   point to to show that you were asked to do these

15   things specifically in discrimination because of

16   your race?

17             A.    Can you ask that one more time,

18   please?

19             Q.    What makes you think it was

20   discriminatory for you to be asked to do those three

21   new things?

22             A.    I felt that that was a change that

23   wouldn't typically happen.  I felt like because I

24   had taken leave, I had -- you know, being a black

25   male in that position, that that may not have

1    happened if I was not.

2            Q.    So I want to make sure we're clear.

3    Because the discrimination based on your race is a

4    different claim and a different question than the

5    retaliation for leave.

6            A.    Correct.

7            Q.    So I'm specifically asking, these

8    three new things that you've said were

9    discriminatory, what makes you think that being

10   asked to report at 7:30, being assigned two new

11   class periods, and calling failing students, what

12   makes you think you were told to do those things

13   specifically as discrimination for your race?

14           A.    So as far as the calling the failing

15   students piece, I believe, when looking back -- and

16   I thought this was sent over -- I know, for

17   instance, I think it was Edgenuity at the time, I

18   can't remember which one, I had 41 students.  The

19   aides that were in there didn't have more than a, I

20   don't believe, an associate's degree or, you know, a

21   bachelor's degree, you know, high regard, they had

22   to call five or six or seven.  Me calling 41

23   students compared to them calling five or six or

24   seven each, and they're aides and, you know,

25   typically -- I felt that that was played on because

1    of myself.

2                   As far as -- and now we're going to

3    7:30.  I feel like with me taking leave, if, you

4    know, I conformed or whatever else to the rules and

5    changes of me, you know, arriving at 7:30, I don't

6    think I would have been terminated at the end.  And

7    I do, again, from those biases that were held before

8    of me not working or not wanting to work, that

9    was -- I mean, there was shrouded there.

10                  As far as -- was it the technology

11   one?  Sorry.

12            Q.   I thought you said that the

13   technology was, you felt, in response.

14            A.   Correct.  And then, again, I think

15   the plaintiff -- going back to me being -- even

16   though it wasn't said -- the lazy black male in this

17   role, felt that, okay, you're getting added more

18   classes because, regardless of kids failing or not,

19   I had not been in that capacity.  It felt like that

20   was there at the time.

21            Q.   Who accused you of being lazy?

22            A.   I felt that that was the air of,

23   okay, prior to -- okay, so going back to when I took

24   leave, Mr. Shafer had stated, hey, this has never

25   been done before, I've been on the phone with Eric

324

1    Ball trying to figure this out because you're an

2    athletic director, this has never ever been done.

3    Can you instead change your schedule from instead of

4    taking leave, come in early, right?  And I'm like,

5    well, I can't because I don't know who's going to

6    actually take care of my kids if my wife has to go

7    to work.

8              That going back and playing, again,

9    out, later of, hey -- it was not said, I felt that

10   at the time that's what it was, I guess, I don't

11   know, coded in would be the word of, okay, you

12   didn't work hard in the fall because you were out,

13   so we're now going to add more to your load.

14         Q.   Sure.  I understand what you're

15   saying, but my question is:  If you're under the

16   impression that someone feels that you're lazy and

17   that's why you're having all of this stuff tacked

18   on, what does that have to do with your race, and

19   why do you feel that that was racially motivated?

20         A.   I can't point to it specifically, but

21   I felt -- again, I felt that that was a factor.

22         Q.   Okay.  We looked earlier at the team

23   assignments of people who had been instructed to

24   reach out to students who were failing in December

25   of 2020.

1              A.    Uh-huh.

2              Q.    Those individuals, the

3    administrators, do you have any idea how many

4    students they were being asked to call each?

5              A.    Not from that list, no, but I know

6    about the list that was behind -- again, I don't

7    know if it was Edgenuity at the time, but I had a

8    list of students I was to contact, and it came up

9    that I had, you know, 41 compared to the six or

10   seven, or five to seven that other people had to

11   contact.

12             Q.    Everyone had to contact only six and

13   seven besides you?

14             A.    At least -- again, I was in a

15   separate group, I believe there were only aides in

16   this group, I had a list of 41, they had a list of

17   five to seven.

18             Q.    Okay.  What do you mean they were

19   aides?

20             A.    Like aides, building aides, like

21   people that help teachers or students around the

22   building.

23             Q.    So those individuals are also

24   teaching classes?

25             A.    No, they're aides.

326

1          Q.   Well, I mean, they were in the

2     classroom helping teachers?

3          A.   Correct.

4          Q.   Okay.  So you mentioned earlier that

5     teachers were not asked to do this direct, you know,

6     very targeted effort of reaching out to students who

7     were failing, right?

8          A.   Is this in reference to Andy Dusing's

9     e-mail?

10         Q.   Yes.

11         A.   Yes.

12         Q.   Okay.  Is that the e-mail that you're

13    listing that the aides were listed?

14         A.   No, this is a completely different

15    group of people.

16         Q.   Okay.  So this is the Edgenuity --

17         A.   Yeah, I don't know which one is

18    Edgenuity or which one was just a list of students

19    failing, but combined I had, yes, more than 41, and

20    there was another list that Cody Ryan upheld.

21         Q.   Okay.  So not the Cody Ryan one?

22         A.   Not the Cody Ryan one.  This is a

23    completely different list, yes.

24         Q.   The Edgenuity list that was provided,

25    didn't we discuss earlier that that list was

1    provided in lieu of you doing the ISS class?

2         A.   No, this was completely different.

3         Q.   So were you still overseeing some

4    kind of online course?

5         A.   No.  At the time, I was sent a list,

6    these are the students that are failing, you have 41

7    students to contact.  And at the time, I'm looking

8    at it like why does it seem like everyone else has

9    much less than me, right?

10              Again, I don't know if that title was

11   Edgenuity at the time.  I don't know what title it

12   was over.  These are the 41 students you need to

13   contact, in addition to the other list of students

14   that were juniors.  Does that make sense?

15        Q.   Yeah.

16        A.   Now, as far as that, then, again, the

17   administrators weren't on this list.  These were

18   aides that were on this list.  I believe they were

19   all aides.  But, yeah, I felt, yeah, my load was a

20   little different if I'm contacting 41, and

21   collectively I think it was told that they had 48

22   between those other individuals.

23        Q.   Okay.  And you believed that that was

24   discriminatory and that you were asked to do more

25   reaching out to students because of your race?

328

```
 1              A.    I believe that was a component, yes.
 2    If I have 41 compared to 48, and that's just solely
 3    me.  I don't know the makeup of everybody else that
 4    was on the list.  I'm sorry.
 5              Q.    Okay.  So you don't know the race of
 6    any of the other individuals on that list?
 7              A.    I did not at the time.  I can't
 8    remember.  I think there might have been one other
 9    black male who was an aide and he had maybe five or
10    six kids to contact.
11              Q.    Okay.
12              A.    But that doesn't have anything to do
13    with myself.
14              Q.    Well, it does --
15              A.    Oh, okay.
16              Q.    -- because a racial discrimination
17    case is that you were treated differently than
18    people.
19              A.    I would say that 41 compared to
20    everyone else contacting five to seven is different.
21              Q.    But there was another black male aide
22    who was only given five.
23              A.    Okay.  Yes.
24              Q.    Okay.  Let's just move on.
25              A.    Okay.
```

1    Q.   So just kind of to sum up because I

2  don't want to get into it because I think you've

3  already answered it, but those four items that are

4  still left, the arriving by 7:30, the two new

5  periods, the technology, and the calling failing

6  students, you believe that it was retaliatory for

7  taking leave because people thought you were being

8  lazy, and that's what the response was, to give you

9  more work?

10    A.   I believe it was retaliatory for me

11  taking leave.  I don't know the other thoughts

12  behind it.  But I do feel like it was retaliatory in

13  me bringing up the harassment piece and the whole

14  list of other things.

15    Q.   Okay.  One thing I just want to make

16  sure we're all clear on, that there's a lot of

17  reference to FMLA time.  You were not actually on

18  FMLA, you were on EFMLEA, correct?

19    A.   Yeah, I'm assuming -- I thought they

20  were both the same, so --

21    Q.   Okay.  You've never filled out

22  paperwork specifically requesting FMLA time?

23    A.   I can't remember honestly.  I

24  thought -- again, I thought they were the same.  I

25  don't remember what forms I filled or what.

1          Q.   Okay.  I can ask it a different way

2    then.

3          A.   Yeah.

4          Q.   Have you ever claimed leave time

5    because of a medical emergency that you or a family

6    member were experiencing?

7          A.   No, I have not.  No.

8          Q.   Okay.  Try to wrap this up quickly

9    because I feel like this has been a very long day.

10              So on Interrogatory 13.

11         A.   Uh-huh.

12         Q.   You were asked again instances of

13   retaliation.  You answered that throughout your

14   tenure you complained of racism which was never

15   investigated.

16         A.   Where are you at?

17         Q.   On Interrogatory 13.  And the

18   response, the second sentence, it says, "Plaintiff

19   states that throughout his tenure he complained of

20   racism which was never investigated."  When did you

21   complain of racism and to whom?

22         A.   That was actually in response to -- I

23   believe that was the first year, with Matt Turner as

24   principal, and me complaining about Pete Coleman,

25   and how I feel that he's coming across as not

331

1    friendly or as racist.  And that was the statement

2    that Matt Turner stated that, don't you believe in

3    God, and I said -- and I looked at him, and I said,

4    yes.  And he was like, well, you should do as God or

5    Jesus does and turn the other cheek.  I'm like --

6    that's when I made the statement that most people

7    can't just come from the outside and disrupt work

8    and think it's okay.  So that was that statement.

9    And, again, I don't know if the reference of Jesus

10   and religion was based in it, but that's what I

11   felt.

12             Q.   Other than that interaction with Pete

13   Coleman, are there any other times that you went to

14   an administrator and complained of racism?

15             A.   Outside of the ones listed, no.  No.

16             Q.   Okay.  The rest of these I think

17   we've covered pretty well.

18             So the last thing I wanted to talk

19   about is damages.  So in Interrogatory 16 you are

20   asked to state the amount of damages that you're

21   seeking to recover for certain amounts of items.

22   And you've said -- you know, you object and to see

23   initial disclosures.

24             I can let you take a look at this if

25   you want, but there's not really a whole lot to look

1    at.  In your initial disclosures, which are

2    incorporated here by your discovery responses, you

3    have asked for lost backpay, including benefits from

4    the date of your termination throughout the trial.

5              Lost backpay, I'm assuming, does that

6    just mean that you feel that you are entitled to

7    compensation from whatever the remainder of the 2021

8    school year was?

9         A.   You said 16, correct?

10        Q.   Yes.  Sorry.  I'm looking at a copy

11   of your initial disclosures.  I apologize, I do not

12   have this printed out, but there's not an actual

13   calculation on here, so I just want to ask, you

14   know, you.

15        A.   Yeah, I mean, from not only the rest

16   of the year, but moving forward as well.  I was in

17   good-standing prior and felt that I would have been

18   rehired again, and I don't know if that goes in

19   backpay or future pay.  Yes, moving forward, yes,

20   for the remainder of that salary as well as -- yeah,

21   moving forward.  I apologize.

22        Q.   Okay.  So you had a limited contract

23   of employment with the Boone County Schools?

24        A.   Uh-huh.

25        Q.   You had no assurance or promise that

333

1   your contract would be renewed for the 2021-'22

2   school year; is that correct?

3         A.    At the time, I did not realize if it

4   would be or not, but I felt that it would be

5   renewed.

6         Q.    Okay.  But were you ever told that

7   your contract would automatically renew unless

8   terminated otherwise?

9         A.    Is that a two-part question?  Sorry.

10        Q.    If it was, I didn't mean it to be.

11              So did anyone ever say, you for sure

12   have a job for the '21-'22 school year?

13        A.    No.

14        Q.    Okay.  So is it fair to say that as

15   of January 2021 you were only guaranteed

16   compensation from the Boone County Schools through

17   the end of 2020-'21 school year?

18        A.    Through that contract, correct.

19        Q.    Okay.  Earlier we discussed attempts

20   to find a new job.  Do you think that you've done

21   everything you can to get a new stream of revenue?

22        A.    I'm trying literally everything I

23   can.

24        Q.    Have you only applied to AD positions

25   or have you applied to other general teaching jobs

1   as well?

2          A.   I've applied to teaching, as well as

3   outside of teaching, as well as sweeping floors, so

4   yes.

5          Q.   When did you decide to move so that

6   your wife could be a travel nurse?

7          A.   We decided when we looked and said,

8   okay, I'm not finding a position.  I thought this

9   would be easier after -- I think I said I had the

10  Hamilton County interview maybe around March 2021,

11  and hadn't heard anything, and we didn't want to

12  lose our house.  So we said, okay, we have equity in

13  it, and you can support us for a little bit with

14  covering both salaries with how much they're paying,

15  so that's what we did.

16         Q.   Do you think that moving from Ohio to

17  Panama City and then to Georgia and then back to

18  Ohio has, just by the sheer nature of moving, made

19  it difficult to find a job?

20         A.   No.  Because I stated that prior, I

21  was still looking in Cincinnati as well, Cincinnati

22  and Kentucky.  But, yeah, we had discussed that if

23  it came back, that was where we were going to go.

24  So even though I did look for positions in those

25  other states -- you hear that it's a hiring market,

1    and I haven't been hired, so I don't know.

2              Q.    Why do you think that is?

3              A.    I think a number of reasons.  There's

4    a big gap on my resume that says, you know, from

5    January 2021 I haven't picked up employment.  I

6    believe that in some areas where I have a master's

7    and I'm applying for a job that's typically for a

8    high school student, that it looks different.  And,

9    yeah, I've only been called in for a couple of

10   interviews, so I don't know.

11             Q.    So you also ask for general

12   compensatory damages.  Obviously, a component of

13   that would be the pay, you know, you're looking for

14   backpay.  And I assume, you say you're looking for

15   front pay as well.  So how many years, I suppose,

16   are you claiming that you're entitled to as a result

17   of this lawsuit?

18             A.    I honestly don't know.

19             Q.    Okay.  Do you anticipate finding a

20   new job any time soon?

21             A.    I hope so.

22             Q.    You provided to us in discovery a

23   large file of health records, mental health records?

24             A.    Are those the ones you guys

25   requested, I believe, and they were sent to you

1  guys?

2          Q.    Yes.

3          A.    Okay.

4          Q.    Are you claiming any kind of

5  compensatory damages for emotional distress or

6  anything of that nature?

7          A.    Yes.

8          Q.    Okay.  Tell me about the emotional

9  distress.

10         A.    Well, considering I'm on anxiety

11  medicine now and losing sleep, this has been

12  stressful for not only myself, but family.  But,

13  yeah, it's taken a toll, especially not having a job

14  and feeling qualified to find a job.  But I don't

15  know if they did the prescription of anxiety

16  medicine on there, but it should be in there.  I

17  don't know if they did or not.

18         Q.    When did you start anxiety

19  medication?

20         A.    A couple months back.

21         Q.    A couple months back from now?

22         A.    Well, sorry, I'm saying a couple

23  months back, I'm out of it.  Would have been 2022, I

24  believe.

25         Q.    Okay.  Have you ever been treated for

337

1    mental health issues, whether it's anxiety, just

2    needing to talk to someone, have you ever sought

3    mental health treatment prior to your employment

4    with the Boone County Schools?

5         A.   When I was younger I spoke to, I

6    mean, a counselor, and then I was prescribed

7    Adderall, so I don't know if that's in there as

8    well, but --

9         Q.   Okay.  What specifically -- and I'm

10   going to try to find a way to ask this question

11   well.

12             What specifically did the Boone

13   County Schools do to you, in your opinion, that has

14   elicited this amount of emotional distress?

15        A.   Being terminated, being one of only,

16   I mean, at the time, like one of so many black

17   athletic directors, right, it's -- that's a very

18   visible position.  Not being able to complete it.  I

19   mean, even in my first interview with Hamilton

20   County Schools, the question was why are you leaving

21   such a prestigious school, right?  So it travels

22   that you were with the Boone County Schools, but

23   I've still not been able to get anything because

24   there's a glaring omission of -- yeah, not being

25   able to work.  You know, being anxious and being --

338

1   having anxiety was not something that I thought I

2   would have, but I do now, yeah.

3          Q.   So being fired and now being unable

4   to get a job, that's the --

5          A.   It's haven't been able to find a job.

6          Q.   Excuse me?

7          A.   You said now being able to find a

8   job, I haven't been able to find one.

9          Q.   Well, right, I just mean through this

10  time, that's what's causing your anxiety?

11         A.   I believe so.

12         Q.   Okay.  I don't mean to beat a dead

13  horse here, but specifically, you know, why is it

14  the Boone County Schools' fault that you haven't

15  been able to find a job?

16         A.   I was terminated.  I mean, I wasn't

17  even able to get, what, unemployment because of

18  whatever was written about me.  I mean, yeah.  I

19  think if, you know, I wasn't terminated, I would

20  hopefully be moving on to either being in an AD

21  position or being a principal somewhere, so --

22         Q.   Do you think that your prior

23  disciplinary issues in Ohio could contribute in any

24  way to your inability to find a job currently?

25         A.   I don't know.

339

1          Q.   Do you think that your long history

2    of not holding employment for more than two years at

3    a time could factor into your ability to get a job

4    now?

5          A.   I don't know.  I think that's

6    typically how people are moving now, is trying to

7    move up.

8          Q.   Okay.  Other than compensation --

9    well, I assume, are you seeking compensation for

10   your mental health treatment?  So did you have to go

11   see a therapist?

12         A.   I spoke with him, but he ironically

13   had a stroke and heart attack within a month.

14         Q.   Oh, gosh.

15         A.   So he's no longer there.  I haven't

16   spoken to him since.  But, yeah, sure.

17         Q.   So are you seeking compensation for

18   any kind of mental health treatment that you've

19   received?

20         A.   For the visits?

21         Q.   Yes.

22         A.   No.

23         Q.   No.  Okay.

24              Are you seeking compensation for the

25   anguish and mental distress that you've experienced

```
 1   because of the termination?

 2            A.   Yes.  Yes.

 3            Q.   How much have you quantified that at?

 4            A.   I have not quantified that.

 5            Q.   Okay.  How do you envision being able

 6   to quantify that?  Because you have to give a jury a

 7   number at some point, and I'd like to know what that

 8   number is.

 9            A.   I don't have that number for you

10   right now.

11            Q.   Okay.  You're also seeking, you have

12   listed here, punitive damages.  What do you think

13   has been so egregious by the school district that

14   merits punitive damages?

15            A.   Give me the definition of punitive.

16   Sorry.

17            Q.   Punishment.  Punitive damages are

18   damages that are not necessarily to compensate you

19   for something, but are to punish the school

20   district.

21            A.   Can I see that?  Am I able to see it?

22            Q.   Yeah.  It says punitive damages on

23   Item 7.

24            A.   I mean, I would hope that this would

25   not happen again, but as far as punitive, I believe
```

1    that was in relation to obviously the violations

2    that happened.  At least my understanding is that,

3    yeah, to ward it from happening again, punitive

4    damages have to be listed.

