UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON
CASE NO. 2:22-CV-00026-DLB-CJS


| | | |
|---|---|---|
| MARIO KIRKENDALL | ) | DEPOSITION TAKEN ON |
| | ) | BEHALF OF PLAINTIFF |
| | ) | BY: NOTICE |
| PLAINTIFF | ) | |
| | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| | ) | |
| BOONE COUNTY BOARD OF | ) | |
| EDUCATION | ) | |
| | ) | WITNESS: |
| | ) | |
| DEFENDANT | ) | MATT SHAFER |


* * * * * * * *


        The deposition of MATT SHAFER was taken

before Lisa E. Hoinke, Court Reporter and Notary Public

in and for the State of Kentucky at Large, at the law

offices of Adams Law, PLLC located at 40 West Pike

Street, Covington, Kentucky, on June 2, 2023,

commencing at the approximate hour of 1:10 p.m.  Said

deposition was taken pursuant to Notice, heretofore

filed, to be read and used on behalf of the Plaintiff

in the above-captioned action and all other purposes as

permitted by the Federal Rules of Civil Procedure.

APPEARANCES:

        Hon. Jon B. Allison
        FREKING MYERS & REUL LLC
        600 Vine Street, Ninth Floor
        Cincinnati, Ohio 45202
        jallison@fmr.law

        COUNSEL FOR THE PLAINTIFF,
        MARIO KIRKENDALL


        Hon. Olivia Amlung
        ADAMS LAW PLLC
        40 West Pike Street
        Covington, Kentucky 41012
        oamlung@adamsattorneys.com

        COUNSEL FOR THE DEFENDANT,
        BOONE COUNTY BOARD OF EDUCATION


ALSO PRESENT:

        Mario Kirkendall, Plaintiff

I N D E X

                                                                      PAGE


WITNESS: MATT SHAFER


CROSS-EXAMINATION
          By Mr. Allison   ...................   4-123


REPORTER'S CERTIFICATE ....................... 124-125


* * * * * * * * *

| | |
|---|---|
| 1 | The witness, MATT SHAFER, after first being |
| 2 | duly sworn, was examined and testified as follows: |
| 3 | CROSS-EXAMINATION |
| 4 | By Mr. Allison: |
| 5 | MR. ALLISON:    Mr. Shafer, my name is Jon Allison. |
| 6 | I represent Mario Kirkendall in |
| 7 | this matter.  We've asked you here |
| 8 | today to find out what you know or |
| 9 | don't know about his case.  Can you |
| 10 | please go ahead and start the |
| 11 | deposition by stating your name? |
| 12 | WITNESS:    My name is Matt Shafer. |
| 13 | MR. ALLISON:    And have you ever had your |
| 14 | deposition taken before? |
| 15 | WITNESS:    I have not. |
| 16 | MR. ALLISON:    I'm sure you met with your |
| 17 | attorney, but some basic ground |
| 18 | rules that make sense to go over. |
| 19 | We have a court reporter here. |
| 20 | She's taking down everything that |
| 21 | we say.  And the most important |
| 22 | thing is a clean record so that at |
| 23 | the end of the day somebody can |
| 24 | read it and understand what was |

```
 1                           said.
 2   WITNESS:               Understood.
 3   MR. ALLISON:           So I will be asking questions;
 4                          you'll be answering questions.
 5                          Your lawyer may make an objection
 6                          from time to time.  Just whoever is
 7                          talking, just try to, you know,
 8                          resist the urge to start responding
 9                          before that person stops talking.
10                          We'll do the same thing.  You have
11                          to answer questions with words.
12                          Some people shake their head.  You
13                          can't do that; it won't work.  If
14                          you don't understand a question,
15                          just ask me to rephrase.  You can
16                          ask for clarification anytime you
17                          want.  That's -- it helps the
18                          process, I think.  If you need a
19                          break, just ask to take a break.
20   WITNESS:               Okay.
21   MR. ALLSION:           Yeah.  Any questions for me?
22   WITNESS:               No, sir.
23   Q        Okay.  What did you do to prepare for your
24            deposition today?  And what I'm looking for
```

```
1              is anything you did other than the contents

2              of what you may have discussed with your

3              attorney.

4    A         Nothing else.

5    Q         Did you meet with an attorney?

6    A         I did.

7    Q         And who did you meet with?

8    A         Olivia.

9    Q         And when did you meet?

10   A         Yesterday.

11   Q         And where did you meet?

12   A         Met at the board office, Board of Education.

13   Q         And how long did you meet?

14   A         About an hour and a half.

15   Q         Anybody else present in that meeting?

16   A         There were the other Plaintiffs -- I don't

17             know what -- they are the other members that

18             were in -- you know, for the deposition.

19   Q         Other people who were going to be deposed?

20   A         Correct, yes, sir.

21   Q         And did you review any documents as part of

22             that --

23   A         We did not.

24   Q         You didn't review anything?
```

| | | |
|---|---|---|
| 1 | MS. AMLUNG: | I had them review a copy of the |
| 2 | | Complaint, and that's it. |
| 3 | A | The Complaint, that was it. |
| 4 | Q | Did you review any documents outside of the |
| 5 | | meeting with your attorney? |
| 6 | A | I looked back at email records. |
| 7 | Q | When did you do that? |
| 8 | A | Yesterday. |
| 9 | Q | What all did you look at? |
| 10 | A | Just, you know, the communications that, you |
| 11 | | know, Mario and I had. |
| 12 | Q | And do you know if those -- were you looking |
| 13 | | at documents, emails that had been marked as |
| 14 | | exhibits in Mr. Kirkendall's deposition?  Do |
| 15 | | you know if that's accurate? |
| 16 | A | To say that -- no, I just typed into my, you |
| 17 | | know, Mario Kirkendall, and then just to see, |
| 18 | | just to kind of refresh. |
| 19 | Q | Did you look at any other documents? |
| 20 | A | Huh-uh (NEGATIVE).  No, sir.  Sorry. |
| 21 | Q | Let's go through your educational and |
| 22 | | employment background. |
| 23 | A | Yes, sir. |
| 24 | Q | I don't need to know where you went to high |

| | | |
|---|---|---|
| 1 | | school, but can you tell me what college you |
| 2 | | had, college and beyond? |
| 3 | A | Yes, sir.  So I went four years undergrad at |
| 4 | | Union College in Barbourville, Kentucky.  And |
| 5 | | then two years as a -- in my Master's degree |
| 6 | | in Union, as well.  And then started teaching |
| 7 | | at Pineville Independent Schools.  And then |
| 8 | | received -- and then while I was teaching |
| 9 | | there, I did two more years, so I have two |
| 10 | | Master's degrees from Union College. |
| 11 | Q | Okay. |
| 12 | A | Taught in Pineville for nine years and then |
| 13 | | we moved back north and three years at |
| 14 | | Pendleton County High School.  And now I just |
| 15 | | finished my fifth year at Ryle. |
| 16 | Q | What positions did you hold at the schools |
| 17 | | you taught at prior to Ryle? |
| 18 | A | So at Pendleton County I was a teacher, |
| 19 | | Social Studies teacher, or excuse -- I'm |
| 20 | | sorry; that is incorrect.  At Pineville |
| 21 | | Independent I was a teacher, Social Studies |
| 22 | | teacher.  At Pendleton County High School I |
| 23 | | was the assistant principal for two years, |
| 24 | | and then I was the principal for my last year |

```
1                   there.

2       Q           Okay.  And then you moved on to Ryle?

3       A           At -- yeah, at Ryle I was the assistant

4                   principal for two years.  And then I just

5                   finished my third year as the principal of

6                   the building.

7       Q           And Matt Turner was your predecessor --

8       A           Yes, sir.

9       Q           -- is that correct?

10      A           Yes, sir.

11      Q           And did you know -- well, before we get

12                  there.  Some of these job moves, did you

13                  leave all those jobs voluntarily?

14      A           Yes.

15      Q           Okay.  Did you know Mario Kirkendall, the

16                  Plaintiff in this case, prior to his hire at

17                  Ryle?

18      A           I did not.

19      Q           And I want to walk through his hiring

20                  process.

21      A           Yes, sir.

22      Q           You had some involvement in his --

23      A           Yes, sir.

24      COURT REPORTER:    Make sure his question is finished
```

```
 1                              before you start to answer.
 2    WITNESS:              I'm sorry, okay, sorry.
 3    COURT REPORTER:       Thank you.
 4    Q        So if you could just -- and I'll ask follow-
 5             up questions, but how does the hiring process
 6             begin?  I imagine there's an opening for an
 7             AD position, correct?
 8    A        Correct.  We had retirees.
 9    Q        And then what happens?
10    A        And then we formed a committee, and the
11             committee reviews applicants to -- you know,
12             who has the experience or what -- what, you
13             know, what the committee deems.  And then we
14             set up app -- we set up interviews from
15             there.
16    Q        Who was on the committee?
17    A        I believe there were two -- two to three
18             coaches on that committee.  Mr. Turner was
19             the principal at the school -- of the school
20             at the time, so he was on the committee.
21             Myself.  Potentially another assistant
22             principal, but, you know, it was two-and-a-
23             half years ago.  But I do know that Mr.
24             Turner and, you know, a few coaches.
```

```
 1    Q       Any reason why coaches would be on the

 2            committee?

 3    A       Just because it's an athletic director

 4            position.  They would be the ones who would

 5            be working with this person.

 6    Q       Do you know which coaches were on the

 7            committee?

 8    A       I -- I want to say our volleyball coach, our

 9            girls' basketball coach, and our football

10            coach.  There could have been one or two

11            others, but I believe -- I know that -- I'm

12            almost positive those three were on the

13            committee.

14    Q       Those three and then you and Mr. Turner?

15    A       Correct.

16    Q       Anybody else?

17    A       Potentially, another assistant principal,

18            but, again, I -- I'm not -- I can't remember

19            that.

20    Q       How many assistant principals are there at

21            Ryle?

22    A       There are four assistants at -- right now

23            there are four assistants and one vice

24            principal.
```

| | | |
|---|---|---|
| 1 | Q | What's a vice principal? |
| 2 | A | It is -- in our hierarchy, it's -- they get |
| 3 | | paid on a lower index.  They don't work as |
| 4 | | many days, but still have administrative |
| 5 | | duties and have to have a principal's |
| 6 | | license. |
| 7 | Q | Okay.  That's just, I guess, a function of |
| 8 | | the size of the school that you would need to |
| 9 | | have four assistant principals? |
| 10 | A | Correct, yes, sir.  The state regs, I think, |
| 11 | | for every 500 students, there's an assistant |
| 12 | | principal. |
| 13 | Q | Oh, okay.  Now, who decides who's on this |
| 14 | | committee that's going to hire an athletic |
| 15 | | director? |
| 16 | A | At that time, Mr. Turner, just, you know, |
| 17 | | told me to get a committee together and kind |
| 18 | | of told me what the makeup of the committee |
| 19 | | should be.  And then, you know, from there, I |
| 20 | | went with -- I took his direction and made |
| 21 | | the committee. |
| 22 | Q | And then how do you publicize that there's an |
| 23 | | opening? |
| 24 | A | So there's -- the main way at this time was |

```
 1              just on our school website, the employment --
 2              employment tab.
 3    Q    And I would assume you didn't need to go any
 4              further because you got some interest; is
 5              that correct?
 6    A    Correct.
 7    Q    Do you know how many people applied for the
 8              AD position?
 9    A    So there's a two-part process.  The first
10              part happened initially and we interviewed
11              candidates and we selected an athletic
12              director.  However, we recommended an
13              athletic director to be hired.  That athletic
14              director was coming from out of state and
15              there were some issues with compensation and
16              just -- so he never fully got hired.  So then
17              we had to go back to the drawing board.  And
18              when we reopened the application process,
19              Mr. Kirkendall had not applied for the first
20              -- the first time the job was posted, but the
21              second time the job was posted within a, you
22              know, a month window, Mr. Kirkendall had
23              applied for that second time.
24    Q    And then when you say the job was posted,
```

```
1                    that just means on that website?

2      A            On the employment website, yes, sir.

3      Q            Do you know how many people applied that

4                    second time around?

5      A            I don't.  I do know that there was more than

6                    one in our -- yeah, there -- there was more

7                    than one, but I don't think we had as much

8                    interest that time because by this point it

9                    was late -- late June, so people were

10                   starting to sign their contracts for the

11                   incoming year.

12     Q            And what did you -- what was the job posting,

13                   or what was the description that was on the

14                   website as to what job was available?

15     A            So it's a teaching -- it's a teacher position

16                   and then ath -- you know, with an ath --

17                   athletic -- and athletic director.  So like

18                   the way that our postings work, if I can

19                   remember this, you know, trying to remember

20                   back is, you know, it talks about what the

21                   extra duty part of the athletic director is,

22                   but the idea that there's the teacher

23                   contract there as well.

24     Q            It says that on the job posting?
```

```
 1   A         I -- I can't remember, but I believe so.  I
 2             mean, that's how the same was when, you know,
 3             I got hired as a principal.  We're all hired
 4             as teachers.
 5   Q         Yeah.
 6   A         On the teacher contract, excuse me.
 7   MR. ALLISON:       Do you know if that posting has
 8                      been produced?
 9   MS. AMLUNG:        I don't know if we would still have
10                      it from online anymore, but I don't
11                      think we produced it.  All we would
12                      have is the actual application
13                      itself.  But I can see if they have
14                      -- if Eric can get a copy of it.
15                      I'll check.
16   MR. ALLISON:       Okay.
17   Q         Do you know -- it would have been on your
18             website back in 2019, and then you fill the
19             position, it's going to disappear from the
20             website, correct so far?
21   A         Correct.
22   Q         Do you know what happens?
23   A         From that point on?
24   Q         Yes.
```

```
 1    A        I do not.

 2    Q        Okay.  Right.  When Mr. Kirkendall left I

 3             think he was replaced by a guy by the name of

 4             Jon Erickson; is that correct?

 5    A        That is correct.

 6    Q        Did you do a similar posting on the website

 7             for that?

 8    A        So at the time that Mr. Erickson -- or that

 9             Mr. Kirkendall no longer was employed with

10             us, it was February.  So at that point, I

11             assumed the position of athletic director.

12             Mr. Erickson helped.  He was a teacher in our

13             building and he helped with athletic

14             director.  So Mr. Erickson was acting

15             athletic director, but there was never a job

16             posted until the end of the school year.  And

17             then we re-posted that position.

18    Q        Do you know if the posting was the same as

19             the posting when Mr. Kirkendall applied?

20             Would it have looked the same?

21    A        I would assume, but I -- to say that it was,

22             I mean, I -- I would assume.  But we don't --

23             you know, that's -- that's not our part.

24    MR. ALLISON:        So even if I could get that one.
```

```
 1    MS. AMLUNG:        Okay.

 2    MR. ALLISON:         Right, or if I could get them both.

 3    Q        Okay.  So there would be one in 2019 and then

 4             one in 2021.  Sometime in the summer of 2021,

 5             right?

 6    A        Correct, the spring of 2021.

 7    Q        Yeah, yeah, okay.  Did Jon Erickson get the

 8             job?

 9    A        He did not.

10    Q        Who got it?

11    A        We hired a -- his name was -- his name is

12             still Keaton Belcher, who was a teacher in

13             our building.

14    Q        Keadon?

15    A        Keaton Belcher.

16    WITNESS:        Mr. Kirkendall is outside.

17    Q        Keaton Belcher.

18    A        Yes, sir.

19    MR. ALLISON:      I'll go get him in a second.

20    Q        All right.  Okay.  So there would have been a

21             posting that Keaton Belcher responded to?

22    A        Yes, sir.

23    Q        That looked similar to the one that

24             Mr. Kirkendall responded to?
```

```
 1    A         Yes, sir.

 2    Q         And maybe identical?

 3    A         Yes, sir.

 4    Q         And then that's the last time there would

 5              have been a posting like that?

 6    A         No.  So Mr. Belcher was our athletic director

 7              for a year and then he moved to a different

 8              school, so we posted it -- we posted the

 9              athletic director job.

10    Q         In 2022?

11    A         Correct.

12    Q         And that might be identical to 2021 and 2019?

13    A         I would assume, but, you know, that's the HR

14              side of it.

15    Q         HR does that?

16    A         Correct.

17    Q         Do you know who in HR?

18    A         I mean, Eric Ball is the -- Eric Ball, his

19              office.

20    Q         That would be your guess?

21    A         Yeah.

22              (OFF THE RECORD)

23    Q         And then what race is Mr. Belcher?

24    A         He's Caucasian.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  Going back to Mr. Kirkendall's hire, |
| 2 | | you believe there was more than one person |
| 3 | | who submitted an application, correct? |
| 4 | A | Correct. |
| 5 | Q | Do you know if it was more than two? |
| 6 | A | I know that there were only two candidates |
| 7 | | that we looked at. |
| 8 | Q | Okay. |
| 9 | A | And then -- but to say -- I -- I can't |
| 10 | | remember if there was more than two. |
| 11 | Q | Who was the other one, if you remember? |
| 12 | A | His name was Nick Wilson. |
| 13 | Q | And when you say looked at, what does that |
| 14 | | mean? |
| 15 | A | Just looked at his -- you know, checked |
| 16 | | references and, you know, we looked at his |
| 17 | | application. |
| 18 | Q | Did you interview him? |
| 19 | A | We did not. |
| 20 | Q | How come? |
| 21 | A | Our line was -- you know, we were looking for |
| 22 | | people with high school athletic director |
| 23 | | experience, and he did not have that. |
| 24 | Q | So is Mr. Kirkendall the only one that you |

| | | |
|---|---|---|
| 1 | | interviewed? |
| 2 | A | I believe so. |
| 3 | Q | And walk me through that interview -- well, |
| 4 | | who all interviewed him, the whole committee? |
| 5 | A | Yes, sir. |
| 6 | Q | And how long was that interview? |
| 7 | A | I can't remember. |
| 8 | Q | Okay. |
| 9 | A | Yeah, I can't remember. |
| 10 | Q | All right.  So there's approximately five |
| 11 | | people on the committee.  You invite |
| 12 | | Mr. Kirkendall in for the interview.  There's |
| 13 | | some back and forth, correct so far? |
| 14 | A | Yes, sir. |
| 15 | Q | Okay.  And then how long after that interview |
| 16 | | did you make the decision to hire Mr. |
| 17 | | Kirkendall? |
| 18 | A | I can't remember, but I do -- I would say it |
| 19 | | was probably within a day or two Mr. Turner |
| 20 | | called Mr. Kirkendall and offered him -- |
| 21 | | recommended him for the position. |
| 22 | Q | All right.  And after Mr. Kirkendall's |
| 23 | | interview was there a discussion amongst the |
| 24 | | committee? |

