**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**
**CASE NO. 2:22-CV-00026-DLB-CJS**

**MARIO KIRKENDALL**                                                                    **PLAINTIFF**

**v.**

**BOONE COUNTY BOARD OF EDUCATION**                                        **DEFENDANT**

---

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Defendant, Boone County Board of Education, by and through counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully moves the Court to enter summary judgment in their favor since the material facts are undisputed and Defendant is entitled to judgment as a matter of law. A Memorandum in Support and proposed Order are attached.

Respectfully submitted,

*/s/ Olivia F. Amlung*
Mary Ann Stewart, Esq. (#82754)
Olivia F. Amlung, Esq. (#97449)
Adams Law, PLLC
40 West Pike Street
Covington, KY 41011
859.394.6200 | 859.392.7200 – Fax
mstewart@adamsattorneys.com
oamlung@adamsattorneys.com

*Attorneys for Defendant, Boone County Board of Education*

**CERTIFICATE OF SERVICE**

This is to certify that on this **4th** day of December, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Olivia F. Amlung*
Olivia F. Amlung, Esq.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**
**CASE NO. 2:22-CV-00026-DLB-CJS**

**MARIO KIRKENDALL**                                                    **PLAINTIFF**

**v.**

**BOONE COUNTY BOARD OF EDUCATION**                                     **DEFENDANT**

---

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

The Defendant, Boone County Board of Education, by and through counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, states the following in support of its Motion for Summary Judgment:

**I.     INTRODUCTION**

The COVID-19 pandemic created chaos across the world, but few sectors here in the U.S. were more affected than schools. Educational institutions were tasked with developing innovative ways to educate students across platforms on a scale that had never been done before, all while complying with ever-changing restrictions on how they could accomplish such a feat. Ryle High School was no exception. Countless students were failing due to the difficulty of adapting to the virtual classroom, and schools struggled to keep students engaged. Thus, schools across the District implemented an "all hands on deck" approach to education. At Ryle, every employee – from the librarian to the athletic director –was asked to help in their efforts to reach struggling students.

Plaintiff, Mario Kirkendall, was the Athletic Director at Ryle during the height of the COVID-19 Pandemic. At every turn, every request, Kirkendall sat back and refused to help his colleagues and the students of his school. Not only did Kirkendall scoff at the idea of

taking on more responsibilities, but he also actively refused to undertake the job that he was hired to do.

Indeed, in the chaotic wake of the Pandemic, and even though athletics had been indefinitely suspended, Kirkendall refused to help his colleagues navigate through the changes to education. Ironically, despite serving as the director of team sports, Kirkendall is the opposite of a team player. And when asked, he even admitted to being a team player only "some days." (Kirkendall Tr. 275:14-19). After he was ultimately terminated for insubordination after repeatedly refusing to supervise a class at the direction of the Principal, Kirkendall filed this lawsuit under the guise of an FMLA and racial discrimination case in a transparent attempt to force the District to give him a job with no responsibilities.

With the close of discovery, the undisputed evidence tells the narrative of a man who simply did not want to do his job. The rest of Ryle High School's administration jumped at the call to action to promote student success during one of the hardest times in our nation's recent history, but Kirkendall maintained an egotistical and recalcitrant attitude toward completing tasks he erroneously believed were not his responsibility. Indeed, there is not a shred of evidence that suggests Kirkendall was terminated for nefarious reasons. As such, for the reasons set forth below, Kirkendall's claims fail as a matter of law and judgment should be entered in the District's favor.

## II.     STATEMENT OF FACTS

Mario Kirkendall was the Athletic Director for Ryle High School in the Boone County School District from August 2019 to his termination in January 2021. As a standard practice in the District, Kirkendall was hired as a teacher (reflected by his teaching contract and teaching certificate), and he held an "Extra Duty Assignment" contract for Athletic Director.

4

(Kirkendall Tr. 213:3-23; Ex.s 9-10). In the District, every certified staff employee is "a teacher first and foremost" (Ex. 30), and any extra assignment – such as principal, vice principal, or athletic director – is memorialized by a separate contract. Essentially, even if a person is hired by the District to fill a position that is primarily non-teaching, they are first hired as a teacher if they have a teaching certificate. (Kirkendall Tr. 157:14-25).  During Kirkendall's first year as Athletic Director, he oversaw athletics at the school, administered an in-school suspension class and study hall, and monitored the lunchroom. (*Id.* at 52:11-20). But in March 2020, the world turned upside down and Kirkendall was essentially paid to sit and wait while athletics were completely shut down. (*Id.* at 164:5-18).

In summer 2020, the District sent out an email advising employees about their options for leave in light of the chaos of the pandemic and Congress' recent passage of the Family First Coronavirus Response Act. (Ex. 11). As a part of the Act, Congress passed the Emergency Family and Medical Leave Expansion Act ("EFMLEA") and the Emergency Paid Sick Leave Act ("EPSLA"). In relevant part, EMFLEA required that certain employers provide up to 10 weeks of paid, and 2 weeks unpaid, emergency family and medical leave to eligible employees if the employee is caring for his or her son or daughter whose school or place of care is closed or whose childcare provider is unavailable for reasons related to COVID-19. (Paid Leave Under the Families First Coronavirus Response Act, 85 Fed. Reg. 19326 (Apr. 6, 2020)). In a similar fashion, the EPSLA allowed an employee up to 80 hours of paid sick leave if they are caring for their child whose school has been closed. (*Id.*)

When Kirkendall learned that his children's school was closing due to the Pandemic, the District approved Kirkendall to begin his leave on an intermittent basis on September 21, 2020. (Kirkendall Tr. 92:3-5; Ex. 18). His leave began on an intermittent basis for around

5

two weeks, to allow him to assist in the transition of handing over his duties to the interim Athletic Director. (*Id.* at 90:12-16).

