UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON
CASE NO. 2:22-CV-00026-DLB-CJS


| | | |
|---|---|---|
| MARIO KIRKENDALL | ) | DEPOSITION TAKEN ON |
| | ) | BEHALF OF PLAINTIFF |
| | ) | BY:  NOTICE |
| PLAINTIFF | ) | |
| | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| | ) | |
| BOONE COUNTY BOARD OF | ) | |
| EDUCATION | ) | |
| | ) | WITNESS: |
| | ) | |
| DEFENDANT | ) | ERIC McARTOR |


* * * * * * * *


The deposition of ERIC McARTOR was taken

before Lisa E. Hoinke, Court Reporter and Notary Public

in and for the State of Kentucky at Large, at the law

offices of Adams Law, PLLC located at 40 West Pike

Street, Covington, Kentucky, on June 5, 2023,

commencing at the approximate hour of 10:45 a.m.  Said

deposition was taken pursuant to Notice, heretofore

filed, to be read and used on behalf of the Plaintiff

in the above-captioned action and all other purposes as

permitted by the Federal Rules of Civil Procedure.

APPEARANCES:

        Hon. Jon B. Allison
        FREKING MYERS & REUL LLC
        600 Vine Street, Ninth Floor
        Cincinnati, Ohio 45202
        jallison@fmr.law

        COUNSEL FOR THE PLAINTIFF,
        MARIO KIRKENDALL


        Hon. Olivia Amlung
        ADAMS LAW, PLLC
        40 West Pike Street
        Covington, Kentucky 41012
        oamlung@adamsattorneys.com

        COUNSEL FOR THE DEFENDANT,
        BOONE COUNTY BOARD OF EDUCATION


ALSO PRESENT:

        Mario Kirkendall, Plaintiff
        Sarah Froelich, Law Clerk
        Alexandria Anderson, Law Clerk

<u>I N D E X</u>

<u>PAGE</u>

<u>WITNESS: ERIC McARTOR</u>

CROSS-EXAMINATION
        By Mr. Allison   .................   4-30

REPORTER'S CERTIFICATE .......................  31-32

* * * * * * * * *

| | |
|---|---|
| 1 | The witness, ERIC McARTOR, after first being |
| 2 | duly sworn, was examined and testified as follows: |
| 3 | CROSS-EXAMINATION |
| 4 | By Mr. Allison: |
| 5 | MR. ALLISON:    Will you please start the deposition |
| 6 | by stating your name? |
| 7 | WITNESS:    Eric McArtor. |
| 8 | MR. ALLISON:    Mr. McArtor, my name is Jon |
| 9 | Allison.  I represent Mario |
| 10 | Kirkendall, the Plaintiff in this |
| 11 | case.  And we've asked you here to |
| 12 | find out what you know or don't know |
| 13 | about his case.  Have you ever had |
| 14 | your deposition taken before? |
| 15 | WITNESS:    Yes. |
| 16 | MR. ALLSION:    How many times? |
| 17 | WITNESS:    One, I believe. |
| 18 | MR. ALLISON:    Do you believe what that was in -- |
| 19 | when was that? |
| 20 | WITNESS:    Oh, it's probably been three or four |
| 21 | years ago.  It was concerning a case |
| 22 | or a construction case here at our |
| 23 | district. |
| 24 | MR. ALLISON:    Just some basic ground rules you |

```
 1                      probably went over with your
 2                      attorney.  But we've got a court
 3                      reporter here.  The most important
 4                      thing is that the record is clear at
 5                      the end.  So I'll be asking
 6                      questions.  You'll be giving
 7                      answers.  Your attorney may object
 8                      from time to time.  Just whoever is
 9                      talking, let them finish, and we'll
10                      extend you the same courtesy.
11                      You've got to answer verbally, yes,
12                      no, words, that sort of thing.  You
13                      can't do head nods; that can't be
14                      taken down.  If you don't understand
15                      a question, just ask me to rephrase
16                      it, or just tell me you don't
17                      understand it.  If you don't know
18                      the answer to a question, just tell
19                      me you don't know.  If you need a
20                      break, just ask to take a break.
21                      Any questions for me?
22   WITNESS:           No.
23   Q     What did you do to prepare for your deposition
24         today?
```

```
 1   A          I reviewed some of the documents that we have
 2              in our office.  I did met with our attorney
 3              last --
 4   MS. AMLUNG:        Don't discuss any of the discussions
 5                      that we had, of course.
 6   MR. ALLISON:       Right.
 7   A          -- week.  And that's pretty much it.
 8   Q          What documents did you review?
 9   A          Just the dates, some of the dates because it's
10              been a while since that occurred on my part,
11              in this case, just to refresh my memory of the
12              dates and when that occurred.
13   Q          Did you review any email exchanges?
14   A          No, nothing -- no.  There's a pretty thick --
15              it's a pretty thick document that we have in
16              our district, and I just looked at the actual
17              letter that was sent to Mr. Kirkendall, and
18              that's about it.
19   Q          You looked at the letter that was sent to
20              Mr. Kirkendall, which was expressing what?
21   A          His termination.
22   Q          Okay, got that part.  When you said it was a
23              pretty thick document, I didn't understand
24              that.  Can you tell me what you meant by that?
```