5              Q.   Okay.  How much are you seeking in

6    punitive damage?

7              A.   I don't know.

8              Q.   Okay.  So I'm going to make another

9    request to your attorney to get a calculation to me

10   and supplement to the response to Interrogatory

11   No. 16 of a calculation of these damages, because we

12   just need to know what you're looking for at this

13   point.

14             A.   Okay.

15             MS. AMLUNG:  Believe it or not, I

16   think I am finished.

17             Do you have any questions,

18   Mr. Allison?

19             MR. ALLISON:  No.

20             MS. AMLUNG:  We are done.

21

22             _____

23                MARIO KIRKENDALL

24

25        (DEPOSITION CONCLUDED AT 4:26 P.M.)

C E R T I F I C A T E

COMMONWEALTH OF KENTUCKY:
COUNTY OF KENTON          :

         I, Kelly A. Brabender, the undersigned, a

duly qualified notary public within and for the

Commonwealth of Kentucky, do hereby certify that

MARIO KIRKENDALL was by me first duly sworn to

depose the truth, the whole truth, and nothing but

the truth; that the foregoing is the deposition

given at said time and place by said witness; that

said deposition was taken pursuant to stipulations

hereinbefore set forth; that said deposition was

taken by me in stenotypy and transcribed by means of

computer under my supervision; that the transcribed

deposition was submitted to the witness for

examination and signature and that signature may be

affixed out of the presence of the Court Reporter;

that I am neither a relative of any of the parties

or any of their counsel and have no interest in the

result of this action.

         IN WITNESS WHEREOF, I have hereunto set my

hand and official seal of office at Covington,

Kentucky, this 9th day of May, 2023.

                    /s/Kelly A. Brabender_____

          Kelly A. Brabender-Notary Public #KYNP12186
          My commission expires: September 28, 2024

# Boone County Schools Online Application



Kirkendall , Mario - AppNo: 4866                                    Date Su

## Personal Data

| Name: | Mario | A | Kirkendall |
|---|---|---|---|
| | (First) | (Middle Initial) | (Last) |

Other name(s) under which transcripts, certificates, and former applications may be listed:

| Other: | | | |
|---|---|---|---|
| | (First) | (Middle Initial) | (Last) |

**Email Address:** ▬▬▬▬▬▬▬▬

## Postal Address

| Permanent Address | | Present Address | |
|---|---|---|---|
| Number & Street: | ▬▬▬▬ | Number & Street: | |
| Apt. Number: | | Apt. Number: | |
| City: | | City: | |
| State/Province: | ▬▬▬ | State/Province: | |
| Zip/Postal Code: | ▬▬▬ | Zip/Postal Code: | |
| Country: | United States of America | Country: | |
| Daytime Phone: | ▬▬▬ | Phone Number: | |
| Home/Cell Phone: | 0 | | |

## Employment Desired

| Position Desired: | Experience in Similar Positions |
|---|---|

**Administration**
1. Assistant Principal or Vice Principal — Clinical/Internship

**Extra Duty**
1. Athletics — 2 years

**Teacher**
1. Elementary Teacher — 3 years
2. High School Teacher — 1 year
3. Middle School Teacher — 3 years

## Boone County Schools Disclosures

**Prior Employment**

| x | No |
|---|---|
| x | |
| x | |
| x | |
| x | |

**Anti-Nepotism Statement**

| x | No |
|---|---|
| x | |
| x | |
| x | |
| x | |
| x | |

## Boone County Schools Online Application

| Kirkendall, Mario - AppNo: 4866 | Date Submitted: 7/11/2019 |

### Boone County Schools Disclosures continued

**Kentucky Retirement Systems**

| | |
|---|---|
| x | |
| x | No |
| x | |
| x | No |
| x | |

### Certification

Do you hold National Board for Professional Teaching Standards certification?  **No**

Do you hold or anticipate a Kentucky certificate?  **Certificate is held**

| Type | Certificate code | Expiration Date | Status |
|---|---|---|---|
| xxx | OH3067458 | 06/30/2016 | Current |
| xxx | | | Will Apply For When Eligible |

Please list any other endorsements and/or verifications documented on your certificate(s):

Do you hold a current out-of-state certificate? Yes

| State | Type | Certificate Number | Expiration Date | Current? |
|---|---|---|---|---|
| | | | mm/dd/yyyy | |

List your out-of-state certified teaching/administration fields:

### Education

Please tell us about your educational background beginning with the most recent

| | |
|---|---|
| **High School Attended:** | Sycamore High School, Cincinnati, OH |
| **Location:** | , |
| **Graduation Status:** | H.S. Diploma |

### Colleges, Universities and Technical Schools Attended:

## Boone County Schools Online Application

Kirkendall    , Mario - AppNo: 4866                                    Date Submitted: 7/11/2019

| Name and location | Dates Attended: From - To | Major area of study | Minor area of study | Degree | Date Conferred or Expected | GPA | Graduated |
|---|---|---|---|---|---|---|---|
| OH - University of Cincinnati (Earned Credit Hours: 37) | 07/2013 04/2014 | Educational Leaderhsip | | M.Ed | 04/2014 | 4.0 | Yes |
| Miami University (Earned Credit Hours: 153) | 01/2007 12/2011 | Physical Education | | B.S | 12/2011 | 3.2 | Yes |

**List honors, awards or distinctions you have earned:**

## Experience

Please list ALL relevant work and volunteer experience
beginning with the most recent.

| Current or Most Recent Position | | Employer Contact Information | | Supervisor/Reference Contact Information | |
|---|---|---|---|---|---|
| Phoenix Community Learning Center K-8 Phys. Ed/Health Ed. Teacher and K-3 Reading Tutor Coordinator | | 3595 Washington Avenue Cincinnati, OH 45229 513-351-5801 | | ▬▬▬▬▬n | |
| Date From - Date To: | 08/2013 - | Full or Part Time: | Full | Last Annual Salary: | 36000 |
| Reason for Leaving: | | | | | |
| May we contact this employer? | Yes | | | | |
| Responsibilities/ Accomplishments at this Position | Currently educating K-8 students physical education and health that is aligned to the Ohio state standards. I am also in charge of implementing, coordinating, and running the reading tutor program for my school. This position has me keeping data on all students in grades K-4, and making sure those who are not reading on grade level receive help from a tutor | | | | |

| Previous Position Held | | Employer Contact Information | | Supervisor/Reference Contact Information | |
|---|---|---|---|---|---|
| St Teresa of Avila Physical Education Teacher | | 1194 Rullison Ave Cincinnati, OH 45241 513-471-4530 | | ▬▬▬▬▬▬▬▬ | |
| Date From - Date To: | 08/2012 - 06/2013 | Full or Part Time: | Part | Last Annual Salary: | |
| Reason for Leaving: | I am seeking a full time position. I met the guidelines for a full year, but not full time | | | | |
| May we contact this employer? | No | | | | |
| Responsibilities/ Accomplishments at this Position | Successful hoops for heart and jump rope for heart! Tutoring students that have drastically improved their grades. | | | | |

## Boone County Schools Online Application

| Kirkendall    , Mario - AppNo: 4866 | Date Submitted: 7/11/2019 |
|---|---|

## Experience Continued

| Previous Position Held | | Employer Contact Information | | Supervisor/Reference Contact Information | |
|---|---|---|---|---|---|
| Substitute Loveland Schools<br>Substitute | | 757 South Lebanon Road<br>Loveland, OH 45140 | | | .org |
| Date From - Date To: | - | Full or Part Time: | Sub | Last Annual Salary: | 80/day |
| Reason for Leaving: | | | | | |
| May we contact this employer? | Yes | | | | |
| Responsibilities/ Accomplishments at this Position | | | | | |

| Previous Position Held | | Employer Contact Information | | Supervisor/Reference Contact Information | |
|---|---|---|---|---|---|
| Shepherd Color Company<br>Laborer | | 4539 Dues Drive<br>Cincinnati, Oh 45241 | | | |
| Date From - Date To: | 05/2011 - 12/2012 | Full or Part Time: | Full | Last Annual Salary: | 15/hr |
| Reason for Leaving: | School conflicts | | | | |
| May we contact this employer? | Yes | | | | |
| Responsibilities/ Accomplishments at this Position | I was responsible for daily task that included putting colors in drums and weighing them, but also working on the computer, problem solving, and making sure my area was in good order for the next worker. | | | | |

| Previous Position Held | | Employer Contact Information | | Supervisor/Reference Contact Information | |
|---|---|---|---|---|---|
| Sport Chiro Fitness<br>Trainer | | 507 S College ave<br>Oxford, OH 45056 | | | |
| Date From - Date To: | 08/2008 - 01/2009 | Full or Part Time: | Part | Last Annual Salary: | 8.25/hr |
| Reason for Leaving: | | | | | |
| May we contact this employer? | Yes | | | | |
| Responsibilities/ Accomplishments at this Position | Trained children to older adults: rehab, strength training, cardio training, cross training, weight loss training. | | | | |

## Boone County Schools Online Application

Kirkendall          , Mario - AppNo: 4866                                    Date Submitted: 7/11/2019

## Experience Continued

| Previous Position Held | Employer Contact Information | | Supervisor/Reference Contact Information | |
|---|---|---|---|---|
| Children's Home of Cincinnati Child Care Worker | 5050 Madison Road Cincinnati, OH 45227 513-272-2800 | | ████████ | |
| **Date From - Date To:** | 08/2009 - 01/2011 | **Full or Part Time:** Full | **Last Annual Salary:** | 8.50 |
| **Reason for Leaving:** | Wanted to work with kids in a different setting | | | |
| **May we contact this employer?** | Yes | | | |
| **Responsibilities/ Accomplishments at this Position** | Working with Cincinnati Public schools as well as working the summer program for under privileged children. I was able to set up programs, and implement ideas to not only have group cooperation but allowed for the children to try new things that they may have not been exposed to. | | | |

## Student Teaching

xx

| School District | |
|---|---|
| Location | |
| School Phone # | |
| School Year | |
| Date Completed (mm/yyyy) | |
| Length of Experience | |
| Grade Level(s)/Subject Area(s) Taught | |
| Name and Phone of Cooperating Teacher or Field Supervisor | |
| Name and Phone of Add'l Cooperating Teacher or Field Supervisor | |
| Name and Phone of University Supervisor | |
| Academic Grade Received | |

xxx

| School District | |
|---|---|
| Location | |
| School Phone # | |
| School Year | |
| Date Completed (mm/yyyy) | |
| Length of Experience | |
| Grade Level(s)/Subject Area(s) Taught | |
| Name and Phone of Cooperating Teacher or Field Supervisor | |
| Name and Phone of Add'l Cooperating Teacher or Field Supervisor | |
| Name and Phone of University Supervisor | |
| Academic Grade Received | |

## Boone County Schools Online Application

Kirkendall    , Mario - AppNo: 4866                                    Date Submitted: 7/11/2019

## Extracurricular Activities

| Athletic | Baseball | Basketball | · | Football | Intramural Basketball |
|----------|----------|------------|---|----------|----------------------|
|          | Track    |            |   |          |                      |

Please provide more details regarding your experience or interest in your selected extra curricular activities. For instance, provide details on any experience as a participant at the high school or college level or as a director, coach, supervisor, or sponsor.

The activities in which I feel comfortable to coach I have been a part of in one way or the other. With being a Phsyical Education teacher I have been able to not only participate in different sports and clubs, I have been able to direct and implement my own coaching style and see the results.

## Language Skills

Do you know any language other than English? No

## Professional References

|  | Reference 1 | Reference 2 |
|--|-------------|-------------|
| Name: | ██████████ | ██████████ |
| School / Company: | Newport ISD/Highlands High School | Newport Independent Schools |
| Job Title: | CTE Teacher/Special Ed | Assistant Principal |
| Work Phone: | ██████████ | ██████████ |
| Mailing Address: | 900 E 6th Street Newport, KY 41011 | 900 E 6th Street Newport, KY 41011 |
| Email: |  | ██████████ |
| Relationship to Candidate: | Peer | Supervisor |
| Years Known: | 1 | 2 |
|  | Reference 3 | Reference 4 |
| Name: | ██████████ | ██████████ |
| School / Company: | oak hills | West Clermont |
| Job Title: | business teacher/asst AD/head basketball coach | Princial |
| Work Phone: |  |  |
| Mailing Address: |  |  |
| Email: |  | ██████████ |
| Relationship to Candidate: |  | Mentor |
| Years Known: | 12 | 10+ |

## Boone County Schools Online Application

Kirkendall    , Mario - AppNo: 4866                                        Date Submitted: 7/11/2019

## Professional References cont.

|  | Reference 5 |  |
|---|---|---|
| Name: | Mike Rich |  |
| School / Company: | Loveland Middle School |  |
| Job Title: | Physical Education |  |
| Work Phone: | 513-683-5800 |  |
| Mailing Address: | Loveland Middle School |  |
|  | 801 South Lebanon Road |  |
|  | Loveland, OH 45140 |  |
| Email: |  |  |
| Relationship to Candidate: | Student Teaching Host |  |
| Years Known: | 1 |  |

## Certified Questionnaire

x
x

x
x

A similar theme has been of having students that may not be outgoing or "popular" I welcome them into class and make it a point to connect with them. Any time I had the pleasure of helping a student reach the "A-ha" moment I have counted those as most significant.

x

A common phrase you hear me saying is "meet them at the door" and when I would see my students I would make sure they knew that I was willing to find out about them and be a support system.

x

I took it as a normal day or normal days, connecting with students helps go a long way regarding the success of your classroom.

x

I feel great about helping my students that go unnoticed feel welcomed and a part of the classroom.

x

I would change following up with students, making sure they know that the classroom is just the gateway and not the end.

x
x

I have been very fortunate to work/coach within different school settings, and in doing so it has afforded me the ability to work with many students that may have differing views. The best way I can help in making sure that students are striving for better is to make sure all students feel that they have a voice, as well as an ear to listen. The assumption should not be that all students are willing to learn, some students have to be met at the door and encouraged and worked with. These things I continually do, even through mentoring students that I use to coach or teach.

## Boone County Schools Online Application

Kirkendall        , Mario - AppNo: 4866                                    Date Submitted: 7/11/2019

## Certified Questionnaire continued

x

I had an athlete that had gotten cut the year before, and I could see he was working so hard to make the team the upcoming year. I would make it a point to stop and speak with him (never about sports). This athlete made the team, and the statement I made was "You worked hard to get your foot in the door, it will now be even harder to stay in the door." At the time that statement was nothing significant, but I like to connect sports to life.

Years later this student athlete is a police officer and holds 2 bachelors degrees, every time I see him he shakes my hand and gives me hug and thanks me.

x

That I am always there, and that I am fair. It seems like most in education have a knack for just being in the school building even when they are not required, I am no different. I like going to students games, competitions, and being seen supporting.

x

Mentor and help others. I volunteer in my spare time or mentor students/players that I have previously had. I like training students, with the focus being that life is much more than sports or "Now."

x

I believe that Boone County Schools are a great school system within Kentucky. I believe that there are ample amounts of opportunities for growth within Boone County, and I believe that this opportunity came open for me.

I am a good fit, because I am something different, but in a good way. I have been in many different schools and have coached many different players, I take this position as no different. The focus is on the students and them excelling and I know I can foster that.

## Referrals

How did you hear about employment with us?

| Current District Employee | | |
|---|---|---|

## Additional Information

x

I am currently waiting for my Administration License to be processed as I have taken the test and passed.

## Boone County Schools Online Application

Kirkendall    , Mario - AppNo: 4866                                    Date Submitted: 7/11/2019

## Disclosures

**Contract Status**

x                                                                    No
x
x
x

**Professional Status**

x                                                                    No
x
x

x                                                                    No
x

x

x                                                                    No

x

x                                                                    No
x
x

x

x                                                                    No
x

x

## Legal Information

x                                                                    Yes

x                                                                    No
x

## Boone County Schools Online Application

Kirkendall    , Mario - AppNo: 4866                                    Date Submitted: 7/11/2019

## Legal Information continued

x
x

I have no criminal convictions

Xx
x
x

x                                                              | No

x

x                                                              | No

## Equal Opportunity Employer

x
x

## Applicant's Acknowledgment and Agreement

x
x
x
x
x
x
x
x
x
x
x
x
x
x
x
x
x
x
x
x
x

**BCSD-000151**

## Boone County Schools Online Application

Kirkendall        , Mario - AppNo: 4866                                                  Date Submitted: 7/11/2019

x
x
x
x

I, Mario Kirkendall        , agree to all of the    ☒ I agree
terms above.



# BEFORE THE OHIO STATE BOARD OF EDUCATION

*IN THE MATTER OF:*

|  |  |  |
|---|---|---|
| *Mario A. Kirkendall* | : | *Report and Recommendation* |
|  | : | *of the Hearing Officer* |
|  | : |  |

## <u>EXECUTIVE SUMMARY</u>

*Mario A. Kirkendall ("Mr. Kirkendall") has applied for a two-year extension of his four-year resident educator multi-age teaching license that was issued in 2012 and has now expired. He also holds a three-year pupil activity permit that was issued in 2015 and has now expired. The Ohio Department of Education ("ODE") wishes to deny Mr. Kirkendall's pending application and prohibit him from applying for any license with the State Board of Education for a period of three years, and until he completes 8 hours of professionalism training, 16 hours of classroom management training, and 8 hours of nonphysical intervention training, due to violations or 3319.31(B)(1).*

*The Hearing Officer found that, as set forth in ODE's Notice, on or about October 23, 2015, Mr. Kirkendall engaged in conduct unbecoming to the teaching profession when he inappropriately placed his arm around Student 1's neck, leading to Student 1 pushing him away. In addition, Mr. Kirkendall made an inappropriate comment to Student 1 related to Student 1's mother.*

*The Hearing Officer recommends that Mr. Kirkendall's pending application be denied, and that he be prohibited from applying for any license with the State Board of Education for a period of three years, and until he completes 8 hours of professionalism training, 16 hours of classroom management training, and 8 hours of nonphysical intervention training, due to violations of R.C. 3319.31(B)(1), as requested by ODE.*

## <u>HEARING PROCEDURES</u>

This appeal came to be heard at Columbus, Ohio on March 28, 2019. Briefs were submitted on April 25, 2019. Assistant Attorney General Mary Hollern represented the Department of Education ("ODE"). Attorney Abigail Miller was present as ODE's representative. Mr. Kirkendall was represented by attorney John P. Concannon, of the law firm of Freking, Myers and Reul.

Sworn oral testimony was received from Mr. Kirkendall and Ollie Moore.