```
 1    A        Oh, yeah.  I mean, as with -- with any
 2             interview.
 3    Q        And was anybody against hiring Mr.
 4             Kirkendall?
 5    A        Not that I can remember.
 6    Q        And so a day or so later Mr. Turner is the
 7             one who makes the call?
 8    A        He makes the recommendation, and then it goes
 9             to HR.  He recommends someone for employment
10             to HR, and then we do all of the -- you know,
11             they do their part.
12    Q        And so when he made that recommendation were
13             you present for that?
14    A        I don't believe so.
15    Q        You just know that he did it because it's
16             logical that he would have done it?
17    A        Correct.
18    Q        That's fine.  Do you know what he said when
19             he made the recommendation?
20    A        I do not.
21    Q        Do you know who he spoke with in HR when he
22             made the recommendation?
23    A        I do not.  It's a form; there's a form that
24             gets sent over to HR with -- you know, so in
```

```
 1                this case, Mr. Kirkendall's name.
 2        Q       It might not even be a call; it might just be
 3                the form?
 4        A       From what I understand, yes, sir.
 5        Q       Okay.  And you don't know who gets that?
 6        A       On the -- it goes to two separate -- it goes
 7                to -- so for this position, it would have
 8                gone to -- for the teacher part of the -- it
 9                would have gone to -- it goes to somebody; I
10                can't -- I can't remember exactly who it
11                would have gone to at that time.  And then
12                for the athletic director part, that would
13                have gone to whoever handled the classified.
14                So the certified was the teacher part.  The
15                classified was the -- was the athletic
16                director part.
17        Q       Okay.  Explain to me the difference between
18                when you used the term certified and
19                classified.  Just explain to me your
20                understanding of those terms --
21        A       So certified --
22        Q       -- in this context.
23        A       Yeah.  So certified in this context would be
24                the teacher part of the contract.  The
```

| | | |
|---|---|---|
| 1 | | athletic director part would be the |
| 2 | | classified, meaning the extra -- the extra |
| 3 | | duty part of it. |
| 4 | Q | Why that term? |
| 5 | A | That's the term that, I believe, the state |
| 6 | | uses.  And there are certain requirements. |
| 7 | | Certified means you have to go to the state |
| 8 | | certification board.  So, you know, to teach |
| 9 | | English, you need to have an English |
| 10 | | certification.  Classified, there's some |
| 11 | | requirements, but there's not -- you don't |
| 12 | | have to get certified through a certifying |
| 13 | | body for those. |
| 14 | Q | So the recommendation for the AD position |
| 15 | | goes to somebody different in HR than the |
| 16 | | recommendation for the teaching position, to |
| 17 | | your knowledge? |
| 18 | A | To my knowledge. |
| 19 | Q | That's fair.  Then what happens after that? |
| 20 | | Do you know what HR does? |
| 21 | A | They would call.  And then, you know, I don't |
| 22 | | know what happens after that. |
| 23 | Q | Who do they call? |
| 24 | A | They would call Mr. -- they would call the |

1               employee who was -- who they are

2               recommending.  And then they have criteria

3               that, you know, that they -- that that

4               employee needs to --

5    Q     Oh, so then there's some process between HR

6               and the potential employee?

7    A     Yes, sir.

8    Q     And you're not directly involved in that

9               either?

10   A     No, sir.

11   Q     And you don't know what's said in that?

12   A     No, sir.

13   Q     And then -- okay.  Who actually makes the

14              hiring decision, or is it made at that point,

15              and we're just kind of talking past each

16              other?

17   A     Ultimately, in the schools, the

18              superintendent is the ultimate -- is the

19              ultimate hire.

20   Q     So is that later than where we are now?

21   A     I -- to be honest, I don't know that part of

22              it.

23   Q     Okay.

24   A     I don't know that part of it.

| | | |
|---|---|---|
| 1 | Q | The part you know is that there is a |
| 2 | | committee.  You meet; you interview; |
| 3 | | principal makes a recommendation; HR does |
| 4 | | some process.  And at some point, the |
| 5 | | superintendent has to make the decision; |
| 6 | | that's your understanding? |
| 7 | A | Yes, sir. |
| 8 | Q | And you don't know when that decision was |
| 9 | | made? |
| 10 | A | Yeah, I don't know that process. |
| 11 | Q | How -- how did you learn that -- that there |
| 12 | | had been a final decision to hire Mr. |
| 13 | | Kirkendall? |
| 14 | A | Usually, we -- that's a great question.  I'm |
| 15 | | just trying to think of how we -- usually the |
| 16 | | employee just contacts us and says, hey, |
| 17 | | we're -- we're ready to go. |
| 18 | Q | Okay.  So Mr. Kirkendall would have called |
| 19 | | you? |
| 20 | A | And, again, to say that he did or didn't, I |
| 21 | | don't know how that went in this case. |
| 22 | Q | Nevertheless, at some point he was hired, |
| 23 | | correct? |
| 24 | A | Yes, sir. |

```
1    Q    And your understanding is that he was hired

2         as AD and as a teacher, right?

3    A    Correct.  Like I'm hired as a teacher, and

4         then I have an index for my principal spot,

5         but my initial contract is as a teacher.

6    Q    So if you know, who met with him and

7         explained to him what he was being hired for,

8         if you know?

9    A    I don't; I don't know that.  I can't remember

10        that.

11   Q    Who meets with him and goes over the various

12        contracts he signs, if you know?

13   A    I don't.

14   Q    But it's not you?

15   A    It was -- it was not me, no.

16   Q    Okay.  You don't have an extra duty contract?

17        The assistant principals don't have that or

18        the principals don't either, correct, or do

19        you?

20   A    It's still on the certified side of things.

21        There is a different contract.  It's not a

22        classified.  There's a different base teacher

23        contract and then the principal contract on

24        top of that.
```

```
 1    Q       Okay.  So when you got hired in as -- as
 2            assistant principal, you signed multiple
 3            contracts?
 4    A       I believe so.
 5    Q       And then when you made the switch to
 6            principal, was that a new contract?
 7    A       The teaching contract, you know, remained
 8            intact, but the principal contract was --
 9            yes, it -- it is.  To be the building
10            principal is -- is a different -- in my --
11            from what I can remember is a different
12            contract than the assistant principal
13            contract.
14    Q       And do you sign these contracts every year?
15            I know Mr. Kirkendall, you know, he was there
16            for a couple of years, and he signed
17            contracts on an annual basis.  Is that what
18            everybody does?
19    A       Yes, sir.
20    Q       So if there was a representation made from
21            anybody, whoever met with him and spoke to
22            him about his hiring and went over his
23            contracts, if there was a representation made
24            to him that, look, everybody gets hired in as
```

1          a teacher, but you are the athletic director,

2          and that's what your job really is, you don't

3          know whether or not that representation was

4          made?

5     A    I know that our previous athletic director

6          had taught half the day.  You know, and I

7          knew that there was some expectation that

8          there was a part day of, you know, relieving

9          people of duties or lunch duty; that there

10         were some -- not direct instruction, but some

11         type of duty of a class or of an area of the

12         building.

13    Q    Yeah.  No, but I'm just asking if when

14         Mr. Kirkendall met with whoever it is he met

15         with to go over his hiring, the contacts he

16         would be signing, what he was actually

17         responsible for, whatever representations

18         were made to him, you don't know?

19    A    No; correct.

20    Q    And you don't know who he met with, whether

21         it was HR or the principal or the

22         superintendent; you don't know?

23    A    I do not.  I don't remember.

24    Q    Do you -- there's been testimony in this

```
1                    case -- well, let me ask you this, do you
2                    know whether the principal or the
3                    superintendent of the school had the
4                    authority to hire somebody to be an athletic
5                    director or band director, a coach, who has
6                    no teaching responsibilities whatsoever?  Do
7                    you know whether they have the authority to
8                    do that?
9       A            I don't know that.
10      Q            Okay.  Okay.  Have you personally reviewed
11                   any of the contracts Mr. Kirkendall ever
12                   signed?
13      A            At that time when I became the principal, and
14                   in that December and then January leading to,
15                   ultimately, his termination, I did look at
16                   the job description for teacher and the job
17                   description for athletic director, just to --
18                   just to make sure that I wasn't -- I wasn't
19                   saying or doing something that wasn't in his
20                   con -- in the contract.
21      Q            You looked at the job descriptions?
22      A            The job description.
23      Q            Did you look at the contracts?
24      A            That -- I believe those are the same things
```

1            in our district.  The job description is

2            approved by the Board of Education, and then

3            that job description is on every -- the same

4            teacher job description is on every teacher

5            -- every certified employee in our build --

6            in our district.  And then that's part of the

7            document -- one of the documents that they

8            sign.

9      Q    You're telling me that you think the job

10           description is part of the contract; is that

11           what you're telling me?

12     A    Yes, I believe so.

13     Q    So Mr. Kirkendall is hired in and he begins

14           working, and at that time you're the

15           assistant principal?

16     A    Yes, sir.

17     Q    And how much interaction did you have with

18           Mr. Kirkendall at that time?

19     A    We just, you know, we talked a relative

20           amount of times.  You know, we -- we had a

21           good relationship.  We're from similar areas,

22           knew similar people, so -- or not similar

23           people; we just knew some of -- some of the

24           same people.  So, you know, we -- we would

| | | |
|---|---|---|
| 1 | | talk frequently, but, you know, just in |
| 2 | | support. |
| 3 | Q | And did you -- in your interactions with him, |
| 4 | | whether it's of a personal nature or a, you |
| 5 | | know, job-related nature, did you form an |
| 6 | | opinion as to his job performance during that |
| 7 | | first year? |
| 8 | A | No. |
| 9 | Q | Okay. |
| 10 | A | No. |
| 11 | Q | Meaning, did you know -- did you have an |
| 12 | | opinion as to whether he was doing a good |
| 13 | | job, bad job, not sure, I mean.... |
| 14 | A | Yeah, I can't remember. |
| 15 | Q | Okay.  All right.  In terms of his specific |
| 16 | | role, what he was doing on a day-to-day |
| 17 | | basis, who had involvement in setting that |
| 18 | | schedule other than Mr. Kirkendall, of |
| 19 | | course? |
| 20 | A | Mr. Turner, the principal. |
| 21 | Q | So the principal would have the direct |
| 22 | | communication with the employee about what |
| 23 | | their day-to-day responsibilities were? |
| 24 | A | In this case, yes. |

1    Q        Is it different in other cases?

2    A        No.  You know, just sometimes there's

3             delegation of -- but not with the athletic

4             director.  It comes from the principal.

5    Q        Okay.  All right.  Now, there came a point in

6             time during that second year, I believe --

7             no, it was during the first year that Covid

8             -- that Covid hit.  There were, you know, it

9             was a lot going on, et cetera, et cetera.

10            And at some point in time, Mr. Kirkendall

11            requested leave under the FMLA or the -- the

12            Covid-related FMLA, I'll just call it for

13            purposes of this conversation.  Do you recall

14            that happening?

15   A        Yes, sir.

16   Q        Okay.

17   A        By that time I was the principal.

18   Q        By that time you were the principal --

19   A        Yes.

20   Q        All right.  What's your understanding of what

21            Mr. Kirkendall was seeking with respect to

22            leave at that point in time?

23   A        Yeah.  Our conversation, when we talked down

24            in his office, you know, I knew his wife was

1           a nurse, and childcare was going to be -- you

2           know, going to be an issue.  So the

3           conversation was, I'm going to come into the

4           office -- try to come in the office a couple

5           of days.  I'll let you know when -- when that

6           happens, and -- and we'll go from -- and

7           we'll just kind of play it week by week from

8           there.

9    Q    Okay.  And did you have an understanding as

10         to how long that arrangement was going to

11         last?

12    A    I believe at the time I was given -- you

13         know, the leave was going to last until a

14         certain amount of time, but to tell you what,

15         you know -- I knew that it was starting.  We

16         talked maybe a week before it started.  And

17         I knew he had conversations with HR.  And

18         then at some point I was told from HR, you

19         know, Mr. Kirkendall is going on this leave

20         until a certain point.

21    Q    Okay.  Did you have decent understanding of

22         how the FMLA or this Covid-related leave

23         operated?

24    A    I did not, you know, because it was more on

1           the HR side.

2    Q      Do you understand what the term intermittent

3           means?

4    A      I do.

5    Q      What's your understanding of that term?

6    A      The idea that it's taken when needed, but the

7           employee would work and, you know, would

8           communicate to me or to HR the days that they

9           wouldn't -- they weren't going to work.

10   Q      And did you have any understanding as to what

11          type of leave Mr. Kirkendall was taking?

12          Before I get there, do you know what

13          continuous leave is?

14   A      I'm not aware.

15   Q      Okay.  So if I tell you that intermittent

16          leave is -- you've got this leave of absence,

17          but there's going to be some periods of time

18          of work, where continuous is, there's going

19          to be no work?

20   A      Right, okay, that makes sense.

21   Q      Meaning you go out, it's like a pregnancy

22          leave of absence, where you go out and you're

23          just out for a period of time and then you

24          come back.  Did you have any understanding as

1          to whether Mr. Kirkendall was taking

2          intermittent or continuous leave at any point

3          in time during his leave?

4     A    When we started he had told me that it was --

5          he was going to come into the building a

6          couple days and do some of the athletic

7          director duties, covering games, those type

8          of things.  So I believe that it was

9          intermittent -- intermittent.  At the end of

10         October, I was told by HR this is a

11         continuous leave.  And then I ceased

12         communication at that point.

13    Q    Who in HR told you that, Eric?

14    A    Told me which part?  I'm sorry.

15    Q    This is a continuous leave.

16    A    I -- yeah, can't remember.

17    Q    Okay.

18    A    Yeah, I can't remember.

19    Q    Who told you it was intermittent?

20    A    Mr. Kirkendall.

21    Q    Your understanding of whether it was

22         intermittent initially was based on your

23         conversations with him?

24    A    Correct.