Kirkendall's intermittent leave ended after two weeks when it changed to consecutive leave, meaning that he would be unavailable full-time. After he failed to notify Principal Shafer of his change in leave status, Principal Shafer occasionally texted Kirkendall asking for him to answer questions related to his Athletic Director position. (*Id.* at 95:12-23, Shafer Tr. 35:4-24). Kirkendall reached out to the District's Human Resources Assistant Director, Eric Ball, who assured Kirkendall that he was not expected to respond to this communication while he was on full-time leave and instructed him to tell Principal Shafer that he was on full-time leave. (Kirkendall Tr. 104:9-105:18; Ex. 16). Kirkendall relayed the message to Principal Shafer, and the communications to Kirkendall ceased until he returned from leave. (Kirkendall Tr. 182:21-183:4; Shafer Tr. 35:9-12). Kirkendall returned from leave on December 4, 2020. (Kirkendall Tr. 111:18-20).

Because of the COVID-19 Pandemic, the landscape of Ryle High School that Kirkendall returned to was drastically different from when he left. On top of the general struggles that came with the school's functioning during the Pandemic, Ryle High School was in a state of crisis with the number of students that were failing or falling behind academically. There were close to 175 seniors whose ability to graduate in 2021 was in jeopardy. (Shafer Tr. 58:18-59:2). The Administration began to address this dilemma by creating teams of staff members that would communicate with the failing students and their families to discover if there were any ways that the school could support these students, both academically and personally to keep them on track. (*Id.* at 59:2-10, 64:13-65:7; Ex. 22). Getting these students

6

engaged and up-to-speed while being remote required an all-hands-on-deck approach from the entire Ryle High School team. (Kirkendall Tr. at 114:14-22).

The teams that were divided up to call the failing students consisted of school employees that did not have classroom assignments like assistant principals, counselors, front desk staff, library staff, and other administrators, including Kirkendall who was the only school employee who did not want to contribute. (Shafer Tr. 60:5-62:21). Despite expressing that he hopes to be a school principal in the future, Kirkendall stated that the was uncomfortable with the task of reaching out to parents and students he had not met before and that he felt it was outside of his job description. (Kirkendall Tr. 156:1-15) Kirkendall also felt that administering a Study Skills class of three students for fourth through sixth periods also went beyond the confines of his teaching contract with the District because it would be a more "hands-on" role. (*Id.* at 193:2-194:11). Kirkendall was informed before Winter Break 2020 that he was tasked with "teaching" these classes starting in 2021 where his main duty would be to "help students with organization and keep them on track in Edgenuity." (*Id.* at 191:18-192:2; Ex. 23). Essentially, Kirkendall would be watching the students do their work that was assigned to them by their classroom teachers, and he could even bring the students into his office to monitor them while he worked. (Kirkendall Tr. 262:15-18).

Since he had just returned from leave, Kirkendall believed that being assigned the Study Skills classes constituted a substantive change in his duties, in violation of the FMLA. (*Id.* at 212:8-16). When he expressed that he did not want to teach the classes, Principal Shafer responded that he was hired as a teacher first and would have to supervise the classes pursuant to his teaching contract with the District. (Ex. 30).

7

When the day came for Kirkendall to administer the Study Skills class on January 19, 2021, Kirkendall refused to go to the classroom. (Shafer Tr. 108:12-16). When Principal Shafer was informed of this, he came to Kirkendall's office and asked again if Kirkendall would go to the classroom. (*Id.* at 109:18-110:20; Kirkendall Tr. 273:22-274:25). Kirkendall informed Principal Shafer that he had an issue with the duty based on taking FMLA leave, so Shafer informed Kirkendall that he was suspended with pay until a hearing with the District disciplinary office occurred. *Id.* Kirkendall inquired from the president of the teacher's union if a claim contesting his discipline would have merit, and the President agreed with Principal Shafer's position. (Kirkendall Tr. 284:4-285:18). The President stated that, "Regardless of your [Athletic Director] Position, you are still a teacher first and can be assigned to other duties. The claim of insubordination will stand from the district standpoint." (*Id.*; Ex. 33). She also informed Kirkendall that his employer had the right to change his schedule without his consent because the teaching contract does not state specific job duties. (*Id.* at 286:6-17; Ex. 33).

At Kirkendall's disciplinary hearing where he was represented by an advocate from the teacher's union, the District generously offered to merely reprimand Kirkendall if he agreed to teach the Study Skills classes. (*Id.* at 294:23-295:4). Kirkendall stubbornly refused to accept the role, and he was terminated shortly after the disciplinary hearing. (*Id.* at 294:5-22). As of the date of his deposition in April 2023, Kirkendall has not been employed since he was terminated in January 2021. (*Id.* at 18:8-12). He blames this on the fact that he was terminated by the District, which has made him unemployable, yet he refuses to acknowledge that he has never held a job for more than one to two years in his entire career and lacks a teaching certificate in Ohio. (*Id.* at 257:25-258:6, 338:12-339:7).