| | | |
|---|---|---|
| 1 | A | There are a bunch of different items in there |
| 2 | | pertaining to the case.  I did -- I did not |
| 3 | | review all of those.  There are just a lot of |
| 4 | | documents in there from our law firm, it |
| 5 | | looked at.  I saw a lot of -- when I was |
| 6 | | perusing through. |
| 7 | Q | Okay.  And how did you get a hold of that |
| 8 | | document? |
| 9 | A | It's in our office, in our main office. |
| 10 | Q | What's it called? |
| 11 | A | It's the secretary's office cabinet that's |
| 12 | | locked and secured. |
| 13 | MS. AMLUNG: | Just to be clear, I want to make |
| 14 | | sure we're talking about things that |
| 15 | | you can speak to as opposed to |
| 16 | | things that I've given you.  I mean, |
| 17 | | I provided, just as a standard |
| 18 | | practice, my clients' all discovery |
| 19 | | that's exchanged.  That may be kept |
| 20 | | somewhere, but if that's what you're |
| 21 | | referring to, no conversations |
| 22 | | around that.  But if you're talking |
| 23 | | about the personnel file, just maybe |
| 24 | | a little clearer? |

```
 1    A         Oh, no, it's pertaining to what you just said.

 2              It's not the personnel --

 3    Q         Just the file Michelle keeps?

 4    A         Correct.

 5    MS. AMLUNG:         Okay.

 6    A         That's what -- that's what I'm pertaining to.

 7    Q         Okay.  What's the file that Michelle keeps?

 8              Is it -- what is it from your -- don't tell me

 9              anything attorney-client privileged

10              information, but just can you describe what it

11              is?

12    A         It's just a series of documents that's been

13              copied of the case.

14    Q         I see.  And who is Michelle?

15    A         The superintendent's secretary.

16    Q         Okay.

17    A         Michelle Ashley.

18    Q         Okay.  So that may contain attorney-client

19              privileged material.  It may contain

20              discovery.  It may contain directives to go

21              find this document or that document.  It's

22              that type of file?

23    A         I assume.  Yeah, I didn't look through all of

24              it.
```

```
 1    Q        I understand.  And you said you didn't review

 2             any emails that you can remember; is that

 3             correct?

 4    A        Correct.

 5    Q        Do you recall there being any email exchanges

 6             that you were involved in in connection with

 7             these events as they transpired?

 8    A        There may have been from the Principal Matt

 9             Shafer.  If he was -- I can't remember if he

10             emailed me as far as, you know, what was going

11             on or if he was the summary of the case or not

12             the case, summary of what happened leading up

13             to a possible hearing.  But I don't remember

14             if there was one.  I can't remember about

15             that.

16    Q        Would there be email exchanges between you and

17             Mr. Turner?

18    A        No, not to my knowledge.

19    Q        And why not?

20    A        If there's something that I needed to talk to

21             him about, I would probably just verbally talk

22             to him.

23    Q        Because?

24    A        Our offices are right there --
```

```
 1    Q        Okay.

 2    A        I mean, very close to each other.

 3    Q        All right.  What -- well, let me just go

 4             through this exercise first.  Let me get your

 5             educational and employment background.  I

 6             don't need to know where you went to high

 7             school.  Just tell me what post high school

 8             education you have.

 9    A        Okay.  My undergrad degree is from Eastern

10             Kentucky University in Education.  Master's

11             degree from Northern Kentucky University.  I

12             have a Master's in Administration from the

13             University of Cincinnati.  I have a

14             Superintendent's Certificate from the

15             University of Kentucky.  I've been in

16             education for 34 years.  Twenty-five of those

17             years have been in Boone County Schools.

18    Q        Okay.  That was very helpful.  What positions

19             have you -- can you tell me what years you got

20             those degrees and certifications, roughly?

21    A        Yeah.

22    Q        It's not a memory test.

23    A        Yeah.  In the early '90s -- well, I graduated

24             from EKU in 1988.  And so early in the 1990s I
```