ODE's exhibits 1-10, including all subparts, were admitted without objection. Exhibits 2a, 5a, 8a and 10 were admitted under seal. Mr. Kirkendall had no additional exhibits.

All evidence admitted in this matter, including the testimony, even if not specifically mentioned, was thoroughly reviewed and considered by the Hearing Officer prior to preparing this Report and Recommendation. All statutory procedural requirements have been complied with and this matter is properly before the Ohio State Board of Education for consideration.

## FINDINGS OF FACT

Upon consideration of the matters before the Hearing Officer, and having weighed the demeanor and credibility of the witnesses and reviewed the evidence admitted, the Hearing Officer makes the following findings of fact:

1. Mr. Kirkendall (DOB ▊▊▊▊ 1985) has applied for a two-year extension of his four-year resident educator multi-age teaching license that was issued in 2012 and has now expired. He also holds a three-year pupil activity permit that was issued in 2015 and has now expired. Tr. 13-14; ODE exhibits 1a-c

2. On or about June 5, 2018, 2018, ODE informed Mr. Kirkendall that the State Board of Education intended to determine whether to deny or permanently deny his pending application and to limit, suspend, revoke, or permanently revoke his expired pupil activity permit (the "Notice"). Mr. Kirkendall was offered an opportunity to request a hearing. The Notice was sent by certified mail. Service on Mr. Kirkendall was not perfected. Attorney Concannon was served a courtesy copy of the Notice. Tr. 15-16; ODE exhibits 2, 2a

3. On or about June 15, 2018, attorney Concannon requested a hearing on behalf of Mr. Kirkendall. ODE exhibit 3

4. On or about June 20, 2018, ODE acknowledged the request for a hearing and began the process of scheduling the hearing. ODE exhibit 4

5. On or about August 8, 2018, the Notice was reissued and the previous request for a hearing was acknowledged. Service was perfected on Mr. Kirkendall by certificate of mailing. ODE exhibits 5, 5a, 6

6. On or about January 28, 2019, the hearing was scheduled by mutual agreement for March 28, 2019. ODE exhibit 7

7. Mr. Kirkendall is currently employed as a teacher in the state of Kentucky.

8. During the 2015-2016 school year, Mr. Kirkendall was employed as a middle school physical education teacher by the Princeton City School District. He was thought to have to related well to students. He liked to joke with them. Tr. 15, 38, 61; ODE exhibits 8, 9

2

BCSD001461

9. On or about October 23, 2015, Mr. Kirkendall and the student at issue, referred to as Student 1, were both in the school gymnasium, along with numerous other students of both sexes. Student 1 was a ▆▆ grade student. A video in the gymnasium captured what took place. The video has no sound. Tr. 53; ODE exhibit 8a

10. The video shows Mr. Kirkendall approaching Student 1, who was sitting on a chair. Mr. Kirkendall appears to reach for Student 1. Student 1 pushes Mr. Kirkendall away. Mr. Kirkendall, who was wearing a "boot" or soft cast for an injury to his foot, appears to lose his balance and fall forward toward Student 1. Mr. Kirkendall reaches his arm around Student 1's neck. Student 1 gets up while Mr. Kirkendall still has his arm around Student 1's neck. Mr. Kirkendall takes several steps with his arm still around Student 1's neck. Student 1 pushes him away. Tr. 64, ODE exhibit 8a

11. Student 1 sits back down in the chair. Mr. Kirkendall approaches him again. There appears to be some discussion. Student 1 gets up and begins to walk away from Mr. Kirkendall. Student 1 then suddenly turns around and appears to be rushing toward Mr. Kirkendall. Student 1 is held back by two different students. ODE exhibit 8a

12. Mr. Kirkendall was the only person present for the October 23, 2015 incident who testified at the hearing.

13. Mr. Kirkendall testified that the morning of October 23, 2015, he was walking to his office, which was connected to the gymnasium. He stopped to speak to Student 1, who was seated, about the previous night's football game. Student 1 stepped on the front of Mr. Kirkendall's boot with his foot as he rose from the chair to walk away from Mr. Kirkendall. Mr. Kirkendall started falling forward because Student 1's foot was on his boot. Mr. Kirkendall and Student 1 then walked several steps with Mr. Kirkendall's arm around Student 1's neck.    Student 1 pushed Mr. Kirkendall away. Mr. Kirkendall accidentally stepped on Student 1's shoes. Tr. 20-29, 46; ODE exhibit 8

14. Mr. Kirkendall further testified that Student 1 sat back down again. He complained about his shoes. Mr. Kirkendall approached Student 1 again to say that he was sorry that he had stepped on Student 1's shoes. Student 1 told Mr. Kirkendall that Mr. Kirkendall had "man boobs." Mr. Kirkendall replied that "the moms seem to like them." Student 1 started to walk away. Another student told Student 1 that Mr. Kirkendall was "talking about your mom." Student 1 turned and rushed toward Mr. Kirkendall. Student 1's friends held him back. Student 1 repeatedly stated that he was going to get Mr. Kirkendall fired. Tr. 25-33, 88, 97

3

15. In 2015, Ali Moore ("Mr. Moore") was the principal of Princeton Community Middle School. Mr. Moore watched the video and investigated the incident. Tr. 38

16. Mr. Moore testified that Student 1 came to him in the hall stating that Mr. Kirkendall had "put his hands on him." Student 1 was "very angry," and "crying" after the incident. No written statement from Student 1 was provided. Tr. 39-41, 54

17. Mr. Moore was concerned because "(w)e don't' want anyone to put hands on anyone in our buildings." He described Mr. Kirkendall's conduct as "within the realm of inappropriateness. We just don't put our hand or arms on students." Tr. 46, 68

18. Mr. Moore further opined that comments to students about Student 1's mom or moms in general would be inappropriate and "not allowed." Tr. 55

19. Mr. Kirkendall told Mr. Moore that "he was talking with (Student 1), kind of playing around, joking with him as they were getting ready for the bell to change." ". . . that's when he put the arm around the head, you know, kind of joking with him, and the student just didn't see it as a joke." Tr. 51-52

20. Mr. Moore asked if any other students had observed what took place. Three students came forward. Students 2, 3 and 4 each stated that they heard Mr. Kirkendall make a derogatory comment to Student 1 about Student 1's mother. Student 2 recalled that after Student 1 said that Mr. Kirkendall had "bigger titties" than his mom, Mr. Kirkendall responded "that's not what your mom said." Student 2, Student 3, and Student 4 described Mr. Kirkendall as holding Student 1 in a "headlock" after the "boobs" comment. ODE exhibit 9

21. However, the video does not show Student 2 in any frame at all until after the incident concluded, calling into question his entire account of the incident. The video also does not support Mr. Kirkendall placing Student 1 in a headlock, or any kind of a hold at all (either neck or headlock) after the "boobs" comment, which was what Students 2, 3, and 4 allegedly witnessed. Student 3 is Student 1's cousin. This calls into question the statements of all three student witnesses, and tends to lend credence to Mr. Kirkendall's account that Student 1 stated that he would get Mr. Kirkendall fired. Tr. 57, 62-63, 89, 91-92, 98-99; ODE exhibits 8a, 9

22. What is supported by the video and testimony provided under oath is that Mr. Kirkendall walked several steps with his arm around Student 1's neck. Student 1 did not welcome the physical contact and pushed him away. Mr. Moore deemed any physical contact with a student to be inappropriate. Mr. Kirkendall also made an inappropriate comment about moms and "boobs" to Student 1 that would have included Student 1's mom along with all other moms. Mr. Moore also deemed this to be inappropriate behavior on the part of Mr. Kirkendall.

4

23. Mr. Kirkendall was placed on administrative leave.   He resigned his position effective February 22, 2016. Tr. 20, 53; ODE exhibit 8

24. Mr. Moore opined that Mr. Kirkendall was a young teacher who made a bad mistake.   However, Mr. Moore subsequently recommended him for a teaching position. Tr. 75

**CONCLUSIONS OF LAW**

Based on the evidence and testimony presented and the subsequent findings of fact, the Hearing Officer has made the following conclusions of law:

1. All statutory procedural requirements have been complied with and this matter is properly before the Ohio State Board of Education for consideration.

2. The standard of proof for administrative cases is a preponderance of the evidence. ODE has the burden of proof in this matter, by a preponderance of the evidence.   VFW Post 8586 v. Ohio Liquor Control Comm. (1998), 83 Ohio St.3d 79, 81; Pang v. Minch (1990), 53 Ohio St.3d 186

3. A preponderance of the evidence is a preponderance of reliable, probative, and substantial evidence. ODE must prove by a preponderance of reliable, probative and substantial evidence that the misconduct occurred and that the misconduct constitutes conduct unbecoming a teacher. Our Place, Inc. v. Ohio Liquor Control Comm. (1992), 63 Ohio St.3d 570

4. R.C. §3319.31(B) provides as follows:

    (B) For any of the following reasons, the state board of education, in accordance with Chapter 119 and section 3319.311 of the Revised Code, may refuse to issue a license to an applicant, may limit a license it issues to an applicant; may suspend, revoke, or limit a license that has been issued to any person; or may revoke a license that has been issued to any person and has expired:

    1. Engaging in an immoral act, incompetence, negligence, or conduct that is unbecoming to the applicant's or the person's position;

5. OAC 3301-73-21(A) lists factors for the state board to consider in determining whether a teacher's actions constitute "conduct unbecoming" under R.C. 3319.31(B)(1).  The factors that are applicable to Mr. Kirkendall's conduct include:

    ▪ Crimes or misconduct involving minors;

5

- Crimes or misconduct involving school children;

- Any other crimes or misconduct that negatively reflect upon the teaching profession, including sanction and/or disciplinary action by another state educational entity or another professional licensing board or entity

6. The State Board of Education adopted the *Licensure Code of Professional Conduct for Ohio Educators* in 2008. Principle 2 provides that educators shall maintain a professional relationship with all students at al times, both in and out of the classroom.

7. Principle 2 lists using inappropriate language at any school-related activity, such as lewd or lascivious expressions, as conduct unbecoming a teacher at 2(e).

8. Principle 2 lists engaging in a physical altercation with students as conduct unbecoming a teacher at 2(f).

9. Based on the foregoing findings of fact, and applicable law as set forth herein, the Hearing Officer concludes, as a matter of law, that ODE has proven, by a preponderance of the evidence, that Mr. Kirkendall's conduct occurred and that it constitutes conduct unbecoming a teacher, as set forth in Count 1 of ODE's Notice, in violation of R.C. §3319.31(B)(1).

10. The State Board of Education may also take into consideration mitigating and aggravating factors when determining a final action under division (B)(1) of section 3319.31 of the Revised Code. OAC 3301-73-21(B)(1) lists "the nature and seriousness of the crime or misconduct" as an aggravating factor. Engaging in a physical altercation with a student and directing a lewd comment to a student are serious matters, and Mr. Kirkendall has already been disciplined by his employing school district for his misconduct.

11. This case presents some mitigating factors. As mentioned by Mr. Moore, Mr. Kirkendall was a relatively young (29 years) teacher when the incident took place in 2015. No previous or subsequent disciplinary record or other misconduct was mentioned, and it has been three and a half years since the misconduct occurred. OAC 3301-73-21(B)

12. Some courts hold that there must be a nexus between an applicant's conduct and his or her ability to perform as a teacher. Johnson v. State Board of Education (1990, WL 62988), No. CA-8019, 5th Dist. Co. App., 5/14/90; Sayers v. State Board of Education, (1994 WL 676869), No. 66578, 8th Dist. Co. App., 12/1/94. The Hearing Officer concludes that there is a nexus between Mr. Kirkendall's

BCSD001465

conduct and his continued employment in the teaching profession that can be rectified with further training.

13. Denial of a license is an action the State Board may take in accordance with Chapter 119 and RC. 3319.311. OAC 3301-73-22(A)

14. After denying an application, the state board shall impose one of the conditions described in paragraphs (A)(3)(a) and (b) of OAC 3301-73-22. OAC 3301-73-22(a) provides that the state board may establish a minimum period of time before an applicant can apply for a new license. At the conclusion of the specified period, and upon demonstration of compliance with any educational requirements, criminal background check requirements, the terms of the state board's order, and the criteria set forth in rule 3301-73-24 of the Administrative Code, the state board may issue a new license to be applicant.

15. After weighing the various factors set forth herein, the Hearing Officer recommends that Mr. Kirkendall's pending application be denied, and that he be prohibited from applying for any license with the State Board of Education for three years, and until he completes 8 hours of professionalism training, 16 hours of classroom management training, and 8 hours of nonphysical intervention training, due to violations of 3319.31(B)(1).

## **RECOMMENDATION**

Based upon the foregoing Findings of Fact and Conclusions of Law, the Hearing Officer recommends that the State Board of Education deny Mr. Kirkendall's pending application, and that he be prohibited from applying for any license with the State Board of Education for three years, and until he completes 8 hours of professionalism training, 16 hours of classroom management training, and 8 hours of nonphysical intervention training, due to violations of 3319.31(B)(1).

May 28, 2019

_____
Date

Respectfully submitted,

*Linda Morbach*

Linda F. Mosbacher
Hearing Officer

2019 MAY 31 AM 11: 26
PROFESSIONAL CONDUCT
OHIO DEPT OF EDU

7

BCSD001466

EXHIBIT
3
KAB 4/21/23

Proceed

```
 1          Q.    And what's the name of your school
 2   district?
 3          A.    Now?
 4          Q.    Yes.
 5          A.    Newport.
 6          Q.    Newport schools?
 7          A.    Correct.
 8          Q.    In Kentucky?
 9          A.    Correct.
10          Q.    And finding a job in Ohio did not
11   happen; is that correct?
12          A.    I didn't seek employment in Ohio.  I
13   didn't want this to be -- I wanted this to be
14   cleared up before finding a job.
15          Q.    And you would have been truthful on an
16   application about this issue?
17          A.    Uh-huh.  Yeah.
18          Q.    Okay.  And your desire is to be back
19   in Ohio as a teacher?
20          A.    Preferably, yes.
21          Q.    And you are --
22          A.    Or administrator.
23          Q.    Yeah.  Or an administrator.  Right.
24   And you are -- how many years experience?  I'm
25   sorry.
```

BCSD001379

Proceedings

93

1          A.    It would have been -- well --

2          Q.    Where were you on the pay scale at

3    Princeton?  The number of years that you --

4          A.    I was on Step 5.

5          Q.    Step 5.  Okay.

6          A.    Yeah.  Because they gave me another

7    year from when I did my substitution, which counted

8    toward I guess the resident educator license.

9          Q.    And you understand you have an

10   agreement not to go back to Princeton?

11         A.    Correct.

12         Q.    And that's something you voluntarily

13   entered into?

14         A.    Uh-huh.

15         Q.    But you are not currently prohibited

16   from applying to any other school districts in Ohio;

17   is that correct?

18         A.    Yeah.  I have been -- until I spoke to

19   her, I didn't realize I could actually apply for

20   jobs in Ohio.  But like I said, I don't want this to

21   be on the record.

22         Q.    And you'd be honest on an application

23   as to a pending discipline?

24         A.    Correct.

25         Q.    Okay.

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481



# LIMITED CONTRACT OF EMPLOYMENT

COMMONWEALTH OF KENTUCKY - COUNTY OF BOONE

Pursuant to KRS 161.730, this contract is made and entered into this the 24th day of July 2019, by and between the **Boone County School District**, Florence, Kentucky, hereinafter called the District, and

**Mario Kirkendall**
3714 Malaer Dr.
Cincinnati, OH 45241

a teacher holding a regular teacher's certificate issued in accordance with section 161.020 of the Kentucky Revised Statutes, and now in force, hereinafter called the Teacher.

WITNESSETH: THAT SAID TEACHER HAS BEEN DULY APPOINTED BY THE SUPERINTENDENT OF THE DISTRICT IN THE PUBLIC SCHOOLS OF BOONE COUNTY FOR ONE YEAR. THE PARTIES TO THIS CONTRACT HEREBY AGREE TO THE FOLLOWING CONDITIONS:

1. The services to be performed by said teacher shall be such as are required by the Kentucky Revised Statutes, by the lawful rules and regulations of the State Board for Elementary and Secondary Education, and the lawful rules and regulations of the District.

2. The duties to be performed are to commence on the first day required by the school calendar adopted or amended by the District and approved by the State Department of Education for the **2019-2020** school year, for the number of days required by such calendar, to end no later than June 30 of the school year in such school or schools.

3. For and in consideration of the services provided for by this contract teacher shall be paid a salary in accordance with his or her qualifications and the salary schedule adopted by the District and the salary schedule adopted by the State Board for Elementary and Secondary Education for the year coming within the limits of this contract except salaries capped for special reasons (i.e. out of state experience capped at 15 years and salaries paid by grants).

4. Said salary shall be payable not later than the end of each month during the period of employment and/or in accordance with a plan adopted by the District in compliance with state law and the lawful rules and regulations of the State Board for Elementary and Secondary Education.

5. The teacher shall be entitled to sick leave, other leave and fringe benefits in accordance with state law, the lawful rules and regulations of the State Board for Elementary and Secondary Education, and the lawful rules and regulations of the District.

6. The teacher shall keep such records and reports and furnish same to the District Superintendent at regular periods designated by him, state law, the lawful rules and regulations of the State Board for Elementary and Secondary Education, and the lawful rules and regulations of the District.

7. The power of the District to transfer, suspend or dismiss the teacher, as provided for in KRS 160.380, 161.170 and 161.790, or other applicable statutes, is in no manner impaired or affected by this contract.

8. This contract shall remain in full force subject to all provisions herein set forth, unless and until terminated in compliance with KRS 161.170, 161.750, 161.780 and 161.790, or other applicable statutes.

WITNESS the following signatures as of the day, month, and year first above.

BOONE COUNTY BOARD OF EDUCATION
School District

By: _Randy Poe_
Superintendent

_Mario V. Kirkendall_
Teacher – 107466

EXHIBIT
5
KTB 4/21/23

## BOONE COUNTY SCHOOLS
## JOB DESCRIPTION

TITLE: **Teacher – High/Middle School**

QUALIFICATIONS:
1. Holds a bachelor's or higher degree and the required Kentucky certificate for the assigned position

2. Has demonstrated the ability to work effectively with students, peers, and adults

3. Has demonstrated ability to communicate effectively with students, parents, staff, and community

REPORTS TO:  Principal

JOB GOAL:  To create a class environment favorable to learning and personal growth; to establish effective rapport with pupils; to motivate students to acquire knowledge, skills and attitudes that society feels will contribute to their development into mature, able and responsible men and women in accordance with each student's ability and to establish good relationships with parents and with other staff members.