```
 1   Q       Did he use that word or did he just tell you
 2           what he was going to do?
 3   A       He didn't use the word intermittent.  He said
 4           he was going to check with HR.  And then when
 5           I didn't hear anything from HR to the
 6           contrary, I figured -- and there was one or
 7           two days after he went on the leave that he
 8           came in and -- he came into the building and,
 9           you know, covered a game or performed some of
10           the athletic director duties.
11   Q       I imagine you went through these emails
12           yesterday and we'll get to these.  But there
13           was some back and forth on whether he was
14           being paid for days that he worked while he
15           was out on leave; that's one issue.  There
16           was some back and forth on whether he was
17           being communicated with, contacted, asked to
18           do things while he was out on leave.  Those
19           are sort of two separate issues as I'm
20           dividing them up anyway.  Do you have some
21           familiarity with both of those issues?
22   A       I do.
23   Q       Let's start with the paid piece.  What's your
24           understanding as to what he was requesting on
```

```
1              the paid piece of it?
2      A       My understanding was that there were days
3              that he had -- that he was requesting to be
4              paid for, that I didn't approve him to work
5              from home, and he wasn't in the building on
6              those -- on some of those days.
7      Q       He was asking to be paid for days that he
8              worked, correct, so far?
9      A       Not worked.
10     Q       Not --
11     A       That he was saying that he worked, but not --
12             not that he actually -- he was requesting to
13             be paid for days that -- what he was calling
14             work, but I was, as was the building
15             principal was, was he actually working those
16             days?  And I was not aware of that work at
17             that time.
18     Q       Okay.  Let's break that down.  So your
19             understanding is he was asking to be paid
20             certain days, and he was saying that he
21             worked those days, correct so far?
22     A       He was saying he worked those days, correct.
23     Q       And you are questioning whether he actually
24             worked those days; is that what you're
```

```
 1                telling me?

 2     A          The only days that I knew that he worked were

 3                the two to three days that he actually

 4                physically -- physically came on the campus

 5                and -- and, you know, observed or -- you

 6                know, observed games or, you know, did some

 7                type of duty.  Those were the only days that

 8                were approved by me.  There was no, you know,

 9                allowance to work from home or anything like

10                that at that point.

11     Q          Okay.  The days that he came in, are you

12                saying that you know he worked because you

13                witnessed him there on the premises?  How do

14                you know he came --

15     A          No, he --

16     Q          -- how do you know he came --

17     A          -- he communicated with me.

18     Q          Okay.

19     A          And there was coverage for a game.

20     Q          Okay.

21     A          Yeah.

22     Q          So those days you're in agreement that, yeah,

23                he showed up to work on those days --

24     A          Those days, correct.
```

```
 1    Q        -- correct so far?

 2    A        Yes, sir.

 3    Q        Are you in agreement that he gets paid for

 4             those days?

 5    A        Again, when I was thinking of the -- you

 6             know, he came in those days and worked and, I

 7             mean, again, that's not my decision to make,

 8             but that's HR's --

 9    Q        That's HR.

10    A        But our agreement was, those are the days

11             that he was on campus performing his duties

12             and, you know....

13    Q        Okay.  So at least from your perspective, I

14             think what you're telling me is your

15             understanding was that he was intermittent,

16             correct so far?

17    A        Yes, sir.

18    Q        Your understanding was that he worked some

19             days, but it was only the days that he

20             actually showed up on campus; correct so far?

21    A        Yes, sir.

22    Q        And your understanding is that he would be

23             compensated for those days; correct so far?

24    A        Under the way that I knew intermittent, yeah,
```

```
 1              FMLA or whichever one was --
 2       Q      I get it.  Your understanding is your
 3              understanding; I get that part, and that's
 4              what I'm trying to -- in a deposition, I'm
 5              just trying to find out what you know or
 6              understand.
 7       A      Yeah.
 8       Q      Okay.  You're also telling me that you did
 9              not -- your understanding is that he was
10              asking to be paid for work that he was doing
11              while at home, and you're telling me that you
12              didn't approve working from home, right?
13       A      At that point, yes.
14       Q      So I believe Mr. Kirkendall's complaint or
15              concern, however you want to phrase it --
16       A      Yes, sir.
17       Q      -- was, I'm doing work; I'm being asked to do
18              work by Mr. Shafer, among others, and I'm
19              doing that, and I should be getting paid for
20              that.  And whether I'm on the premises or
21              not, I should be getting paid for that.  And
22              you're telling me -- you understand that
23              that's what he's claiming, right?
24       A      I understand that's what his claim is, yes.
```

```
 1    Q        And you're saying, well, if I didn't approve

 2             you to work from home, you don't get paid for

 3             those days, correct?

 4    A        Can you repeat that?

 5    Q        Your position is, well, if I didn't approve

 6             your work from home, you're not getting paid

 7             for those days?

 8    A        Correct.

 9    Q        Okay.  But I think Mr. Kirkendall's response

10             to that is, well, if I'm asked to be doing

11             work that -- that doesn't require me to

12             physically be at the school, and I'm doing

13             it, isn't that the approval?  What's your

14             response?

15    A        There was very few -- I mean, at that point

16             athletics were in session, so he had an out

17             -- out of office reply on his email --

18    Q        Yep.

19    A        -- directing people where they should -- who

20             they should communicate with.  So the only

21             athletic director duties at that time that

22             would have been able to be done would have

23             been being on campus supervising.  Anybody

24             who sent him an email got an out -- out of
```

1               office reply that they could immediately

2               contact myself or Mr. Erickson.

3     Q         But if somebody is sending him emails or

4               calling him, and he's responding, even if

5               he's doing that from home, in your mind is

6               that -- and I'm just trying to get your

7               understanding --

8     A         Yeah.

9     Q         -- which is fine.  In your mind, is that not

10              compensable because it doesn't count as work

11              or it wasn't approved?

12    A         Can you restate that?  I'm having -- I'm

13              trying to --

14    Q         Yeah.  If people are communicating with him,

15              asking him to do things, respond to emails,

16              make calls, whatever it is, and he's doing

17              that from home, your position is that none of

18              that is compensable because there's not

19              approval that you gave to work from home?

20              That's what your position is?

21    MS. AMLUNG:          OBJECT to form, but answer if you

22                         can.

23    A         When he left, the work that I was going to

24              approve was when he came onto campus to

```
 1              perform those, you know, those duties.  I
 2              never directed him to respond to emails.  I
 3              never directed him to take phone calls.  I
 4              directed him actually to put an out of office
 5              reply.  And he actually sent the
 6              communication to all of our coaches, as well,
 7              so to cover both bases, letting them know he
 8              is going on leave.  If you have concerns,
 9              contact this -- you know, contact Mr. Shafer
10              or Mr. Erickson.
11     Q        And this may be more of an HR question, and
12              that's fine if it is, but if there's -- if
13              there's back and forth about doing work,
14              whether it's on the premises or at home or
15              whatever it is, do you know if an employer
16              can just say, well, you may have done the
17              work, but we're not going to pay you for it
18              because --
19     A        Yeah, that would be an HR question.
20     Q        Okay, that's fine.  Are you saying that you
21              believe it was clear what you approved and
22              what you didn't approve?
23     A        I believed so.  And I knew it was clear that
24              the only days that were going to count to
```

```
 1                  work were the days that he was on campus.
 2       Q          And did you make that clear via verbally or
 3                  is that in writing somewhere where -- is
 4                  there somewhere in writing where it should be
 5                  clear to him that, hey, you're approved to
 6                  work on the days that you show up here, and
 7                  that's what you're going to get paid for.
 8                  You are not approved to work from home.
 9                  Don't do it.  And you're not going to get
10                  paid for it.  Is that made clear somewhere in
11                  your --
12       A          In our communi -- in our verbal
13                  communication.
14       Q          Okay.  Is there anywhere in writing that's
15                  made clear, that distinction?
16       A          I know HR, you know, the idea was when he was
17                  on a leave, the days that he wasn't, you
18                  know, he was not to respond; he was not to
19                  answer those type of things, so....
20       Q          Okay.  And were you copied on some of the --
21                  he was mostly talking to Eric Ball, right?
22       A          I -- I --
23       Q          Not sure?
24       A          Yeah, I'm not sure.
```

```
 1    Q       And were you copied on any of those?

 2    A       I don't remember.

 3    Q       When you went through your emails yesterday

 4            or the day before, whatever it was, did you

 5            go through some of the emails between

 6            Mr. Kirkendall and Eric Ball?

 7    A       No, I didn't.  If I was copied on one, I

 8            can't remember, but no, I don't remember

 9            that.

10    MR. ALLISON:       How are we doing talking over each

11                       other?

12    WITNESS:           I'm sorry.

13    COURT REPORTER:    You're okay; yeah, you're fine.

14    MR. ALLISON:       I'll slow down.  Sometimes if I

15                       slow down, that helps sometimes,

16                       okay.

17    Q       Do you know -- so I think there was --

18            there's a dispute over what days Mr.

19            Kirkendall should or should not be paid for.

20            Do you know how that dispute was resolved?

21            Do you have any idea or is that an HR

22            question?

23    A       It would be an HR question.

24    Q       That's fine.  Do you know what prompted, if
```

```
 1              anything, HR to inform you that this is a

 2              continuous leave?

 3    A         I believe Mr. Kirkendall brought a concern to

 4              HR about continuing to be contacted, and

 5              that's when HR got in touch with me and said,

 6              hey, he is on continuous -- he is on a

 7              continual leave.  Cease all -- cease

 8              communication.

 9    Q         Who is Randy Poe?

10    A         He was a superintendent.

11    Q         At the time?

12    A         At the -- at the time that Mr. Kirkendall was

13              hired.

14    Q         Where is he now?

15    A         He's retired.

16    Q         Is he still around; do you have any idea?

17    A         He's in Northern Kentucky somewhere, but....

18    Q         Do you keep in contact with him at all?

19    A         No.  I've maybe had two conversations with

20              him so....

21    Q         Matt Turner replaced Randy Poe, did he not?

22    A         Yes, sir.

23    Q         In your understanding, every -- every teacher

24              contract you signed has been identical over
```

| | | |
|---|---|---|
| 1 | | the last five years; is that correct, or have |
| 2 | | there been differences that you know of? |
| 3 | A | Not that I know of.  Yeah, I think they're |
| 4 | | identical. |
| 5 | Q | Okay.  Now, if Randy Poe is the person who -- |
| 6 | | the superintendent who signs off on the 2020 |
| 7 | | contract, would he have -- would he meet with |
| 8 | | Mr. Kirkendall personally to go over the |
| 9 | | contracts or could that be somebody else? |
| 10 | A | I believe that's at HR. |
| 11 | Q | HR would do it? |
| 12 | A | I believe so. |
| 13 | Q | Would the principal potentially do it?  You |
| 14 | | never did it? |
| 15 | A | At -- at that time, I can't remember. |
| 16 | Q | And when did you become principal?  Were you |
| 17 | | principal in July of 2020? |
| 18 | A | Correct, yes, sir. |
| 19 | Q | Okay.  You never met with Mr. Kirkendall to |
| 20 | | go over his actual contracts? |
| 21 | A | No, sir. |
| 22 | Q | And never made any representations as to the |
| 23 | | meanings of any of those contracts? |
| 24 | A | Can you repeat? |

```
 1   Q        You never met with Mr. Kirkendall and made

 2            any representations to him about the meanings

 3            of his contracts?

 4   A        When you say representation, can you -- I'm

 5            not understanding.

 6   Q        Like, this is what your contract says, but

 7            this is what your responsibilities really

 8            are?

 9   A        We talk to all of our employees about what

10            their job duties are for the -- for the

11            coming year.

12   Q        Did you meet with Mr. Kirkendall and go over

13            that with him?

14   A        We talked, yes.

15   Q        Okay.  Do you recall specifically what was

16            said?

17   A        Just what -- what his schedule would be for

18            the year.

19   Q        Okay.  But did you, you know, throw the

20            contract in front of him and say, this is

21            what's expected under this contract; this is

22            what's expected under this contract, anything

23            like that?