After the EEOC issued a Right to Sue Letter, Kirkendall filed suit against the District, asserting six causes of action under both federal and state law against the District. Kirkendall asserts claims for retaliation and interference in violation of the FMLA (Count I), race discrimination in violation of Title VII and the Kentucky Civil Rights Act (Counts II and III), retaliation in violation of Title VII and the KCRA (Counts IV and V), and breach of contract under Kentucky law (Count VI). As Discovery proved, Kirkendall has not asserted any facts that would lead a reasonable jury to believe that he was subject to FMLA retaliation, race discrimination, or a breach in his contract with the District. The facts clearly show an unrebutted narrative whereby Kirkendall was terminated based solely on his insubordination and refusal to do his job. For the reasons that follow, Kirkendall's claims must therefore be dismissed.

### III.    STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56. No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

The moving party has the initial burden of showing the absence of any genuine issues of material fact. *Brown v. Stacy*, 2018 U.S. Dist. LEXIS 51245 (E.D.Ky. 2018). Once the moving party has met its burden, the nonmoving party must cite to evidence in the record upon

which a reasonable jury could return a verdict in its favor; a mere scintilla of evidence will not do. *Id.* At the summary judgment stage, a court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Id.; Burgess,* 735 F.3d at 471.

**IV.    THE DISTRICT IS ENTITLED TO ENTRY OF SUMMARY JUDGMENT ON KIRKENDALL'S FMLA RETALIATION CLAIM BECAUSE KIRKENDALL CANNOT ESTABLISH THE NECESSARY ELEMENTS.**

In Kirkendall's First Cause of Action, he erroneously claims that he was terminated from his position in retaliation for exercising his rights under the Family Medical Leave Act (FMLA). (R. 1, PageID 3 ¶ 28) Specifically, Kirkendall claims that he was retaliated against when Principal Shafer "changed" his job duties upon his return and via his termination. Yet, with the close of discovery, Kirkendall has produced no evidence whatsoever of this "retaliation." Instead, he relies on his own incorrect notions of his job duties to assert that he suffered a change in his position after returning from leave. In reality, Kirkendall was tasked with duties that were wholly within his contract and job description at all times during his employment.

To establish a *prima facie* case of FMLA retaliation, a plaintiff must show by a preponderance of the evidence that (1) he was engaged in activity protected by the FMLA; (2) the employer knew that he was exercising his rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274 (6th Cir. 2012). Where a plaintiff relies on indirect evidence, the court evaluates the claim under the *McDonnell Douglas* burden-shifting framework. *Id.* (citing *McDonnell Douglas Corp. v. Green,*

10

411 U.S. 792 (1973)). The Sixth Circuit notes that, "while temporal proximity '*may* constitute evidence of a causal connection...the law in this circuit is clear that temporal proximity cannot be the *sole* basis for finding pretext." *Snyder*, 2022 U.S. App. LEXIS 32984 (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007); *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 281 (6th Cir. 2012)). Thus, a plaintiff cannot establish a causal connection based on the length of time between taking leave and suffering an adverse employment action alone.

Kirkendall cannot establish a *prima facie* FMLA retaliation case. As an initial matter, Kirkendall did not take FMLA leave during the 2020-2021 year as alleged, and his claim thus fails.

Regardless, assuming *arguendo* that this Court is inclined to construe Kirkendall's claim as alleging retaliation pursuant to his EFMLEA leave and EPSLA leave, his claim still fails. Retaliation claims pursuant to these laws are analyzed under the same burden-shifting framework as the FMLA. *Crider v. Lute Supply, Inc.*, 2022 U.S. Dist. LEXIS 43375 (E.D. Ky. 2022). With this framework in mind, Kirkendall's claim fails as a matter of law.

A.     **REQUIRING KIRKENDALL TO ARRIVE AT THE START OF SCHOOL, TAKE ON TWO STUDY SKILLS CLASSES, SUPERVISE STUDENTS ON EDGENUITY, AND CALL FAILING STUDENTS ARE NOT ADVERSE EMPLOYMENT ACTIONS**

An adverse action is defined in the Sixth Circuit as "a materially adverse change in the terms of employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004). Such actions include "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 798 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). The employment action must be "more disruptive than a mere

11

Commented [OA1]: In his depo, these actions are ones he claimed were retaliatory (Kirkendall Tr. 319:1-13) – move your arguments about those items here and change the argument from causal connection to the fact that these do not constitute a change in duties to equate to an adverse employment action

inconvenience or alteration of job opportunities." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir. 2000). *De minimis* employment actions are not materially adverse and thus not actionable. *Id.* at 462.

Kirkendall argues that he suffered an adverse employment action when he believed that he was being required to arrive to school at 7:30 A.M.; when he was required to teach two Study Skills classes; when he was required to supervise students on Edgenuity; and when he was required to call failing students to check in on them to see if the school could offer additional support. (Kirkendall Tr. 319:1-3). These were not adverse employment actions, and they were additional duties assigned to Kirkendall within the bounds of his job.