1           got my Master's from Northern.  And then right

2           after that, middle, late '90s was the UC

3           degree.  And probably late 1990 or late 1999,

4           1998, around there, was my Superintendent

5           Certificate.

6      Q    And then you said 30-some-odd years with Boone

7           County Schools?

8      A    Twenty-five.

9      Q    Twenty-five, sorry.

10     A    Uh-huh (AFFIRMATIVE).

11     Q    What positions have you held with Boone

12          County?

13     A    I have been a vice principal, an assistant

14          principal, a principal.  And in my current

15          position, I'm the chief operating officer.

16     Q    How long have you been the chief operating

17          officer?

18     A    Nine years.

19     Q    Okay.  So during all the relevant events in

20          this case, you've been the chief operating

21          officer?

22     A    Yes.

23     Q    Okay, all right.  So how do you know

24          Mr. Kirkendall, the Plaintiff in this case?

| | | |
|---|---|---|
| 1 | A | I know him as being the athletic director at |
| 2 | | Ryle School for a period of time.  I met him |
| 3 | | when he was hired.  I oversee the athletic |
| 4 | | directors, so I had monthly meetings with |
| 5 | | them.  In Mario's case, I probably didn't have |
| 6 | | too many meetings with them because he is |
| 7 | | fairly new and, you know, and then we had |
| 8 | | Covid and things like that. |
| 9 | Q | Right.  So you would have monthly meetings |
| 10 | | with the ADs together or individually? |
| 11 | A | Together. |
| 12 | Q | Okay. |
| 13 | A | We would either -- I think we'd usually meet |
| 14 | | by Zoom or sometimes in person, depending on |
| 15 | | the situation.  Mainly, went to Zoom during |
| 16 | | the Covid time. |
| 17 | Q | Yeah.  And what would those meetings be about? |
| 18 | A | Could be about events coming up, where we are, |
| 19 | | you know, the period -- the athletic year, |
| 20 | | planning for the year, just anything that may |
| 21 | | come up.  During Covid, things changed as far |
| 22 | | as athletic events and how we could proceed, |
| 23 | | you know, with people being able to attend and |
| 24 | | their roles for athletes.  And there was a |