PERFORMANCE RESPONSIBILITIES:
1. Meet and instruct assigned classes in the location at the times designated using the curriculum guides developed by the faculty and approved by the Board

2. Maintain a classroom environment that is conducive to learning and appropriate to the maturity and interests of the students

3. Develop daily lesson plans and instructional materials and provide individualized and small group instruction in order to adapt the curriculum to the needs of each pupil

4. Translate lesson plans into learning experiences to best utilize the available time for instruction

5. Evaluate pupil's academic and social growth, keep appropriate records and prepare progress reports

6. Communicate with parents through report cards, notes, conferences and other means to discuss pupil's progress and interpret the school program

7. Assess the learning needs of students on a regular basis and seek the assistance of District specialists as required

8. Establish and maintain standards of pupil behavior needed to achieve a functional learning atmosphere in the classroom and appropriate behavior in other school related activities as set forth by the Student Code of Conduct

9. Take all necessary and reasonable precautions to protect students, equipment, materials, and facilities

10. Create an effective environment for learning through functional and attractive displays, bulletin boards, and interest centers

11. Maintain accurate, complete, and correct records and safeguard their confidentiality as required by law, District policy and administrative procedures

12. Maintain professional competence through in-service education activities provided by the District and other self-selected professional growth activities

BCSD-000120

## BOONE COUNTY SCHOOLS
## JOB DESCRIPTION

13. Work with faculty colleagues to develop and implement instructional programs that will meet the individual needs, interests and abilities of students to include IEP's of special students

14. Participate cooperatively with the appropriate administrator to develop the method, which the teacher will be evaluated in conformance with District guidelines

15. Select, requisition, and maintain required inventory records of books and instructional materials

16. Supervise pupils in and out of classroom activities during the assigned working day

17. Strive to maintain and improve professional competence by participating in planning and implementing in-service education activities, taking college courses, developing special projects, etc.

18. Attend staff meetings and, as possible, serve on staff committees and participate in the sponsorship of pupil activities

19. Maintain a professional awareness of current literature related to assignment, including working

20.  knowledge of state and federal law, Board policy and administrative regulations

21. Maintain all grades in an approved record book and turn in completed record book at the end of the school year

22. Plan and supervise purposeful assignments for teacher aide(s) and volunteer(s)

23. Perform other duties consistent with the position assigned as may be requested by the supervisor

TERMS OF EMPLOYMENT:
- Salary
- 9 ¼ months
- Board approved 3-23-92

**Teacher – High/Middle School**
Page **2** of **2**

BCSD-000121 

EXHIBIT

6

KATB 4/21/23

SEP 0 4 2019

# BOONE COUNTY SCHOOLS
## EMPLOYEE AGREEMENT FOR EXTRA DUTY ASSIGNMENT

This AGREEMENT dated **August 30, 2019** is between the BOONE COUNTY BOARD OF EDUCATION, hereinafter referred to as "School", and **MARIO A KIRKENDALL**, hereinafter referred to as "Employee".

1.  **Employment:** The School hereby employs the Employee at **RYLE HIGH SCHOOL** and the Employee accepts employment upon the terms and conditions hereinafter set forth.

12. **Term:** Subject to the provisions for termination as hereinafter provided, the term of this Agreement shall begin **July 15, 2019** and shall terminate on **June 30, 2020** with the right on the part of the School to extend this Agreement for an additional school year upon written notice to the Employee given prior to the end of the current school year. When used in this Agreement, the term "school year" shall not infer a guarantee of employment for one continuous year or provide a vested property right but rather said term is used in conjunction with KRS 160.380 which limits the employment of any school employee to no longer than the current school year.

3.  **Compensation and Duties:** The Employee is hereby retained in the capacity of **HS ATHLETIC DIRECTOR (Job Code 6109)** with the School and shall be paid an index of **.14** totaling the annual salary of **$6,275.00** in accord with the approved salary schedule. The Employee's duties shall be performed in accordance with the School Board policy applicable thereto and subject to the terms, statutes and regulations. The Employee shall be responsible to his/her immediate supervisor and perform his/her duties responsibly and efficiently according to instructions.

4.  **Termination:** Either party may terminate this Agreement for any reason or cause whatsoever with the giving of 10 days written notice. Upon request by the Employee, the Superintendent shall provide a written statement containing the grounds upon which non-renewal, termination or suspension of the contract is based but in no event shall the Employee be entitled to reinstatement after termination, non-renewal or suspension.

5.  **Further Conditions:** Must attend a workshop at their school on procedures of coaching and extra assignments. Must sign a Code of Ethics and will be evaluated yearly.

NOTE:

6.  **Coaching Experience:** Number of years coaching: **6**

7.  **Pay Election:** Check box for pay election (If not checked, pay will be lump sum)

    ☑ **Over Year** - is taxed the same as regular wages.
    ☐ **Lump Sum** - is taxed at Federal - 22%, State - 5%.
    No consideration for exemptions claimed or additional tax deductions on employee's W-4 form.

    Retirement, Medicare, Social Security, etc. will be deducted.

BOONE COUNTY BOARD OF EDUCATION
By:

*Randy Poe*

Randy J. Poe, Ed.D.
**Superintendent of Schools**

**ON REVERSE SIDE
PLEASE READ AND SIGN
CODE OF ETHICS**

By:                                        EMPLOYEE

*Marie A. Kirkendall*

107466

# BOONE COUNTY BOARD OF EDUCATION
## CODE OF ETHICS
### FOR
## COACHES, SCHOOL ADMINISTRATORS AND ATHLETIC DIRECTORS

1. Strive to develop and maintain a broad athletic program, which seeks the highest academic and athletic accomplishments of all athletes.

2. Will carry out the basic policies of Northern Kentucky Athletic Conference and Kentucky High School Athletic Association rules and regulations.

3. Coaches, School Administrators and Athletic Directors will promote good sportsmanship not only with athletes, but also with the spectators.

4. Coaches, School Administrators and Athletic Directors must strive to set and maintain highest ethical and moral conduct by setting an example with all involved in athletics.

5. The continuing education achievement must be checked to ensure that the educational minimum met by the school administration or site-base council is maintained.

6. Coaches, School Administrators and Athletic Directors should be active in preventing, tobacco, drug, and alcohol use or abuse.

7. Coaches, School Administrators and Athletic Directors should not promote or incite athletes or spectators to be abusive toward game officials.

8. Coaches, School Administrators and Athletic Directors will not pressure, encourage or plead with faculty members to give athletes special consideration.

9. Coaches, School Administrators and Athletic Directors will not encourage potential athletes to transfer to their respective school. Students shall attend the school in the district in which they live in accordance with board policy.

10. Coaches, School Administrators and Athletic Directors will treat each player, opposing coach and players, officials, parents and administrators with respect and dignity.

11. Coaches, School Administrators and Athletic Directors will do their best to learn the fundamental skills teach and evaluation techniques, and strategies of their sport.

12. Coaches, School Administrators and Athletic Directors will become thoroughly familiar with the rules of their sport.

13. Coaches, School Administrators and Athletic Directors will uphold the authority of officials who are assigned to the contest in which they coach and will assist them in every way to conduct fair and impartial competitive contests.

14. Coaches, School Administrators and Athletic Directors will learn the strengths and weaknesses of the players so that they might place them in to situations where they have a maximum opportunity to achieve success.

15. Coaches, School Administrators and Athletic Directors will conduct practices so that all players have an opportunity to improve their skill level through active participation.

16. Coaches will cooperate with the administration of the school in the enforcement of rules and regulations and will report any irregularities that violate sound competitive practices.

17. Coaches, School Administrators and Athletic Directors will protect the health and safety of their players by insisting that all of the activities under their control be conducted for their welfare rather than for the vicarious interest of adults.

_Mario Kirkendall_
**Employee Name**

_Maria A. Kirkendall_
**Employee Signature**

8/30/19
**Date**

BCSD-000134

(5)

**BOONE COUNTY SCHOOLS**
**JOB DESCRIPTION**

EXHIBIT
7
KAB 4/21/23

TITLE:  **Athletic Director**

QUALIFICATIONS:

1.  Holds a valid Kentucky teaching certificate; or

2.  Holds a Bachelor's degree or higher with 2.5 grade point average; or

3.  Has a minimum of three years successful teaching and coaching experience

4.  Has the proven ability to communicate effectively with students, staff <u>parents, media, and community</u>

REPORTS TO:  Principal

JOB GOAL:  To provide each enrolled student in the school the opportunity to participate in an interscholastic athletic activity that will foster physical skills, a sense of worth and competence, a knowledge and understanding of the pleasures of sport, and the principles of fair play

PERFORMANCE RESPONSIBILITIES:

1.  Organize and administer the overall program of interscholastic athletics in his/her school

2.  Provide leadership in the selection, assignment, supervision, and evaluation of athletic coaches and staff members

3.  Promote good school-community relations by keeping the community aware of and responsive to the athletic program

4.  Organize and schedule all interscholastic athletic events

5.  Select officials, team physician, and security persons as required, and assume general responsibility for the proper supervision of home athletic events

6.  Arrange with the Director of Transportation for the transportation for athletic contest participants

7.  Arrange for meals for athletes and coaches when situation is warranted

8.  Develop appropriate rules and regulations governing the conduct of athletic activities

9.  Prepare and administer the athletic program budget

10. Requisition program supplies and equipment as provided for in the budget

11. Supervise all ticket sales and fund-raising events of the athletic program, and assume responsibility for the accurate accounting of all monies

12. Arrange all details of visiting teams' needs, including lodging, meals, towels, gymnasium services, and field assistance, as appropriate

13. Work with the coaches to develop schedules for all athletic events, including practice schedules

14. Assume responsibility for the physical examination of all athletes, and assume responsibility for the processing of all injury reports and claims

**Athletic Director**
Page **1** of **2**

BCSD-000118

**BOONE COUNTY SCHOOLS**
**JOB DESCRIPTION**

15. Administer the insurance program covering school athletes

16. Keep records of the results of all school athletic contests, and maintain a record file of all award winners

17. Plan and supervise an annual recognition program for all school athletes

18. Coordinate all planning for special athletic event

19. Participate in those functions and activities as described in the regular teacher job description

20. Have all students under supervision of certified personnel at all times at approved after school programs

21. Perform other duties consistent with the position assigned as may be requested by the supervisor

TERMS OF EMPLOYMENT:
- Index
- 12 months
- Board approved 9-12-02

**Athletic Director**
Page **2** of **2**

BCSD-000119



**RETALIATION PROHIBITED**

No one shall retaliate against an employee or student because s/he submits a grievance, assists or participates in an investigation, proceeding, or hearing regarding the charge of harassment/discrimination of an individual or because s/he has opposed language or conduct that violates this policy.

Upon the resolution of allegations, the Superintendent shall take steps to protect employees and students against retaliation.

**OTHER CLAIMS**

When a complaint is received that does not appear to be covered by this policy, administrators shall review other policies that may govern the allegations, including but not limited to, 03.113, 03.1325 and/or 09.422.

## GRIEVANCES (03.16) 11/02

**GENERAL**

The Superintendent shall develop specific grievance procedures to include, but not be limited to, the opportunity for grievances to be addressed and resolved at each level of the chain of command from the point of origin, time limitations for the filing and the appeal of a grievance, and procedures for the orderly review and appeal of each individual grievance. Grievances are individual in nature and must be brought by the individual grievant. The Board shall take action only on those grievances that fall within the authority of the Board.

**GENERAL GRIEVANCES**

The Board will hear grievances only after the unsuccessful resolution by the employee's supervisors.

**PERSONNEL ISSUES**

The Board will not hear any grievance concerning personnel actions taken by the Superintendent/designee, unless the grievance is based on an alleged violation of constitutional, statutory, regulatory, or policy provisions. Before accepting a grievance appeal, the Board shall seek the advice of the Board attorney as to whether the appeal falls within the requirements of this policy. Any personnel grievance not falling within those requirements shall be appealed only to the level of the Superintendent. The Board shall not hear grievances concerning simple disagreement or dissatisfaction with a personnel action.

**EXCEPTION**

Harassment/Discrimination allegations shall be governed by policy 03.162.

## PROMOTION (03.1312) 10/02

The promotion of certified personnel shall be made by the Superintendent. Promotional positions are defined as those positions that require additional administrative and/or supervisory responsibilities excepting extended time employment and/or extra assignment. District employees shall be given priority consideration for promotions. The Superintendent shall not promote a personal relative or the relative of a Board member who continues employment in the District under provisions of KRS 160.380. The promotion of personnel shall be based on qualifications, success in past assignments, and potential for success in the new position.

## DEMOTION (03.1313) 10/02

In accordance with statutory provisions, the demotion of certified personnel shall be made by the Superintendent.

## SUPERVISION (03.132) 3/93

**IMMEDIATE SUPERVISOR**

Supervision shall be provided for all certified employees. Employees shall be informed as to whom their immediate supervisor is and to whom they will be responsible.

**JOB DESCRIPTION**

Each employee shall be provided a job description, which shall delineate all essential functions and the general duties and responsibilities of the position held by the employee. Job descriptions shall not be considered all-inclusive descriptions of the job but shall indicate the general parameters of the duties and responsibilities of the position. The immediate supervisor may, as needed, assign other reasonable duties to the employee.

## USE OF SCHOOL PROPERTY (03.1321) 8/13

All personnel shall be responsible for school equipment, supplies, books, furniture, and apparatus under their care and use. Any damage, lost, stolen, or vandalized property shall be reported to the employee's immediate supervisor, who shall then report it to the Superintendent/designee once it is confirmed that the item cannot be recovered. In addition, employees shall not perform personal services for themselves or for others for pay or profit during work time and/or using District property or facilities. District property being used for unauthorized purposes shall be reported to that employee's immediate supervisor.

**OUTSIDE WORK**

BCSD 000022



# LIMITED CONTRACT OF EMPLOYMENT

**COMMONWEALTH OF KENTUCKY - COUNTY OF BOONE**

Pursuant to KRS 161.730, this contract is made and entered into this the **1st day of July 2020**, by and between the **Boone County School District**, Florence, Kentucky, hereinafter called the District, and

**MARIO KIRKENDALL**
**3714 MALAER DRIVE**
**CINCINNATI, OH 45241**

a teacher holding a **Regular** teacher's certificate issued in accordance with section 161.020 of the Kentucky Revised Statutes, and now in force, hereinafter called the Teacher.

WITNESSETH: THAT SAID TEACHER HAS BEEN DULY APPOINTED BY THE SUPERINTENDENT OF THE DISTRICT IN THE PUBLIC SCHOOLS OF BOONE COUNTY FOR ONE YEAR. THE PARTIES TO THIS CONTRACT HEREBY AGREE TO THE FOLLOWING CONDITIONS:

1. The services to be performed by said teacher shall be such as are required by the Kentucky Revised Statutes, by the lawful rules and regulations of the State Board for Elementary and Secondary Education, and the lawful rules and regulations of the District.

2. The duties to be performed are to commence on the first day required by the school calendar adopted or amended by the District and approved by the State Department of Education for the  school year **2020-2021**, for the number of days required by such calendar, to end no later than June 30 of the school year in such school or schools.

3. For and in consideration of the services provided for by this contract teacher shall be paid a salary in accordance with his or her qualifications and the salary schedule adopted by the District and approved by the State Board for Elementary and Secondary Education for the year coming within the limits of this contract except salaries capped for special reasons (i.e. out of state experience capped at 15 years and salaries paid by grants).

4. Said salary shall be payable not later than the end of each month during the period of employment and/or in accordance with a plan adopted by the District in compliance with state law and the lawful rules and regulations of the State Board for Elementary and Secondary Education.

5. The teacher shall be entitled to sick leave, other leave and fringe benefits in accordance with state law, the lawful rules and regulations of the State Board for Elementary and Secondary Education, and the lawful rules and regulations of the District.

6. The teacher shall keep such records and reports and furnish same to the District Superintendent at regular periods designated by him, state law, the lawful rules and regulations of the State Board for Elementary and Secondary Education, and the lawful rules and regulations of the District.

7. The power of the District to transfer, suspend or dismiss the teacher, as provided for in KRS 160.380, 161.170 and 161.790,  or other applicable statutes, is in no manner impaired or affected by this contract.

8. This contract shall remain in full force subject to all provisions herein set forth, unless and until terminated in compliance with KRS 161.170, 161.750, 161.780 and 161.790, or other applicable statutes.

WITNESS the following signatures as of the day, month, and year first above.

<u>BOONE COUNTY BOARD OF EDUCATION</u>
School District

By *Randy Poe*

Randy J. Poe, Ed.D.
Superintendent of Schools

Teacher **107466**

BCSD-000130



AUG 3 1 2020

# BOONE COUNTY SCHOOLS
## EMPLOYEE AGREEMENT FOR EXTRA DUTY ASSIGNMENT

This AGREEMENT dated **July 15, 2020** is between the BOONE COUNTY BOARD OF EDUCATION, hereinafter referred to as "School", and **MARIO A KIRKENDALL**, hereinafter referred to as "Employee".

1. **Employment:** The School hereby employs the Employee at **RYLE HIGH SCHOOL** and the Employee accepts employment upon the terms and conditions hereinafter set forth.

2. **Term:** Subject to the provisions for termination as hereinafter provided, the term of this Agreement shall begin **July 15, 2020** and shall terminate on **June 30, 2021** with the right on the part of the School to extend this Agreement for an additional school year upon written notice to the Employee given prior to the end of the current school year. When used in this Agreement, the term "school year" shall not infer a guarantee of employment for one continuous year or provide a vested property right but rather said term is used in conjunction with KRS 160.380 which limits the employment of any school employee to no longer than the current school year.

3. **Compensation and Duties:** The Employee is hereby retained in the capacity of **HS ATHLETIC DIRECTOR (Job Code 6109)** with the School and shall be paid an index of **.14** totaling the annual salary of **$6,408.00** in accord with the approved salary schedule. The Employee's duties shall be performed in accordance with the School Board policy applicable thereto and subject to the terms, statutes and regulations. The Employee shall be responsible to his/her immediate supervisor and perform his/her duties responsibly and efficiently according to instructions.

4. **Termination:** Either party may terminate this Agreement for any reason or cause whatsoever with the giving of 10 days written notice. Upon request by the Employee, the Superintendent shall provide a written statement containing the grounds upon which non-renewal, termination or suspension of the contract is based but in no event shall the Employee be entitled to reinstatement after termination, non-renewal or suspension.

5. **Further Conditions:** Must attend a workshop at their school on procedures of coaching and extra assignments. Must sign a Code of Ethics and will be evaluated yearly.

NOTE: ONE YEAR ONLY

6. **Coaching Experience:** Number of years coaching: **7**

7. **Pay Election:** Check box for pay election (If not checked, pay will be lump sum)

   ☒ Over Year  - is taxed the same as regular wages.
   ☐ Lump Sum  - is taxed at Federal - 22%, State - 5%.
   No consideration for exemptions claimed or additional tax deductions on employee's W-4 form.
   Retirement, Medicare, Social Security, etc. will be deducted.