24   A        No.
```

1    Q        It's just going over the schedule?

2    A        Schedule and then, you know, I was a new

3             principal, so kind of some of the

4             expectations of an athletic director.

5    Q        Do you have an understanding as to the

6             difference between the regular FMLA leave and

7             the other types that sort of became available

8             in connection with Covid, or is that an HR

9             question?

10   A        That's an HR question.

11   Q        I'm just going to show you what we've marked

12            Exhibit 14 in Mr. Kirkendall's deposition,

13            the second page anyway.  Do you know who

14            wrote, intermittent, on that?

15   A        I have no idea.

16   Q        Do you know what the context of whoever wrote

17            intermittent -- do you know what the context

18            was of that?

19   A        I do not.

20   Q        All right.  I didn't expect that you would,

21            but you're here, I figured I'd ask.  Now, do

22            you know when Mr. Kirkendall started his

23            leave?

24   A        Not off the top of my head.

```
 1   Q        If I say it was September 21, 2020; does that
 2            sound about right?
 3   A        That sounds -- yes, sometime in September.
 4            Like I said, he sent an email -- email out to
 5            the head coaches letting them know when he
 6            was taking....
 7   Q        And you were copied on that?
 8   A        Yes, sir.
 9   Q        And how was it decided -- well, and -- and
10            Jon Erickson was tasked to fill in for him;
11            is that correct?
12   A        That is correct, yes, sir.
13   Q        Do you know how that was decided?
14   A        I -- I just needed -- I needed somebody.  He
15            was a person in the building, and I just
16            needed -- I needed someone to take some of
17            the duties on.
18   Q        Got it; and, no, I get that part.  But how
19            did you pick him, or are you the one who
20            picked him?
21   A        Ultimately, I picked him, yes, sir.
22   Q        And how did you make that decision?
23   A        Just his background as a teacher and a coach
24            in our building.
```

```
 1    Q        I understand that part.  Why not the other
 2             coaches, because there were other teachers
 3             and coaches in the building?
 4    A        No one else approached me or, you know, I
 5             went -- I -- I actually -- none of the head
 6             coaches -- because we were right in the
 7             middle -- so none of the head coaches, and he
 8             at the time was one of the few assistant
 9             coaches that was in the building.  And none
10             of my administrators could do it with
11             everything else we were dealing with right,
12             you know, coming back to school with A days,
13             B days, and I recall that.
14    Q        Did Jon approach you?
15    A        I don't think so.  I -- I approached him.
16             And he thought about it and then ultimately,
17             you know, said he would help.
18    Q        It sounds like you made the decision because
19             you thought he was available?
20    A        He was -- yes, correct.
21    Q        Maybe more available than the other --
22    A        Any other head coach, yes, correct.
23    Q        Okay.  Anything else factor into your
24             decision?
```

```
 1    A         No, sir.
 2    Q         Okay.  No emails from Eric Ball or from
 3              Carrie Brannon were ever forwarded to you
 4              about pay while being out on leave, that you
 5              remember?
 6    A         Not that I can remember.
 7    Q         You had indicated a little bit earlier in
 8              your testimony that HR had told Mr.
 9              Kirkendall that -- something along the lines
10              of, don't respond to emails.  I forget how
11              you put it, and you can correct me if I'm
12              wrong.  Didn't you say that HR had said,
13              don't respond to --
14    A         At some point in, I would say, late October,
15              I got a call just to, hey, he is on a
16              continuous leave.  You need to make sure
17              you're not communicating with him.
18    Q         Okay.  And do you know when Mr. Kirkendall
19              ended his leave?
20    A         It was the end of November.
21    Q         Okay.
22    A         I want to say 12/4, but that -- that was the
23              actual --
24    Q         That's a good memory, there you go.  Well,
```

1              maybe you looked at this yesterday.  You

2              know, there was -- there was testimony this

3              morning from Mr. Rigg that I didn't fully

4              understand and I want to get your take on it.

5              He said that at some point Mr. Kirkendall had

6              exhausted his leave and then like wasn't

7              coming back to work; is that consistent with

8              your memory of what happened?

9    A        I don't remember that.

10   Q        Okay.  I think he may have just been

11             mistaken, but I didn't understand that

12             testimony.  Okay.  I'm going to show you

13             Exhibit 18 to Mr. Kirkendall's deposition.

14             Do you know what that is?

15   A        It's an absence history through our Frontline

16             manager or Aesop.

17   Q        Had you seen that in connection with

18             Mr. Kirkendall's matter ever?

19   A        I have not.

20   Q        Okay.  Do you know what it was used for, if

21             anything?

22   A        This would all be on the HR side of things.

23   Q        And that's fine.  But do you know if his

24             history was ever looked at for any particular

```
 1              reason?
 2    A         Not in my -- I don't know.
 3    MR. ALLISON:        I don't know is a perfectly
 4                        acceptable answer, you know.
 5                        That's fine.  Why don't we take
 6                        just a couple of minutes, you know,
 7                        break, and then we'll get into his
 8                        return from leave.
 9    WITNESS:            Okay.
10         (A BREAK IS TAKEN)
11    Q         Now, is it true that at one point Jon
12              Erickson, I guess, was out, I think, on a
13              honeymoon or some sort of personal reason,
14              and was Mr. Kirkendall asked to come in and
15              work during that time?
16    A         Yes.  That's when the agreement was
17              Mr. Erickson was going to take over and your
18              -- you know, with -- with your intermittent,
19              and when he's on his honeymoon, those are
20              some more days that I need you to come in.
21    Q         And then did he -- did Mr. Kirkendall come in
22              on those days --
23    A         I can't --
24    Q         -- or do you remember?
```

1    A        Yeah, I can't remember.

2    Q        Do you know if that was -- the days that

3             Mr. Erickson were out, that -- that you were

4             asking Mr. Kirkendall to cover, were those

5             after you were notified of the continuous

6             leave, or do you know?

7    A        It would have been before that.

8    Q        Now, after Mr. Kirkendall came back, was he

9             still doing athletic director duties from

10            home?

11   A        When you say after -- clarification on when

12            you mean, after he came back?

13   Q        After he came back on December 4, after his

14            leave ended.

15   A        At that time, schools had shut back down and

16            all sports had been suspended.  And at that

17            time, I'd given Mr. Kirkendall, just like

18            many of our other employees, you know, the

19            opportunity to work from home.

20   Q        Okay.  So at some point there was a

21            communication from you that working from home

22            was approved?

23   A        Correct.  But after he returned in December.

24   Q        Okay.  You're telling me that that approval

| | | |
|---|---|---|
| 1 | | was after he returned in December? |
| 2 | A | Correct. |
| 3 | Q | Not before? |
| 4 | A | Correct. |
| 5 | Q | So from your perspective, any work from home |
| 6 | | before December 4 had never been approved by |
| 7 | | you? |
| 8 | A | Correct. |
| 9 | Q | It was only after he came back? |
| 10 | A | Correct. |
| 11 | Q | I just want to go through a few more of |
| 12 | | Mr. Kirkendall's concerns that he raised.  He |
| 13 | | raised the issue about getting paid for work |
| 14 | | and getting contacted.  Some of the other |
| 15 | | issues that he raised, at least in his |
| 16 | | deposition and in some of the emails you |
| 17 | | probably went over yesterday or the day |
| 18 | | before, he had a concern that a coach had |
| 19 | | been hired and he wasn't aware of that while |
| 20 | | he was out.  Do you recall that being -- |
| 21 | A | He -- |
| 22 | Q | -- an issue? |
| 23 | A | He brought that up as a concern once he |
| 24 | | returned, yes. |

| | | |
|---|---|---|
| 1 | Q | And what's your response to that? |
| 2 | A | I was told not to contact -- have any |
| 3 | | communication with him -- |
| 4 | Q | Okay. |
| 5 | A | -- and we needed to hire a soccer coach for |
| 6 | | the girls' program. |
| 7 | Q | Okay.  And your -- your position -- I think |
| 8 | | you said that earlier was that after you |
| 9 | | received that communication from HR, you |
| 10 | | ceased all contact; is that what your |
| 11 | | position is? |
| 12 | A | That was what I was told, yes. |
| 13 | Q | And did you follow that -- |
| 14 | A | I -- |
| 15 | Q | -- directive? |
| 16 | A | I believe I did. |
| 17 | Q | Okay.  Now, so at some point in time, Mr. |
| 18 | | Kirkendall returns in December.  And then |
| 19 | | there's some dialogue around changes that |
| 20 | | were going to be made to what he was doing on |
| 21 | | a day-to-day basis, correct? |
| 22 | A | Correct, just as with many people at that |
| 23 | | time. |
| 24 | Q | And what's your understanding as to the |

```
 1                    changes that -- were you the one making the

 2                    decisions on what the changes were?

 3    A              Ultimately, as the building principal, yes,

 4                    sir.

 5    Q              Was anybody else involved in that

 6                    decision-making that you know of?

 7    A              I mean, most -- I'm pretty collaborative, so

 8                    our assistant principals would have been

 9                    involved, but, ultimately, all decisions

10                    would have come from me.

11    Q              Do you recall specifically any involvement of

12                    any specific assistant principal?

13    A              No.  I mean, we all pretty much work

14                    hand-in-hand with each other.

15    Q              Okay.  And what were the changes to Mr.

16                    Kirkendall's day-to-day activities from your

17                    perspective?

18    A              Well, so in December when he returned from

19                    the 12/4, obviously, we weren't in the

20                    building.  So my ask for him was to monitor

21                    some students.  We had 175, close to 175

22                    seniors who because of the end of their

23                    junior year and then how they had started

24                    that year, that were -- could -- the
```

```
 1            possibility of graduating was in jeopardy
 2            because they weren't completing doing....  So
 3            we divided our admin team up.  We just took
 4            the whole -- we -- we divided our admin team
 5            up, and then used our instructional coach.
 6            Any -- anybody who didn't have student-facing
 7            positions, you know, didn't have a classroom
 8            with teachers, we divided them up into
 9            multiple teams, so each team had three to
10            four to five people on those teams.  And
11            then, you know, they were to -- everything
12            from communication -- and then with Mr.
13            Kirkendall one thing I asked is, there's a
14            handful of students to -- if he would monitor
15            an Edgenuity program, which is a credit
16            recovery program.
17       Q    Okay.  So I think there were two aspects to
18            what you were telling me.  One was contacting
19            students who were not doing well --
20       A    Correct.
21       Q    -- is that correct?
22       A    Correct.
23       Q    And you were just describing that, correct?
24       A    Correct.
```

| 1 | Q | And then there was another piece where you |
|---|---|---|
| 2 | | wanted him to monitor people that would be |
| 3 | | using the Edgenuity -- |
| 4 | A | Edgenuity program, correct. |
| 5 | Q | -- program?  Okay.  In terms of the divvying |
| 6 | | up who was going to be calling who, who took |
| 7 | | that responsibility? |
| 8 | A | The assistant principals.  We -- we had a |
| 9 | | leader, an administrative leader over each |
| 10 | | team.  And then, you know, I don't |
| 11 | | micromanage, so they -- they did that from |
| 12 | | there. |
| 13 | Q | And you said there were 175 students who were |
| 14 | | not doing well? |
| 15 | A | I think for those student success teams, that |
| 16 | | was overall school.  The other position -- |
| 17 | | and, again, I can't remember exactly, but |
| 18 | | there was 175 seniors, I do know that, who |
| 19 | | were struggling, that -- that jeopardy -- |
| 20 | | graduation was in jeopardy. |
| 21 | Q | Okay.  Now, correct me if I'm wrong, but I |
| 22 | | think that on the call list there were |
| 23 | | seniors, juniors, sophomores, and freshmen, |
| 24 | | does that sound right? |

```
 1    A       It could.  That's why I said it could have

 2            been two separate things, correct.

 3    Q       And was it Cody Ryan who was kind of in

 4            charge of putting this together?

 5    A       On the team that, I believe, Mr. Kirkendall

 6            was on, yes.

 7    Q       What about the other teams?

 8    A       The -- there was enough -- I have five

 9            assistant principals, so they each ran their

10            own team.

11    Q       Okay.  They each ran their own team, and Cody

12            Ryan --

13    A       I believe all five of them did -- we have

14            three assistant principals with the alphabet,

15            so at least those three did.  I don't want to

16            misspeak.  You know, either three, four, the

17            five were the ones who -- were the leaders of

18            their team.

19    Q       But you've got multiple assistant principals

20            involved in directing teams of multiple

21            employees to make calls to multiple

22            students --

23    A       Yes, sir.

24    Q       -- who were not doing well?  And I think you
```

```
 1              said we took the employees who were --
 2    A         Who didn't have class -- who didn't have
 3              students that they had to meet on Google
 4              Meets every single day.  So didn't have a
 5              roster of students.
 6    Q         And the people who would have to meet the
 7              students on Google Meets every day are the
 8              people who are actually teaching, is that how
 9              that's broken down?
10    A         The people that had classroom, like a full
11              schedule of, you know, five students.  So we
12              used our instructional coach, who is another
13              certified employee, who, you know, has a
14              secondary contract for the instructional, so
15              that person was involved on these teams.
16              Again, our assistant principals -- I do
17              believe our three assistants and the two
18              other were part of the auxiliary team, so,
19              yes, any -- any certified and also classified
20              person who didn't have a classroom roster of
21              students at the time.
22    Q         That's how you made the decision?
23    A         Correct.
24    Q         And why did you make the distinction that
```

```
 1                   way?  Why was that the distinction?

 2   A      Well, with school not being in session, one

 3           could say that, what -- what were these

 4           people -- either be my assistants, anybody

 5           who was not meeting with students every

 6           single day with the -- you know, with

 7           everything shut down, no sports, no -- what

 8           were these people doing?  So we needed to

 9           engage this part of our -- you know, these --

10           these people in order to contact these

11           students.

12   Q      You felt like they'd have more availability?

13   A      Correct.

14   Q      Okay.  Do you have any understanding as to

15           how it was broken up?  Let's say there's 100

16           people to call and we're going to have this

17           employee call 50 people, and this employee

18           only call 5.  Do you know if it was broken up

19           that way?