First, requiring Kirkendall to arrive at school when students arrived is not an adverse employment action because this was not a significant change in his employment status. *Burlington Indus.*, 547 U.S. at 761. Arriving at the time that students arrived is a rule that would apply to all teachers and was not used to single out and punish Kirkendall for taking leave. Further, this would be considered a mere inconvenience for Kirkendall rather than a significant change in his duties and would constitute a *de minimis* employment action rather than an adverse employment action. *Bowman*, 220 F.3d at 461.

Second, requiring Kirkendall to take on two additional study skills classes is not an adverse employment action because it was already a requirement of his job. Kirkendall admitted multiple times throughout his deposition that he held a teaching contract with the District. (Kirkendall Tr. 45:17-46:5, 157:14-158:1, 216:7-10, 268:11-15). On Kirkendall's teaching and Athletic Director contracts, which he signed with the District for both the 2019-2020 and 2020-2021 school years, there are explicit caveats in his job description stating that Kirkendall would be required to perform additional assignments consistent with his

position, as requested by his supervisor. (*Id.* at 49:23-50:7; Exs. 5, 7). Additionally, Kirkendall's employee handbook stated that:

> Job descriptions shall not be considered all-inclusive descriptions of the job but shall indicate the general parameters of the duties and responsibilities of the position. The immediate supervisor may, as needed, assign other reasonable duties to the employee.

(*Id.* at 51:9-18; Ex. 8). Both his contracts and Employee Handbook should have made it clear to Kirkendall that he was hired on as a teacher as well as an Athletic Director and that he could be assigned duties consistent with both contracts for the entire time that he was employed by the District. Despite his subjective belief that his job duties changed after returning from leave, his Study Skills assignments were clearly within his role and within Principal Shafer's ability to assign those classes as Kirkendall's supervisor.

Further, in the 2019-2020 school year, Kirkendall monitored an in-school suspension class and had a study hall class of 40-50 students each for one period out of the day. (*Id.* at 53:6-54:24). He also monitored the hallway during the lunch period. (*Id.* at 52:14-16). These constituted three times out of a school day when Kirkendall would be fulfilling a role that did not strictly relate to his Athletic Director position, similar to the three periods out of the day he would be administering the Study Skills class, yet he raised no issue to these assignments prior to taking leave. (Shafer Tr. 71:5-15). Kirkendall only seemed to care that the slightest extra duty was requested of him when he was assigned to monitor student progress on Edgenuity for the Study Skills class. Admittedly, Kirkendall did not know "what Edgenuity was at the time" he refused to teach the class, and he "believed it would be more hands-on" than something he felt like he should have to do. (Kirkendall Tr. 195:6-11).

If Kirkendall had actually administered the class instead of obstinately claiming it was not his job, he would have realized that it consisted of "turning on a computer and making

13

Commented [OA2]: Block quotes should always be single spaced, indented both sides by .5, with the cite *after* the block

sure [the student] is in front of it"—not the involved role that he imagined. *Id.* He also would have realized that the role was consistent with what he did as the ISS and Study Hall teacher. Thus, Kirkendall's role as the Study Skills class teacher did not consist of more work than he had experienced in the past or a change in position that violated the FMLA. The Study Skills class reflected that Ryle High School was attempting to adapt to the challenges that came with the COVID-19 Pandemic by giving extra adult supervision to failing students who needed to stay on track. Kirkendall selfishly made the issue of administering the class about himself and his job duties rather than focusing on the real victims—the failing students.

Kirkendall erroneously believed that his job schedule had to remain unchanged from when he left to when he returned from leave, but on top of failing to understand that his job duties had not actually changed in violation of the FMLA, he also failed to acknowledge that the Pandemic would change how Ryle High School functioned. Just because Kirkendall took FMLA leave, does not mean that he was entitled to keep his exact pre-Pandemic duties or that he would be insulated from adjustments in roles when every other employee at Ryle had to adapt to changes. Further, Kirkendall admitted that he may have raised concerns about administering the Study Skills classes even if he had never taken leave, which indicates that he simply did not want to teach the classes and was using the FMLA as an excuse to explain why he did not have to teach the classes. (*Id.* at 220:17-221:23).

Thus, Kirkendall cannot prove that being assigned to administer the Study Skills classes constituted adverse employment action because he was never tasked with doing anything that was not already in his contract or job description. *Burlington Indus.*, 547 U.S. at 761. Just because he did not want to teach the classes, does not mean that he was retaliated against for taking EFMLEA leave.

14

Third, requiring that Kirkendall monitor student progress on Edgenuity also was not an adverse employment action because it was also requirement of his job. As discussed previously, pursuant to Kirkendall's contract with the district, he was required to complete additional tasks as required by his supervisor Principal Matt Shafer. In Kirkendall's own words, he stated that he would simply be "making sure that they are doing their work…" through the online Edgenuity platform. (Kirkendall Tr. 116:1-2). This would not constitute a significant change in Kirkendall's role to meet the level of an adverse employment action.