| | | |
|---|---|---|
| 1 | | period of time we couldn't play at all, so |
| 2 | | things like that. |
| 3 | Q | Now, you know Mr. Kirkendall; I think it was |
| 4 | | when he was employed at Princeton.  Are you |
| 5 | | aware that Mr. Kirkendall had an allegation |
| 6 | | made against him by a student when he was |
| 7 | | working at Princeton?  Something along the |
| 8 | | lines of putting him in a headlock.  Did you |
| 9 | | become aware of that allegation? |
| 10 | A | I was not aware of that when he was hired in |
| 11 | | our district, no. |
| 12 | Q | When did you first become aware of it? |
| 13 | A | Well, I did sit in his deposition and -- maybe |
| 14 | | a month ago or month and a half ago.  I can't |
| 15 | | remember.  And I was made aware of during that |
| 16 | | time. |
| 17 | Q | Okay.  Is that the first time you were aware |
| 18 | | of it? |
| 19 | A | Uh-huh (AFFIRMATIVE).  Yes.  I'm sorry. |
| 20 | Q | That's okay. |
| 21 | A | Sorry about that. |
| 22 | Q | So if Mr. Kirkendall says you became aware of |
| 23 | | it much earlier during your work with |
| 24 | | Mr. Kirkendall while he was employed, you |

```
 1                      would dispute that, correct?

 2      A              Yes.  I didn't know about it.

 3      Q              Okay, all right.  Now, you indicated you had

 4                      met Mr. Kirkendall when he was hired, and that

 5                      was probably in connection with your

 6                      supervising the ADs, correct?

 7      A              Yes, uh-huh (AFFIRMATIVE).

 8      Q              Did you have any involvement in the hiring

 9                      process?

10      A              I did not.

11      Q              Do you know anything about the posting, what

12                      it said, anything like that?

13      A              Just that it was for the athletic director,

14                      I'm assuming what he was hired for.

15      Q              Do you have any role in drafting the job

16                      posting?

17      A              I do not.

18      Q              Do you even see it?

19      A              I usually do not, no.

20      Q              What about the requests to fill the position

21                      that the principal might send or the

22                      recommendation that gets sent after interview,

23                      do you see any of those documents?

24      A              I do not.
```

| | | |
|---|---|---|
| 1 | Q | You weren't on the hiring committee for |
| 2 | | Mr. Kirkendall? |
| 3 | A | I wasn't. |
| 4 | Q | You don't know who else was seeking that open |
| 5 | | AD job? |
| 6 | A | No, no. |
| 7 | Q | Just after he gets hired, you meet with him, |
| 8 | | and that's when your relationship starts, |
| 9 | | okay. |
| 10 | A | Right. |
| 11 | Q | That's fine; all right.  And do you have any |
| 12 | | understanding as to -- I mean, as you said, he |
| 13 | | was hired and was the AD, correct? |
| 14 | A | Uh-huh (AFFIRMATIVE).  Yeah.  Yes.  Sorry; I'm |
| 15 | | sorry about that. |
| 16 | Q | And but he signs different contracts when he |
| 17 | | begins his employment? |
| 18 | A | Yes. |
| 19 | Q | Okay.  And what's your understanding as to |
| 20 | | what those contracts provide? |
| 21 | A | He would sign a teaching contract and he would |
| 22 | | also sign an athletic director contract which |
| 23 | | is extra duty. |
| 24 | Q | Okay.  Is it true, though, that he was hired |

```
 1                  in to be the AD, and that would be what his

 2                  job was; is that true?

 3      A          Yeah, I would say he was hired as the AD --

 4                  the athletic director.  And then -- but also

 5                  with that was a teaching contract, whatever

 6                  jobs necessarily that the supervisor may

 7                  assign to you.  Meaning, in this case, would

 8                  be his principal.

 9      Q          Okay.  Have you ever held a role where you

10                  had an extra duty contract or multiple

11                  contracts?

12      A          Yeah.  Actually, my contract is stated that

13                  way.  So I'm under a contract just similar to

14                  that where it says at the very bottom,

15                  anything that's assigned by your supervisor to

16                  perform those duties.

17      Q          Are you also -- do you also have a teacher

18                  contract?

19      A          I sign the teaching contract, and I have

20                  what's called, extra hours or duties, as well

21                  under mine, the same, uh-huh (AFFIRMATIVE).

22      Q          And the extra duty contract is for the COO

23                  role?

24      A          Being the deputy superintendent, yes.
```