**BOONE COUNTY BOARD OF EDUCATION**
By:

**Matthew Turner**
**Superintendent of Schools**

**ON REVERSE SIDE
PLEASE READ AND SIGN
CODE OF ETHICS**

By:                                              **EMPLOYEE**

107466

BCSD-000131

## BOONE COUNTY BOARD OF EDUCATION
## CODE OF ETHICS
## FOR
## COACHES, SCHOOL ADMINISTRATORS AND ATHLETIC DIRECTORS

1. Strive to develop and maintain a broad athletic program, which seeks the highest academic and athletic accomplishments of all athletes.

2. Will carry out the basic policies of Northern Kentucky Athletic Conference and Kentucky High School Athletic Association rules and regulations.

3. Coaches, School Administrators and Athletic Directors will promote good sportsmanship not only with athletes, but also with the spectators.

4. Coaches, School Administrators and Athletic Directors must strive to set and maintain highest ethical and moral conduct by setting an example with all involved in athletics.

5. The continuing education achievement must be checked to ensure that the educational minimum set by the school administration or site-base council is maintained.

6. Coaches, School Administrators and Athletic Directors should be active in preventing, tobacco, drug, and alcohol use or abuse.

7. Coaches, School Administrators and Athletic Directors should not promote or incite athletes or spectators to be abusive toward game officials.

8. Coaches, School Administrators and Athletic Directors will not pressure, encourage or plead with faculty members to give athletes special consideration.

9. Coaches, School Administrators and Athletic Directors will not encourage potential athletes to transfer to their respective school.  Students shall attend the school in the district in which they live in accordance with board policy.

10. Coaches, School Administrators and Athletic Directors will treat each player, opposing coach and players, officials, parents and administrators with respect and dignity.

11. Coaches, School Administrators and Athletic Directors will do their best to learn the fundamental skills teach and evaluation techniques, and strategies of their sport.

12. Coaches, School Administrators and Athletic Directors will become thoroughly familiar with the rules of their sport.

13. Coaches, School Administrators and Athletic Directors will uphold the authority of officials who are assigned to the contest in which they coach and will assist them in every way to conduct fair and impartial competitive contests.

14. Coaches, School Administrators and Athletic Directors will learn the strengths and weaknesses of the players so that they might place them in to situations where they have a maximum opportunity to achieve success.

15. Coaches, School Administrators and Athletic Directors will conduct practices so that all players have an opportunity to improve their skill level through active participation.

16. Coaches will cooperate with the administration of the school in the enforcement of rules and regulations and will report any irregularities that violate sound competitive practices.

17. Coaches, School Administrators and Athletic Directors will protect the health and safety of their players by insisting that all of the activities under their control be conducted for their welfare rather than for the vicarious interest of adults.

Mario Kirkendall
_____
Employee Name

_____          8/24/20
Employee Signature                              Date

BCSD-000182

**Ball, Eric R**

| | |
|---|---|
| **From:** | Ball, Eric R |
| **Sent:** | Wednesday, August 26, 2020 2:48 PM |
| **To:** | Kirkendall, Mario |
| **Subject:** | RE: Notice to All Employees Regarding Leave |

I am available now if you can call back?

Eric

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Wednesday, August 26, 2020 2:46 PM
**To:** Ball, Eric R <eric.ball@boone.kyschools.us>
**Subject:** RE: Notice to All Employees Regarding Leave

Thank you for calling, I was finishing a zoom meeting with the other AD's.

I will call you in the morning. Thank you again for reaching out

Mario Kirkendall
Ryle High School Athletic Director
e-mail: Mario.kirkendall@boone.kyschools.us
P: 859-384-5300 x71146

**From:** Ball, Eric R <eric.ball@boone.kyschools.us>
**Sent:** Wednesday, August 26, 2020 1:42 PM
**To:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Subject:** RE: Notice to All Employees Regarding Leave

Mr. Kirkendall,

I would be more than happy to discuss your options. Please give me a call at 859-283-3210.

Eric Ball
Assistant Director – Human Resources
859-283-3210

 Boone County Schools



NOTICE: This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged or confidential. It is not to be transmitted to or received by anyone other than the named addressee's or a person authorized to deliver it to the named addressee's. It is not to be copied or forwarded to

1

any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it, and notify the sender of the error by replying via email so that our address record can be corrected.

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Wednesday, August 26, 2020 11:14 AM
**To:** Ball, Eric R <eric.ball@boone.kyschools.us>
**Subject:** RE: Notice to All Employees Regarding Leave

Good morning Eric,

I hope all is well, and that you are staying safe. I wanted to reach out as I have been running in to some Covid closures for school/childcare issues and I wanted to at least speak to you regarding the below email. I know there was a cap on when things had to be turned in – I just wanted to ask and make sure I had clarity on things.

Mario Kirkendall
Ryle High School Athletic Director
e-mail: Mario.kirkendall@boone.kyschools.us
P: 859-384-5300 x71146

**From:** Ball, Eric R <eric.ball@boone.kyschools.us>
**Sent:** Thursday, July 30, 2020 9:52 AM
**Cc:** Turner, Matthew - Superintendent <matthew.turner@boone.kyschools.us>; Detwiler, James <james.detwiler@boone.kyschools.us>; McArtor, Eric <eric.mcartor@boone.kyschools.us>; Watson, Jenny <jenny.watson@boone.kyschools.us>; Radford, Jason <jason.radford@boone.kyschools.us>; Poiry, Michael <michael.poiry@boone.kyschools.us>
**Subject:** Notice to All Employees Regarding Leave

As the Boone County Board of Education re-opens schools in August, the following leave options will be offered for employees, both certified and classified. Keep in mind that all employees are required to report to campus when school re-opens, unless you have received confirmation of a remote teaching assignment or an approved leave of absence.

If you believe that you are unable to report to work due to a health issue related to COVID-19, and would like to request the opportunity to work remotely, you must submit a note from your treating physician stating the following:
1. Specific health condition that would put you at higher risk of COVID-19 related complications.
2. Statement recommending that you work remotely

Your doctor's note should be faxed to 859-282-5643, emailed to Eric Ball (eric.ball@boone.kyschools.us) or delivered to the Human Resources office. These notes must be submitted to HR by **4:00p.m. on Tuesday August 4th, 2020**.

If your child care will be impacted by COVID-19 (i.e. daycare center closures or a school's hybrid schedule) you may be eligible for EPSLA and EFMLEA. Information on each of those leaves can be found by clicking on the following link:
https://www.boone.kyschools.us/Administration/16

If you would like to request a leave of absence for the 2020-2021 school year, and your scenario is not listed above, please contact HR at 859-282-2374.

Eric Ball
Assistant Director – Human Resources
859-283-3210

2

BCSD-000238

 Boone County Schools



NOTICE: This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged or confidential. It is not to be transmitted to or received by anyone other than the named addressee's or a person authorized to deliver it to the named addressee's. It is not to be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it, and notify the sender of the error by replying via email so that our address record can be corrected.

BCSD-000239

**EXHIBIT**
12
KAB 4/21/23

## Ball, Eric R

| | |
|---|---|
| **From:** | Ball, Eric R |
| **Sent:** | Tuesday, September 1, 2020 8:12 AM |
| **To:** | Kirkendall, Mario |
| **Subject:** | RE: Thank you for your time |

Mr. Kirkendall,

We are not offering the opportunity to use sick days to make an individual's pay whole if they are using EFMLEA days.

Eric Ball
Assistant Director – Human Resources
859-283-3210

 Boone County Schools



NOTICE: This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged or confidential. It is not to be transmitted to or received by anyone other than the named addressee's or a person authorized to deliver it to the named addressee's. It is not to be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it, and notify the sender of the error by replying via email so that our address record can be corrected.

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Monday, August 31, 2020 12:29 PM
**To:** Ball, Eric R <eric.ball@boone.kyschools.us>
**Subject:** Thank you for your time

Good afternoon Mr. Ball,

I hope you had a great weekend, I did want to say thank you for your time last week helping me understand a potential leave.

After trying to learn more on my own, with the 2/3's - I wanted to ask am I able to exhaust my sick balance/combination of my absence balances to make my pay whole? I did read that it is left up to the company/place of employment, so I did want to check as this does weigh in on what is feasible.

I look forward to hearing from you, have a great rest of your day.

Mario Kirkendall
Ryle High School Athletic Director

1

e-mail: Mario.kirkendall@boone.kyschools.us
P: 859-384-5300 x71146

2

BCSD-000249



**Ball, Eric R**

| | |
|---|---|
| **From:** | Kirkendall, Mario |
| **Sent:** | Thursday, September 10, 2020 5:02 PM |
| **To:** | Ball, Eric R |
| **Subject:** | FW: [External Sender] Preschool enrollment 2 of 2 |
| **Attachments:** | Scan_0001.pdf |

Mr. Ball,

Here is the letter sent by Princeton City Schools.

I did have a question on the EMFLEA – Do I put the date after the 10 Sick days are up or the same date?

Also, I will look for my employee ID #. Thank you

Mario Kirkendall
Ryle High School Athletic Director
e-mail: Mario.kirkendall@boone.kyschools.us
P: 859-384-5300 x71146

**EXTERNAL MESSAGE**

---------- Forwarded message ---------
From: **Jenavieve Kirkendall** <jena.kirkendall@gmail.com>
Date: Sun, Aug 30, 2020 at 2:20 PM
Subject: Fwd: [External Sender] Preschool enrollment
To: Mario <mariokirkendall@gmail.com>

---------- Forwarded message ---------
From: **Steinberg, Marna** <msteinberg@vikingmail.org>
Date: Mon, Aug 3, 2020 at 8:33 AM
Subject: Re: [External Sender] Preschool enrollment
To: Jenavieve Kirkendall <jena.kirkendall@gmail.com>

good morning,
Thank you for your email.  At this time our preschool classes are full and preschool students will be attending.  There is not remote learning for preschool.  Hope this information helps
Thank you.
marna

On Thu, Jul 30, 2020 at 9:52 PM Jenavieve Kirkendall <jena.kirkendall@gmail.com> wrote:

1

Good evening Marna,

I hope this email finds you well. I am reaching out to you as we recently enrolled my son, Simeon kirkendall, into Sharonville elementary kindergarten. We also have a daughter that would be eligible for preschool in the fall. Could you please tell me if we are able to enroll her for a remote learning option?

Thank you for your help?
Jena
--
*Jenavieve J. Kirkendall BSN, RN*

--
Marna **Steinberg**
Registrar
3900 Cottingham Drive
Cincinnati, Ohio 45241
P 513.864.1113

www.princetonschools.net



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIALITY NOTICE: All information in this e-mail, including attachments, is strictly confidential and intended solely for delivery to and authorized use by the addressee(s) identified above. If you are not the named recipient, please notify the sender immediately by e-mail or telephone at 513.864.1113 and delete the contents of this message from your system without disclosing the contents of this message to anyone, using them for any purpose, or storing or copying the information on any medium. If you are not the named recipient you are hereby notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

--
*Jenavieve J. Kirkendall BSN, RN*

2

BCSD-000251

**Ball, Eric R**

| | |
|---|---|
| **From:** | Kirkendall, Mario |
| **Sent:** | Thursday, September 10, 2020 5:02 PM |
| **To:** | Ball, Eric R |
| **Subject:** | FW: MCC Preschool 1 of 2 |

Good afternoon Mr. Ball,

Here is one of the emails from my child's school.

Mario Kirkendall
Ryle High School Athletic Director
e-mail: Mario.kirkendall@boone.kyschools.us
P: 859-384-5300 x71146

**EXTERNAL MESSAGE**

---------- Forwarded message ---------
From: **Chris Conner** <CConner@mcc.church>
Date: Thu, Aug 13, 2020 at 3:08 PM
Subject: MCC Preschool
To: Kirkendall, A <jena.kirkendall@gmail.com>

Dear MCCP Parents

I realize some of you have made your decision for the fall, but I want you to know the options I have available.  If you have already withdrawn, please disregard this email.  I pray for everyone to have a safe and positive school year.

The options for MCC Preschool this fall are:

1.  Enrolled families may withdraw;  registration fee and summer tuition refunded;

    **please send email by August 18 if this is your choice**
2.  *Families may participate with learning 'at home packets' (see below for details and tuition information);

1

**please send email with request by August 18 if this is your choice**

3. Families who do not want to participate in 'at home learning' may be placed on the wait list for January; second priority with no summer tuition refunded but applied to May 2021 if

placed; January tuition would be due upon returning if placed; **please send email by August 18 if this is your choice**

4. Enrolled families who have not paid summer tuition are withdrawn
5. Registration for January begins November 24

*Mrs. Sarah Moeller, Mrs. Julie Morgan, Mrs. Jackie Thornton, Mrs. Darci (Chapel Director) and I are very excited to find ways to stay in touch with the preschool families!  We agreed that for the fall we want to make it easier for preschool

families to have at home learning with a variety of activities.  The weekly packets will be available for pick-up in the parking lot at the preschool entrance every Tuesday.  Families participating will receive first priority for January placement.  The summer

tuition payment is applied to May 2021 and the regular January tuition is due upon returning.

**Tuition for the 'at home learning' opportunity is $75 a month to cover teacher salaries and supplies.**

**I must know if you plan to participate in the 'at home learning' by AUGUST 18!  I need to know how many packets to make for each age group.**

Packets may include most or all of the following:

Tool Kit (first week only)

Newsletter

Themes based on the weekly newsletter from Scholastic

Letter and number recognition activity sheet

2

BCSD-000253

Letter sounds with the Alphabet song we use—possibly a link to the song

Counting activity

Sheets with names dotted so each child can practice writing their name

Suggestions for fine motor activities to strengthen fingers

Skill building activity/project

Simple preschool game to help teach following directions, taking turns, being a good loser, counting, etc.

Use of positional words at home

Email to families with links:

Reading—link to books being read or video one of us reading; encourage getting a library card to check out suggested books

Virtual field trips with some of us

Music suggestions

3

BCSD-000254

Shutterfly option

Chapel email with online link

Please let me know your decision by August 18.  Thank you.

**CHRIS CONNER**

Preschool Director

cconner@mcc.church | 513-469-5333 O | 513-587-1933 F

• • • • • • • • • • • • • • • • • •

**Montgomery Community Church**

11251 Montgomery Rd.

Cincinnati, OH  | 45249 | 513-489-0892

4

BCSD-000255

[www.mcc.church](www.mcc.church)

*"engaging people to live and serve like Jesus"*

\-\-
*Jenavieve J. Kirkendall BSN, RN*

\-\-
Best Regards,
Mario Kirkendall
513-335-3865
[mariokirkendall@gmail.com](mailto:mariokirkendall@gmail.com)

BCSD-000256

**Ball, Eric R**

| | |
|---|---|
| **From:** | Ball, Eric R |
| **Sent:** | Friday, September 11, 2020 8:43 AM |
| **To:** | Kirkendall, Mario |
| **Subject:** | RE: [External Sender] Preschool enrollment 2 of 2 |

Mr. Kirkendall,

We have received your EPSLA request. Tina Herbert will let you know when your request has been processed.
The start date for EFMLEA should match the start date for the EPSLA form as they run concurrent for the first 10 days.

** Please note, you must notify your principal/supervisor of the days that you will be utilizing this leave.

Eric Ball
Assistant Director – Human Resources
859-283-3210

 Boone County Schools



NOTICE: This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged or confidential. It is not to be transmitted to or received by anyone other than the named addressee's or a person authorized to deliver it to the named addressee's. It is not to be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it, and notify the sender of the error by replying via email so that our address record can be corrected.

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Thursday, September 10, 2020 5:02 PM
**To:** Ball, Eric R <eric.ball@boone.kyschools.us>
**Subject:** FW: [External Sender] Preschool enrollment 2 of 2

Mr. Ball,

Here is the letter sent by Princeton City Schools.

I did have a question on the EMFLEA – Do I put the date after the 10 Sick days are up or the same date?

Also, I will look for my employee ID #. Thank you

Mario Kirkendall
Ryle High School Athletic Director
e-mail: Mario.kirkendall@boone.kyschools.us

BCSD-000257

P: 859-384-5300 x71146

**EXTERNAL MESSAGE**

---------- Forwarded message ----------
From: **Jenavieve Kirkendall** <jena.kirkendall@gmail.com>
Date: Sun, Aug 30, 2020 at 2:20 PM
Subject: Fwd: [External Sender] Preschool enrollment
To: Mario <mariokirkendall@gmail.com>

---------- Forwarded message ----------
From: **Steinberg, Marna** <msteinberg@vikingmail.org>
Date: Mon, Aug 3, 2020 at 8:33 AM
Subject: Re: [External Sender] Preschool enrollment
To: Jenavieve Kirkendall <jena.kirkendall@gmail.com>

good morning,
Thank you for your email.  At this time our preschool classes are full and preschool students will be attending.  There is not remote learning for preschool.  Hope this information helps
Thank you.
marna

On Thu, Jul 30, 2020 at 9:52 PM Jenavieve Kirkendall <jena.kirkendall@gmail.com> wrote:

Good evening Marna,

I hope this email finds you well. I am reaching out to you as we recently enrolled my son, Simeon kirkendall, into Sharonville elementary kindergarten. We also have a daughter that would be eligible for preschool in the fall. Could you please tell me if we are able to enroll her for a remote learning option?

Thank you for your help?
Jena
--
*Jenavieve J. Kirkendall BSN, RN*

--
Marna **Steinberg**
Registrar
3900 Cottingham Drive
Cincinnati, Ohio 45241

2

BCSD-000258

P 513.864.1113

[www.princetonschools.net](http://www.princetonschools.net)



*********************************************************
CONFIDENTIALITY NOTICE: All information in this e-mail, including attachments, is strictly confidential and intended solely for delivery to and authorized use by the addressee(s) identified above.  If you are not the named recipient, please notify the sender immediately by e-mail or telephone at 513.864.1113 and delete the contents of this message from your system without disclosing the contents of this message to anyone, using them for any purpose, or storing or copying the information on any medium. If you are not the named recipient you are hereby notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.


*********************************************************



--
*Jenavieve J. Kirkendall BSN, RN*

BCSD-000259



**Ball, Eric R**

| | |
|---|---|
| **From:** | Ball, Eric R |
| **Sent:** | Tuesday, September 15, 2020 7:51 AM |
| **To:** | Kirkendall, Mario |
| **Cc:** | Herbert, Catina |
| **Subject:** | FW: Signed Form |
| **Attachments:** | Scan_0002.pdf |

Mr. Kirkendall,

I just wanted to confirm that we have received your EFMLEA request. Tina Herbert will let you know when that request has been processed.

Eric

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Monday, September 14, 2020 3:17 PM
**To:** Ball, Eric R <eric.ball@boone.kyschools.us>
**Subject:** Signed Form

Mr. Ball,

Attached is my EMFLEA form, with a start date of 9/21. I will contact Ms. Herbert regarding my intermittent days that I will be able to come in.

Thank you so much for your time and help clarifying things.