20   A      I -- that part, I don't know.  I do know that

21           most of our support staff, front office

22           secretarial ladies that were in the -- that

23           came to the building did -- did a majority of

24           the phone calls.  And I don't think there was
```

| | | |
|---|---|---|
| 1 | | an actual -- and, again, I'm not sure because |
| 2 | | each team was able to do -- contact, in my |
| 3 | | purview, did not always have to mean phone |
| 4 | | call. |
| 5 | Q | And in terms of reaching out to these |
| 6 | | students, it's remote at this point, correct? |
| 7 | A | Correct. |
| 8 | Q | Okay. |
| 9 | A | There are no students in the building. |
| 10 | Q | And so the contact would be either an email |
| 11 | | or a phone call, and the idea is that it |
| 12 | | would say, what? |
| 13 | A | Probably just to notify the parent, hey, your |
| 14 | | child is behind.  What -- what are the -- |
| 15 | | what are the needs that you have?  Because |
| 16 | | during this time, all the administrators in |
| 17 | | the building and several of the support |
| 18 | | staff, while we were still running the |
| 19 | | operation of the building, we're -- we're |
| 20 | | running food; we're running meals.  You know, |
| 21 | | as an administrator, your -- your -- your |
| 22 | | duty is more than just, you know, what's on |
| 23 | | the paper.  So we were running food.  We were |
| 24 | | running Chrome books.  We were running -- so |

1          just making sure that the students that have

2          some other barrier that -- and made sure

3          their parents knew that they weren't -- you

4          know, that they weren't logging on.  But then

5          also to find -- try to see if there was some

6          other barrier that they had and if we could

7          try to help that.

8     Q    And then are you aware of what the responses

9          were?  When the communications were made,

10         there would be responses; do you know --

11    A    I don't.

12    Q    And that's because that's delegated and other

13         people are handling that?

14    A    Correct; yes, sir.

15    Q    And so it seems to me that some of the

16         responses would be such that maybe the person

17         reaching out wouldn't have the expertise to

18         be able to handle what the assistance was

19         that was needed; is that fair?

20    A    No, I wouldn't say that it was fair.

21    Q    Okay.

22    A    I would say -- I would say if it got to a

23         level -- you know, we had secretaries who

24         were calling and they -- they may not know

```
 1                 specifics of the math --
 2   Q      Right.
 3   A      -- but they would report back to the
 4          assistant principal, here's the issue, and
 5          then, you know, that assistant principal
 6          would either connect them -- so, yeah, that's
 7          kind of....
 8   Q      Okay.  So the idea is something comes back to
 9          somebody who's on Cody Ryan's team, and they
10          report it up to Cody Ryan.  Okay, now, what
11          do we do?  Is that the idea?
12   A      Yes, I believe, yes, sir.
13   Q      So we've got that responsibility.  And then
14          walk me through -- what was the Edgenuity
15          expectation?
16   A      There was a handful of students just, you
17          know, who were on a computer-based program.
18          And it was just monitoring, logging -- you
19          know, seeing where they were at and -- yeah.
20   Q      All right.  And then were there extra class
21          times that Mr. Kirkendall was expected to
22          cover?
23   A      Not in December.
24   Q      So when he came back in December the changes,
```

```
1              from your perspective, consist of the people

2              to call?

3   A          Uh-huh (AFFIRMATIVE).  Yes, sir.

4   Q          Under Cody Ryan's direction and then the

5              Edgenuity piece?

6   A          Yes, sir.

7   Q          And that-- the Edgenuity piece is -- is still

8              remote?   I

9   A          Yes, sir.

10  Q          And so what exactly is he doing there?

11  A          Really just being a point of contact if a

12             student had an issue and just updating the

13             parent, if needed, if the kid was not

14             progressing.

15  Q          Okay.  Were there any other changes in

16             December?

17  A          There were no change -- no.  No.  We were

18             remote.  Sorry, I didn't mean to interrupt

19             you.

20  Q          And to your knowledge, did Mr. Kirkendall

21             make those calls?

22  A          Yes, sir.

23  Q          To your knowledge, did he do the Edgenuity

24             piece?
```

```
 1    A        Yeah.  When I emailed him on the Edgenuity

 2             piece, his was -- I'll do whatever I need to

 3             do.

 4    Q        Okay.  And did he raise any concerns at that

 5             time about making the calls or --

 6    A        Not to me.

 7    Q        Okay.

 8    A        Not that I can remember.

 9    Q        So then at some point in time there are

10             additional changes that are made.  Am I

11             correct so far?

12    A        At the end of December when it -- it became

13             known that we were going to be coming back to

14             school, there were -- yes, that's when I

15             communicated, you know, a couple additional

16             changes in response to, again, that high --

17             that high volume of students that were

18             failing.

19    Q        And do you know what those were?

20    A        I can't remember.  It is in a document

21             somewhere.

22    Q        Yeah, okay.  I'll just throw those in front

23             of you momentarily, and we'll do it that way.

24             Before we get there, I do want to ask you
```

```
 1              sort of an overarching question.

 2    A         Yes, sir.

 3    Q         Do you understand Mr. Kirkendall's position

 4              in this case is that, I'm out on FMLA leave.

 5              It's job-protected leave.  I come back.  I'm

 6              supposed to be put in the same job or

 7              substantially equivalent, and these changes

 8              aren't that, and so it's a violation of the

 9              FMLA.  Do you understand that that's his

10              position?

11    A         I understand that's his position, yes.

12    Q         Okay.  And I want to make sure I understand

13              clearly your position.  Mr. Rigg testified

14              this morning that, from his perspective,

15              Kirkendall could have gone out as the AD

16              doing no teaching duties whatsoever, and then

17              come back -- and I'm -- I'm paraphrasing, but

18              I think this is the gist of it.  And then

19              come back and say, okay, well, athletics is

20              shut down; we're not doing any AD stuff.  You

21              are now just doing teaching duties all day

22              long, and that even under the FMLA that was

23              permissible because of what Mr. Kirkendall's

24              contracts say, I guess, some -- some other
```

```
 1                  reasons, but is that -- do you understand

 2                  what I'm saying?

 3       A          I'm trying to --

 4       Q          I can break it down.

 5       A          Yes, yeah, please.

 6       Q          Okay.  Mr. Kirkendall's position is, I'm --

 7                  I'm the athletic director.  I don't have -- I

 8                  don't any teaching responsibilities even

 9                  though I have this teacher contract.  I go

10                  out on leave.  I come back and I now have a

11                  lot of teaching responsibilities, and that's

12                  a change.  You understand that's his

13                  position?

14       A          I understand that's his position.

15       Q          Okay.  And when I talked to Mr. Rigg this

16                  morning, from his perspective, he said, look,

17                  Mr. Kirkendall could go out on leave doing

18                  all AD duties and then come back, do no AD

19                  duties and just do teaching duties, and

20                  that's permissible because of his contracts.

21                  Do you follow what I'm saying?

22       A          I follow.

23       Q          Do you agree with Mr. Rigg on that?  Is that

24                  your understanding of how Mr. Kirkendall
```

| | | |
|---|---|---|
| 1 | | could be brought back? |
| 2 | A | He's a teacher allocation in my -- in my |
| 3 | | building. |
| 4 | Q | Okay. |
| 5 | A | You know, and as the principal, I, you know, |
| 6 | | can use that teacher allocation how I want. |
| 7 | | His -- the agreement he was -- he -- he never |
| 8 | | had -- he had a duty -- he had two duty |
| 9 | | periods.  And all I was changing is changing |
| 10 | | those duty periods to instead of cafeteria |
| 11 | | duty and covering in-school suspension, I was |
| 12 | | just saying, hey, there's going to be a |
| 13 | | handful of seniors, senior student athletes |
| 14 | | who I would like to have in your office so |
| 15 | | that you can monitor.  So in my opinion -- |
| 16 | | because Mr. Kirkendall, we had talked, he |
| 17 | | wanted to be an administrator.  You know, to |
| 18 | | me, to monitor those -- and then the fifth |
| 19 | | period which was the one period that -- and I |
| 20 | | think what the document says -- but, again, |
| 21 | | there's no -- there's no creation of content. |
| 22 | | Every other athletic director in our district |
| 23 | | teaches, has students and -- |
| 24 | Q | How do you know that? |

```
 1    A        What's that?  Oh, I -- because when I -- when
 2             I -- and we talked a lot during those times,
 3             but I -- I know that during that time that
 4             all those other athletic directors had
 5             teaching -- had teaching positions like where
 6             they actually had to provide content, grade
 7             papers.  I wasn't asking Mr. Kirkendall to do
 8             any of that; just simply monitor student
 9             athletes, mainly, seniors, who were failing.
10             He had told me that he wanted to be an
11             administrator one day.  You know, there's
12             extra -- there's duties if you want -- if
13             that's -- if that's what you want to do.
14    Q        Yeah.  How many athletic directors are there
15             in the district?
16    A        Four high school athletic directors.
17    Q        And you're saying you know that they had
18             teaching duties how, at that time?
19    A        At that -- at that time?
20    Q        Yes.
21    A        You know, it was -- we were in
22             communications.  I mean, ultimately, you
23             know, as -- as I'm becoming a new principal
24             and we were -- at that time it was, hey, what
```

```
 1                  does your athletic director do?  What is, you

 2                  know -- and prior to Mr. Kirkendall coming

 3                  in, our previous athletic director had at

 4                  least one teaching -- one teaching duty, as

 5                  well.

 6      Q           Is that all verbal with the other athletic

 7                  directors?

 8      A           Say that -- I'm sorry.  Yes, yes.  I'm sorry.

 9                  Yeah, it would have been just me trying to

10                  figure out -- navigating the world of new

11                  principal in Boone County and just kind of

12                  the expectations from there.

13      Q           I just want to go back to the question I

14                  asked a little bit earlier.  From your

15                  perspective, is there any amount of teaching

16                  duties that you could have added that would

17                  have created an FMLA violation or is your

18                  position that, look, you're a teacher first;

19                  I could just have you teach all day long?

20    MS. AMLUNG:            OBJECT to form, but answer if you

21                  can.

22      A           Yeah, that I -- I mean, ultimately, my --

23                  what I, at that time, what I realize is I

24                  could have said, all six periods, you know,
```

| | | |
|---|---|---|
| 1 | | you have that, but that's not what I did. |
| 2 | Q | How did you come to that understanding that |
| 3 | | you could do that? |
| 4 | A | Just the teacher contract part of it.  But |
| 5 | | that's not the way that I proceeded. |
| 6 | Q | Okay.  Let's go through some of these.  The |
| 7 | | exhibits that I give you at this point are |
| 8 | | going to, ultimately, go to the court |
| 9 | | reporter.  Not those. |
| 10 | A | Oh, sorry. |
| 11 | Q | Okay.  I'm going to hand you what was marked |
| 12 | | Exhibit 19 to Mr. Kirkendall's deposition, |
| 13 | | okay.  Please take your time to review it, |
| 14 | | and then I'm going to ask you some questions |
| 15 | | about it. |
| 16 | | (WITNESS REVIEWS DOCUMENT) |
| 17 | Q | All set? |
| 18 | A | Yes, sir. |
| 19 | Q | Okay.  Focusing on page 2, do you see the |
| 20 | | little number in the bottom right-hand |
| 21 | | corner? |
| 22 | A | Yes, sir. |
| 23 | Q | Sometimes we'll refer to those just to |
| 24 | | clarify.  Okay.  So this is bate stamp 886. |

```
 1                The bottom half of that page, there's an
 2                email from you dated November 30; do you see
 3                that?
 4     A          Yes, sir.
 5     Q          And you write here that, if you could fulfill
 6                the AD duties while at home, that's fine.  Do
 7                you see that?
 8     A          Yes, sir.
 9     Q          And is that when you first communicated that
10                working from home on the AD duties was
11                approved?
12     A          Yes, sir.
13     Q          And then you get into some of the teaching
14                duties, and this is what we talked about a
15                moment ago, correct, with the monitoring of
16                some of the students and then the Edgenuity
17                piece, correct?
18     A          That's correct.  Yeah, this is the Edgenuity
19                piece in December.
20     Q          And then you write at the end, if this all
21                sounds good, let me know.  Why did you ask
22                that?
23     A          I just -- I would say just so that way we
24                were -- had an understanding.  I think I
```

```
 1              would end a lot of my emails -- I didn't want

 2              to just -- I'm not the type to just force

 3              something on somebody.

 4    Q         If he said, no, that doesn't sound good to

 5              me, what would you have done?

 6    A         We would have had a conversation, but, you

 7              know, as you can see here, he didn't say

 8              that.

 9    Q         Okay.  And did you see any emails with Eric

10              Ball about whether or not you had approved

11              work for -- remote work?  Did you see any of

12              that?

13    A         There was an email chain where I think Mario

14              initiated it to try to get some things

15              cleared up and wanted me to verify if --

16              verify to Mr. Ball that he worked some of

17              those days.

18    Q         Okay.  You can put that aside.

19    A         Okay.

20    Q         I'll hand you what was marked Exhibit 21 in

21              Mr. Kirkendall's deposition.

22    A         Yes, sir.

23    Q         Please take your time to review and then let

24              me know, and I'll ask you some questions
```

```
 1                   about that.

 2                   (WITNESS REVIEWS DOCUMENT)

 3       A           Okay.

 4       Q           Reading this email, does it refresh your

 5                   recollection as to some of the back and forth

 6                   on approval or not approval for work while

 7                   out on leave?

 8       A           Part of our conversation earlier today?

 9       Q           Yeah.

10       A           I mean, yes, we talked through this.

11       Q           Yeah.  Anything in here inconsistent with

12                   what you told me earlier, from your

13                   perspective?

14       A           I don't believe so.

15       Q           Okay.  It appears that Mr. Kirkendall

16                   believes that he had approval to do the work

17                   from home and -- and you're telling him, no,

18                   you didn't, right?

19   MS. AMLUNG:          I'm going to OBJECT to that

20                        characterization just because of

21                        that top email.

22       A           Sorry, I lost track --

23       Q           You lost track what the question was?

24       A           No, I'm sorry, when she said that, I didn't
```

1           know that -- sorry.

2     Q     Yeah, no, if there's an objection, you can

3           still answer.  You know, but the document

4           speaks for itself, so -- anything in here

5           that causes you to change your earlier

6           testimony?

7     A     I don't believe so.

8     Q     Okay, put it aside.  I'm handing you what was

9           marked Exhibit 23 of Mr. Kirkendall's

10          deposition.  Please review that.

11    A     Okay.

12    Q     And I'll ask you some questions about it.

13          (WITNESS REVIEWS DOCUMENT)

14    A     Okay.

15    Q     Let's start with your email December 18 at

16          the bottom of that first page.  This is where

17          you're laying out your expectations going

18          into the second semester --

19    A     Yes.

20    Q     -- third quarter, second semester.

21    A     Yes, sir.

22    Q     All right.  And I think your testimony

23          earlier was that in terms of coming up with

24          these expectations, you made the final

| | | |
|---|---|---|
| 1 | | decision, but assistant principals may have |
| 2 | | had some input? |
| 3 | A | With this email? |
| 4 | Q | Yes. |
| 5 | A | This email was -- is my decision. |
| 6 | Q | That's all you? |
| 7 | A | Correct. |
| 8 | Q | Okay.  All right.  Let's walk through those |
| 9 | | expectations.  So number one, teaching |
| 10 | | duties.  What are these three Study Skills |
| 11 | | classes? |
| 12 | A | So just as I say there, class roster would be |
| 13 | | viewable to him and they wouldn't start -- I |
| 14 | | believe at that time -- or there -- yeah, |
| 15 | | with -- the main duty of this class is to |
| 16 | | help students with organization and keeping |
| 17 | | them on track in Edgenuity.  So really just |
| 18 | | monitoring students. |
| 19 | Q | Okay.  And was he doing anything like that |
| 20 | | prior to -- |
| 21 | A | Fourth period he had a supervision period. |
| 22 | | Fifth period he did not.  And then sixth |
| 23 | | period, when he covered our in-school |
| 24 | | suspension room, that was pretty much the |

```
 1                   nature of -- it still was a very similar type

 2                   of -- you know, those students -- a lot of

 3                   those students were in there for credit

 4                   recovery using the Edgenuity program.  So he

 5                   just monitored those students.