If anything, monitoring students on Edgenuity would be similar to Kirkendall's position as the study hall teacher where he also made sure that students did their work. Instead of doing it in person, he would be completing this work virtually due to landscape of the COVID-19 Pandemic where some students remained online. Thus, Kirkendall cannot claim that this constitutes a significant change in his job duties and was merely an alteration in his job schedule that would equate to a *de minimis* employment action. *Bowman*, 220 F.3d at 461.

Fourth, being tasked with reaching out to failing students was not an adverse employment action. Although adding the duty of calling failing students and their families was a permissible alteration in his job duties, it would be considered a mere inconvenience for Kirkendall rather than a significant change in his job duties. *Bowman*, 220 F.3d at 461.

Further, it is asinine for Kirkendall to claim that being asked to check in on failing students was retaliatory. Every person at Ryle who did not have a classroom teaching assignment—from office workers to assistant principals—were tasked with calling these students. The COVID-19 Pandemic required an all-hands-on-deck approach to not only ensure student success but pull students from the brink of failing out of school. Kirkendall

15

not only had the gall to express that checking in on students was not his job, but the task partially led him to *sue his employer* over a "change in duties." This further proves that Kirkendall is not a team player and refused to step up to the plate, even when a simple phone call may have made the difference between a struggling student's failure or success in school.

**B.      KIRKENDALL HAS FAILED TO PROFFER ANY EVIDENCE OF A CAUSAL CONNECTION BETWEEN HIS LEAVE AND THE RETALIATORY ACTIONS HE CLAIMS TO HAVE EXPERIENCED**

Indeed, the record is clear that Kirkendall was terminated for his blatant insubordination of Principal Shafer's requests to facilitate three small Study Skills classes. Despite Kirkendall's erroneous belief that the Study Skills assignment constituted an unlawful change in his job duties after returning from leave, overseeing the classes was clearly within his job description.

Thus, just because Kirkendall was terminated after taking FMLA leave, there was no causal connection between his termination and taking leave. There may have been a temporal connection, but temporal proximity cannot be the sole basis for establishing pretext. *Snyder*, 2022 U.S. App. LEXIS 32984. Even if Kirkendall could meet the burden of establishing a *prima facie* case for FMLA retaliation, his claim would fail when the burden shifts to the Defendant to prove that there was a legitimate reason for Kirkendall's termination. This would be easy for the Defendant to prove because Kirkendall engaged in obvious insubordination based on the incorrect and unmerited belief that he should not have been required to teach the Study Skills class. Therefore, if Kirkendall's only showing of pretext relates to temporal proximity between taking leave and being terminated, his claim for FMLA retaliation must fail.  For these reasons, the Defendant is entitled to summary judgment on Kirkendall's FMLA retaliation claim.

16

**V.    THE DEFENDANT IS ENTITLED TO ENTRY OF SUMMARY JUDGMENT ON KIRKENDALL'S FMLA INTERFERENCE CLAIM BECAUSE KIRKENDALL CANNOT ESTABLISH THE NECESSARY ELEMENTS OF A CLAIM.**

In Kirkendall's First Cause of Action, he also claims that the Defendant "interfered with [his] FMLA rights." (R. 1, PageID 3 ¶ 27). To establish a *prima facie* case of FMLA interference, an employee must show that: (1) he was an eligible employee; (2) the defendant was a covered employer under the FMLA; (3) he was entitled to take leave under the FMLA; (4) he notified his employer of his intent to take leave; and (5) the employer denied him benefits or rights to which he was entitled under the FMLA. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419 (6th Cir. 2014). Kirkendall's claim fails because he was never denied benefits or rights to which he was entitled under the FMLA.

The record reflects that Kirkendall was afforded leave under the EMFLEA and EPSLA on an intermittent or consecutive basis from mid-September to December 4, 2020. (Kirkendall Tr. 108:20-24). Kirkendall was also assisted in taking leave by discussing his options to take leave with HR Director, Eric Ball. (*Id.* at 81:17-82:15; Ex. 11). Because he was permitted to take leave and was assisted throughout his leave, Kirkendall cannot establish that the Defendant interfered with his ability to take leave or denied him any rights or benefits that he was entitled to under the FMLA. Nothing within the record remotely indicates that the Defendant interfered with Kirkendall's ability to take FMLA leave; thus, the Defendant is entitled to summary judgment on Kirkendall's FMLA interference claim.

**VI.    THE DEFENDANT IS ENTITLED TO ENTRY OF SUMMARY JUDGMENT ON KIRKENDALL'S RACE DISCRIMINATION CLAIMS BECAUSE KIRKENDALL CANNOT ESTABLISH THE NECESSARY ELEMENTS OF A CLAIM.**

In his Second and Third Causes of Action, Kirkendall alleges that he was discriminated against based on his race in violation of Title VII and KRS 344.040 under the Kentucky Civil

Rights Act (KCRA). Title VII makes it unlawful to discriminate against an employee on the basis of race, color, religion, sex, and national origin. *See* 42 U.S.C. § 2000e-2(a). The KCRA is Title VII's Kentucky state law counterpart, and it echoes the federal law. These claims will be analyzed together because "courts generally interpret Title VII 'consonantly' with the KCRA." *Crawford v. E. Ky. Univ.*, 2019 U.S. Dist. LEXIS 26767 (E.D. Ky. 2019). Here, Kirkendall has established no direct evidence of race discrimination, and he relies on his own speculation and conjecture to prove that he was discriminated against.