| | | |
|---|---|---|
| 1 | Q | The deputy superintendent, do you -- |
| 2 | A | It's the chief operating officer/deputy |
| 3 | | superintendent. |
| 4 | Q | Do you do any teaching? |
| 5 | A | I do not. |
| 6 | Q | Does the superintendent have the same set up |
| 7 | | where he has a teaching contract and also an |
| 8 | | extra duty contract that says he's a |
| 9 | | superintendent, or is that different? |
| 10 | A | It's different.  He's hired under a different |
| 11 | | contract.  He's under a contract with our |
| 12 | | Board of Education. |
| 13 | Q | Okay.  What about the principal and the |
| 14 | | assistant principal at this -- |
| 15 | A | They would be the same, under a teaching |
| 16 | | contract and have extra duties. |
| 17 | Q | And the extra duty is principal? |
| 18 | A | Yeah.  Extra -- yes, yes, uh-huh |
| 19 | | (AFFIRMATIVE). |
| 20 | Q | Okay.  Do you -- so I know you sat through |
| 21 | | Mr. Kirkendall's deposition. |
| 22 | A | Uh-huh (AFFIRMATIVE). |
| 23 | Q | What I'd like to explore is -- well, you're |
| 24 | | aware that at some point in time he utilized |

| 1 | | leave in connection with Covid, correct? |
| 2 | A | Uh-huh (AFFIRMATIVE), yes. |
| 3 | Q | Were you aware of that in realtime or only as |
| 4 | | part of this case? |
| 5 | A | Yeah.  I was not aware of it when it was going |
| 6 | | on, no. |
| 7 | Q | You're aware that he made a number of |
| 8 | | allegations, complaints that are race-related. |
| 9 | | He testified to it in his deposition; you |
| 10 | | recall his testimony, correct? |
| 11 | A | Yes. |
| 12 | Q | Were you aware of any of those -- |
| 13 | A | I was not. |
| 14 | Q | -- in realtime? |
| 15 | A | I was not. |
| 16 | Q | Did you only become aware of those complaints, |
| 17 | | concerns, as part of the litigation? |
| 18 | A | Yes. |
| 19 | Q | Did you have any opinion as to |
| 20 | | Mr. Kirkendall's performance of his job duties |
| 21 | | in the 2019-2020 year, or were you just not |
| 22 | | close enough to know? |
| 23 | A | I wasn't -- I didn't know him -- |
| 24 | Q | Yeah. |

```
 1   A        -- as well, and because he was relatively new.
 2            And I didn't really know him well as a person
 3            at that point.
 4   Q        Yeah.  Your only interaction is these monthly
 5            meetings?
 6   A        Uh-huh (AFFIRMATIVE).
 7   Q        And you're just going over sort of strategy or
 8            whatever it is as a whole --
 9   A        Yeah.
10   Q        -- as a district?
11   A        Yes.
12   Q        Not specific to Mr. Kirkendall, not specific
13            to Ryle?
14   A        No.
15   Q        Yeah.  You would have seen during
16            Mr. Kirkendall's deposition all of these
17            exchanges between him and Mr. Shafer about
18            his job duties and expectations, et cetera,
19            et cetera.  Were you aware of those in real
20            time?
21   A        I was not.
22   Q        And then at some point in time, you learned of
23            a potential disciplinary issue?
24   A        Yes.
```