Mario Kirkendall
Ryle High School Athletic Director
e-mail: Mario.kirkendall@boone.kyschools.us
P: 859-384-5300 x71146

1

## Emergency Family Medical Leave Expansion Act Request Form

I, **Mario Kirkendall** _____ am requesting the use of Emergency Family and Medical Leave Expansion
_____
**Employee Name**

Act (EFMLEA) days due to COVID-19 related child care issues in accordance with the Families First Coronavirus Response Act (FFCRA.) I understand that the use of EFMLEA days will <u>not</u> impact my current number of sick, personal or vacation days. (For more information on the FFCRA please use this link https://hrkentucky.com/uplimg/posters/FFCRA_Poster_WH1422_Non-Federal.pdf.)

| 1st Date of EFMLEA: | Last Date of EFMLEA: TBD |
|---|---|
| INTERMITTENT | |

**Relationship to Child (Circle one (1) option):** <u>Parent</u> / <u>Grandparent</u> / <u>Guardian</u> / <u>Aunt or Uncle</u> / <u>Other</u>

Please email completed forms to Eric Ball (eric.ball@boone.kyschools.us). You may sign the form and scan, or take a picture, and email to Eric You may also drop the form off in the box outside of the HR office.

## ** You must include documentation when you submit this form. Approved documentation includes: an official letter or notice or posting that states that your school, facility or day care provider has closed or is no longer available due to COVID-19.

All COVID-19 related absences will be recorded in Absence Management (AESOP) by the HR staff. <u>Please do not record COVID-19 related absences in Absence Management.</u> All absences submitted under the Emergency Paid Sick Leave Act will appear on the pay period following the submission of this form.

_____
**Employee Signature**

_____
**Employee Number**

## Ryle High School
_____
**Work Location**

## Teacher/AD
_____
**Job Title**

**Part III: (To be completed by Human Resources):**

____ Approved     ____ Denied. Does not meet the requirements of EFMLEA

**HR Signature:** _____     **Date:** 9/25/20



**Date : 9/16/2020 9:50:58 AM**
**From : "Kirkendall, Mario" mario.kirkendall@boone.kyschools.us**
**To : "Erion, Amy" amy.erion@boone.kyschools.us, "Casson, Sarah"**
**sarah.casson@boone.kyschools.us, "chalkonyourboots@yahoo.com"**
**chalkonyourboots@yahoo.com, "Collins, Stephen"**
**stephen.collins@boone.kyschools.us, "McCord, Clifford A "Chip""**
**clifford.mccord@boone.kyschools.us, "Johnny Vidal"**
**johnny.l.vidal@gmail.com, "Echeverria, Edmundo"**
**edmundo.echeverria@boone.kyschools.us, "Lovins, Tasha"**
**tasha.lovins@boone.kyschools.us, "Haitz, Katie"**
**katie.haitz@boone.kyschools.us, "Belcher, Keaton"**
**keaton.belcher@boone.kyschools.us, "Ruschell, Tim"**
**timothy.ruschell@boone.kyschools.us, "pinkman1@me.com"**
**pinkman1@me.com, "Aylor, Joseph" joseph.aylor@boone.kyschools.us,**
**"Engler, Michael B" michael.engler@boone.kyschools.us, "Klaas, Brenda"**
**brenda.klaas@boone.kyschools.us**
**Cc : "Shafer, Matt" matt.shafer@boone.kyschools.us, "Erickson, Jon M"**
**jon.erickson@boone.kyschools.us, "Jenna Weyer"**
**Jenna.Weyer@stelizabeth.com**
**Subject : Quick Update**

Good morning Coaches,

I hope you are starting your day off well.

*Beginning Monday 9/21/20 I will be taking leave – periodically checking in. In my absence Mr. Jon Erickson jon.erickson@boone.kyschools.us will be filling in for me.

If you need anything from me before I am out, please let me know.

Mario Kirkendall
Ryle High School Athletic Director
e-mail: Mario.kirkendall@boone.kyschools.us
P: 859-384-5300 x71146

BCSD-000484



**Ball, Eric R**

| | |
|---|---|
| **From:** | Ball, Eric R |
| **Sent:** | Thursday, October 15, 2020 2:39 PM |
| **To:** | Kirkendall, Mario |
| **Subject:** | RE: Leave Question/Statement |

Mr. Kirkendall,

Any questions you have regarding pay should be directed to Carrie Brannan (carrie.brannan@boone.kyschools.us.) As a reminder, you will only receive 2/3 your daily rate of pay (with a $200/day cap) for the days that you utilize EFMLEA. You would receive your full pay for the days that you fulfill the duties of the teaching and AD position.

In regards to responsibilities while on leave, you are not required to participate in any work related activities on the days that you are on an approved leave. Please notify Mr. Shafer of the individuals who are sending you emails and text so that he can address that with those individuals. If you are receiving emails/text from Mr. Shafer you will need to schedule an appointment with him so that the next time you are on campus you can give him all of the information he may need to access the programs/systems that are needed to fulfill the AD duties.

Eric Ball
Assistant Director – Human Resources
859-283-3210







NOTICE: This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged or confidential. It is not to be transmitted to or received by anyone other than the named addressee's or a person authorized to deliver it to the named addressee's. It is not to be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it, and notify the sender of the error by replying via email so that our address record can be corrected.

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Thursday, October 15, 2020 10:53 AM
**To:** Ball, Eric R <eric.ball@boone.kyschools.us>
**Subject:** Leave Question/Statement

Good morning Eric,

I hope you are doing well.

I wanted to reach out to you, as I was afraid I would run in to the issue on Pay. I have been doing work (have came in a few days) responding to emails and text messages from Coaches and Schools while on leave.

With my pay coming up drastically shorter than it normally would, what does the remedy need to be going forward? I am sure you do not have all information as to what I have done - emailing and texting. But I know one of the points you stated is not to feel obligated, but this has been daily.

If you have time to speak today, my number is 513-335-3865

Thank you for your time,
Mario Kirkendall

BCSD-000265

EXHIBIT
17
KAB  4/21/23

**Herbert, Catina**

| | |
|---|---|
| **From:** | Herbert, Catina |
| **Sent:** | Thursday, December 3, 2020 3:36 PM |
| **To:** | Dunican, Teresa; Ensley, Jennifer; Hammons, Ruby; Herbert, Catina; McCarthy, Danielle; Stork, Marianne W; Taylor, Katrina; Watkins, Melissa; Willett, Jimmi; Winsett, Jennifer |
| **Subject:** | Kirkendall, Mario - EFMLEA |

Mario will end his EFMLEA as of 12/4.

Thanks,

*Tina Herbert*
Boone County Schools
Human Resources
Administrative Assistant
859-283-3228 Phone
859-282-5643 Fax
Catina.herbert@boone.kyschools.us

1

BCSD-000282

4/29/2021

Employee | Absence History (13556)

**EXHIBIT**

18

KAB 4/21/23

CREATE ABSENCE   CREATE VACANCY   ABSENCE MODIFY   DAILY REPORT   SCHOOL   FIND EMPLOYEE   FIND SUBSTITUTE

| General Information | Permission | Configuration Settings | Absence Reasons | Preferred Substitutes | Absence Approvers | Reports |

| Absence History | Qualified Substitutes | Communications to Employee | Change Log | Login History |

Select Another Employee | Create an Absence | Add Employee 🔵 | Send Letter/Email

**Employee: KIRKENDALL, MARIO**
**Absence history for the next 366 days as well as the past 366 days**

| CONF# | Substitute | Feedback ABOUT Substitute | Feedback Left by Substitute | Start Date | Absence Reason | Days | School | Status |
|---|---|---|---|---|---|---|---|---|
| 436630260 | | | | 01/20/2021 | Suspension-PAID | 8.00 | Ryle High School | Substitute Not Needed |
| 433652966 | | | | 01/12/2021 | Sick Leave-I do solemnly swear, under penalty of law, that on the above mentioned day I was unable t | 1.00 | Ryle High School | Substitute Not Needed |
| 429146792 | SIPPLE, AMELIA | | | 11/30/2020 | EFMLEA-HR USE ONLY | 3.00 | Ryle High School | Filled |
| 426772409 | | | | 11/24/2020 | EFMLEA-HR USE ONLY | 4.00 | Ryle High School | Substitute Not Needed |
| 426936862 | | | | 11/23/2020 | EFMLEA-HR USE ONLY | 1.00 | Ryle High School | Substitute Not Needed |
| 426939519 | | | | 11/20/2020 | EFMLEA-HR USE ONLY | 1.00 | Ryle High School | Substitute Not Needed |
| 426939477 | | | | 11/19/2020 | EFMLEA-HR USE ONLY | 1.00 | Ryle High School | Substitute Not Needed |
| 426936644 | | | | 11/17/2020 | EFMLEA-HR USE ONLY | 1.00 | Ryle High School | Substitute Not Needed |
| 426762393 | | | | 11/16/2020 | EFMLEA-HR USE ONLY | 1.00 | Ryle High School | Substitute Not Needed |
| 426936816 | | | | 11/13/2020 | EFMLEA-HR USE ONLY | 1.00 | Ryle High School | Deleted |
| 426936770 | | | | 11/12/2020 | EFMLEA-HR USE ONLY | 1.00 | Ryle High School | UnFilled |
| 426939448 | | | | 11/11/2020 | EFMLEA-HR USE ONLY | 1.00 | Ryle High School | Substitute Not Needed |
| 426936542 | | | | 11/10/2020 | EFMLEA-HR USE ONLY | 1.00 | Ryle High School | UnFilled/Held |
| 426762333 | | | | 11/09/2020 | EFMLEA-HR USE ONLY | 1.00 | Ryle High School | UnFilled/Held |
| 426762237 | | | | 11/02/2020 | EFMLEA-HR USE ONLY | 4.00 | Ryle High School | UnFilled/Held |
| 422905047 | WIHEBRINK, JAMES | | | 10/19/2020 | EFMLEA-HR USE ONLY | 8.00 | Ryle High School | Filled |
| 422905447 | WIHEBRINK, JAMES | | | 10/15/2020 | EFMLEA-HR USE ONLY | 2.00 | Ryle High School | Filled |
| 422904622 | | | | 10/14/2020 | EFMLEA-HR USE ONLY | 3.00 | Ryle High School | Substitute Not Needed |
| 423517518 | | | | 10/09/2020 | Exchange Day | 1.00 | Ryle High School | Substitute Not Needed |
| 423314721 | | | | 10/08/2020 | EFMLEA-HR USE ONLY | 2.00 | Ryle High School | UnFilled/Held |
| 422904622 | | | | 10/07/2020 | EPSLA-2/3 HR ONLY | 1.00 | Ryle High School | Substitute Not Needed |
| 420983733 | STUHR, ALISON | | | 10/02/2020 | EPSLA-2/3 HR ONLY | 1.00 | Ryle High School | Filled |
| 421082137 | | | | 09/30/2020 | EPSLA-2/3 HR ONLY | 1.00 | Ryle High School | Substitute Not Needed |
| 420799008 | | | | 09/29/2020 | EPSLA-2/3 HR ONLY | 1.00 | Ryle High School | UnFilled |
| 420517603 | | | | 09/28/2020 | EPSLA-2/3 HR ONLY | 1.00 | Ryle High School | UnFilled |
| 420512471 | | | | 09/21/2020 | EPSLA-2/3 HR ONLY | 5.00 | Ryle High School | Substitute Not Needed |

7

**BCSD-000283**

EXHIBIT

19

KAB 4/21/23

**Date : 12/3/2020 7:50:52 AM**
**From : "Shafer, Matt" matt.shafer@boone.kyschools.us**
**To : "Kirkendall, Mario" mario.kirkendall@boone.kyschools.us**
**Subject : Re: Checking In**
**Attachment : Outlook-zsgde5ub.png;Outlook-xiawa31q.png;**

Let me know when you would like to talk. I would need you to be more accessible via email if this is going to work out, which I hope it can.  Let me know when you can talk so we can get this ball rolling.

*Thanks,*

*Matt Shafer*
*Principal*
*Larry A. Ryle High School*
*859-384-5300*



---

**From:** Shafer, Matt <matt.shafer@boone.kyschools.us>
**Sent:** Wednesday, December 2, 2020 10:26 AM
**To:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Subject:** Re: Checking In

I am free from 11:30-1 and then after 1:30.  Let me know.

*Thanks,*

*Matt Shafer*
*Principal*
*Larry A. Ryle High School*
*859-384-5300*



---

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Wednesday, December 2, 2020 8:41 AM
**To:** Shafer, Matt <matt.shafer@boone.kyschools.us>
**Subject:** Re: Checking In

Good morning,

I should have everyone wrangled by 10:30 if that works for you or the afternoon.

**From:** Shafer, Matt <matt.shafer@boone.kyschools.us>
**Sent:** Tuesday, December 1, 2020 8:32 PM
**To:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Subject:** Re: Checking In

Perfect. Let me know when you can talk tomorrow and we will set somethings up.

Thanks,

Matt Shafer
Principal
Larry A. Ryle High School
859-384-5300

On Dec 1, 2020, at 5:53 PM, Kirkendall, Mario <mario.kirkendall@boone.kyschools.us> wrote:

This will work. Just let me know what you need me to do.

Thank you,
Mario

**From:** Shafer, Matt <matt.shafer@boone.kyschools.us>
**Sent:** Monday, November 30, 2020 12:52 PM
**To:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Subject:** Re: Checking In

Hey, hope all is well. If you believe that you can fulfill the AD duties while at home, that is fine with me. Please communicate this to all our coaches.

As far as the teacher part of your duties I need your help with a handful of students that are being placed online. I will need you to monitor their progress. These students will be on Edgenuity so you do not need to prepare curriculum just be in communication with them and track progress. As you can probably imagine we have a large amount of students who are falling behind and I need all hands on deck to get things working.

If this all sounds good to you, let me know and I will have Katie Parks get in touch with you about the monitoring.

*Thanks,*

*Matt Shafer*
*Principal*
*Larry A. Ryle High School*
*859-384-5300*
<Outlook-1t4fp3pm.png>

---

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Monday, November 30, 2020 9:15 AM
**To:** Shafer, Matt <matt.shafer@boone.kyschools.us>
**Subject:** Checking In

Good morning Matt,

I hope you and your family had a great Thanksgiving, and were able to relax some.

As for this week and next, I have the kids basically 9 days out of the 10 (potentially cut to 7 if there aren't any cancellations to my wife's schedule).

How would you like me to proceed? I can check emails and start building out the schedules for GoFan with Winter Sports schedules, logistics things from home or would you like me to put the out of office message back up?

Have a great start to your day and week.

Thank you,
Mario Kirkendall

BCSD-000887

EXHIBIT
20
KAB 4/21/23

**Ball, Eric R**

| | |
|---|---|
| **From:** | Ball, Eric R |
| **Sent:** | Wednesday, December 9, 2020 1:15 PM |
| **To:** | Kirkendall, Mario |
| **Subject:** | RE: Dates 9/21-10/29 Questions |

Mr. Kirkendall,

Based on the information that we have for the dates 9/21/2020-10/29/2020 you were on an approved EFMLEA leave. In order to receive full pay for this time I will need documentation showing that Mr. Shafer approved a remote work request for you. Once I have that documentation we can change the days from EFMLEA to 'regular' working days.
If you did not receive approval to work remotely during this time we would be required to keep 9/21-10/29 as EFMLEA days.

Eric Ball
Assistant Director – Human Resources
859-283-3210

 Boone County Schools

 #Boone2020

NOTICE: This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged or confidential. It is not to be transmitted to or received by anyone other than the named addressee's or a person authorized to deliver it to the named addressee's. It is not to be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it, and notify the sender of the error by replying via email so that our address record can be corrected.

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Tuesday, December 8, 2020 10:57 AM
**To:** Ball, Eric R <eric.ball@boone.kyschools.us>
**Subject:** Dates 9/21-10/29 Questions

Good morning Eric,

I hope you are doing well.

I had not receive confirmation on this but, I had emailed you regarding my working from home the dates 9/21-10/29 my last email from home.

BCSD-000268

What steps do I need to take to receive full pay from that time? As working would have shifted from Covid pay to normal pay during this time.

Please let me know when you get a chance.

Thank you,
Mario Kirkendall

2

BCSD-000269

**Ball, Eric R**

| | |
|---|---|
| **From:** | Kirkendall, Mario |
| **Sent:** | Thursday, December 10, 2020 2:13 PM |
| **To:** | Shafer, Matt |
| **Cc:** | Ball, Eric R |
| **Subject:** | Re: Clarification on Days worked while on Covid Leave |

Thank you for your email back.

Yes, this is correct I was on fmla and you had advised me that Mr. Erickson and you would handle my duties. Outside of the few meetings we had prior where there was not a conclusive answer to working from home during this time - it did end up being conclusive that it could happen. As well, you are correct in that this was not discussed with the inclusion of Mr. Ball, because of the emails/text that required my immediate attention - they required me to work.

I am seeking compensation for the duties which I had performed.

Thank you,
Mario Kirkendall

**From:** Shafer, Matt <matt.shafer@boone.kyschools.us>
**Sent:** Thursday, December 10, 2020 1:44 PM
**To:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Cc:** Ball, Eric R <eric.ball@boone.kyschools.us>
**Subject:** Re: Clarification on Days worked while on Covid Leave

I appreciate the email. When we talked in early September you had told me that you were going on eFMLEA leave but that you would work a few days when possible and this was starting on 9/21. We never discussed you working remotely at that time.

I do know that you came in three days in early October. Those other days were days I assumed you were on eFMLEA as we had never discussed you working remotely and the AD duties at the time were being handled by Mr. Erickson and myself.

I know this is not the news you may want to hear for those dates.

Call me if you have any questions.


*Thanks,*

*Matt Shafer*
*Principal*
*Larry A. Ryle High School*
*859-384-5300*

1



**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Wednesday, December 9, 2020 6:34 PM
**To:** Shafer, Matt <matt.shafer@boone.kyschools.us>
**Cc:** Ball, Eric R <eric.ball@boone.kyschools.us>
**Subject:** Clarification on Days worked while on Covid Leave

Hey Matt,

I am trying to get this cleared up for compensation for the days that I was working while on Covid Leave.

I have copied Eric Ball on this message as well. I've been advised by Eric Ball that for me to receive compensation on the days that I had been working during Covid Leave it would need to be approved and confirmed by you.

The specific dates in which I was working various Athletic Director duties during Covid Leave are below:

9/21-24
9/29, 10/1, 10/2
10/5-10/9
10/12-10/16
10/19, 10/22
10/27-29

Please let me know if more information is needed, thank you for your time.

Mario Kirkendall

BCSD-000272

EXHIBIT

22

KAB 4/21/23

**Date :** 12/7/2020 10:28:00 AM
**From :** "Ryan, Cody"
**To :** "Kirkendall, Mario" mario.kirkendall@boone.kyschools.us
**Subject :** RE: Team Organization and Duties

Good morning!