 6     Q     And was there an expectation that he come in

 7           at 7:30 every day?

 8     A     No, sir.

 9     Q     Was that ever communicated?

10     A     Not that I can recall.  That's the reason I

11           say the fourth, fifth, and sixth there.

12     Q     So if Mr. Kirkendall says that one of the

13           expectations that was communicated to him was

14           that he had to come in at 7:30, you would

15           dispute that?

16     A     Yes, sir.

17     Q     And then these athletic director -- we're on

18           the second page now.

19     A     Yeah, yeah, understood.

20     Q     All right.  Looks like there's some changes

21           in the athletic director duties too, correct,

22           right?

23     A     No, not from --

24     Q     No?
```

```
 1    A        -- from general expectations of athletic

 2             director.

 3    Q        So I'm looking at 5A, it says, you know,

 4             taking a load off of our coaches.  And then

 5             you've got set up and tear down; do you see

 6             that?

 7    A        Correct.

 8    Q        Is there anything different about set up and

 9             tear down than what Mr. Kirkendall had been

10             doing prior to January?

11    A        This was starting off the first indoor

12             sporting events of -- so this was my

13             expectation of what, you know, what -- going

14             into indoor athletic events.

15    Q        But is your expectation that he would be

16             exclusively responsible for set up and tear

17             down; that he would just do all of it?

18    A        Oh, no.  I mean, custodians -- you could get

19             the custodians to help as well.

20    Q        Custodians to help.  Anything else?

21    A        I mean, no.

22    Q        And when would set up and tear down be

23             occurring?  What time of day, if you know?

24    A        I mean, set up would probably be two to three
```

```
 1                    hours before the first game and then tear

 2                    down immediately after.

 3      Q             And when would the first game start?

 4      A             Depended on, you know, if you had a JV, you

 5                    know, or a freshman game, you know, 4:30 to

 6                    5:00 at the earliest, 6:00 if you had a

 7                    double header.

 8      Q             And then when would tear down be?

 9      A             Immediately after.  Oh, time-wise?

10      Q             Yeah.

11      A             If it's a varsity game, 9:00, 9:30.

12      Q             Okay.  So you deny that you were requiring

13                    him to come in at 7:30.  You acknowledge that

14                    you were expecting him to be there doing tear

15                    down at 9:00, 9:30?

16      A             Correct.  Knowing the -- the nature of the

17                    athletic duties -- athletic director duties

18                    that you could be there till 9:30, 10:00,

19                    that's the reason we -- the expectation was

20                    AD didn't have to be there until right before

21                    fourth period or RAP, 10:30.

22      Q             If you had required him to come in at 7:30 do

23                    you think that would be a potential change

24                    that would be violative of the FMLA?
```

```
 1    MS. AMLUNG:            OBJECT to form, but answer if you
 2                          have an opinion.
 3    A          It's not something I would do.
 4    Q          Right.  But if you did, would that be a
 5               change that -- I mean, I guess what I'm
 6               trying to ask, my understanding of Mr. Rigg's
 7               testimony was essentially, look, we can make
 8               any change we want.  I'm just giving you my
 9               understanding.
10    A          Uh-huh (AFFIRMATIVE).
11    Q          And it would be acceptable because of the
12               contracts that we have.  I mean -- and I'll
13               -- I'll just ask again.  I mean, is that sort
14               of your understanding, that really with these
15               -- with his teacher contract and this AD
16               contract -- I mean, his -- his AD duties, it
17               seems to me, there's a lot of duties late in
18               the evening, correct?
19    A          Correct.
20    Q          And if -- but the teaching duties can start
21               really early -- early in the morning and then
22               all of a sudden you've got 15, 16 hour days
23               potentially.  In your mind, is that all
24               permissible -- permissible under the
```

```
 1                contracts?

 2    A           It -- it is because the three other ADs in

 3                our district do it.  My wife is an AD in the

 4                middle school, and that's exactly what she

 5                does.  She's there at 7:30 every morning and

 6                sometimes there till 9:30 at night.

 7    Q           Okay.  This last bullet point on this same

 8                page where it says, I expect you to be at

 9                school every day to fulfill your teaching

10                duties and athletic supervisory duties.  If

11                you cannot fulfill this, then you would have

12                to use some sort of absence day; do you see

13                that?

14    A           Yes.

15    Q           And why did you write that?

16    A           It became clear that I just needed to be very

17                clear with my expectations, so that way we

18                didn't have a -- a breakdown in

19                communication.

20    Q           And how did it become clear that you needed

21                to do that?

22    A           Just with the idea when he had sent that

23                previous email about not knowing if he could

24                be on -- you know, he said in an email about
```

| | | |
|---|---|---|
| 1 | | it not being conclusive.  So I just realized |
| 2 | | that I needed to be very specific in order |
| 3 | | to -- in my email communication. |
| 4 | Q | And then did you have some in-person meetings |
| 5 | | about these expectations? |
| 6 | A | So this happened, I believe, in -- like right |
| 7 | | before we went to winter break.  And then we |
| 8 | | did meet when we came -- when we returned in |
| 9 | | January. |
| 10 | Q | I'm going to hand you Exhibit 24 -- |
| 11 | A | Okay. |
| 12 | Q | -- of Mr. Kirkendall's deposition.  Please |
| 13 | | flip through that, and then I'm going to ask |
| 14 | | you some questions about that. |
| 15 | | (WITNESS REVIEWS DOCUMENT) |
| 16 | A | Okay. |
| 17 | Q | This appears to be an email from |
| 18 | | Mr. Kirkendall on January 5, 2021; do you see |
| 19 | | that? |
| 20 | A | Yes, sir. |
| 21 | Q | And it's directed at you.  I'm just going to |
| 22 | | go through some of the things he says here. |
| 23 | | So he writes about midway through the page, |
| 24 | | when I was hired it was understood that I |

1        would have one class relieving Mr. Jack Carr

2        during an ISS.  And then the only thing that

3        superseded that was conflicting AD duties.

4        Do you see that?

5   A    Yes, sir.

6   Q    Do you know whether that was the

7        understanding?  Do you know whether that

8        sentence is accurate?

9   A    That would be between he and Mr. Turner, who

10       -- who hired him.  But he did have a fourth

11       period lunch duty.  He -- he -- he manned the

12       door.

13   Q    Okay.  And then he -- then he says, last

14       year, this class was third period.  This year

15       it was agreed to switch to sixth.  And then

16       that would be under your -- your purview,

17       correct?

18   A    Correct, because -- because he states later

19       in the email, the agreement was, you know, he

20       needed to drop his kids off at school, so we

21       moved that duty to sixth period to

22       accommodate his schedule.

23   Q    Okay.  And that was an agreement that you and

24       he came to?

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | And then he says, don't understand the reason |
| 3 | | for adding additional classes when the |
| 4 | | athletic director responsibilities remain the |
| 5 | | same; do you see that? |
| 6 | A | I see that. |
| 7 | Q | And did you -- did you discuss that with him? |
| 8 | | Did you have a response to that? |
| 9 | A | Well, it -- it was -- it was in the other |
| 10 | | emails.  We had a tremendous amount of |
| 11 | | failing seniors. |
| 12 | Q | Okay. |
| 13 | A | I was covering classes almost every single |
| 14 | | day.  I was substitute teaching a class, also |
| 15 | | doing my principal job. |
| 16 | Q | Okay.  All right.  Moving down to the bottom, |
| 17 | | he talks about finding out a girls' soccer |
| 18 | | coach was hired, games being changed, and |
| 19 | | conversation around holding back grade |
| 20 | | checks.  Can you give me your reaction to |
| 21 | | each of those items? |
| 22 | A | Yes.  So the first one was -- I was not -- I |
| 23 | | was -- you know, that was during the non- |
| 24 | | contact when I wasn't supposed to be in |

| 1 | | contact with him. |
|---|---|---|
| 2 | Q | Uh-huh (AFFIRMATIVE). |
| 3 | A | The -- I'm not -- I'm not aware of the second |
| 4 | | one.  If there was anything about the |
| 5 | | coaches, you know, seeking me would have been |
| 6 | | in response to one of the items that he talks |
| 7 | | about before about not getting a response. |
| 8 | | And then I can't -- I can't recall the third. |
| 9 | | I do know that grade reports were a topic of |
| 10 | | conversation when I was acting athletic |
| 11 | | director and, you know, Mr. Erickson was |
| 12 | | helping just, you know, at the state level |
| 13 | | just because students were in and out of the |
| 14 | | building that, you know, the state had |
| 15 | | conversations on what that actually looks |
| 16 | | like. |
| 17 | Q | Okay.  That one, yeah, I need some |
| 18 | | explanation.  What does that mean, holding |
| 19 | | back grade checks? |
| 20 | A | I'm not sure. |
| 21 | Q | What's your understanding of what this is |
| 22 | | about, let's put it that way? |
| 23 | A | I believe it would be about the week we came |
| 24 | | back in January of not doing grade checks |

1              that week.

2    Q        Why not?

3    A        We still had two weeks left in the semester

4              at that point.

5    Q        Okay.

6    A        That's why none of his duties started until

7              the 19th.  So for a litany of reasons, just

8              the idea of the shear number of students that

9              were failing and falling behind.

10   Q        Okay.  That's what that's about.  When Mr.

11             Kirkendall returned did you take steps to

12             inform him of some of the things that he

13             missed, like the hiring of the coach; like,

14             you know, returning or revisiting passwords

15             or whatever that he turned over?  Did you do

16             anything like that?

17   A        No.  Any -- when our teachers return they

18             usually set up a meeting with me in order to

19             -- if not, I just feel like they're --

20             they're up to speed and they're ready to

21             rock.

22   Q        Okay.  So what you're telling me is, from

23             your perspective, that if he wanted to figure

24             out what happened in his absence, it was

| | | |
|---|---|---|
| 1 | | really on him to set up a meeting with you to |
| 2 | | discuss? |
| 3 | A | Any other teacher who's gone on leave has set |
| 4 | | up a meeting with me when they return just to |
| 5 | | ask what they've missed. |
| 6 | Q | So going to the second page, he writes that |
| 7 | | essentially set up should not be solely my |
| 8 | | responsibility, gym set up.  And did you |
| 9 | | respond to that? |
| 10 | A | You said, can I respond to that?  I'm sorry. |
| 11 | Q | Did you? |
| 12 | A | I believe there is -- I believe that there is |
| 13 | | a response email to this. |
| 14 | Q | Okay.  What is the response? |
| 15 | A | I never said that he was -- had to be the one |
| 16 | | who physically set up the gym. |
| 17 | Q | Okay. |
| 18 | A | But as -- even being the administrator, if a |
| 19 | | toilet is overflowing and I don't have a |
| 20 | | custodian, I go get a plunger and I plunge |
| 21 | | the toilet. |
| 22 | Q | But you're telling him -- but you're -- |
| 23 | | you're saying that at some point you |
| 24 | | communicated with him that, well, I'm not |

1              saying it's your sole responsibility, but

2              you're responsible for it whether it's

3              janitors and what have you, that's what

4              you're telling me?

5     A        Correct.  Just like I'm responsible for

6              everything, you know, I've told -- like I

7              said, I don't micromanage, but when things

8              aren't set up....

9     Q        He writes in here that his understanding was

10             that he's supposed to be there at 7:30.

11    A        Well, then he also says, even though this

12             wasn't explicitly stated this is how it read,

13             which --

14    Q        When he raised it here did you -- did you

15             ever tell him, no, I'm not expecting you to

16             be here at 7:30?

17    A        I never -- I don't -- again, just knowing the

18             nature of the job, I don't believe I ever

19             said that to him.

20    Q        No, but I just want to make sure I'm clear,

21             did you ever say to him, no, I'm not

22             expecting you to be here at 7:30?

23    A        I'm sure I probably did, but I -- you know,

24             it was two years ago, two-and-a-half years