Kirkendall cannot successfully establish the elements of race discrimination claim under state and federal law, so the Defendant should be entitled to summary judgment on this claim. Kirkendall's claim is based on circumstantial evidence, so it is analyzed under the same *McDonnell Douglas* burden-shifting framework discussed previously. *See McDonnell Doulgas*, 411 U.S. 792. Kirkendall carries the burden of establishing a *prima facie* case for race discrimination, so he must prove that (1) he is a member of a protected class; (2) he was qualified for the job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside of the protected class or was treated less favorably than a similarly situated individual outside of his protected class. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). If Kirkendall can establish a *prima facie* case for race discrimination, the burden shifts to the Defendant to prove that Kirkendall was terminated for a non-discriminatory reason. *See McDonnell Douglas* 411 U.S. 729.

To establish a *prima facie* claim of disparate-treatment discrimination under Title VII, Kirkendall must show that he was treated differently from similarly situated members of the unprotected class. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012). To

**Commented [OA3]:** Be careful. In the claim, Kirkendall alleges over discrimination and disparate treatment -- they are different standards (see the Watson MTD) -- we do not want to overlook one.

18

establish disparate treatment, a plaintiff must produce evidence that other employees are "similarly situated in all respects." *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992) *citing Stotts v. Memphis Fire Department*, 858 F.2d 289 (6th Cir. 1988). "To be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Vitt v. City of Cincinnati*, 250 F. Supp. 2d 885, 892 (S.D. Ohio 2002) (quoting *Mitchell*, 964 F.2d at 583). Kirkendall has made no efforts to prove disparate treatment. In fact, his own testimony even undermines such argument – in his deposition, he repeatedly acknowledged that *everyone* (not just him) in the RHS administration was adjusting to post-pandemic change to accommodate changing educational needs. (*See e.g.,* Kirkendall Depo. 147:23-150:12)

Kirkendall cannot establish the elements of a *prima facie* case of race discrimination, and even if he could, his claim would clearly fail when the burden shifts to the Defendant. It is undisputed that Kirkendall is a member of a protected class because he is African American. However, that is where his ability to demonstrate a prima facie case stops.

**A.   KIRKENDALL WAS NOT QUALIFIED FOR HIS JOB AND FAILED TO PERFORM IT SATISFACTORILY**

First, Kirkendall's qualifications are suspect because he lied on his job application with the District. Specifically, Kirkendall did not disclose that he was disciplined in Ohio, which led to a suspension of his Ohio teaching license; he did not list his most recent school employment; and, most egregiously, he stated that his Ohio teaching license was current when he applied with the District. (Kirkendall Tr. at 37:1-40:11; Ex. 1). Kirkendall's Ohio

19

teaching license was suspended for three years because he "put a student in a chokehold"
and "talked about [the student's] mother," which was determined to be inappropriate and
unbecoming of a teacher. (*Id.* at 15:6-19; Ex. 2). If Kirkendall's disciplinary history and
suspension of his Ohio Teaching Certificate was disclosed to the District at the application
stage, Kirkendall would not have been hired. But, by lying about his credentials and work
history on his application, he did not give the District an opportunity fairly evaluate him, and
he committed an offense that would have given the District the right to fire him for no other
reason. *Woods v. FacilitySource, LLC*, 640 Fed.Appx. 478, 491-492 (6th Cir. 2016).

Second, Kirkendall did not perform is job satisfactorily through his blatant
insubordination of Principal Shafer's requests to complete duties that were within his job
description. Insubordination of a superior has been recognized as a factor in showing that
an employee did not perform their job satisfactorily in the discrimination context. *Sanders v.
Owens*, 2011 U.S. Dist. LEXIS 98898 (W.D. Ky.). Based on these factors, Kirkendall's *prima
facie* claim for race discrimination fails because he cannot prove that he was qualified for his
job with the District in the first place, and he did not perform his job satisfactorily.

**B.    KIRKENDALL CANNOT PROVE THAT HE SUFFERED DISPARATE
TREATMENT REQUIRED TO DEMONSTRATE A PRIMA FACE CASE OF
DISCRIMINATION**

Kirkendall cannot meet his burden of establishing a *prima facie* claim for disparate
treatment because he has failed to point to any instances where his white colleagues engaged
in similar insubordination that did not lead to their termination. Kirkendall cannot use his
termination as the benchmark for the allegation that he was discriminated against when he
has offered no comparison for times that his white colleagues were disciplined less severely
or not disciplined at all for similar conduct.

Because Kirkendall has failed to demonstrate that he was treated differently from similarly situated members of an unprotected class with respect to his termination due to clear insubordination of his supervisor, his *prima facie* claim for disparate-treatment race discrimination fails as a matter of law.

### C.    KIRKENDALL'S CLAIM FAILS ON THE REMAINING ELEMENTS OF HIS PRIMA FACIE CASE

As discussed previously regarding Kirkendall's EMFLEA retaliation claim, Kirkendall fails to make his *prima facie* claim for race discrimination because he has failed to prove that a causal connection exists between his termination and his race. Kirkendall was terminated solely due to his insubordination when he was assigned to assist with failing students—not his race or any other reason that he has alleged.