| | | |
|---|---|---|
| 1 | Q | Why don't we try to take that chronologically. |
| 2 | | What's the -- when's the first time you heard |
| 3 | | that there was an potential disciplinary issue |
| 4 | | with Mr. Kirkendall? |
| 5 | A | I believe January of 2021, I believe. |
| 6 | Q | And how did you learn of it? |
| 7 | A | Mr. Shafer, the principal. |
| 8 | Q | Okay.  And what form did it take, written, |
| 9 | | verbal? |
| 10 | A | He had called me on the phone and said that he |
| 11 | | had a problem.  They were trying to cover |
| 12 | | these classes and he had talked to Mr. |
| 13 | | Kirkendall to help cover, I believe, three |
| 14 | | individual students in his office during a |
| 15 | | certain part of the day and, basically, he |
| 16 | | refused to do that.  That's basically is what |
| 17 | | he told me. |
| 18 | Q | And that's what he relayed in the call.  Do |
| 19 | | you recall anything else about what Mr. Shafer |
| 20 | | relayed during that phone call to you? |
| 21 | A | No.  It was mainly about that, and that was |
| 22 | | the -- because they were trying to cover |
| 23 | | multiple different or catch kids up, so to |
| 24 | | speak, help them with their academics, and he |

```
 1                  was trying to divide it up amongst different

 2                  people.  And these three wanted Mario to

 3                  help.  And he said that was not in his job

 4                  duties; that he didn't want to do that.  He

 5                  wouldn't do it.

 6     Q    And did anything about the FMLA come up in

 7                  that first call?

 8     A    No.

 9     Q    What's the next thing that happened?

10     A    So I guess, he -- I can't remember exactly

11                  what I told him over the phone.  I said, well,

12                  you need to meet with Mario and go over that.

13                  And if he continues to refuse, then I guess we

14                  will have to have a disciplinary hearing and

15                  go from there because at that point, I would

16                  consider it to be insubordinate.

17     Q    Okay.  And then what's the next thing that

18                  happened?

19     A    I can't remember the exact date, but we did

20                  end up having a disciplinary hearing.  I was

21                  the superintendent's designee at that point.

22     Q    What does that mean?

23     A    Meaning that I ran that meeting.  I was in

24                  charge of that meeting.  And so a formal
```

1  letter was sent out to Mario concerning the

2  hearing; that we would have a hearing in

3  Central Office.  And Mr. Shafer came -- was

4  there.  Mario was there with Mr. LeCates; that

5  was his representative.  And during the

6  hearing, I go over, you know, the ground rules

7  of what we're there for.  And then I have the

8  principal determine -- or say why we're there.

9  What are the reasons why we are here, please

10  list those.  And the charge of insubordination

11  was what Mr. Shafer had stated.  And he

12  basically said that he had asked Mario to

13  cover these classes or not -- it's really not

14  a class.  It's to cover or help these three

15  individuals be on a program that they were

16  working on to help with their grades, and that

17  Mario refused to do that.  And so, I said,

18  okay, and let them speak.  And then I always

19  let the other side speak.  And Mario, what do

20  you say to that?  I can't remember verbatim

21  what Mario said or stated, but it was to the

22  point of, I don't believe I should have to do

23  that.  It's not in my job description.  I know

24  he did confer with Mr. LeCates a little bit

1          within the hearing.  I don't know what they

2          said.  They were talking together.  I don't

3          remember if Mr. LeCates talked during that

4          time.  I do remember that I had -- towards at

5          the end, at the very end of the whole hearing,

6          I stated to Mario -- well, actually, let me

7          back up.  I apologize.  I gave the example

8          that even myself as a deputy superintendent,

9          if my superintendent asked me to do something,

10         I kind of went over the job descriptions, and

11         it states in my job description that if my

12         supervisor asks me to do something that would

13         be out of the ordinary of what I usually do

14         day to day, that I would do that.  I gave that

15         as an example.  And so I stated to Mario at

16         the very end after we were all done, I said

17         that would you want to go back to Ryle and

18         under the conditions that you would perform

19         the duties that Mr. Shafer is asking you to,

20         no different than I would perform duties that

21         Mr. Turner asked me to do?  It's really not

22         any different.  And he said, no, I'm not doing

23         that.  And I said, okay.  And I know at one

24         point that he and Mr. LeCates walked outside

1          to -- I don't know how long they were gone,

2          but they came back in, and I think I even said

3          one final time, so you don't want to go back

4          to Ryle, just so I'm clear and perform your

5          duties?  And I believe his words were, no

6          deal.  And I said, all right, and that was

7          basically, the end of the meeting.  The

8          meeting didn't last that long, maybe 20 to 30

9          minutes.  And then what I do as the deputy

10         superintendent is I make a recommendation.  I

11         make a recommendation to the superintendent.