Yeah I broke it up by grade.  You have juniors.  I would just start with the ones that are failing the most.

Thanks boss.

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Monday, December 7, 2020 9:15 AM
**To:** Ryan, Cody <cody.ryan@boone.kyschools.us>
**Subject:** Re: Team Organization and Duties

Good morning Cody,

Checking on the list, is there a breakdown of who takes what kids? If you sent it I honestly missed it or didn't read down that far.

I was going to start emailing today for times to talk this week.

Thank you,
Mario

**From:** Ryan, Cody <cody.ryan@boone.kyschools.us>
**Sent:** Thursday, December 3, 2020 10:20 AM
>
**Subject:** RE: Team Organization and Duties

Not off to a great start!  Here is the link to the failure list.

https://docs.google.com/spreadsheets/d/1L-K1oKeX9wwIg_tdmw_L8RELk5t1AzWINo2zbNS63Rg/edit?usp=sharing

**From:** Ryan, Cody
**Sent:** Thursday, December 3, 2020 10:18 AM
>
**Subject:** FW: Team Organization and Duties

Good morning team!

This is a daunting task ahead of us and it is made more interesting since some people (myself included) are having to work from home for a while.  I am sharing an updated failure list with you.  I think the easiest way to break this down is for Vonderlage to take freshmen, Hanser sophomores, Kirkendall juniors, and Arkenberg and I will work on seniors and fill in the gaps.  You can filter the sheet as needed to get your groups.

As you go you can fill in the sheet with when you contacted the students/parents. As time permits we can then enter the contact into the PLP tab in IC. Anyone can enter the contact into the PLP, just mark that it was entered on the google sheet. There is also a column for notes in case there is something you feel the group should know.

Let's start as soon as possible. People working from school please prioritize making the calls since it will show as coming from Ryle. People at home prioritize inputting the contact into IC.

Let me know if you have questions.

Cody

**From:** Dusing, Andrew W <andrew.dusing@boone.kyschools.us>
**Sent:** Thursday, December 3, 2020 10:00 AM
>; Bush, Heather D <heather.bush@boone.kyschools.us>; Mann, Lauren <lauren.mann@boone.kyschools.us>; Arkenberg, Erik <erik.arkenberg@boone.kyschools.us>; Ryan, Cody <cody.ryan@boone.kyschools.us>; >; Weiss, Angie <angie.weiss@boone.kyschools.us>
Cc: Shafer, Matt <matt.shafer@boone.kyschools.us>; Parks, Katie <katie.parks@boone.kyschools.us>
Subject: Team Organization and Duties

Colleagues,

We are organizing into teams to attack those students who are significantly struggling at this time. The expectation will be that we call/communicate with students and their parents in hopes of getting them back on track. Right now, our hands are tied but this is one thing we CAN do to connect and address our most needy students. We will all have to document each attempt and main ideas of conversation. For continuity your documentation needs to makes its way it IC at some point. Each team will be able to prioritize who they are calling and distribution of names within the team.

The teams are as follows:
Team 1 – Coleman, Brendel, Medious, Bush, Mann
Team 2 – Arkenberg, Ryan, Kirkendall, Hanser, Vonderlage
Team 3 – Dusing, Schilling, Pastura, Weiss, Miller

I understand some of our staff are already making calls on students. These calls would be in addition to that. It is up to each team to get together and set next steps.....

Rockstar Status to All,

Andy

Assistant Principal – P-Z
Larry A Ryle High School
839-384-5300 Ext. 311

BCSD-000896



**Date : 12/21/2020 7:46:29 PM**
**From : "Shafer, Matt" matt.shafer@boone.kyschools.us**
**To : "Kirkendall, Mario" mario.kirkendall@boone.kyschools.us**
**Subject : Re: Second Semester Expectations**
**Attachment : Outlook-yr01wlni.png;**
    Sorry for the delay. Trying to detach from my email and phone.  Shoot me a text at some time tomorrow and we set up a call. Definitely, not meaning to convey any tone or attitude, just want to make sure we are on same page.

Thanks,

Matt Shafer
Principal
Larry A. Ryle High School
859-384-5300


        On Dec 20, 2020, at 6:09 PM, Kirkendall, Mario
        <mario.kirkendall@boone.kyschools.us> wrote:


        Matt,

        Thank you for your email. Before I assume the tone that is used in this
        email, I think it is best that we speak. Tomorrow I have call with the
        state and do not know how long that will take, but I have time
        Tuesday and Wednesday available.

        Please let me know which day and time works best if any. I look
        forward to hearing from you.

        Mario Kirkendall
        _____
        **From:** Shafer, Matt <matt.shafer@boone.kyschools.us>
        **Sent:** Friday, December 18, 2020 3:14 PM
        **To:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
        **Subject:** Second Semester Expectations

        I hope you are doing well and things are starting to get back
        to normal.

        I wanted to relay my expectations when we return to school on Jan
        4th and beyond.

            1. Teaching Duties
                a. Due to the influx of failing Seniors, I will need you to be
                   the teacher for 3 Study Skills classes which will be run 4th,

BCSD-000954

         5th and 6th period
- b. The main duty of this class is to help students with organization and keeping them on track in Edgenuity.
- c. Your class roster will be viewable when we return
- d. These classes would not start until Jan. 19th when we return to hybrid

5. Athletic Director Duties
   - a. The number one goal should be taking a load off of our coaches
     - i. Set-up
       1. I need you to take care of gameday set-up
          - a. I do not want a repeat of our first soccer game this year, where I was on the field moving items and getting things set up.
          - b. This includes marking the bleachers to accommodate parents
       3. This includes GoFan, Streaming, etc....
       4. This is not to be left up to our coaches
     - ii. Tear Down
       1. Our coaches/athletes will not be responsible for tearing down the gym after games
   - b. Schedule
     - i. I need that Athletic Calendar, that I sent you this morning, filled out so that I can make sure that we have coverage. I do not (nor do I want to) understand Jenna's schedule
   - b. Other AD Duties as listed in the job description

General

- As with anyone at our school, I need to make sure that you are responding to emails within a 24 hour period. If it is communication from a coach, I expect immediate responses.
- I also expect you to be at school every day to fulfill your teaching and athletic supervisory duties. If you cannot fulfill this then you would have to use some sort of absence day. If this is the case, I will need this communicated to me in a timely fashion.

I know these have been trying times and I appreciate your work the past two weeks. I just want to make sure we are on the same page as we begin games on January 4th.

*Thanks,*

BCSD-000955

*Matt Shafer*
*Principal*
*Larry A. Ryle High School*
*859-384-5300*
<Outlook-yr01wlni.png>

BCSD-000956

EXHIBIT

24

KAB 4/21/23

**Date : 1/4/2021 11:41:01 AM**
**From : "Shafer, Matt" matt.shafer@boone.kyschools.us**
**To : "Kirkendall, Mario" mario.kirkendall@boone.kyschools.us**
**Subject : Athletics Meeting**

Discuss athletic needs and coverages
Also discuss Study Skills class

**Date : 1/5/2021 8:08:05 PM**
**From : "Kirkendall, Mario" mario.kirkendall@boone.kyschools.us**
**To : "Shafer, Matt" matt.shafer@boone.kyschools.us**
**Subject : 1/4 Meeting**

Mr. Shafer,

Per our meeting scheduled on 1/4

Since we were unable to get to the email that you had sent on 12/18 regarding expectations for Second Semester. These point I felt needed to be addressed:

When I was hired it was understood that I would have 1 class relieving Mr. Jack Carr during an ISS only thing superseding this was conflicting AD duties (i.e. district/conference/regional meetings, conferences, etc.). Last year this class was 3rd period, this year it was agreed to the switch to 6th. Do not understand the reason for adding the additions classed when the Athlete Director responsibility remain the same. As well implementing this change without discussing.

Regarding AD Duties:

Decisions have been made while I was on leave that I am finding out after with no information or trail of conversations at all.

- Finding out a Girls Soccer Coach was hired – first hearing about this from the Coach that was hired in an email.
- Games being changed without discussion in addition to coaches seeking you out and then telling me.
- Yesterday finding out from Jon Erickson (after sending out grade reports) that a conversation was had between you and him regarding holding back grade checks for this week.

BCSD-000969

These are just 3 points in which needed addressing. I am unable to successfully perform my duties with the lack of information.

Additionally:

You referenced Gym set up – this has been done by teams – more student athletes, maybe there was a lull in season starting up and me coming back if this decision.

Coaches were to have all bases covered similar to Fall (i.e. clock, announcer, stats). If coaches are now not setting up the gym, that sole responsibility is not falling on me.

Questions I have:

With practices/tryouts originally starting Mid October- Have all coaches been informed to this point?

It was understood when I signed my contract 2 years ago that I would be able to drop my kids off and make it to school – from your email it seems that this is an issue. Prior to your email I have not had any issues fulfilling my duties. I do not have a standard schedule as an Athletic Director – this is a well-known fact, but as I am reading from your email the expectation is that I am here at 7:30 (even though this wasn't explicitly stated, this is how it read).

You had made mention of emails within 24 hours, and I agree with you being the policy – however, what examples are there that this has been an issue? You also had made mention of responding to coaches even sooner - if the only examples of me not responding are from when I was on leave I would really appreciate knowing.

At the end of the email it was stated that if I can't be at school fulfilling my duties then I would need to use leave - I believe my schedule needs to be further discussed.

Thank you for taking the time to read this over.

--
Best Regards,

Mario Kirkendall
513-335-3865
mariokirkendall@gmail.com

BCSD-000971

**EXHIBIT**

25

KAB 4/21/23

**Date : 1/6/2021 3:09:05 PM**
**From : "Shafer, Matt" matt.shafer@boone.kyschools.us**
**To : "Kirkendall, Mario" mario.kirkendall@boone.kyschools.us**
**Subject : AD Meeting**

Discuss concerns in your email

BCSD-000974

**EXHIBIT**

26

KAB 4/21/23

**Date :** 1/12/2021 3:21:54 PM
**From :** "Shafer, Matt" matt.shafer@boone.kyschools.us
**To :** "Kirkendall, Mario" mario.kirkendall@boone.kyschools.us
**Subject :** Re: basketball tomorrow night
**Attachment :** Outlook-qu4zvswd.png;

Thanks. I hope everything went well with your sons surgery, I am definitely praying for you guys. I wanted to send this email so that I did not bother you on text, as you are working through way more important stuff.

However, Three things from today that were not handled

1. There was no game scheduled on the streaming website
   a. I called BlueFrame and got it set up
2. Holmes called and needed the ticket link?
   a. Heather sent it to them
2. I spoke to the officials and set them up (per the email I sent you)
   a. We will use the locker room near Keatons office
   b. I am getting water for them as well (this needs to be an always thing)

Lastly, the custodians and I set up the gym and the sound as per our conversation on Thursday, I did not want our teams to do it.

We can discuss later if you would like, but like we talked about in our meeting these were things that I hoped I would not have to deal with. I am here to support and help so let me know if you need anything going forward.


*Thanks,*

*Matt Shafer*
*Principal*
*Larry A. Ryle High School*
*859-384-5300*



---

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Tuesday, January 12, 2021 1:51 PM
**To:** Shafer, Matt <matt.shafer@boone.kyschools.us>
**Subject:** Fw: basketball tomorrow night

Holmes Pass List

**From:** Stevens, Tina - Secretary, Holmes High School <tina.stevens@covington.kyschools.us>
**Sent:** Monday, January 11, 2021 1:00 PM
**To:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Subject:** Re: basketball tomorrow night

**EXTERNAL MESSAGE**

Here is our list

Ken Ellis
Alvin Garrison
Dave Hartman
Gary Huhn
Jim Huhn
Dan Curtis
Joan Curtis
Craig Russell

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Monday, January 11, 2021 12:06 PM
**To:** Stevens, Tina - Secretary, Holmes High School <tina.stevens@covington.kyschools.us>
**Subject:** Re: basketball tomorrow night

**This email originated from outside of the Covington Independent Public School District. Please identify that the sender is legit before responding or opening any included attachments.**

You get 10 on a pass list. Sorry I am playing catch up.

Mario

**From:** Stevens, Tina - Secretary, Holmes High School <tina.stevens@covington.kyschools.us>
**Sent:** Monday, January 11, 2021 12:05 PM
**To:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Subject:** Re: basketball tomorrow night

**EXTERNAL MESSAGE**

Will there be an administrative pass list tomorrow evening?

Thx,
Tina



**Date : 1/15/2021 2:29:24 PM**
**From : "Kirkendall, Mario"**
**To : "Shafer, Matt" matt.shafer@boone.kyschools.us**
**BCc : "Mario Kirkendall" mariokirkendall@gmail.com**
**Subject : Going in to 1/19**

Mr. Shafer,

As we come to the end of this week and are going into next week - I think a few things need to be clarified:

Since I have been back from Leave it seems as though my work is being scrutinized increasingly through text and email - this is something I feel needs to be addressed.

I do not feel my job performance had been an issue prior to Leave and coming back from Leave there have been multiple issues in my performance.

Examples to the above - while on Leave Tuesday (giving you the reasoning that my son was having surgery - It is not necessary to give you a reason) being contacted multiple times prior and receiving an email about things that were not done.

Last night, 1/14 - The message you received from a teacher regarding the streaming service. I am not a tech teacher or staff, game management does not include when something crashes. BlueFrame Technology does not seem to have been vetted prior to the contract regarding their Beta Product.

I already responded to the email I was sent the day of my son's surgery.

Starting 1/19 - You had stated that I have 3 classes (2 being added to my original agreed upon 1 - which was for 6th period). Adding classes on top of being an Athletic Director which I was hired in for, conflicts with my Athletic Director duties.

As I referenced in our meeting, if I have the correct information, I can successfully do my job. At this point going back and forth and being scrutinized daily seems like it is directed solely at me, and I have never been in a position where this was the case.

Mario Kirkendall
Ryle High School Athletic Director

**Date : 1/15/2021 4:13:45 PM**
**From : "Shafer, Matt" matt.shafer@boone.kyschools.us**
**To : "Kirkendall, Mario" mario.kirkendall@boone.kyschools.us**
**Subject : Expectation Meeting Going Forward**

Discuss expectations going forward and your email.

.....................................................................

### Join online meeting

.....................................................................

EXHIBIT

29

KAB 4/21/23

PENGAD 800-631-6989

**Date : 1/15/2021 3:16:57 PM**
**From : "Shafer, Matt" matt.shafer@boone.kyschools.us**
**To : "Kirkendall, Mario" mario.kirkendall@boone.kyschools.us**
**Subject : Re: Going in to 1/19**
**Attachment : Outlook-y4m1ryx1.png;**

Hey, stopped by your office around 2:30 and could not find you. Cell phone went to voicemail too.

I definitely do not want you to feel that any of this is directed at you, it all has been more as giving you information, I apologize if you took it any other way.

As I said prior, you are in charge of all things athletics, so when athletic questions or conversations arise, I want to include you.

As for the teaching duty, this is non-negotiable, your contract is for being a teacher first. There was no issue with this when we met last week. You will be responsible for students 4th-6th period.

4th period is in room 224
5th period room 247 (Choir room by auditorium)
6th period: Mr. Carr's room 133

As I stated (and you agreed) The 4th and 5th period classes are small (both have less than 3 students in person, total), so you can take them to your office once you establish a routine.

Please give me a call.


*Thanks,*

*Matt Shafer*
*Principal*
*Larry A. Ryle High School*
*859-384-5300*



---

**From:** Kirkendall, Mario <mario.kirkendall@boone.kyschools.us>
**Sent:** Friday, January 15, 2021 2:29 PM
**To:** Shafer, Matt <matt.shafer@boone.kyschools.us>
**Subject:** Going in to 1/19

**EXHIBIT**

30

KAB 4/21/23

Date : 1/19/2021 10:04:56 AM
From : "Shafer, Matt" matt.shafer@boone.kyschools.us
To : "Kirkendall, Mario" mario.kirkendall@boone.kyschools.us
Subject : Recap of Meeting
Attachment : Outlook-a2inpzhn.png;

Thank you for meeting with me this morning to discuss expectations. I wanted to send you a recap of what we discussed so that we are on the same page.

- Your contract is as a teacher first and foremost. This is the same for me as well.
  - Your teaching load will be:
    - RAP (When we start in February)
    - 4th Period: Study Skills in room 224
    - 5th Period: Study Skills in room 247
    - 6th Period: Study Skills/ISS coverage in room 133
  - Mr. Pastura is your contact person
  - I gave you your rosters as of 1/15
- I know you were not pleased with this, but I explained the process if you do not fulfill these teaching duties.
- Athletic Director
  - This is a stipend position
  - You are in charge of everything that involves Athletics.
    - If there is anything that is amiss, I will send you an email or text to let you know.
  - I will be directing all coaches to you, as we discussed. I know this had been an issue and I agree that I will follow through with this.

I appreciate your time this morning and that we were able to get on the same page. I know there is apprehension on your end about the Study Skills courses, but during this pandemic time we have a need that has arisen due to the amount of failures that we have. As an allocated teacher position I am using you to help with this via the Study Skills classes 4th and 5th.

If you have any questions or concerns going forward please let me know.

*Thanks,*

*Matt Shafer*
*Principal*
*Larry A. Ryle High School*
*859-384-5300*

EXHIBIT
31
KB 4/21/23
PENGAD 800-631-6989

# Larry A. Ryle High School

The *"Union"* of Technology and Tradition
10379 U.S. 42
Union, Kentucky 41091
Phone (859) 384-5300
FAX (859) 384-5312

**Andrew W. Dusing**, *Assistant Principal*
**Elaine Brendel**, *Assistant Principal*
**Cody Ryan**, *Assistant Principal*
**Tony Pastura**, *Assistant Principal*
**Morgan Medious**, *Vice Principal*
**Jennifer Warford**, *College & Career Coach*

**Matt Shafer**, Principal

**Michelle Schilling**, *Counselor*
**Erik Arkenberg**, *Counselor*
**Amy Coleman**, *Counselor*
**Katie Parks**, *Counselor*
**Mario Kirkendall**, *Athletic Director*
**Jennifer Woolf**, *Instructional Coach*

January 19, 2021

Dear Mr. McArtor,

On Tuesday, January 19th, 2021 Mario Kirkendall, a teacher assigned to Ryle, refused to fulfill his teaching responsibilities by refusing to go to his 4th period class.

An email was sent on December 18th letting Mr. Kirkendall know of his responsibilities when we began the second semester. The need for these additional classes was due to the 187 Seniors that were in danger of failing for the year. This prompted the administration to add a few study skills course to help get these students on track. Mr. Kirkendall is not the only teacher that was assigned a study skills and no class is over five students.

Regardless, I had a meeting with Mr. Kirkendall on January 7th to discuss the December 18th email after he asked for some clarification. Mr. Kirkendall did not object to any of these duties at that meeting. On January 15th Mr. Kirkendall sent an email stating "adding classes on top of being an Athletic Director which I was hired in for, conflicts with my Athletic Director duties."