```
 1              ago.
 2    Q    Do you know if that's in writing anywhere,
 3         no, I'm not expecting you to be here?
 4    A    Well, what is in writing is when I expect
 5         his duties to start, so fourth, fifth, and
 6         sixth period, so that's not -- there's
 7         nothing that states that I needed him here at
 8         7:30.
 9    Q    I'm handing you what was 26 to
10         Mr. Kirkendall's deposition.
11         (WITNESS REVIEWS DOCUMENT)
12    A    Okay.
13    Q    Can you tell me what this is?
14    A    There's a Holmes pass list that Mr.
15         Kirkendall for our -- I'm assuming just our
16         regular season game due to it being January
17         12th, and this was just, as it's stated at
18         the top, you know, he -- he was dealing with
19         bigger things, so I just wanted him to have
20         an email so that way he didn't have to
21         respond to a text while he was dealing with
22         his son.  And I just wanted to kind of let
23         him know some of the things that -- that were
24         not set up for that athletic event.
```

| | | |
|---|---|---|
| 1 | Q | And from your perspective, is that his |
| 2 | | responsibility or somebody else's? |
| 3 | A | Every single thing on there, one -- and I see |
| 4 | | I have two 2s -- every single one of those |
| 5 | | items are, yeah, under the purview of the |
| 6 | | athletic director. |
| 7 | Q | Okay.  And was he -- time frame-wise was -- |
| 8 | | was this supposed to happen prior to his |
| 9 | | son's surgery; is that what you're telling |
| 10 | | me? |
| 11 | A | So number one, number two -- the first number |
| 12 | | two -- |
| 13 | Q | Uh-huh (AFFIRMATIVE). |
| 14 | A | -- those could have been done really as soon |
| 15 | | as -- as soon as the games were scheduled. |
| 16 | | So those could have been done.  The second |
| 17 | | number two, you know, I'm not exactly sure |
| 18 | | the email I sent.  I think -- I believe we |
| 19 | | had an official reach out to us and say that |
| 20 | | he had not received a response from Mr. |
| 21 | | Kirkendall, and so we needed to -- to tell |
| 22 | | them what -- what room they were going to use |
| 23 | | in order -- in order to dress, with the Covid |
| 24 | | restrictions.  So, again, that was an email, |

| 1 | | if I can remember correctly, that was sent to |
| 2 | | him that he had not responded to, that -- so |
| 3 | | all -- all three of those items could and |
| 4 | | should have been done -- you know, it could |
| 5 | | have been done days ahead. |
| 6 | Q | Okay.  You can put that aside.  I'm handing |
| 7 | | you what was Exhibit 27 -- |
| 8 | A | Okay. |
| 9 | Q | -- to Mr. Kirkendall's deposition.  When |
| 10 | | you're ready, I want to ask you some |
| 11 | | questions about that. |
| 12 | | (WITNESS REVIEWS DOCUMENT) |
| 13 | A | Okay. |
| 14 | Q | And what is this document? |
| 15 | A | This is Mr. Kirkendall -- this is an email |
| 16 | | from Mr. Kirkendall. |
| 17 | Q | And it's dated January 15, 2021? |
| 18 | A | Yes, sir. |
| 19 | Q | Okay.  And the second paragraph, he writes, |
| 20 | | since I have been back from leave it seems |
| 21 | | that my work is being scrutinized |
| 22 | | increasingly through text and email.  Do you |
| 23 | | see that? |
| 24 | A | Yes, sir. |

| | | |
|---|---|---|
| 1 | Q | Okay.  And would you agree or disagree with |
| 2 | | that? |
| 3 | A | There was no concerns with any of it.  He |
| 4 | | returned from leave on 12/4, so the whole |
| 5 | | month of December there was no -- there was |
| 6 | | no concerns. |
| 7 | Q | Is the first concern reflected in the email |
| 8 | | we just looked at prior, January 12? |
| 9 | A | That was a concern because those were not |
| 10 | | meeting the expectations that I'd set out in |
| 11 | | one of the previous emails. |
| 12 | Q | But are you saying this is the first concern |
| 13 | | you ever raised with him in writing? |
| 14 | A | In writing, yes. |
| 15 | Q | Is it the only one? |
| 16 | A | There was one referenced here that the first |
| 17 | | soccer game of the season, I walked down on |
| 18 | | the field and the field was not set up |
| 19 | | correctly, so I walked down and while |
| 20 | | Mr. Kirkendall watched, and I -- the trainer |
| 21 | | and myself moved the benches to the |
| 22 | | appropriate cages, and all of those things to |
| 23 | | be approved -- so I did tell him that, you |
| 24 | | know, that I didn't want a repeat of -- |

| | | |
|---|---|---|
| 1 | Q | And when was that? |
| 2 | A | It was the first soccer game of that season, |
| 3 | | so this would have been prior to him going on |
| 4 | | leave. |
| 5 | Q | And you think that's documented in writing |
| 6 | | somewhere? |
| 7 | A | Yeah, there's an email.  It just said -- in |
| 8 | | one of these it said, I don't want a repeat |
| 9 | | of the first soccer game of the season. |
| 10 | Q | Oh, I see.  You can put that aside. |
| 11 | A | Yeah. |
| 12 | Q | Okay.  I hand you what I've marked as Exhibit |
| 13 | | 29.  Is there a text on the back of that |
| 14 | | page? |
| 15 | A | There's not.  I think it was this email. |
| 16 | Q | Oh, yeah, yeah, yeah.  Yeah, that's why, |
| 17 | | okay.  Go ahead, read it. |
| 18 | A | Yeah, I read it. |
| 19 | Q | Okay.  And this is your response to his email |
| 20 | | to you about his concerns; is that what this |
| 21 | | is? |
| 22 | A | Yes, sir. |
| 23 | Q | That were reflected in the last exhibit, |
| 24 | | okay.  You can set that aside.  I'll hand you |

1              what is Exhibit 30 to Mr. Kirkendall's

2              deposition.  Please review that.

3              (WITNESS REVIEWS DOCUMENT)

4    A         Okay.

5    Q         And what is this document?

6    A         Excuse me?

7    Q         What is this document?

8    A         This is an email, a recap of our meeting that

9              we had.

10   Q         On January 19?

11   A         Yes, sir.

12   Q         Okay.  And when you say that you'll be

13             directing all coaches to Mr. Kirkendall,

14             what's that about?

15   A         He had brought up a concern in one of these

16             emails that he felt like coaches were still

17             going to me, just where I had been in an

18             athletic director position.  So that's, you

19             know, I agreed with him that, you know, that

20             that would be something that I would make

21             sure that all coaches know, you know, that my

22             first question in the conversation was -- if

23             a coach came to me I'm just going to say,

24             have you talked to Mr. Kirkendall?  And if

1          the answer was no, then that's where they had

2          to start.

3    Q     Well, you can set that aside.  There's an

4          allegation in this case that you made the

5          statement, Mr. Kirkendall looks like he went

6          to Princeton and I went to Sycamore.  Are you

7          aware of that allegation?

8    A     I'm aware of the allegation from the

9          deposition.

10   Q     Okay.

11   A     That's the first time that I'd ever heard

12         that.

13   Q     Did you say that?

14   A     No, sir.

15   Q     So if Mr. Kirkendall says you said that, you

16         dispute that, correct?

17   A     I dispute that, yes, sir.

18   Q     And then there's an allegation that you said,

19         I want Mr. Kirkendall to be partnered up with

20         his boy, Mr. Pastura.  Are you aware of that

21         allegation?

22   A     And I -- yes.

23   Q     And do you dispute that, that that occurred,

24         that you said --

```
 1    A        As far as like -- I mean, that probably
 2             sounds like something I'd say, as far as boy
 3             meaning friend, his friend, Mr. Pastura.
 4    Q        So you may have said that?
 5    A        Yeah, I -- I could reasonably see myself
 6             saying that.
 7    Q        Okay.  Did you read Mr. Kirkendall's
 8             deposition to get ready for your deposition?
 9    A        Yes.
10    Q        When did you do that?
11    A        When it was provided to me.
12    Q        There's an allegation that Mr. Turner had
13             spoken to Mr. Kirkendall and was describing
14             how he had learned how to talk to black and
15             nonwhite students; are you aware of that
16             allegation?
17    A        I saw that allegation, but I'm not aware of
18             that conversation.
19    Q        The first you heard of that was when you read
20             the deposition?
21    A        Yes, sir.
22    Q        There's a number of allegations.  I'll just
23             go through each of them to get your
24             understanding.  There's one allegation that
```

```
 1              -- there's a lot of people with the name Matt

 2              in this case --

 3   A          Yes.

 4   Q          -- and so I lose track of who was who, okay.

 5              So there's one allegation that a coach --

 6              there was some complaints about a coach,

 7              about him treating -- it was a football

 8              coach, about him treating his black players

 9              differently, and there were some concerns by

10              the parents of racism.  And Mr. Kirkendall

11              was questioned about whether he thought the

12              coach was a racist.  Are you aware of that

13              sequence of events?

14   A          I'm aware of the sequence of events.  I'm not

15              aware of the questioning, but if it was --

16   Q          Were you involved in that?

17   A          If I was, I -- I can't -- I remember the

18              situation.

19   Q          Okay.  What do you remember about the

20              situation?

21   A          What I remember is there was a parent who --

22              who had alleged that her child was not

23              playing, and that racism could be involved.

24   Q          Okay.
```

```
 1    A        Then as the athletic director, that would be

 2             something that an athletic director would

 3             look into, would investigate.  But then after

 4             that conversation, you know, that -- that was

 5             between Mr. Kirkendall, Mr. Turner, and there

 6             may have been another assistant principal,

 7             but I wasn't in the meetings with the parents

 8             and all -- and all those things.

 9    Q        Okay.  When that set of events happened,

10             you're telling me that you were not the

11             principal, and you think the principal was

12             involved with the athletic director and the

13             coach and the parents, but you weren't

14             involved in that?

15    A        Correct, yes, sir.

16    Q        That's what you're telling me?

17    A        Yes, sir.

18    Q        So that's a Mr. Turner question?

19    A        Yes, sir.

20    Q        There was a -- I think a Charity Ehrenberg

21             who wanted to be a coach.  She wanted

22             something, and she approached Mr. Kirkendall

23             in his office, and was pretty aggressive and

24             yelling and that sort of thing, and he asked
```

```
 1              her to leave, and then she -- I'm telling you

 2              my understanding --

 3    A         Yeah.

 4    Q         -- of the events.  And then she went up and

 5              complained to either you or to Mr. Turner.

 6              Is that a Matt Turner question, or is that

 7              you?

 8    A         At that time, I can't remember if I was the

 9              principal.  I -- yeah, I can't -- I might

10              have been the principal.  If I was the

11              principal, it would have come to me, but I --

12              I do remember that situation.  I just can't

13              remember if I was the principal or the

14              assistant principal at that time, and I may

15              have been.

16    Q         Okay.  My understanding is that

17              Mr. Kirkendall's concern is that,

18              essentially, she's the aggressor.  She goes

19              and complains that he's the aggressor, and he

20              has to defend himself.  And his concern was

21              that the assumption was made that he was the

22              aggressor based on race, okay.  Are you aware

23              of that allegation?

24    A         When I read it in the -- you know, when I
```

1                      read it in the deposition.

2        Q            Okay.  What's your reaction?

3        A            From what I remember from the conversation,

4                      you know, Ms. Ehrenberg was definitely in the

5                      wrong, and I know her personality, you know,

6                      and we've had some personnel conversations on

7                      -- on that end.  I don't recall ever going to

8                      Mr. Kirkendall and ever implying any way,

9                      shape, or form that I thought he was in the

10                     wrong in the situation.

11       Q            Okay.  There was a concern raised that Pete

12                     Coleman who, I believe, who was just a member

13                     of the community and maybe he had some level

14                     of involvement.  I've got it here somewhere.

15                     But that he was harassing Mr. Kirkendall.

16                     Are you aware of that situation?

17       A            Not until I read it in the deposition.

18       Q            Okay, reading it in the deposition was the

19                     first time you became aware of that?

20       A            To my -- yeah, to my recollection.

21       Q            Let's go ahead and move on to the discussion

22                     over the change in duties sort of coming to a

23                     head, all right?

24       A            Okay.

| | | |
|---|---|---|
| 1 | Q | I believe, correct me if I'm wrong, that |
| 2 | | we've covered the communications leading up |
| 3 | | to the day in which Mr. Kirkendall was |
| 4 | | suspended? |
| 5 | A | Correct. |
| 6 | Q | Okay. |
| 7 | A | My expectations, yes, sir. |
| 8 | Q | So let's go over that day. |
| 9 | A | Okay. |
| 10 | Q | What is your memory of how the events played |
| 11 | | out on that day -- |
| 12 | A | So -- |
| 13 | Q | -- the day that he was suspended? |
| 14 | A | I think we met that -- I think this was the |
| 15 | | morning that we met, and I had sent the |
| 16 | | email, and I could be incorrect on that, but |
| 17 | | the way that -- the way that that day played |
| 18 | | out was -- because Mr. Pastura was, you know, |
| 19 | | his contact person.  When fourth period |
| 20 | | started, which was his Study Skills, when |
| 21 | | fourth period started, he did not -- Mr. |
| 22 | | Kirkendall did not go to his class. |
| 23 | Q | How did you discover that? |
| 24 | A | I went to his class to, you know, just to |

```
1              make sure that it was covered.

2      Q       Why did you do that?

3      A       Because I was concerned.  And then Mr.

4              Pastura went down to try to talk to Mr. --

5      Q       Let me slow it down a little bit.

6      A       Oh, yes, sir.

7      Q       When did you decide to go down and -- it's

8              important that we get this.

9      A       Yeah.

10     Q       So let's just slow down.

11     A       Uh-huh (AFFIRMATIVE).

12     Q       So when did it occur to you to go down and

13             check fourth period?

14     A       I -- and, again, I -- I could -- Mr. Pastura

15             may have told me that Mr. Kirkendall -- we

16             were concerned that we were going to have a

17             classroom of students without -- because of,

18             you know, Mr. Kirkendall -- like what I put

19             in here, you know, I know it's not what he

20             wanted to hear, but I was concerned that we

21             were going to have an unoccupied class of

22             students.

23     Q       And you had discussed that prior?

24     A       With Mr. Pastura.  Mr. Pastura knew the
```

1          expectation for Mr. Kirkendall, so we had --

2          when you say, we had discussed that prior,

3          who are speaking about?

4   Q     You and Mr. --

5   A     Pastura, yes, sir.

6   Q     Let's not talk over each other --

7   A     Okay.

8   Q     -- in this part, particularly.  So you and

9          Pastura had communicated that you were

10         concerned that fourth period might be

11         uncovered, correct?

12  A     Mr. Pastura, knowing that he was the contact

13         person, was there making sure that

14         Mr. Kirkendall was covering his room.

15  Q     But I'm asking, you and Mr. Pastura had

16         communicated that you were concerned that

17         fourth period wouldn't be covered, correct?

18  A     From what I can remember, yes, sir.

19  Q     And when did you communicate about that, that

20         day or prior?

21  A     It was that day after Mr. Kirkendall and I

22         had met.

23  Q     Okay.  So then somebody goes down to see

24         whether that classroom is covered.  Are you

1              telling me you can't remember whether it was

2              you or Pastura?

3     A      I can't.

4     Q      Then what happened?

5     A      Then Mr. Pastura went down to talk to

6              Mr. Kirkendall.

7     Q      So Mr. Pastura goes down to talk to

8              Mr. Kirkendall before you.  And what are you

9              doing at that point?

10    A      To be honest, I think I was in my office.

11    Q      And who was in the classroom at that point?

12    A      I -- I can't remember, but Mr. Pastura made

13             sure it was covered.

14    Q      So somebody was put in that classroom, and

15             then Mr. Pastura goes down to talk to

16             Mr. Kirkendall --

17    A      Uh-huh (AFFIRMATIVE).

18    Q      -- is that what happened?

19    A      Yes, sir.

20    Q      Another --

21    A      I mean, just probably any adult, yes.

22    Q      Okay.  Do you know who it was?

23    A      I do not.

24    Q      Okay.  Pastura goes down to talk to Mr.

| | | |
|---|---|---|
| 1 | | Kirkendall? |
| 2 | A | Correct. |
| 3 | Q | You're not there for that? |
| 4 | A | No, sir. |
| 5 | Q | But then Mr. Pastura comes back and relays to |
| 6 | | you what was said? |
| 7 | A | Correct. |
| 8 | Q | And just Mr. Pastura comes back, nobody else, |
| 9 | | correct? |
| 10 | A | From my recollection, yes, sir. |
| 11 | Q | And Mr. Pastura says what? |
| 12 | A | He says that -- something to the effect that |
| 13 | | Mr. Kirkendall said he is not going.  It's |
| 14 | | not in his -- he doesn't agree to the |
| 15 | | changes, and I can't remember the rest of the |
| 16 | | conversation. |
| 17 | Q | And did he mention anything about FMLA? |
| 18 | A | I don't -- I don't remember if Mr. Pastura |
| 19 | | did to me. |
| 20 | Q | And then anything else you can remember about |
| 21 | | that communication? |
| 22 | A | No, sir. |
| 23 | Q | Then what happened? |
| 24 | A | Then I went down -- I went down to Mr. |

```
1              Kirkendall's office.

2    Q         Now, it's just you and Mr. Kirkendall?

3    A         Yes.

4    Q         Where is Pastura at this point?

5    A         I believe Mr. Pastura went back to the

6              classroom to --

7    Q         To that fourth period?

8    A         -- to get -- to get those three students,

9              correct.