### VII.    COUNTS IV AND V SHOULD BE DISMISSED BECAUSE KIRKENDALL HAS FAILED TO PROVE THAT HE WAS RETALIATED AGAINST BECAUSE OF HIS RACE.

In Kirkendall's Fourth and Fifth Causes of Action, he alleges that the Defendant retaliated against him under Title VII and KRS 344.280, which is part of the KCRA. Kirkendall contends in his Complaint that, "Defendant's acts in retaliating against Plaintiff because of his protected complaints include, but are not limited to, treating him less favorably than employees who did not make protected complaints, changing job requirements and terminating his employment, in violation of Title VII." (R. 1, PageID 5 ¶¶ 45, 50).

Kirkendall cannot satisfy the elements of a retaliation claim under federal or state law.[1] To prevail on his retaliation claim, Kirkendall must show that the Defendant retaliated against him because (1) he engaged in an activity protected by Title VII; (2) his employer

---

[1]    Retaliation claims under the KCRA are evaluated under the same standard used to evaluate federal Title VII claims. *Montell v. Diversified Clinical Servs.*, 757 F.3d 497, 497 (6th Cir. 2012).

knew about the protected activity; (3) he experienced an adverse employment action; and (4) there was a causal connection between Kirkendall's protected activity and the adverse employment action. *See Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000).

First, Kirkendall's claim fails because he has failed to demonstrate that he engaged in a protected activity. While the Sixth Circuit has found that "complaining to anyone . . . about allegedly unlawful practices . . ." constitutes a protected activity, *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000), Kirkendall has failed to allege that he complained to *anyone* that he had been discriminated against on the basis of his race. Indeed, even under the low bar required by the Sixth Circuit to establish that a complaint was actually made, Kirkendall does not meet the threshold of engaging in activity protected by Title VII. *See Nguyen*, 229 F.3d 559. The only complaints reflected by the record that Kirkendall ever made related to FMLA leave and his mistaken belief that the Defendant had impermissibly changed his job position—not the Title VII protected classes. Thus, Kirkendall cannot even meet the first prong of establishing a *prima facie* case that he was retaliated against under Title VII, since he cannot show that he engaged in a protected activity.

Moreover, Kirkendall's claim fails for lack of causal connection. To prove causation, Kirkendall must "produce enough evidence from which an inference could be drawn that the adverse action would not have been taken" had he not engaged in protected activity. *Id.* Kirkendall has not produced any evidence to support that he even engaged in protected activity let alone that he would not have been terminated if did not engage in that activity. In fact, the only evidence that Kirkendall has produced alludes to the reality that he was terminated for violating his contracts with the District by engaging in insubordination of his supervisor.

22

In sum, Kirkendall cannot establish a *prima facie* case for Title VII retaliation because he never actually engaged in a protected activity; therefore, he cannot establish the first element of the claim. Further, even if Kirkendall could establish a *prima facie* claim for Title VII retaliation, his claim would fail when the burden shifts to the Defendant to prove that Kirkendall was terminated for reasons wholly unrelated to retaliation. For these reasons, the Defendant is entitled to summary judgment on Kirkendall's Title VII and state law retaliation claims.

## VIII.  THE DISTRICT HAS DEMONSTRATED A NON-DISCRIMINATORY REASON FOR TERMINATING KIRKENDALL

Assuming, *arguendo*, that Kirkendall could make it past the burden of establishing a *prima facie* case, the District can easily show that they held a non-discriminatory reason for terminating Kirkendall—that being his complete inability to rise to the occasion and be a team player when called to do so by Principal Shafer. The burden would then shift back to Kirkendall to establish that the reasons proffered by the Defendant were merely pretextual. *See McDonnell Douglas*, 411 U.S. 729.

> **Commented [OA4]:** Streamline your burden shifting arguments from all of the above into one argument here

At the summary judgment stage, a plaintiff's mere speculation and subjective believe that the employer's non-discriminatory reasons are suspect is "not enough to place the issue of pretext before a jury because there is no material question of fact." *Samuels v. Corr. Med. Servs.*, 2014 U.S. Dist. LEXIS 75284 (E.D. Ky. 2014) (citing *McKinley v. Skyline Chili, Inc.*, 534 F.App'x 461 (6th Cir. 2013)).

When attempting to prove that a defendant's nondiscriminatory reason for an adverse employment action is pretextual, a plaintiff's belief that he was not insubordinate is irrelevant in the analysis. *Tibbs v. Calvary United Methodist Church*, 505 Fed. Appx. 508 (6th Cir. 2012). For example, in *Tibbs*, the plaintiff did not deny that she engaged in the

23

insubordinate action that led to her termination; although, she believed that she was not being insubordinate. *Id.* The Sixth Circuit found that the plaintiff's actions mattered more than how she categorized them, and her employer was able to establish that she was terminated for insubordination, rather than race discrimination. *Id.* Similarly, just because Kirkendall did not believe that his actions amounted to insubordination—merely that he was questioning Principal Shafer's ability to assign him additional tasks after taking leave—this does not mean that he was not objectively acting in an insubordinate way, which led to his termination.