12         So I don't hire or fire anybody.  I can only

13         make a recommendation.  He has to make that

14         determination.  So based on what I viewed in

15         that meeting and -- just the not wanting to

16         perform the duties, insubordination, I

17         determined that I would recommend termination,

18         if he doesn't want to go and do the duty that

19         we're asking him to, no different than what I

20         would perform myself.  And I gave that to

21         Mr. Turner.

22    Q    And did the FMLA come up and the rules and the

23         regulations or did the FMLA come up at all

24         during that meeting?

```
 1    A        That really -- it didn't -- I don't know if
 2             Mr. LeCates spoke to that.  If he did, it was
 3             very brief because I remember talking more so
 4             about the job, the duties of the job
 5             description, and you're hired as a teacher
 6             first and an athletic director second or extra
 7             duty I should say.  I shouldn't say second.
 8             And that you have to abide by your teaching
 9             contract.  And we didn't get into too much
10             that I remember of the FMLA.
11    Q        Do you recall if it came up at all?  Is it
12             possible it did come up at all?
13    A        It's possible but I think the more focus
14             was on not wanting to cover those three
15             students.
16    Q        And what's LeCates position?
17    A        He is, what's called, the UniServe Director
18             for the Union.
19    Q        Do you know if he's a lawyer?
20    A        And I'm not trying to be funny here.  I've
21             been trying to figure out what his position is
22             for a long time with our district.
23    Q        What do you mean, sir?
24    A        He works with our Union, and he is not a
```

| | | |
|---|---|---|
| 1 | | lawyer, no. |
| 2 | Q | What do you mean by that, that you've been |
| 3 | | trying to figure out what his position has |
| 4 | | been? |
| 5 | A | Well, the reason I say that is that we have a |
| 6 | | Union president and -- for the classified |
| 7 | | staff and the certified staff.  And in this |
| 8 | | case, Mario is a certified -- classified |
| 9 | | member and that's who usually would do these |
| 10 | | meetings, or I think should.  But employees |
| 11 | | can bring anybody they would like to bring as |
| 12 | | a representative.  So I don't know why they |
| 13 | | choose to bring him sometimes -- and they do. |
| 14 | | And I don't know -- I just don't know the |
| 15 | | role, is what I'm trying to say. |
| 16 | Q | Okay, that's fair.  Your recommendation to the |
| 17 | | superintendent; is that in writing or is that |
| 18 | | just verbal? |
| 19 | A | It's a verbal.  And then he -- and I will talk |
| 20 | | to him about what went on in the hearing so |
| 21 | | that he gets a full knowledge of what |
| 22 | | happened. |
| 23 | Q | Do you remember doing that in this case? |
| 24 | A | Yeah.  I know I -- yes.  We went -- I went |

```
 1              to his office and talked to him about it.  It
 2              was pretty shortly after the meeting that we
 3              had.
 4    Q         Okay.  Can you tell me what you remember about
 5              that?
 6    A         About meeting Mr. Turner?
 7    Q         Yeah.
 8    A         I really just told him what I told you.  I
 9              mean, we went over things, the teaching
10              contract.  And I said, that's my
11              recommendation that he be terminated if he
12              doesn't want to go back.  I offered him to go
13              back even at the end of the meeting, and he
14              refused.  So I didn't know what else there
15              would be to do.  And he took that.  He didn't
16              tell me what he was going to do when I left,
17              but he had that information.
18    Q         And the hearing, is that recorded in any way,
19              shape, or form whether it's --
20    A         No.  I don't -- no, it's not.  No, it's not.
21    Q         There's no minutes of it or anything?
22    A         Huh-uh (NEGATIVE).  No, sir.
23    Q         Okay.  So just in terms of what happened at
24              the hearing, we just have to rely on what
```