In response to this email, I set a meeting with Mr. Kirkendall for 9:30 on Tuesday, January 19th. During this meeting I informed Mr. Kirkendall, once again, that he was a teacher first and reiterated his schedule. I also informed him of the process if he did not follow through. When fourth period began, Mr. Kirkendall was not in his assigned classroom. I went to Mr. Kirkendall's office and asked him to report to his 4th period class. He told me that he would not be going. At that time, I suspended Mr. Kirkendall with pay until a hearing with your office could occur. I collected his keys and badge without incident.

If you have any questions or concerns please do not hesitate to contact me by email at matt.shafer@boone.kyschools.us or by phone at 859-384-5300.

Sincerely,

Matt Shafer



*Boone County Schools do not discriminate on the basis of race, color, national origin, age, religion, marital status, veteran's status, gender or disability*

# Larry A. Ryle High School

The *"Union"* of Technology and Tradition
10379 U.S. 42
Union, Kentucky 41091
Phone (859) 384-5300
FAX (859) 384-5312



**EXHIBIT**
32
K4B 4/21/23

**Andrew W. Dusing**, *Assistant Principal*
**Elaine Brendel**, *Assistant Principal*
**Cody Ryan**, *Assistant Principal*
**Tony Pastura**, *Assistant Principal*
**Morgan Medious**, *Vice Principal*
**Jennifer Warford**, *College & Career Coach*

**Matt Shafer**, Principal

**Michelle Schilling**, *Counselor*
**Erik Arkenberg**, *Counselor*
**Amy Coleman**, *Counselor*
**Katie Parks**, *Counselor*
**Mario Kirkendall**, *Athletic Director*
**Jennifer Woolf**, *Instructional Coach*

January 19, 2021

At approximately 9:40 am on 1/19/21 Mario Kirkendall reported to Mr. Shafer's office for a meeting. Mr. Shafer recounted a meeting that had been held prior in which he had updated Mr. Kirkendall on his new teaching duties. Mr. Shafer mentioned that they had left that meeting with an understanding that Mr. Kirkendall would need to teach 3 sections of a study skills class. Mr. Kirkendall stated that his silence in that meeting was not meant to be interpreted as him agreeing to that schedule.

Mr. Shafer stated that Mr. Kirkendall was a teacher first, and his contract was as such. Mr. Shafer stated that Mr. Kirkendall would in fact have to teach the three sections of study skills and handed Mr. Kirkendall the rosters for those classes. Mr. Kirkendall did not agree with this change in duties, stating that when he signed his contract he was told he would only be teaching one class. Mr. Shafer explained that due to unforeseen circumstances Mr. Shafer was having to change his duties and that he had verified this change with both Matt Rigg and Eric McArtor. Mr. Kirkendall stated that he would be contacting Mr. McArtor as a result of this meeting.

Mr. Kirkendall also discussed what he sees as a lack of communication among Mr. Shafer and some of the head coaches. Some of this conversation was in reference to events of which I am unaware. Mr. Shafer stated that he believed some coaches got used to contacting him during Mr. Kirkendall's leave, but that in the future he would gladly refer them to Mr. Kirkendall for any athletic issues.

At the conclusion of the meeting Mr. Shafer again reiterated the change in duties for Mr. Kirkendall and stated that if he did not report to those classes it would constitute abandonment of duties and would subsequently result in a hearing with Mr. McArtor. Mr. Kirkendall stated that he understood.

The meeting ended at approximately 10:05am.

Cody Ryan



*Boone County Schools do not discriminate on the basis of race, color, national origin, age, religion, marital status, veteran's status, gender or disability*



---------- Forwarded message ---------
From: **Wilson, Mary** <mary.wilson@boone.kyschools.us>
Date: Mon, Jan 25, 2021 at 12:07 PM
Subject: Re: Time to speak
To: Mario Kirkendall <mariokirkendall@gmail.com>

Mario,

The contract is attached.

I have spoken with Scott LeCates, our UniServ Director.  He will be contacting you.

Mary

*Mary M. Wilson MA, Ed.S.*
*President - Boone County Education Association, Inc.*
*75 Cavalier Boulevard, Suite 324*
*Florence, KY 41042*
*(513) 300-2232*
*president@mybcea.org*



---

**From:** Mario Kirkendall <mariokirkendall@gmail.com>
**Sent:** Monday, January 25, 2021 8:44 AM
**To:** Wilson, Mary <mary.wilson@boone.kyschools.us>
**Subject:** Re: Time to speak

**EXTERNAL MESSAGE**

Good morning Mary,

Thank you for this information on the contract, I did not receive the other attachments that were stated.

1

KIRKENDALL 000092

Regarding the Federal FMLA: Paraphrasing "...returning the employee to the same position or an equal position (1 class to 4 shows this violation).
The increase in workload, as well as the work that I have been told to do is another Tort, as well as the current situation as I have had no issues prior - how we are at a hearing point when I did not agree if I understand correctly from the DOL constitutes that the Leave has caused the issues present.

Regarding the FMLA I am already beginning the process of getting this suit together, as well as the EEOC.

I never agreed to this - which Matt Shafer stated in my email the last 4 conversations that him and I have had are recorded.

Will the KEA Lawyer be able to attend the meeting on Wednesday? Am I able to speak to him prior?

Mario Kirkendall

On Mon, Jan 25, 2021 at 8:22 AM Wilson, Mary <mary.wilson@boone.kyschools.us> wrote:
Mario,

Attached is the Middle-High School Teacher job description.

While searching for a federal law regarding "other duties as assigned," I found the following:

## Can an employer change your job duties?

Generally, unless an **employment** contract or **a** collective bargaining agreement states otherwise, an **employer** may **change** an **employee's job duties**, schedule or work location without **the employee's** consent. ... **The employee** is ordinarily entitled to return to **the** same shift, or **a** similar or equivalent work schedule.

Our bargained contract does not state job duties. Board policy and job descriptions will.

Mary

*Mary M. Wilson MA, Ed.S.*
*President - Boone County Education Association, Inc.*
*75 Cavalier Boulevard, Suite 324*
*Florence, KY 41042*
*(513) 300-2232*
*president@mybcea.org*



---

**From:** Mario Kirkendall <mariokirkendall@gmail.com>
**Sent:** Friday, January 22, 2021 12:46 PM

2

KIRKENDALL 000093

**To:** Wilson, Mary <mary.wilson@boone.kyschools.us>
**Subject:** Re: Time to speak

**EXTERNAL MESSAGE**

Thank you for the clarification,

I would like to extend a 24 hour period until wednesday - If need be I will use up my PTO/Hours.

Yes could you please send me the teacher contract. I am trying to understand how it is documented that I was on leave and coming back to an increased workload is acceptable. I believe that even states that in the Boone Co. portions that I have read. The "assigned other duties" portion I believe from a Federal standpoint is still in violation - the gist being it can't be an open ended contract regardless of "at-will."

Thank you,
Mario Kirkendall


On Fri, Jan 22, 2021 at 12:40 PM Wilson, Mary <mary.wilson@boone.kyschools.us> wrote:
No less than 24 hours will be given to review the documentation. In the event that the teacher needs additional time to review and gather supporting documentation, an additional 24 hours may be granted by mutual agreement of both parties.

You only can request another 24 hours. The grievance process happens separately from the formal discipline procedures and is done while you are still in your position. The district is not going to continue to pay for you to be home. Any additional time would need to be on your own - personal or unpaid.

To answer the insubordination question, in your teaching position description, you have to keep in mind that there is the "other duties as assigned" portion of the description. Every certified position in the district is paid and contracted on the basis of a teaching position. Even Matt Turner or Eric McArtor are paid first as a teacher, but then indexed to accommodate his title. Regardless of your AD position, you are still a teacher first and can be assigned other duties. The claim of insubordination will stand from the district standpoint. If you need me to obtain a teaching position description, please let me know.

The grievance for harassment needs to be kept separate from the due process hearing. When I spoke with Eric, he was planning to investigate the claim of the "intermittent" time while you worked on leave.

Let me know how you would like to proceed.

Mary
*Mary M. Wilson MA, Ed.S.*
*President - Boone County Education Association, Inc.*
*75 Cavalier Boulevard, Suite 324*
*Florence, KY 41042*
*(513) 300-2232*

3

KIRKENDALL 000094

*president@mybcea.org*



**From:** Mario Kirkendall <mariokirkendall@gmail.com>
**Sent:** Friday, January 22, 2021 12:11 PM
**To:** Wilson, Mary <mary.wilson@boone.kyschools.us>
**Subject:** Re: Time to speak

## EXTERNAL MESSAGE

Hello Mary,

Thank you for the information, after reviewing Matt Shafer's documents and reading over the process for

Am I able to request a later date meeting?

With it not being my intention on agreeing to the insubordination- what remedies do I need to take?

If he has one sole document where things were not followed, I'd much rather address the fmla leave, discrimination/retaliation from the legal side of things.

Mario Kirkendall

On Fri, Jan 22, 2021 at 10:48 AM Wilson, Mary <mary.wilson@boone.kyschools.us> wrote:
You will want to look at article 3.1 for harassment and your working environment. Article 8 talks about the entire Grievance procedure.

*Mary M. Wilson MA, Ed.S.*
*President - Boone County Education Association, Inc.*
*75 Cavalier Boulevard, Suite 324*
*Florence, KY 41042*
*(513) 300-2232*
*president@mybcea.org*

4

KIRKENDALL 000095





# Boone County Schools Investigation Report

| Date:  01/27/2021 |
|---|

| Name and Title of Investigator:  Matt Rigg, Director Human Resources |
|---|

| Purpose of Investigation:  To determine if Mario Kirkendall, teacher and athletic director at Ryle High School, was insubordinate by refusing to complete assigned tasks by Principal Matt Shafer consistent with Mr. Kirkendall's teacher job description |
|---|

Policy(ies), Procedure(s), Regulation(s) and/or Law(s) in Question:
- Board Policy 03.1325 – Disrupting the Educational Process
  - Conduct that disrupts delivery of instructional services or interferes with the orderly administration of the school and school-related activities or District Operations
- Board Policy 03.133 – Duties
  - All employees are expected to use sound judgement in the performance of their duties
  - Certified personnel shall also be held responsible for cooperation with students, professional associates, parents, staff, and community groups
- 16 KAR 1:020 – Professional Code of Ethics for Kentucky School Personnel
  - (C) To Education Profession
    - Shall exemplify behaviors which maintain the dignity and integrity of the profession
    - Shall accord just and equitable treatment to all members of the profession in the exercise of their professional rights and responsibilities
- Boone County Schools Job Description – Teacher – Middle/High School
  - 1. Meet and instruct assigned classes in the location at the times designated using the curriculum guides developed by the faculty and approved by the Board
  -  23. Perform other duties consistent with the position assigned as may be requested by the supervisor

Individual(s) Interviewed with Contact Information: (Add as many lines as necessary)

| Name | School/Department | Primary Phone # | E-mail address |
|---|---|---|---|
| Matt Shafer | Ryle Principal | 384-5306 | Matt.shafer@boone.kyschools.us |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

List of Documents/Copies Attached:
1. Board Policy 03.1325 – Disrupting the Educational Process
2. Board Policy 03.133 – Duties
3. Kentucky Teaching Certificate with language from 16 KAR 1:020 – Professional Code of Ethics for Kentucky School Personnel
4. Boone County Schools Limited Contract of Employment for Teacher
5. Boone County Schools Employee Agreement for Extra Duty Assignment – Athletic Director
6. Boone County Schools Job Description – Teacher – Middle/High School
7. Boone County Schools Job Description – Athletic Director
8. Board Approved Extra Duty Stipends Salary Schedule

Summary of Interviews:
- Mr. Shafer outlined expectations in writing (e-mail) for Mr. Kirkendall during 2nd semester for both AD duties and classroom coverage duties in December 2020
- Mr. Shafer scheduled a meeting with Mr. Kirkendall for January 4, 2021 to discuss the expectations in person and ensure understanding
- Mr. Kirkendall cancelled the meeting
- Mr. Shafer rescheduled the meeting for January 7 at 9:30 am
- Mario attended the January 7 meeting
- Mr. Shafer outlined expectations for Mr. Kirkendall to cover certain class periods throughout the day, including Raider Achievement Program (RAP), 4th period lunch duty, 5th period study skills and 6th period study skills
- Mr. Kirkendall did not agree to disagree to the assignment
- Mr. Kirkendall sent an e-mail to Mr. Shafer on 1/15 that he would not fulfill requested duties
- Mr. Shafer scheduled a meeting for 1/19 to discuss Mr. Kirkendall's refusal to complete assigned duties
- Mr. Kirkendall states his silence at 1/7 meeting did not mean agreement with Mr. Shafer's request
- Mr. Kirkendall also told assistant principal Tony Pastura he would not cover 4th period
- To date, Mr. Kirkenkdall has not fulfilled the requests of Mr. Shafer to cover assigned periods

Conclusion(s) and Recommendation:
- Mr. Kirkendall's refusal to cover periods assigned by Mr. Shafer is insubordinate behavior because board policies and the job descriptions for teacher allow for Mr. Shafer to assign classes as needed to any teacher.  Nothing in the job description of Athletic Director states a teacher serving the in the role of athletic director would prevent the athletic director from covering class periods
- It is the recommendation of the Human Resources department that Mr. Kirkendall:
  o Receive a public reprimand for insubordinate behavior to his supervisor, Mr. Shafer
  o Be placed on probation for the remainder of the 20-21 school year and, if employed in 21-22, to remain on probation for the entirety of the 21-22 school year with any additional instances of insubordination leading directly to a disciplinary hearing

Investigation Report
Page 2 of 3

BCSD-000123

Additional Information (If needed):

Final Disposition / Action Taken:

BCSD-000124

PERSONNEL                                                                                     03.1325

- CERTIFIED PERSONNEL -

## Disrupting the Educational Process

Any employee who participates in or encourages activities that disrupt the educational process, whether on school property or at school-sponsored events and activities, may be subject to disciplinary action, including termination of contract.

For purposes of this section, behavior which disrupts the educational process shall include, but not be limited to:

1. Conduct that threatens the health, safety, or welfare of others;

2. Conduct that may damage public or private property, including the property of students or staff;

3. Illegal activity;

4. Conduct that interferes with a student's access to educational opportunities or programs, including ability to attend, participate in, and benefit from instructional and extracurricular activities; or

5. Conduct that disrupts delivery of instructional services or interferes with the orderly administration of the school and school-related activities or District operations.

OTHER CLAIMS

When a complaint is received that does not appear to be covered by this policy, administrators shall review other policies that may govern the allegations, including but not limited to, 09.422 and/or 03.162, which addresses harassment/discrimination allegations.

REFERENCES:

KRS 160.290
KRS 161.790

RELATED POLICIES:

03.113, 03.162, 03.17, 09.422, 10.21

Adopted/Amended: 12/13/2001
Order #:        D-2

BCSD-000125

PERSONNEL                                                                03.133

- **CERTIFIED PERSONNEL -**

## Duties

All employees are expected to use sound judgment in the performance of their duties and to take reasonable measures to protect the health, safety, and well-being of others, as well as District property.

### JOB DESCRIPTION

Prior to the authorization of any personnel position in the District budget, the Superintendent, collaborating with other District authorities with personnel assignment responsibilities, shall develop, for Board approval, a job description which establishes all essential functions of the position. The description shall encompass supervision responsibilities, completion of records and reports, and achievement of professional goals identified to enhance student achievement and help the school and/or District meet goals established by statute and/or Board policy. Certified personnel shall also be held responsible for cooperation with students, professional associates, parents, staff, and community groups.

### INVESTIGATIONS

All employees shall cooperate fully with all investigations conducted by the District as authorized by policy or law. Failure to comply may be considered insubordination.

### ACCOMMODATION

Reasonable accommodation shall be provided each qualifying employee with a disability or limitations related to pregnancy, childbirth, or related medical conditions to comply with the requirements of law and regulation.[1]

### REFERENCES:

[1]Americans With Disabilities Act (ADA); KRS Chapter 344
P. L. 101-336
Rehabilitation Act of 1973; P. L. 93-112 Sec. 504
KRS 158.645; KRS 158.6451
016 KAR 001:020 (Code of Ethics); OAG 91-10; OAG 92-1

### RELATED POLICY:

03.113

Adopted/Amended: 8/8/2019
Order #:      VI.2A

BCSD-000126



EXHIBIT
35
KAB 4/21/23
PENGAD 800-631-6989

**HAND DELIVERED**



**Boone County Schools**

8330 U.S. Highway 42
Florence, KY 41042
Phone: 859-283-1003
Fax: 859.282.2376
www.boone.kyschools.us

**Matthew L. Turner**
Superintendent of
Schools

**Boone County
Board Of Education:**

Maria Brown, Ph.D.

Karen Byrd

Tiffany Buller-Schussler, DDS.

Jesse Parks

Julia Pile

*The Boone County
Board of Education
provides equal
employment and
educational
opportunities.*

January 28, 2021

Mr. Mario Kirkendall
3714 Malaer Drive
Cincinnati, OH 45241



Dear Mr. Kirkendall:

On Thursday, January 28, 2021 you met with Mr. Eric McArtor, Chief Operating Officer/Deputy Superintendent for Boone County Schools, regarding the charges that you had engaged in, Conduct Unbecoming a Staff Member. At this meeting, you were given due process where you were allowed to respond to these charges and where you indicated that you understood the possible range of disciplinary actions, which could be taken against you.

I have reviewed the documentation from Mr. Eric McArtor, Chief Operating Officer/Deputy Superintendent for Boone County Schools. The documentation presented by Mr. McArtor gave an account of the following allegation:

- Conduct Unbecoming a Teacher – Insubordination-refusal to perform assigned duties assigned by supervisor in accordance with the employees job description
- Violation of the Teacher Code of Ethics "Shall exemplify behaviors, which maintain the dignity and integrity of the profession."

As Superintendent of the Boone County School District, I am responsible for the hiring, suspension, and termination of personnel in the District. In accordance with that responsibility and as authorized by KRS 161.790, this letter serves as official notice.

After reviewing the documentation provided by Mr. McArtor, it is my final determination, pursuant to KRS 161.790 that there is sufficient evidence to support a finding that you engaged in Conduct Unbecoming a Teacher and violated the Teacher's Code of Ethics. Based upon this finding I am accepting the recommendation of Mr. McArtor and terminating your contract effective Friday, January 29, 2021.

This letter will serve as documentation that the Boone County Board of Education has notified the Educational Professional Standards Board as required by KRS 161.120, that you may have engaged in conduct which might reasonably be expected to warrant action against your certificate.

Sincerely,

Matthew L. Turner
Superintendent
Boone County Schools
mt/ke


*Achieving*
Excellence Together

TCM

BCSD 000097