10   Q         To get them or to just monitor them?

11   A         I -- I can't remember.  He went to --

12             because, again, that's the micromanaging.  He

13             was going to take those three students.

14   Q         Got it.  So Pastura goes to the classroom.

15             You go down to Mr. Kirkendall's office, and

16             give me everything you can remember about

17             that.

18   A         I mean, from what I can remember is, you

19             know, I said, hey, I need you to go down

20             there.  He said, I'm not doing it.  He says

21             -- I -- I do think at that point he said

22             something about, you know, I didn't agree to

23             this with my return to FMLA, and I think that

24             was in the letter that I sent to the board.
```

1       And -- and I said -- I really just tried to

2       level with him and said, come on, like we're

3       not -- we're talking about a couple of

4       students.  You always had a lunch duty at

5       this time.  We're talking three students,

6       student athletes, like, go down.  And he

7       said, no.  And I had told him in our previous

8       email or in our meeting -- and I didn't

9       threaten him, I said -- and I -- and I put --

10      documented it in here, you know, just the

11      idea of -- I explained the process if he did

12      not fulfill his teaching duties.  So I had

13      told him in our meeting, I said, I am not

14      threatening you.  If you do not fulfill those

15      duties, these are the next steps.  That's not

16      a threat.  I just want -- I want to be -- in

17      any communication I have with staff, parent,

18      I want to be completely clear with what the

19      consequence of your action is.  And at that

20      point, he said, no, I'm not going.  And I

21      said, well, I need your keys and your badge

22      and, you know, you're suspended with pay

23      until -- pending a hearing from the board.

24  Q       And did he raise FMLA in connection with --

```
 1    A       I believe he said something about FMLA.

 2    Q       Okay.  And was there a point in time if he

 3            was going to be suspended that he should have

 4            had a rep made available to him,

 5            representation?

 6    A       That's always -- that's up to the employee,

 7            as far as I'm con -- as far as -- you know,

 8            if we have -- if we have -- any other

 9            employee conversation that I've had -- but at

10            that point, it was just insubordination at

11            the moment, and I immediately went and -- and

12            I did go talk to our BCA rep, our -- our

13            union rep, just to tell that person what

14            happened.

15    Q       Prior to or after telling Mr. Kirkendall that

16            he was suspended?

17    A       After.

18    Q       Okay.  Would it have been your responsibility

19            to go talk to that rep before telling Mr.

20            Kirkendall he was suspended?

21    A       Not that I'm aware of.

22    Q       Okay.

23    A       We always try to -- if we have disciplinary,

24            you know, conversations, we always tell the
```

1          employee, usually, that -- that they have the

2          right for representation.  But my -- what

3          I've always been -- the -- the -- employee

4          has the right, but I don't believe I

5          necessarily have to facilitate that part of

6          the conversation.

7    Q     So what you're saying is -- well, at what

8          point in that meeting -- because I think what

9          you're telling me --

10   MR. ALLISON:      Are we doing okay?

11   COURT REPORTER:    Yes, you're fine.

12   Q     Okay.  I think what you're telling me is that

13         it was Mr. Kirkendall's job to say, I need a

14         rep here?

15   A     That was what -- under -- yes, correct.

16   Q     And how would he know to do that until after

17         you told him he was suspended?

18   A     I had already told him what was going -- the

19         process.  I said, if you do -- do not do

20         this, I'm going to come down wherever you're

21         at and tell you you are suspended without

22         (VERBATIM) pay.  So in my -- in my

23         rationalization, if Mr. Kirkendall knew that

24         this was the action that he was going to

```
1              take, he would have contacted his rep.  Mr.

2              Shafer is going to come down here fourth

3              period, and we're going to go from there.

4    Q        Okay.  So you're telling me that your

5              expectation is that -- you're saying, hey, it

6              should have been clear enough to him that

7              when fourth period starts, and he's not in

8              there, he should know that I'm coming down to

9              send him home?

10   A        It was crystal clear.

11   Q        Okay, that's what you're telling me.  I

12             understand your testimony, okay.  And you

13             read his deposition, so you read his

14             testimony where -- where he said he didn't

15             refuse to go down to the classroom, but he

16             raised his FMLA and didn't feel like that was

17             addressed.  Did you read that part of the

18             testimony?

19   A        I did.

20   Q        Yeah.

21   A        We had been talking about FMLA this entire

22             time, so we had already -- that part of the

23             conversation had already been null and void.

24             And we talked FMLA since -- well, really,
```

```
 1                    since he returned on 12/4.  So the concern

 2                    had already been address -- been brought up

 3                    multiple times.

 4     Q              In terms of whether or not these

 5                    responsibilities were violative of the FMLA,

 6                    what sources, whether it's policies,

 7                    whatever, people, had you consulted to figure

 8                    out -- to determine that it wasn't a

 9                    violation before suspending him?

10     MS. AMLUNG:          I'm going to OBJECT, just on the

11                          basis if you had any

12                          conversations with our office --

13     MR. ALLISON:         Oh, yeah.

14     MS. AMLUNG:          -- that's not --

15     A              Yeah, I wouldn't have -- yeah.  So can you

16                    restate -- restate that?

17     Q              Yeah.  Outside of any conversations you would

18                    have had with a lawyer seeking advice on

19                    whether or not this was a violation of the

20                    FMLA, outside of that --

21     A              Uh-huh (AFFIRMATIVE).

22     Q              -- what sources had you --

23     A              It would have been HR.

24     Q              Okay.
```

```
1    A         It would have been --

2    Q         Did you have those conversations with HR?

3    A         Yes, because I did want to make sure that I

4              wasn't violating FMLA.

5    Q         Who'd you talk to?

6    A         I believe Matt Rigg and probably Eric Ball,

7              as well.

8    Q         Okay.  And what did -- what did you discuss

9              with them?

10   A         Just that, if -- you know, just making sure

11             that I was not violating his rights under

12             FMLA.

13   Q         By having him do these classes?

14   A         Correct.

15   Q         Anything else?

16   A         That's it.

17   Q         So he's suspended?

18   A         Uh-huh (AFFIRMATIVE).

19   Q         He leaves the building?

20   A         Yes, sir.

21   Q         Then what happens?

22   A         I write a letter, per -- per our, you know,

23             our procedures at that time.  I wrote a

24             letter, you know, to the superintendent's
```

```
 1              office stating what happened.
 2   Q          Okay.
 3   A          Then they set up a meeting.
 4   Q          So you wrote a letter, which is probably in
 5              here.
 6   MS. AMLUNG:         Before we get into that, can we
 7                       take a quick break?  I need to grab
 8                       a laptop charger.
 9   MR. ALLISON:        Yeah.
10   MS. AMLUNG:         Thanks.
11              (A BREAK IS TAKEN)
12   Q          All right.  I'm going to hand you what was
13              marked Exhibit 31 to Mr. Kirkendall's
14              deposition and please review it, and I just
15              want you to identify it.
16              (WITNESS REVIEWS DOCUMENT)
17   A          Okay.
18   Q          And what's this document?
19   A          This is the document that I sent to
20              Mr. McArtor, the deputy superintendent of
21              Boone County Schools, my statement of why I
22              had suspended Mr. Kirkendall.
23   Q          All right.  This is the document you were
24              just talking about prior to taking a break,
```

```
 1              right?

 2    A         Correct.  This is the document that I --

 3              yeah.

 4    Q         I'm going to hand you what was marked Exhibit

 5              32.  Just please review that and then I'll

 6              have you identify that too, oh, here.

 7              (WITNESS REVIEWS DOCUMENT)

 8    A         Okay.

 9    Q         And what's this document?

10    A         This is Mr. Ryan's statement of the meeting

11              that Mr. Kirkendall and I had that was sent

12              to the board.

13    Q         And he was present for that, right?

14    A         He was present, yes, sir.

15    Q         Mr. Ryan was present, okay.  So after

16              Mr. Kirkendall was suspended, then you write

17              a letter to Eric McArtor, and then there's a

18              hearing at some point, correct?

19    A         Yes, sir.

20    Q         And do you know what -- was Matt Rigg tasked

21              with anything at that point, to your

22              knowledge?

23    A         I believe that he just represents the HR side

24              of things when it comes to -- to those
```

| | | |
|---|---|---|
| 1 | | hearings. |
| 2 | Q | Okay.  So do you know what, if anything, he |
| 3 | | did? |
| 4 | A | Like during the hearing or to prep for the |
| 5 | | hearing? |
| 6 | Q | Either? |
| 7 | A | I -- to prep for the meeting, I -- again, |
| 8 | | that -- that's a Mr. Rigg thing. |
| 9 | Q | What about at the hearing? |
| 10 | A | At the hearing he just provided the |
| 11 | | documentation of, you know, what constitutes |
| 12 | | FMLA.  What consti -- you know, just the HR |
| 13 | | side of the FMLA, the -- the -- the total |
| 14 | | argument. |
| 15 | Q | Okay.  Did you see his report or whatever it |
| 16 | | is? |
| 17 | A | I didn't see, no. |
| 18 | Q | You did not -- |
| 19 | A | I don't -- |
| 20 | Q | -- prior to the hearing? |
| 21 | A | I don't -- I don't -- no, prior to the |
| 22 | | hearing I didn't see any of this, any of |
| 23 | | those things. |
| 24 | Q | Okay.  Walk me through what happened at the |

```
 1                    hearing.
 2      A            I -- to be honest, I don't remember.  I
 3                    believe Mr. McArtor called the hearing.  I
 4                    explained the reason that we were here,
 5                    really just, you know, kind of recounting
 6                    this.  And then at that time, I can't
 7                    remember of Mr. Kirkendall had the
 8                    opportunity to respond or if that -- you
 9                    know, Mr. Rigg gave his accounting.  I do
10                    believe at some point Mr. Kirkendall and Mr.
11                    LeCates did walk outside.  At the end of that
12                    meeting, I believe that Mr. McArtor even
13                    said, are you agreeing to go back to do these
14                    duties and, you know, we say -- and
15                    Mr. Kirkendall said, no, I do not.  And then
16                    that's when -- so some recollection of -- of
17                    the framework of -- of how that conversation
18                    went.
19      Q            And then is that how the meeting ended?
20      A            I -- I -- I would say when Mr. Kirkendall
21                    said, no, that -- that meeting -- I don't --
22                    to be honest, I don't know.  Mr. McArtor may
23                    have ended the meeting by saying, well, I
24                    need to make my recommendation to Mr. Turner,
```

```
 1                    and then go from there.

 2     Q       Do you know if Mr. Rigg had a recommendation

 3             other than termination that he presented at

 4             any point in time?

 5     A       Not to me, no, sir.

 6     Q       Do you know of any instruction to

 7             Mr. Kirkendall not to talk to students

 8             because coaches might be offended?

 9     A       I do not.

10     Q       Does that seem like an unusual instruction to

11             give to an athletic director?  Is that an

12             instruction you would give to an athletic

13             director?

14     A       Can you repeat what it was?

15     Q       Don't talk to students, coaches might be

16             offended.

17     A       That's not something I would say.

18     Q       Okay.  The coach, I think his name was Mike

19             Engler, who was accused of being racist.  Do

20             you know if there were any consequences for

21             him?

22     A       I wasn't the principal at that time.  I do

23             not know.

24     Q       Pete Coleman, I referenced him earlier.  He
```

1          was a basketball announcer and a community

2          member.  You told me earlier you weren't

3          aware of any allegations about him harassing

4          Mr. Kirkendall?

5     A    No, not that I remember.

6     Q    Until reading the depo?

7     A    Correct.

8     Q    Okay.  Is Jon Erickson still employed at -- I

9          can't remember if I talked about this with

10         you or Mr. Rigg at this point.  Is he still

11         employed?

12    A    As a teacher, yes, sir.

13    Q    Okay.  And then who was hired at the end of

14         the school year when Mr. Kirkendall was let

15         go?

16    A    Keaton Belcher.

17    Q    Is he still employed?

18    A    With Boone County Schools, yes.

19    Q    Were either of them ever disciplined or

20         terminated in connection with having some

21         sort of an inappropriate relationship?

22    A    No; no, sir.

23    Q    Either of them resign any duties in

24         connection with an affair at school?

```
1    A        Mr. Belcher resigned his duties.

2    Q        What duties did he --

3    A        He resigned his athletic director and head

4             basketball coaching duties.

5    Q        In connection with that?

6    A        He had a personal matter.  There was nothing

7             at school.

8    Q        Okay.  Do you know the circumstances around

9             that?

10   A        About what?  I'm sorry.

11   Q        Was he in trouble over some sort of an

12            inappropriate relationship and that's why he

13            resigned?

14   A        Trouble as far as?

15   Q        With the school?

16   A        Not with the school, no, sir.

17   Q        What's your understanding as to why he

18            resigned?

19   A        He and his wife were going through some

20            marital issues.

21   Q        It was his choice; it had nothing to do with

22            something he did inappropriate at school; is

23            that what you're telling me?

24   A        It was his choice, yes, sir.
```

```
 1    MR. ALLISON:          Why don't we take a few minute

 2                          break, so I can confer with Mr.

 3                          Kirkendall and see what else he

 4                          might want me to ask.

 5            (A BREAK IS TAKEN)

 6    MS. AMLUNG:           Signature.

 7

 8                          _____

 9                          MATT SHAFER

10                          * * * * * * * *

11          THEREUPON, the taking of the deposition of

12    MATT SHAFER was concluded at 4:10 P.M.

13                          * * * * * * * *

14
```

STATE OF KENTUCKY )

                       )

COUNTY OF FAYETTE )


        I, LISA E. HOINKE, the undersigned Notary Public, in and for the State of Kentucky at Large, certify that MATT SHAFER, the aforesaid deponent, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the case Mario Kirkendall, Plaintiff, vs. Boone County Board of Education, Defendant, No. 2:22-CV-00026-DLB-CJS, now pending in the United States District Court for the Eastern District of Kentucky at Covington.

        That the foregoing deposition was taken down in stenotype by me and the foregoing is a true record of the testimony given by said witness.

        That the Plaintiff was represented by his counsel, Hon. Jon B. Allison at the taking of said deposition; that the Defendant was represented by its counsel, Hon. Olivia Amlung; that Mr. Mario Kirkendall, Plaintiff, was also present; that there were no other appearances.

That said deposition was taken on behalf of the Plaintiff pursuant to Notice and pursuant to the Federal Rules of Civil Procedure for the District Courts of the United States.

I do further certify that I am a disinterested person in the cause of action heretofore stated; not employed by any of the parties; and to the best of my knowledge, not related to any of the parties.

My commission expires:  June 18, 2027.

IN TESTIMONY WHEREOF, I have hereunder set my hand and seal of office on this the 31st day of August, 2023.


/s/ Lisa E. Hoinke
LISA E. HOINKE
NOTARY PUBLIC, ID KYNP72022
STATE-AT-LARGE, KENTUCKY