Notably, Kirkendall gave no reason to believe that he was discriminated against based on his race. He admitted that no person at Ryle High School had ever made race-related comments to him, nor did he ever have any discussions about his race while at Ryle High School. (Kirkendall Tr. 309:4-9, 314:12-15). His reasons for believing he was discriminated against based on his race were made due to his own suspicions. For example, Kirkendall believed that he was tasked with investigating reported issues related to race on Ryle's football team because he is African American. (*Id.* at 313:10-24). In reality, this investigation was merely part of his job duty as Athletic Director and had nothing to do with his race. *Id.* Additionally, Kirkendall believed that he was accused of being an "angry black man," despite admitting that he was never called that, and it was just a "feeling" he had. (*Id.* at 307:2-308:21). None of Kirkendall's accusations regarding his race relate to anything but his own speculations.

As has been established, Kirkendall was terminated solely due to his own insubordination of Principal Shafer's requests. There is no material question of fact for a jury to decide when Kirkendall, himself, admitted and the record indicates that he refused to

24

teach the Study Skills classes, which led to his termination. Kirkendall can allege that he was terminated for other reasons outside of his control, but the record clearly reflects that he was not terminated for anything other than his own indolence. Indeed, there is no evidence in the record to show pretext. For these reasons, the Defendant is entitled to summary judgment on Kirkendall's discrimination and retaliation claims, Causes of Action I through V.

**IX.     COUNT VI SHOULD BE DISMISSED BECAUSE KIRKENDALL HAS FAILED TO PROVE HIS BREACH OF CONTRACT CLAIM.**

In his Sixth Cause of Action, Kirkendall claims that the Defendant "breached the agreement by changing job duties and terminating [his] employment." (R. 1, PageID 6 ¶ 56). Kirkendall is unclear as to what "agreement" has been breached, yet it can likely be assumed that he is referring to his employment contracts with the Defendant. Despite what he claims, Kirkendall was clearly the breaching party in his contracts, which ultimately led to his termination.

To establish a breach of contract claim in Kentucky, a plaintiff must show (1) the existence of a contract, (2) a breach of that contract, and (3) the breach of that contract caused damages. *Porter v. Sergent*, 2022 U.S. Dist. LEXIS 175902 (E.D. Ky. 2022). Courts analyze the plain language of the contract based on "its ordinary meaning and without resort to extrinsic evidence." *Id.*

Kirkendall can prove that two contracts existed between him and the Defendant: his teaching contract and the "Extra Duty Assignment" contract for his athletic director position. That is where Kirkendall's viable claim for breach of contract ends, though. As discussed previously, both contracts' plain language states that the Kirkendall's job duties could change subject to the reasonable requests of his superior—Principal Shafer. Additionally, Kirkendall's employee handbook stated that: "Job descriptions shall not be considered all-

25

inclusive descriptions of the job but shall indicate the general parameters of the duties and responsibilities of the position." (Ex. 8). Further, Kirkendall admitted that his contract did not specify how many classes he was required to teach per day, so his belief that three classes was too many is clearly unfounded. (Kirkendall Tr. 217:21-218:2).

The plain language of these contract provisions indicate that Principal Shafer was within his right to request that Kirkendall administer the Study Skills classes and that Kirkendall was the breaching party by stubbornly refusing to comply. First, despite what Kirkendall believed he was being hired to do, he was hired first as a teacher—indicated by the teaching contract that he signed. Second, he agreed multiple times throughout the deposition that he was hired by the District as a teacher, which should indicate that he was aware of what the role may have entailed. (*Id.* at 45:17-46:5, 157:14-158:1, 216:7-10, 268:11-15). No matter if Kirkendall did not want to administer the Study Skills classes due to his discomfort at the thought of interacting with a few students or his personal indolence, those are not valid excuses of shirking the very tasks that he was contracted to complete.

Through his insubordination, Kirkendall breached his own contract with the District, which is what led to his termination, not the other way around as Kirkendall claims. Further, Kirkendall's belief that the Defendant should pay for the time that he has been unemployed is completely unreasonable, considering the fact that Kirkendall only held a one-year contract with the District. Additionally, Kirkendall has likely not been hired since his termination with the District because he has an inconsistent employment record and had his teaching license in Ohio suspended due to an inappropriate altercation with a student. Kirkendall believes that his sustained period of unemployment is linked to the fact that he was terminated by the District without acknowledging that he was terminated *pursuant to*

26

*his own actions.* (*Id.* at 338:12-21). For these reasons, the Defendant is entitled to summary judgment on Kirkendall's breach of contract claim.

**X.    CONCLUSION**

Having established that there are no genuine issues as to any material facts and that it is entitled to judgment as a matter of law, the Defendant, Boone County Board of Education, respectfully requests that the Court grant judgment in its favor as a matter of law.

Respectfully submitted,

*/s/ Olivia F. Amlung*
Olivia F. Amlung, Esq. (#97449)
Mary Ann Stewart, Esq. (#82754)
ADAMS LAW, PLLC
40 West Pike Street
Covington, KY  41011
859.394.6200 | 859.392.7200 – Fax
oamlung@adamsattorneys.com
mstewart@adamsattorneys.com

*Attorneys for Defendant, Boone County Board of Education*

**CERTIFICATE OF SERVICE**

This is to certify that on this **4th** day of December, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Olivia F. Amlung*
Olivia F. Amlung, Esq.

27