| | | |
|---|---|---|
| 1 | | people remember? |
| 2 | A | That's correct. |
| 3 | Q | Okay.  And then I guess the same is true for |
| 4 | | your conversation with Mr. Turner.  There's |
| 5 | | not an email or nobody took notes of that, it |
| 6 | | doesn't sound like? |
| 7 | A | No, no, sir. |
| 8 | Q | And do you know if FMLA came up in your |
| 9 | | conversation with Mr. Turner? |
| 10 | A | Did it come up? |
| 11 | Q | Yes. |
| 12 | A | It did not, I don't believe.  It was more |
| 13 | | focused on not supervising the students and |
| 14 | | not wanting to go back. |
| 15 | Q | And do you have any understanding as to any |
| 16 | | requirement under the FMLA when you return |
| 17 | | from a leave of what job you're supposed to be |
| 18 | | returned to, whether there are any |
| 19 | | requirements there? |
| 20 | A | I am not sure of that. |
| 21 | Q | Okay.  You didn't generate any documents in |
| 22 | | connection with this matter, right?  There's a |
| 23 | | document that gets generated to you from Matt |
| 24 | | Shafer. |

| | | |
|---|---|---|
| 1 | A | Yeah -- no. |
| 2 | Q | Is that right? |
| 3 | A | Oh, I'm sorry.  I was just going to say I |
| 4 | | don't think I generated any documents. |
| 5 | Q | Yeah, I think that's right.  I highlighted |
| 6 | | this document, but we're missing the extra |
| 7 | | copies.  But this was marked as Exhibit 31 to |
| 8 | | Mr. Kirkendall's deposition.  I just wanted |
| 9 | | you to take a look at it and tell me if this |
| 10 | | is the only communication you received from |
| 11 | | anybody in connection with this matter?  I |
| 12 | | think it is. |
| 13 | A | Okay. |
| 14 | Q | The highlighting is mine. |
| 15 | A | Okay.  Yeah, I do recall that, yeah. |
| 16 | Q | That's the written communication that you get |
| 17 | | that sets up the -- that would have been after |
| 18 | | or at the same time as the phone call from |
| 19 | | Mr. Shafer to you; is that correct? |
| 20 | A | Probably, very, very close, yes. |
| 21 | Q | And that would really be the only document |
| 22 | | with your name on it to or from in connection |
| 23 | | with this case, I think, right? |
| 24 | A | To my knowledge, yes. |

1    MR. ALLISON:        I don't have any other questions.

2    WITNESS:            Okay.

3    MR. ALLISON:        Thank you for your time.

4    WITNESS:            All right; thank you.

5    MS. AMLUNG:         Signature.

6

7                        _____

8                        ERIC McARTOR

9                        * * * * * * * *

10          THEREUPON, the taking of the deposition of

11   ERIC McARTOR was concluded at 11:20 A.M.

12                        * * * * * * * *

STATE OF KENTUCKY )
                  )
COUNTY OF FAYETTE )


        I, LISA E. HOINKE, the undersigned Notary

Public, in and for the State of Kentucky at Large,

certify that ERIC McARTOR, the aforesaid deponent, was

by me first duly sworn to testify the truth, the whole

truth and nothing but the truth in the case Mario

Kirkendall, Plaintiff, vs. Boone County Board of

Education, Defendant, No. 2:22-CV-00026-DLB-CJS, now

pending in the United States District Court for the

Eastern District of Kentucky at Covington.

        That the foregoing deposition was taken down

in stenotype by me and the foregoing is a true record of

the testimony given by said witness.

        That the Plaintiff was represented by his

counsel, Hon. Jon B. Allison at the taking of said

deposition; that the Defendant was represented by its

counsel, Hon. Olivia Amlung; that Mr. Mario Kirkendall,

Plaintiff, Ms. Sarah Froelich and Alexandria Anderson

were also present; there were no other appearances.

That said deposition was taken on behalf of the Plaintiff pursuant to Notice and pursuant to the Federal Rules of Civil Procedure for the District Courts of the United States.

I do further certify that I am a disinterested person in the cause of action heretofore stated; not employed by any of the parties; and to the best of my knowledge, not related to any of the parties.

My commission expires:   June 18, 2027.

IN TESTIMONY WHEREOF, I have hereunder set my hand and seal of office on this the 5th day of September, 2023.


/s/ Lisa E. Hoinke
LISA E. HOINKE
NOTARY PUBLIC, ID KYNP72022
STATE-AT-LARGE, KENTUCKY