UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON
CASE NO. 2:22-CV-00026-DLB-CJS

| | | |
|---|---|---|
| MARIO KIRKENDALL | ) | DEPOSITION TAKEN ON |
| | ) | BEHALF OF PLAINTIFF |
| | ) | BY:  NOTICE |
| PLAINTIFF | ) | |
| | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| | ) | |
| BOONE COUNTY BOARD OF | ) | |
| EDUCATION | ) | |
| | ) | WITNESS: |
| | ) | |
| DEFENDANT | ) | MATTHEW TURNER |

* * * * * * * *

The deposition of MATTHEW TURNER was taken
before Lisa E. Hoinke, Court Reporter and Notary Public
in and for the State of Kentucky at Large, at the law
offices of Adams Law, PLLC located at 40 West Pike
Street, Covington, Kentucky, on June 5, 2023,
commencing at the approximate hour of 9:00 a.m.  Said
deposition was taken pursuant to Notice, heretofore
filed, to be read and used on behalf of the Plaintiff
in the above-captioned action and all other purposes as
permitted by the Federal Rules of Civil Procedure.

APPEARANCES:

Hon. Jon B. Allison
FREKING MYERS & REUL, LLC
600 Vine Street, Ninth Floor
Cincinnati, Ohio 45202
jallison@fmr.law

COUNSEL FOR THE PLAINTIFF,
MARIO KIRKENDALL


Hon. Olivia Amlung
ADAMS LAW, PLLC
40 West Pike Street
Covington, Kentucky 41012
oamlung@adamsattorneys.com

COUNSEL FOR THE DEFENDANT,
BOONE COUNTY BOARD OF EDUCATION


ALSO PRESENT:

Mario Kirkendall, Plaintiff
Sarah Froelich, Law Clerk
Alexandria Anderson, Law Clerk

<u>I N D E X</u>

<u>PAGE</u>

<u>WITNESS: MATTHEW TURNER</u>

CROSS-EXAMINATION
      By Mr. Allison ......................  4-73

REPORTER'S CERTIFICATE ....................... 74-75

* * * * * * * * *

```
1              The witness, MATTHEW TURNER, after first being

2      duly sworn, was examined and testified as follows:

3                          CROSS-EXAMINATION

4      By Mr. Allison:

5      MR. ALLISON:        We met -- well, we sort of met a

6                          moment ago.  My name is Jon Allison.

7                          I represent Mario Kirkendall in this

8                          matter, and we've asked you here to

9                          find out what you know or don't know

10                         about his case.  Can you go ahead

11                         and start the deposition by stating

12                         your name, please?

13     WITNESS:            Matthew Turner.

14     MR. ALLISON:        And have you ever had your

15                         deposition taken before?

16     WITNESS:            I think maybe once.

17     MR. ALLISON:        How long ago was that?

18     WITNESS:            About two years ago.

19     MR. ALLSION:        And in connection with -- what type

20                         of a matter was it, if you know?

21     WITNESS:            Oh, goodness, it was a lawsuit

22                         regarding virtual instruction, which

23                         is in-person instruction, at the

24                         beginning of the pandemic.
```

| | | |
|---|---|---|
| 1 | MR. ALLISON: | Okay.  Just some basic ground rules. |
| 2 | | I'm sure you went over some of this |
| 3 | | with your attorney, but so the most |
| 4 | | important thing is we've got a court |
| 5 | | reporter here taking down everything |
| 6 | | that we say.  And we want to make |
| 7 | | sure that the record is clear.  So |
| 8 | | I'll be asking questions.  Your |
| 9 | | lawyer might make an objection from |
| 10 | | time to time.  You just want to make |
| 11 | | sure that I finish or she finishes |
| 12 | | or whoever is talking finishes |
| 13 | | before you start talking, and we'll |
| 14 | | do the same for you.  You have to |
| 15 | | answer with verbal -- you can't do |
| 16 | | head nods.  It's kind of a yes, no, |
| 17 | | words, whatever it is.  If you don't |
| 18 | | understand a question, just ask me |
| 19 | | to rephrase.  If you need a break, |
| 20 | | just ask me for a break, and we can |
| 21 | | take one.  It's not meant to be a, |
| 22 | | you know, marathon.  Any questions |
| 23 | | for me? |
| 24 | WITNESS: | No. |

```
 1    Q         Okay.  What did you do to prepare for your
 2              deposition today?
 3    MS. AMLUNG:          Other than speak with me.  Don't go
 4                         over any of that.
 5    A         I reviewed the personnel file that we have in
 6              our district office and, essentially, that was
 7              it.
 8    Q         For Mr. Kirkendall?
 9    A         Yes, correct.
10    Q         And when did you do that?
11    A         I did that early on in the process when the
12              suit was in place.  I can't remember the exact
13              date.  And then also here recently within the
14              last few days just to prepare for this.
15    Q         Okay.  And you met with an attorney at some
16              point?
17    A         Correct.
18    Q         And when was that?
19    A         That was on Friday, I believe, of last week.
20    Q         Let's go through your employment and
21              educational background.  And I'm not looking
22              for high school, but what post high school
23              education do you have?
24    A         I received my Bachelor's degree in Mathematics
```

1    from the University of Kentucky in 1990,

2    Master's degree in Education in 1991, and then

3    received certification for principalship

4    around '98, and then also my superintendent

5    certification process was about, let me see,

6    about 2004, and then just ongoing training as

7    required in the educational field.

8  Q   Any MAs from UK, as well?

9  A   Correct.

10 Q   Thank you.  And then I'd like to go through

11     your employment history as well.  You can

12     either go forward or backwards, however you

13     want to do it.  But --

14 A   Post college?

15 Q   Yeah.

16 A   Okay.  I taught at Barbourville Independent

17     Schools for three years, starting in 1991-92.

18     Then I taught at the Williamstown Independent

19     Schools for seven years.  Then I was an

20     athletic director, assistant principal,

21     combination job, for Erlanger-Elsmere

22     Independent Schools for one year.  I was

23     assistant principal at Ryle High School for

24     three years, and then the principal at Ryle

| | | |
|---|---|---|
| 1 | | High School for 14 years.  And then I've been |
| 2 | | in the role of superintendent for -- this is |
| 3 | | my third year. |
| 4 | Q | Principal was 14 years, did you say? |
| 5 | A | Correct. |
| 6 | Q | AD was at Erlanger; is that what you said? |
| 7 | A | That's right, yes. |
| 8 | Q | All right.  And these different jobs that |
| 9 | | you've had, did you leave them all |
| 10 | | voluntarily? |
| 11 | A | Yes. |
| 12 | Q | Okay.  All right.  I'd like to start -- I'd |
| 13 | | like to talk about Mr. Kirkendall.  How do you |
| 14 | | know Mr. Kirkendall? |
| 15 | A | I first met Mr. Kirkendall during the |
| 16 | | interview process for athletic director at |
| 17 | | Ryle High School. |
| 18 | Q | Okay. |
| 19 | A | I'm trying to remember the exact year.  That |
| 20 | | was my final year as principal, so it would |
| 21 | | have been August of that year, which I think |
| 22 | | would have been '19, maybe. |
| 23 | Q | Sounds right, okay.  So were you involved at |
| 24 | | all in the hiring process for the position |

| | | |
|---|---|---|
| 1 | | which Mr. Kirkendall sought? |
| 2 | A | Yes. |
| 3 | Q | Sounds like that's a yes? |
| 4 | A | Yes. |
| 5 | Q | What was your involvement? |
| 6 | A | My involvement was part of the interviews for |
| 7 | | that position, the selection process, the |
| 8 | | discussions fulfilling that job. |
| 9 | Q | Did you do anything with respect to the |
| 10 | | posting of that job? |
| 11 | A | I forwarded his -- made a recommendation to my |
| 12 | | superintendent at the time, you know, with -- |
| 13 | | recommending that he be placed in that |
| 14 | | position. |
| 15 | Q | Okay.  Prior to that, there's -- there's an |
| 16 | | opening at some point for the position, |
| 17 | | correct? |
| 18 | A | Yes. |
| 19 | Q | And what was the position that needed to be |
| 20 | | filled? |
| 21 | A | It was an athletic director position. |
| 22 | Q | Okay. |
| 23 | A | Which -- and in our school district, that is a |
| 24 | | -- I'm not sure combination is the right word |

| | | |
|---|---|---|
| 1 | | to say it, but, essentially, it's a teaching |
| 2 | | position that has a stipend, an additional |
| 3 | | stipend attached to it for the roles.  It's a |
| 4 | | full-time position. |
| 5 | Q | Okay.  And did you ever see the posting for |
| 6 | | the position? |
| 7 | A | You mean, see that it's -- see that it's |
| 8 | | there; it's on -- that it's been advertised? |
| 9 | Q | Right. |
| 10 | A | Yes. |
| 11 | Q | Did you have any involvement in the posting, |
| 12 | | whether it's drafting or putting it out there, |
| 13 | | whatever it is? |
| 14 | A | No.  I simply send a staffing request to our |
| 15 | | HR Department. |
| 16 | Q | Okay. |
| 17 | A | I sign off as the principal of the school. |
| 18 | | Here's a position that's open in the school, |
| 19 | | send that to our HR Department, and then they |
| 20 | | do the official posting. |
| 21 | Q | And the staffing request, what does that look |
| 22 | | like?  Is that just an email, or is it |
| 23 | | something else? |
| 24 | A | It's essentially a one-page form, and we do it |

```
 1              through Adobe.  And so it's a form that I fill
 2              out and you can -- you simply email that form
 3              through that process we've set up, and it goes
 4              directly to the proper person in Human
 5              Resources.
 6     Q        So it's like a one-page form for the opening.
 7              You completed it, and then you forward it to
 8              HR?
 9     A        Correct.
10     Q        And then what happens after that?
11     A        HR goes through their hiring process, which
12              they contact the applicant and go through an
13              official offer of the position.  And they
14              would go through all the aspects of bringing
15              someone on board.  I'm sure there's an
16              approval process in there that it goes
17              through.
18     Q        Well, no, but I think we're skipping ahead.
19              And that may -- we might be talking past each
20              other, which is fine.  But -- so a position
21              comes open.  Who was the AD prior to
22              Mr. Kirkendall talking over?
23     A        Jim Demler.
24     COURT REPORTER:    What was the name?
```

```
1    A        Jim Demler, D-E-M-L-E-R.

2    Q        Okay.  And he resigned with --

3    A        Uh-huh (AFFIRMATIVE).  He stepped down because

4             he retired.

5    Q        Okay.  And so there's an opening.  And then it

6             falls on your shoulders to fill out the form

7             that says we need a new AD, and you send it to

8             HR, that's the first thing that happens,

9             correct?

10   A        Correct.

11   Q        Okay.  And then HR does what?  I think we're

12            -- earlier in the process than them talking to

13            Mr. Kirkendall.

14   A        Okay.

15   Q        I mean, what do they do with your request?

16   A        That goes through the channels within HR.

17            There's multiple approvals.  You know, is this

18            the right position?  Just checking of making

19            sure this is an accurate position we want to

20            be sure is posted.

21   Q        Yeah.

22   A        So it goes through that approval process, and

23            then the position is actually advertised.

24   Q        And how does that work, if you know?
```

| 1 | A | That works through an electronic system that |
| 2 | | we have, and we post that on our district |
| 3 | | website.  There's a piece of software called |
| 4 | | Frontline that we use as a school district and |
| 5 | | so everything is sent to them and those |
| 6 | | electronic postings are available online or |
| 7 | | our website.  It's also sent to the Kentucky |
| 8 | | Department of Education who does a mass |
| 9 | | listing of all the open education jobs in |
| 10 | | Kentucky. |
| 11 | Q | Okay.  Now, we're in 2023 now, and that |
| 12 | | posting would have been out there in 2019. |
| 13 | | How do I get my hands on that posting to see |
| 14 | | what it looked like at this point?  How would |
| 15 | | I do that? |
| 16 | A | If you wanted to do it right now? |
| 17 | Q | Yeah. |
| 18 | A | That would be contacting our HR group. |
| 19 | Q | And they could -- how would they put it |
| 20 | | together? |
| 21 | A | I'm sure there's an electronic copy of it. |
| 22 | | It's saved as part of a public document, I |
| 23 | | would imagine. |
| 24 | Q | So your belief is that I can -- I mean, I may |

| | | |
|---|---|---|
| 1 | | have it; I'm not sure; I haven't looked |
| 2 | | through all the documents that have been |
| 3 | | produced. |
| 4 | A | Sure. |
| 5 | Q | But there is way to get that, okay. |
| 6 | A | I would imagine so, yes. |
| 7 | Q | Thank you, okay, that's fine.  What about the |
| 8 | | form that you filled out to send to HR, the |
| 9 | | position request? |
| 10 | A | Yes.  So we would -- yeah, we talked about the |
| 11 | | requisition, who made the -- the |
| 12 | | recommendation is a separate form, very |
| 13 | | similar to the first -- |
| 14 | Q | Yeah. |
| 15 | A | -- that the school principal or department |
| 16 | | director who may be is hiring an employee or |
| 17 | | making a recommendation to hire an employee. |
| 18 | | Essentially, that's a similar form you fill |
| 19 | | out with, here's -- here's everything about |
| 20 | | this position, multiple specific questions |
| 21 | | about what may be part of the job duties and |
| 22 | | so forth.  It doesn't have the -- the job |
| 23 | | description listed on that; that's a separate |
| 24 | | document with HR.  But it just goes through |

1        sample questions for the principal to fill

2        out.  Then the principal gives the name of the

3        person they're recommending.  They sign off on

4        it.  They send the same process -- the note

5        through the same process to Human Resources,

6        and they start the hiring process at that

7        point in time --

8    Q    And I would --

9    A    -- after approvals.

10   Q    And I would still be able to get access to

11       that form, as well you think?

12   A    I would say so, yes.

13   Q    Okay.  Are there any other documents -- and

14       even if it's electronic form, email, memo,

15       whatever it is that documents the position

16       that was open that you all were looking to

17       fill at that point?  Other than the form that

18       you sent to HR, the request form, and then the

19       actual posting, what other documents would

20       there be that would reflect this is the

21       position we're looking to fill, if any?

22   A    Other than the job description I just

23       mentioned earlier, what the job duties are as

24       an official part of our school district and

| | | |
|---|---|---|
| 1 | | for each position that we have is spelled out |
| 2 | | and approved by the Board of Education; that |
| 3 | | would be it, I think. |
| 4 | Q | Okay; I appreciate that.  All right.  So you |
| 5 | | put in the request, and then HR does whatever |
| 6 | | HR does.  And then it's posted.  And then |
| 7 | | you're getting some applicants; that's the |
| 8 | | next part of the process, correct? |
| 9 | A | Correct. |
| 10 | Q | Okay.  And do you know who receives the |
| 11 | | applications? |
| 12 | A | The formal applications -- applicants can |
| 13 | | apply online. |
| 14 | Q | Yeah. |
| 15 | A | They can fill out the form electronically. |
| 16 | Q | Okay. |
| 17 | A | And submit that in that Frontline program I |
| 18 | | just mentioned to you earlier.  We also do |
| 19 | | have some applicants that might send their |
| 20 | | information specifically to the principal or a |
| 21 | | director, someone who's hiring within the |
| 22 | | district.  The employee -- or the potential |
| 23 | | employee still has to go out and fill out the |
| 24 | | electronic application, the formal form, that |

```
 1              our district has set up.
 2   Q    Okay.  And do you recall how many people, you
 3        know, put in for this position?
 4   A    I don't know the exact number.  I think it was
 5        in the neighborhood of five to ten.  We may
 6        have had a few more applicants.
 7   Q    Okay.
 8   A    I can't quite remember -- remember the exact
 9        number.
10   Q    And do you think -- okay, all right.  What was
11        the next thing that happened?  People --
12        people put in for the job, and then what
13        happened?
14   A    Essentially, the principal or director sets up
15        a hiring process.  They will get together a
16        representative group of people to be part of
17        the decision-making for that.  So that would
18        -- in a position like an athletic director,
19        that would most likely be a member of the
20        administrative team or two.  That would
21        probably -- would be one or two more coaches,
22        a couple parents, as well, and the principal.
23   Q    Do you recall -- is that like a hiring
24        committee?
```

```
 1    A       Yes.

 2    Q       Do you recall --

 3    A       Interview committee.

 4    Q       And who was tasked with putting together this

 5            hiring or interview committee, if you

 6            remember?

 7    A       That would have been me.

 8    Q       You did that?

 9    A       Yeah, I would -- I would organize that as

10            principal; that's pretty standard because, you

11            know, this employee reports directly to the

12            principal.

13    Q       Do you have a memory of who was on the

14            committee?

15    A       I'm trying to remember which members of the

16            administrative team and which coaches.

17    Q       Well, then let me ask you this instead, is

18            that -- can you reconstruct that some way?  Is

19            there some document that reflects who was on

20            that committee?

21    A       No.

22    Q       How would I figure that out because -- because

23            right now we're relying on your memory four

24            years later.
```

```
1    A        Right.

2    Q        Is there a way to figure that out through

3             documentation or emails?  Like would there be

4             an email chain to the people on the committee

5             after an interview, or something like that

6             that would allow us to figure out --

7    A        There could be.

8    Q        Okay.

9    A        I'm not positive about that.  I know most of

10            the conversations are held as a group.  And

11            then typically the conversations, if the

12            groups not there, might be by telephone or

13            something like that for potential discussion

14            or things of that -- you know, trying to work

15            through the necess -- necessities of the

16            hiring process.  I mean, in any formal record,

17            I don't recall -- I don't -- I -- I don't

18            remember any formal record of that being

19            somewhere.

20   Q        Okay.

21   A        But it could -- could be out there, yeah.

22   Q        Okay.  All right.  Well, tell me your best

23            memory of who was on the hiring committee?

24   A        The only ones I can -- I can -- I believe that
```

```
 1              our sitting football coach at that the point

 2              and time was on it.  His name is Mike Engler.

 3              And I can't be sure of the other coach.  Might

 4              have been Pat Roesel, our baseball coach, or

 5              Tasha Lovins, maybe, our volleyball coach.

 6              Not sure which of those two.  Our parents, I

 7              cannot recall who the parents were --

 8    Q         Would there --

 9    A         -- maybe one or two.

10    MR. ALLISON:        Sorry.

11    Q         Would there definitely have been parents?

12    A         One or two, yes.  Yeah, we always try to

13              include parents in the hiring process, just to

14              gather feedback and get their opinions and

15              also buy in and communication with

16              stakeholders.

17    Q         Okay.  How do you figure out which parents

18              to --

19    A         Usually, it's a parent that may be somewhat

20              involved, you know, someone that's always

21              around.  Someone that may have -- I don't want

22              to say influence; that's not the right word,

23              but someone that's connected within the

24              community and also within the athletic
```

| | | |
|---|---|---|
| 1 | | community at large.  So you want someone that |
| 2 | | kind of understands the bigger picture and |
| 3 | | also someone that can relay information and |
| 4 | | share and talk with other people, just here's |
| 5 | | the process we followed.  Here's how things |
| 6 | | work, just, you know, just for transparency |
| 7 | | purposes.  Someone that can then communicate |
| 8 | | to others in the parent community. |
| 9 | Q | And why have coaches involved? |
| 10 | A | Because this person would be directly working |
| 11 | | with coaches. |
| 12 | Q | The AD position is a full-time position; is |
| 13 | | that correct? |
| 14 | A | That's correct. |
| 15 | Q | Okay. |
| 16 | A | It's a full-time teaching position with an |
| 17 | | additional stipend for athletic duties on top |
| 18 | | of it. |
| 19 | Q | And you were an AD for one year? |
| 20 | A | I was.  I was an athletic director/assistant |
| 21 | | principal for one year. |
| 22 | Q | And how big a school was that that you -- as |
| 23 | | compared to Ryle? |
| 24 | A | It's a school of about, I think, 1,000, give |

```
 1              or --
 2    Q         And how big --
 3    A         -- take.
 4    Q         How big is Ryle?
 5    A         Right now it's about 2,100.
 6    Q         And how would that impact -- what I'm going to
 7              try to get at is how much time would you
 8              expect somebody to have to spend on their AD
 9              responsibilities at a school of like
10              2,000-plus, as opposed to a school of
11              1,000-plus?  That's what I want to try to get
12              at.
13    A         You mean what's the difference between your
14              time or --
15    Q         Well, so, you know, my dad was an athletic
16              director, and he'll -- he'll tell me, you
17              know, it's a full-time job.  You can't do
18              anything else.  Right.  Is that your take on
19              it or not?
20    A         It's a very busy job, yes.
21    Q         Okay.
22    A         It takes quite a bit of time.  You know,
23              there's -- there's time during the school day
24              and also events at night when athletic
```

```
 1                    activities are happening.

 2    Q             Okay.  And so would you expect -- in other

 3                   words, you know, would you expect -- would you

 4                   expect Mr. Kirkendall, if he's hired as the

 5                   athletic director at Ryle, to be spending all

 6                   of his time doing athletic -- athletic

 7                   director duties?

 8    A             Yes.

 9    Q             Okay.

10    A             Now, let me -- let me qualify that, though.

11                   Mr. Kirkendall's predecessor, Jim Demler, in

12                   that role, he actually taught for one period a

13                   day.  And so in addition to the job of

14                   athletic director and all that entails, he

15                   taught class one period a day.  And that was

16                   in my entire tenure -- his entire tenure, I

17                   should say, and mine as principal, he did

18                   that.

19    Q             And what about when you were -- now, you would

20                   agree with me, I think, that when you were the

21                   athletic director of a school half the size,

22                   it might not be as challenging as being the

23                   athletic director twice the size, or am I

24                   wrong on that?
```

| | | |
|---|---|---|
| 1 | A | There may be some -- some slightly different |
| 2 | | challenges, just in terms of scope. |
| 3 | Q | Okay. |
| 4 | A | The number of sports, essentially, are the |
| 5 | | same. |
| 6 | Q | Takes as much time. |
| 7 | A | It takes a lot of time as well in that role. |
| 8 | | You know, is it slightly different in terms of |
| 9 | | there may be a few more teams; there may be a |
| 10 | | few more freshman teams or JV teams just |
| 11 | | because of the sheer number of athletes? |
| 12 | | Yeah, there's -- there's more. |
| 13 | Q | Okay.  So going back to the hiring of Mr. |
| 14 | | Kirkendall, do you know if somebody had been |
| 15 | | offered the position before him? |
| 16 | A | There was discussion -- you mean, with that |
| 17 | | position that he -- |
| 18 | Q | Yeah. |
| 19 | A | There was discussion with another candidate |
| 20 | | prior to Mr. Kirkendall. |
| 21 | Q | And what happened with that? |
| 22 | A | That was just a candidate that we were |
| 23 | | interested in and we had discussions, |
| 24 | | unofficial, at that point in time.  And it |

```
 1              didn't work out and then we continued on with
 2              the hiring process.
 3    Q         Okay.  And do you have a memory of
 4              interviewing Mr. Kirkendall?
 5    A         I have a vague memory of it.  I don't recall
 6              much of it.
 7    Q         So after he was interviewed, and that would
 8              have been by the whole committee, the whole
 9              hiring committee?
10    A         Uh-huh (AFFIRMATIVE).  Yes.  I'm sorry.
11    Q         That's okay.  And then after that interview is
12              when you made the recommendation to HR,
13              correct?
14    A         Correct.
15    Q         And is that -- is there a document that
16              captures that?
17    A         That recommendation?
18    Q         Yeah.
19    A         Yeah, as was mentioned earlier, yes, that's
20              that standard recommendation form that our
21              school district uses.
22    Q         Okay.  And then there are multiple contracts
23              that a person signs when they're hired on at
24              Ryle, correct?
```

```
 1   A        Yeah.  There's essentially one contract, but
 2            there may be some other contracts.  But it's
 3            additional duties --
 4   Q        Okay.
 5   A        -- and so forth that are there, like, for
 6            example -- well, go ahead.
 7   Q        Okay.  And so somebody, I would assume, meets
 8            with Mr. Kirkendall and reviews his contracts
 9            with him and -- and has -- has him sign off;
10            is that how the process works?  It's an in-
11            person meeting?
12   A        Yes.  And the contracts are sent to the
13            principal for -- for all teaching contracts,
14            for all extra-duty contracts.  The principal
15            then meets, touches base with each of the
16            employees to make sure they have their
17            contract, and they have an opportunity to
18            review it.  Then they'll have to sign off on
19            it, if they wish, and return it back or not.
20   Q        Okay.  In this case, do you know who initially
21            met with Mr. Kirkendall to go over his
22            contracts?  Was that you or was that somebody
23            else?
24   A        That -- that would have been me.
```

```
1    Q       And do you recall doing that?

2    A       I do not, right off.  My memory does not -- I

3            don't recall that.

4    Q       Okay.  But your typical process would be --

5            and correct me if I'm wrong, but your typical

6            process would be meet with the employee.

7            You'd have the contracts.  You'd give them to

8            the employee.  They would review them.  You'd

9            have some discussion.

10   A       If there's any questions.

11   Q       And then you'd -- and they'd sign off on them

12           right there with you there; that's how that

13           would work?

14   A       Sometimes they would sign off on them and --

15           and -- beforehand, and give them to me.

16   Q       Okay.  And do you -- do you recall what

17           discussion, if any, you had with Mr.

18           Kirkendall at the time about what the role was

19           that he was accepting?

20   A       I'm not sure I recall that conversation with

21           the contract, to be honest, but I -- I just

22           don't remember.

23   Q       So, you know, Mr. Kirkendall testified in this

24           case that in that process that you had told
```

```
 1                    him, you know, you're -- you're being hired
 2                    for the AD position.  Everybody gets hired in
 3                    as a teacher.
 4      A             Correct.
 5      Q             I'm paraphrasing a bit.
 6      A             Okay.
 7      Q             But everybody gets hired in as a teacher, but
 8                    this is really an AD position, and that's what
 9                    I'm expecting you to be doing.  Do you recall
10                    if you said that?
11      A             Yeah, I'm sure we had a meeting to discuss
12                    that aspect of it, because it is unique.
13      Q             Okay.  In what way?
14      A             Well, just -- just unique in terms of in -- in
15                    Boone County there is a teaching position that
16                    -- that -- that role -- in that role.  There's
17                    also the athletic director extra duty
18                    position.  So someone could be hired in just
19                    as an athletic director and have no teaching
20                    duty.  However, the salary would be very
21                    different.
22      Q             Yeah, how would that work?  Well, actually
23                    before I get to that question.  When you say
24                    somebody could be hired just as the athletic
```

```
  1              director --

  2    A         Correct.

  3    Q         -- you mean at Ryle or do you mean somewhere

  4              else?

  5    A         In our county.

  6    Q         In your county.

  7    A         The way our county has it organized.  The

  8              athletic director is an extra duty position.

  9              So there's a certain list of requirements and

 10              a contract for that.  Then there's a teacher

 11              contract --

 12    Q         Yep.

 13    A         -- as well.  And so, typically, what all four

 14              of our high schools do is we hire someone in

 15              to be the athletic director, and we allocate a

 16              teaching position to that.

 17    Q         That's -- that's typically what you do in your

 18              --

 19    A         School district.

 20    Q         -- district?

 21    A         Yes.  However, it can be done the other way,

 22              as well.

 23    Q         But the other way is not what's done in your

 24              district?
```

| | | |
|---|---|---|
| 1 | A | Well, different districts can do that |
| 2 | | differently.  They handle that in a very |
| 3 | | different way. |
| 4 | Q | Yeah.  Nevertheless, when you met with |
| 5 | | Mr. Kirkendall, did you tell him, you know, |
| 6 | | even though everybody gets hired as a teacher, |
| 7 | | your job is the AD job and that's what you're |
| 8 | | supposed to be doing? |
| 9 | A | I don't recall having a specific -- I |
| 10 | | typically have a meeting like that to explain, |
| 11 | | here's the contract; here's how the process |
| 12 | | works; there's an extra duty job and your |
| 13 | | teaching job. |
| 14 | Q | Okay. |
| 15 | A | I don't specifically recall. |
| 16 | Q | If he testified that that's what you said, |
| 17 | | would you disagree with that or -- |
| 18 | A | If he testified to what? |
| 19 | Q | If Mr. Kirkendall testified that in your |
| 20 | | meeting with him, you told him, look, |
| 21 | | everybody gets hired in as a teaching, but |
| 22 | | you're really being hired in as the AD, that's |
| 23 | | what your job duties are going to be, would |
| 24 | | you dispute that you said that or disagree? |

```
 1    A        No, I would not dispute that.
 2    Q        Okay.  And do you have the authority to hire
 3             some -- as the principal, do you have the
 4             authority to hire somebody in and tell them,
 5             look, even though you've got this teacher
 6             contract, your duties are going to be this
 7             other role, whether it's band director or
 8             athletic director or something else?
 9    A        Well, there's job duties that are officially
10             approved by the Board of Education that are in
11             place.  So those are just the standard for
12             positions and what they may be required to do.
13             And so, invariably, there can be additional
14             duties that someone may have to follow.  There
15             is a clause in those contracts, duties as
16             assigned by their supervisor.  And there's
17             been times as a principal, I had to ask
18             someone to step in to this role or step in to
19             that role, based on unique situations.
20    Q        Uh-huh (AFFIRMATIVE).  And Mr. Kirkendall,
21             after he was hired, he was reporting to you,
22             correct?
23    A        As athletic director, yes, he was.
24    Q        Okay.  And you had the authority to direct his
```

```
 1              work, correct?
 2      A       Yes.
 3      Q       You did not have to ask anybody above your
 4              head what to do in terms of directing what
 5              Mr. Kirkendall was going to do; is that
 6              correct?
 7      A       I did not need permission for that, if that's
 8              what you're asking.
 9      Q       That's what I'm asking.  Thank you.  Sometimes
10              the answer clarifies the question when the
11              question isn't very good.  So I appreciate
12              that.  Okay.  Do you have any memory of
13              Mr. Kirkendall's day-to-day duties after he
14              was hired?  What was his -- what did his
15              schedule look like?
16      A       As athletic director, it varies, depending on
17              the season.  And there's different time
18              constraints, depending on which -- fall
19              sports, winter sports, spring sports, summer,
20              things of that nature.  Daily duties,
21              typically, the athletic director, as I
22              mentioned before, may be teaching a class.
23              They may be supervising; have hallway duty.
24              They may be supervising during lunch sometimes
```

```
 1                 with administrators.  It's, essentially, what
 2                 may be required at the time.  Typically,
 3                 though, it's duties like that.
 4       Q         Okay.  Did you form an impression in working
 5                 with Mr. Kirkendall as to whether he was
 6                 performing well or poorly in that first year?
 7       A         Overall, seemed to be doing fine by my
 8                 measures.
 9       Q         And you were the principal that last year,
10                 2019-2020 school year, correct?
11       A         That's correct.
12       Q         And then at what point in time did you leave
13                 that principal position?
14       A         I started in my current position July 1 of
15                 '20.
16       Q         Yeah, July 1 of '20, okay.  Superintendent,
17                 correct?
18       A         Correct.
19       Q         Okay.  And once that happens, how much would
20                 you have your finger on the pulse of what was
21                 happening at Ryle after you became
22                 superintendent?
23       A         Not so much.
24       Q         Okay.
```

```
 1    A      Would not have contact unless necessary.
 2           Unless, you know, the principal or someone at
 3           the school felt something was necessary that
 4           would, you know, rise to the superintendent's
 5           level.
 6    Q      Yeah.
 7    A      But, typically, at that point, I'm
 8           administrating 27 schools and programs --
 9    Q      Right.
10    A      -- rather than one.
11    Q      Right, okay.  So your knowledge of day-to-day
12           happenings at Ryle is dramatically different
13           from the 2019-2020 year to the 2020-'21 year,
14           correct?
15    A      Yes.
16    Q      Okay.
17    A      Yes.
18    Q      Okay.  All right, that helps.  Do you know if
19           Mr. Kirkendall was performing any teaching
20           responsibilities in that 2019-2020 year when
21           you were principal?
22    A      He was not.
23    Q      Do you know if he was the next year?
24    A      I do not think so.  I don't believe so.
```

1    Q        Okay.

2    A        But I'm not positive of that.

3    Q        Right.  Because at that point, you don't --

4             you're not there?

5    A        Right.

6    Q        Do you change location too?  I mean, if you're

7             the principal, you were at Ryle every day,

8             right?

9    A        Yes.

10   Q        Okay.

11   A        Yeah.

12   Q        Okay.  And you're not; you're the

13            superintendent?

14   A        Right, I'm at the district office, whole

15            different location.

16   Q        And to prepare for your deposition today, you

17            went back through Mr. Kirkendall's file; is

18            that correct?

19   A        Correct, the one at the district office.

20   Q        Okay.  All right.  And that -- so if there was

21            anything in his personnel file that would, you

22            know, impact your memory of his job

23            performance in the 2019-2020 year, you would

24            have seen that?

```
 1    A       I'm sorry?

 2    Q       If there was any sort of like, you know,

 3            discipline or any sort of, you know, positive

 4            pat on the back, all of that stuff would have

 5            been in that file?

 6    A       Well, there's very specific items that are in

 7            the personnel file.

 8    Q       Okay.  All right.  But, nevertheless, your

 9            testimony today, I think, was that you

10            thought things were going fine; is that what

11            you said?

12    A       From my general viewpoint of the school year

13            when I was at Ryle, he was performing

14            satisfactorily.

15    Q       Okay.  Now, other than -- than you, would

16            anybody else make any representations to Mr.

17            Kirkendall about the position he was being

18            hired for as he was being hired, to your

19            knowledge?

20    A       Well, I would say that once an employee is

21            recommended, they interact with Human

22            Resources, various personnel there.  So they

23            may have some type of conversation at that

24            point in time reviewing a job description or
```

1              discussing a position.

2      Q      Yeah, that wasn't a great question, but I

3              appreciate that answer, okay.  So

4              Mr. Kirkendall raised some concerns during his

5              employment, a lot of which may have happened

6              after you became superintendent, but I'm going

7              to go through and see to what extent you have

8              any knowledge of any of these matters.  He had

9              one interaction with a Charity Ehrenberg.  She

10             was -- she had come to his office and was

11             upset about something.  I think she wanted to

12             be the track coach, and they had an

13             interaction that was pretty negative.  And I

14             believe she went up to your office and had

15             complained about Mr. Kirkendall; does any of

16             that ring a bell?

17     A      I do remember a little bit of that, yes.

18     Q      Do you recall what happened there with that

19             circumstance?

20     A      I don't, other then there seemed to be some

21             type of disagreement or misunderstanding.  I'm

22             not sure how to phrase that, but some type of

23             conflict.

24     Q      Do you have any memory as to who was in the

```
 1              wrong?
 2    A         I'm really not -- I'm really not sure.  I
 3              don't really remember the specifics of what it
 4              was.  But I do remember there was conflict of
 5              some sort or misunderstanding of some sort
 6              between the two of them.
 7    Q         Do you recall having any interaction with
 8              Mr. Kirkendall about how he conducted himself?
 9    A         Not really.
10    Q         Do you recall telling him anything along the
11              lines of, I think you were mean, anything like
12              that?
13    A         No.
14    Q         You're bigger, anything like that?
15    A         There could have been a comment.  That is
16              something I'll often talk to teachers and
17              others about when we're working with children,
18              typically, being larger than -- in stature and
19              making sure that we're mindful of that when
20              we're -- we don't want to appear intimidating
21              when we're working with kids or -- and
22              especially, you know, someone of my height,
23              being 6'2, I try to make sure I get down to
24              the level of my students when I'm teaching or
```

| | | |
|---|---|---|
| 1 | | just being mindful of that.  But that's a |
| 2 | | fairly normal conversation I've had with |
| 3 | | people at times over the years. |
| 4 | Q | But you don't have a specific memory in this |
| 5 | | case of whether you had a conversation like |
| 6 | | that with Mr. Kirkendall? |
| 7 | A | I don't remember. |
| 8 | Q | That's fine.  Another issue that he raised, |
| 9 | | there was a Pete Coleman who was a community |
| 10 | | member, and I think an announcer at some |
| 11 | | sports events, and Mr. Kirkendall had |
| 12 | | complained that Mr. Coleman was harassing him. |
| 13 | | Do you remember anything about that? |
| 14 | A | Not really.  I have a vague memory of it. |
| 15 | Q | What do you remember? |
| 16 | A | I just remember there being -- I mean, you |
| 17 | | mentioning Pete Coleman's name, I remember |
| 18 | | that name, and that there was something that |
| 19 | | had happened at that time.  I don't recall |
| 20 | | exactly. |
| 21 | Q | Do you remember how that got resolved? |
| 22 | A | No, I don't. |
| 23 | Q | There was a concern raised by a parent, I |
| 24 | | believe, about the football coach and whether |

| | | |
|---|---|---|
| 1 | | the football coach was treating the players in |
| 2 | | a racially discriminatory manner.  I think it |
| 3 | | was around playing time.  Do you recall |
| 4 | | anything like that?  This would have been that |
| 5 | | last year you were -- |
| 6 | A | I do remember there was -- there was a parent |
| 7 | | that had come forward with some concerns about |
| 8 | | the football coach.  Some other parents had, |
| 9 | | as well at times.  Unfortunately, that happens |
| 10 | | on a regular occurrence. |
| 11 | Q | And do you recall having any interaction with |
| 12 | | Mr. Kirkendall over that issue? |
| 13 | A | I think I remember, but I'm not -- I don't |
| 14 | | remember any of the details, but I remember we |
| 15 | | talked about an issue or two, but I don't |
| 16 | | remember any specifics. |
| 17 | Q | Do you recall the resolution of that matter? |
| 18 | A | No, not speci -- I don't. |
| 19 | Q | Okay. |
| 20 | A | I don't. |
| 21 | Q | That's fair.  Did you ever tell Mr. Kirkendall |
| 22 | | not to interact with students because the |
| 23 | | coaches might not like it or words to that |
| 24 | | effect? |

```
 1    A        Can you rephrase that?

 2    Q        Yeah.

 3    A        I'm not sure I understand.

 4    Q        Did you ever say to Mr. Kirkendall, you know,

 5             look, you really shouldn't be talking to

 6             students because the coaches might react

 7             negatively to that.  They might feel like

 8             you're stepping on their toes, words to that

 9             effect?

10    A        I don't recall that.

11    Q        Sentiments to that effect?  Okay.  Would you

12             dispute having said something like that?

13    A        Would I -- would I dispute that I did say

14             that?

15    Q        Yeah.

16    A        I don't recall --

17    Q        Okay.

18    A        -- saying that or being involved in a

19             conversation about that.

20    Q        Do you believe that?  In other words, do you

21             believe that the athletic director should be

22             cautious about how much interaction they have

23             with students because coaches might feel like

24             their toes are getting stepped on?  Is that an
```

| | | |
|---|---|---|
| 1 | | opinion you have? |
| 2 | A | It sounds like more of an opinion.  I mean, I |
| 3 | | can give you my thoughts on -- |
| 4 | Q | Yes, please do. |
| 5 | A | In a very general sense -- I'm trying to think |
| 6 | | of the right analogy for it.  But we deal in |
| 7 | | relationships in working with kids and |
| 8 | | schools, and so whether it's interaction with |
| 9 | | the teacher and a student and trying to |
| 10 | | navigate some type of disagreement or whether |
| 11 | | it's a coach and playing time, whatever that |
| 12 | | may be, navigating a disagreement there, just |
| 13 | | having to be mindful of the dynamic of, you |
| 14 | | know, making -- making sure that people can |
| 15 | | effectively do their job and try to -- you |
| 16 | | know, as a leader, I always try not to |
| 17 | | micromanage people in that fashion.  I think |
| 18 | | that's standard for people in -- in my |
| 19 | | position because I have 120 employees, 140 |
| 20 | | employees that I'm responsible for.  So I |
| 21 | | guess that's the best context I can provide |
| 22 | | for you. |
| 23 | Q | Okay, that's fine.  Mr. Kirkendall testified |
| 24 | | that Mr. Shafer made the statement, you look |

| | | |
|---|---|---|
| 1 | | like you went to Princeton and I look like I |
| 2 | | went to Sycamore.  Do you have any knowledge |
| 3 | | of that allegation? |
| 4 | A | I do not. |
| 5 | Q | Mr. Kirkendall made an allegation that Matt |
| 6 | | Shafer wanted him to partner up with his boy, |
| 7 | | Pastura, and said words to that effect.  Did |
| 8 | | you ever hear that before today? |
| 9 | A | No, I did not. |
| 10 | | (OFF THE RECORD) |
| 11 | Q | There's an allegation that you had had a |
| 12 | | conversation with Mr. Kirkendall about |
| 13 | | learning how to talk to nonwhite students; do |
| 14 | | you recall anything like that? |
| 15 | A | No, I don't. |
| 16 | Q | Okay.  So the pandemic hits in 2020, and that |
| 17 | | happens in March, I think.  Do you have a |
| 18 | | recollection of when the dramatic changes to |
| 19 | | remote learning and -- and all of that |
| 20 | | happened? |
| 21 | A | Middle of March 2020. |
| 22 | Q | Yeah, okay. |
| 23 | A | We were shut down. |
| 24 | Q | Athletic events, all shut down? |

```
 1    A      Everything was shut down.  So virtual
 2           instruction at that point in time.
 3    Q      Yeah.
 4    A      Students -- students stayed home, didn't come
 5           in to the school for -- for any reason.
 6    Q      Yeah, okay.  And then by mid summer you're now
 7           the superintendent.  There were a number of
 8           requests for leave.  There's FMLA leave, and
 9           then there were different types of leave that
10           became available in connection with Covid;
11           that there were all new types of leave.
12           Mr. Kirkendall requested leave.  This is after
13           -- but this is after you were the
14           superintendent.  So do you have any knowledge
15           whatsoever of Mr. Kirkendall's request for and
16           utilization of leave?
17    A      I don't specifically remember his leave.  All
18           -- any leave requests goes through our HR
19           Department and then, ultimately, does come up
20           to me for just the final signature on it.
21    Q      As the superintendent?
22    A      Uh-huh (AFFIRMATIVE).
23    Q      Okay.
24    A      Well, for certain leaves, specific types of
```

```
 1              leave, yes.
 2    Q         Okay.  But by the time it gets to your desk,
 3              you're -- you're not doing any analysis of
 4              whether or not the leave is appropriate, right
 5              --
 6    A         Not unless --
 7    Q         -- at all?
 8    A         Not unless the HR Director came to me and
 9              said, this -- we need to discuss this, or we
10              need to -- there may be an issue or some type
11              of mediating factor, something might be unique
12              about it.
13    Q         And you have no memory of that happening with
14              respect to Mr. Kirkendall, correct?
15    A         I do not.  We had an enormous number of leave
16              requests and -- and a variety of different
17              requests at that point in time with working
18              conditions.
19    Q         I think Mr. Rigg testified -- well, I can't
20              remember what he said, but it was a large
21              number; it was a large number, not surprising,
22              okay.  So do you know when Mr. Kirkendall
23              began leave, when he ended his leave, anything
24              like that?
```

```
 1    A        I don't recall the specifics, no.
 2    Q        Or the type of leave or the reason for leave,
 3             none of that, correct?
 4    A        I do not.
 5    Q        Okay.  Because at this point, it's just a
 6             piece of paper coming across your desk?
 7    A        (NODS AFFIRMATIVE).
 8    COURT REPORTER:    Yes?
 9    A        Correct.  Sorry.
10    Q        Do you recall there being an issue with
11             students starting to really struggle in
12             connection with the remote learning?  That's a
13             really broad question.
14    A        Thank you.
15    Q        Yeah, so that's appropriate.  Just ask me to
16             rephrase.
17    A        Yeah.
18    Q        That's fine.
19    A        Could you rephrase?
20    Q        My understanding is that there were a number
21             of students at Ryle, and I imagine elsewhere,
22             who were really starting to struggle with
23             remote learning and falling behind.  And Cody
24             Ryan, Matt Shafer, among others, the
```

```
 1                    principal, the assistant principal had sort of

 2                    a plan in place on how to start contacting

 3                    these students and getting them, you know, up

 4                    to speed, sort of divided that work up.  Do

 5                    you know anything about any of that?

 6      A            Very loosely.

 7      Q            What do you know?

 8      A            I -- I just know that at each of our schools

 9                    there was a concerted effort in the spring of

10                    '20 to the end of the school year, the last

11                    couple of months of the school year, to try

12                    to stay in personal contact with kids,

13                    especially kids that may be behind, having

14                    some academic struggles or mental health

15                    struggles, whatever it may be, connecting with

16                    kids that may need part of the free and

17                    reduced lunch program that we have.  So trying

18                    to connect with -- with those students.  So

19                    that outreach occurred quite a bit during the

20                    last part of the school year.  And then it

21                    continued into the next school year even as

22                    well with students that were not responsive to

23                    virtual instruction, maybe falling behind,

24                    maybe not submitting any type of work.  So,
```

```
 1              essentially, schools had to get every resource
 2              they could get together to make some personal
 3              contact to assist teachers with kids that are
 4              struggling or kids that had, essentially,
 5              disappeared and trying to get in contact with
 6              their parents or try to get in contact with
 7              the student, trying to find ways to help them
 8              re-engage with their teachers and try to keep
 9              moving forward.
10      Q       Uh-huh (AFFIRMATIVE).  And do you know on a
11              more specific level how that work was divvied
12              up at Ryle, who was tasked with what, how
13              those decisions were made of who was going to
14              do what, anything like that?
15      A       Not in the following school year, the 2021
16              school year.  I know a little bit about the
17              end of the '19-'20 school year just because
18              that's when I was principal at the point in
19              time.
20      Q       Yeah.  I'm really focused more on the end of
21              2020, coming into 2021.  And you don't really
22              have any knowledge of the specifics of that?
23      A       Different schools did it in different
24              fashions, depending on their -- their staff,
```

```
 1                    their teachers, their administrators.

 2      Q            Okay.  And when you were the principal, what

 3                   was this -- let me just set some context.  So

 4                   the school year only had a couple of months

 5                   left, you know, when you were principal and

 6                   after the pandemic hit.  So you're going to

 7                   start to see some of those challenges with

 8                   kids during that period of time.  But I would

 9                   assume that half a year into it, when you get

10                   to the end of 2020 and you're through an

11                   entire whole semester, the level of

12                   sophistication in dealing with that issue

13                   would sort of ramp up?  Does that sound right

14                   to you?

15      A            Can you rephrase that?  I'm not sure what

16                   you're asking.

17      Q            The school is probably going to have a more

18                   sophisticated response to the problem of

19                   children falling through the cracks further

20                   into the pandemic than in that first couple of

21                   months?

22      A            It may be different, yes.

23      Q            Okay.  Do you know what the differences were

24                   in terms of what Ryle was doing in those
```

1         couple of months right after the pandemic hit

2         as compared to what it was doing in the

3         December-January time frame, you know, at the

4         end of the year?

5    A    I do not.

6    Q    Okay.

7    A    I don't -- I don't remember any specifics

8         about that.

9    Q    Do you recall what steps you took when you

10        were the principal to address kids falling

11        through the cracks?  I mean, maybe that wasn't

12        happening that much yet.  You know, I don't

13        know.

14   A    No, it was not happening -- that was not

15        happening as much.  You know, essentially, the

16        structure of the school when I was principal

17        was that we had an assistant principal,

18        guidance counsel pair that worked with a

19        certain part of the alphabet, and then a

20        separate one for another part of the alphabet,

21        and so on.  So they would be working as a

22        pair, contacting teachers, reaching out to

23        students, reaching out to families.  Moving

24        into the next year when things intensified a

```
 1                    little bit, and I'm speaking just as a whole,

 2                    across the whole district --

 3      Q            Yes.

 4      A            -- with students falling further behind and

 5                    the concern with that -- with virtual

 6                    instruction, providing resources.  There was a

 7                    variety of different strategies across the

 8                    whole district in different schools, different

 9                    elementary schools, middle and high, trying

10                    to approach that in creative and useful ways.

11                    So there's lots of different strategies that

12                    were being used during that time.

13      Q            So whatever the principal and assistant

14                    principals were doing at Ryle and the other --

15                    I mean, you had 27 different schools you were

16                    superintendent over, correct?

17      A            Correct.

18      Q            Whatever they were doing, you weren't

19                    involved?

20      A            Not on a day-to-day basis, yeah.

21      MR. ALLISON:        That was my question.  All right.

22                           Why don't we take a quick, you know,

23                           three to five minute comfort break

24                           and come back?  Thank you.
```

```
 1                    (A BREAK IS TAKEN)
 2    Q     So we finish out the 2019-2020 school year,
 3          then we get into the next year.  And then
 4          when's the next time you have any sort of
 5          dealings with Mario Kirkendall?
 6    A     I'm aware from Eric McArtor, my deputy
 7          superintendent, that there's -- there's a
 8          concern that had been shared with him.  The
 9          principal, he had come forward to him that
10          there may be a disciplinary matter, an
11          employee disciplinary matter that was
12          involving Mr. Kirkendall.
13    Q     Okay.  So that's -- really no involvement with
14          Mr. Kirkendall until we get into the
15          disciplinary matter that, ultimately, results
16          in his separation; is that correct?
17    A     Correct.
18    Q     So why don't you walk me through you sort of
19          start to finish -- well, let's do it this way.
20          So when do you think you first heard from
21          Mr. McArtor?
22    A     I think it was in December, early December, if
23          I'm not mistaken.
24    Q     Okay.
```

| | | |
|---|---|---|
| 1 | A | Sometime in there. |
| 2 | Q | And what did that look like?  Is that a phone |
| 3 | | call, an email? |
| 4 | A | It's typically a phone call or a |
| 5 | | person-to-person conversation.  His office is |
| 6 | | right next door to mine.  So in a dis -- in an |
| 7 | | employee disciplinary matter, he would come |
| 8 | | forward to me that he's got this -- this |
| 9 | | concern and to kind of understand what -- what |
| 10 | | the case was, so to speak, what the facts of |
| 11 | | the situation are and determine -- and |
| 12 | | determine whether there's -- there's a hearing |
| 13 | | or not. |
| 14 | Q | Okay.  McArtor's office is right next to |
| 15 | | yours.  That's still true today? |
| 16 | A | Yes. |
| 17 | Q | Okay.  So do you have any -- tell me to the |
| 18 | | best of your memory what was relayed to you |
| 19 | | about the potential disciplinary matter with |
| 20 | | Mr. Kirkendall in December of 2020. |
| 21 | A | Just information regarding refusal to do some |
| 22 | | work with the school that the principal had |
| 23 | | directed, in terms of, helping to cover a |
| 24 | | class, helping to work with some students in |

1          the school building.

2     Q    Okay.  And what did you do with that

3          information?

4     A    Well, that was just part of determining

5          whether or not there's going to be a hearing

6          or not.  So a hearing was then scheduled at

7          that point in time.

8     Q    And did Mr. McArtor have to -- is he relaying

9          that information to you because you're the one

10         who has the authority to recommend that

11         there's a hearing or is he just telling you

12         what's happening?

13    A    Well, he's telling me what's happening because

14         I'm the only one that can terminate an

15         employee in the school district.

16    Q    Okay.  So Mr. McArtor comes to you and says,

17         hey, we have a disciplinary matter.  We're

18         going to schedule a hearing.  This is somebody

19         that -- this could wind up in termination,

20         that's --

21    A    Correct.

22    Q    Okay.  All right.  What's the next thing that

23         happened?

24    A    He held a hearing with Mr. Kirkendall, and

| | | |
|---|---|---|
| 1 | | then he brought the results of that hearing to |
| 2 | | me, and he made a recommendation to terminate |
| 3 | | the employee. |
| 4 | Q | Okay.  And you were not part of the hearing, |
| 5 | | correct? |
| 6 | A | No, I was not. |
| 7 | Q | Your involvement was just getting the |
| 8 | | information from Mr. McArtor after the |
| 9 | | hearing? |
| 10 | A | Correct. |
| 11 | Q | And what form did that take, a document, a |
| 12 | | conversation? |
| 13 | A | A conversation.  There -- I don't think there |
| 14 | | were any notes, specifically that come out of |
| 15 | | that process. |
| 16 | Q | Can you tell me to the best of your memory |
| 17 | | what was relayed to you at that point after |
| 18 | | the hearing? |
| 19 | A | It was relayed to me that Mr. Kirkendall did |
| 20 | | not follow the directions of his supervisor in |
| 21 | | terms of covering a class that he was asked to |
| 22 | | cover.  I believe it may have been during the |
| 23 | | lunch period of the school day, and working |
| 24 | | with some students that were in -- in that |

```
 1              class, making sure -- making sure they were
 2              getting work done, supervising them.
 3              Essentially, just taking over the job of
 4              watching over their academic work, making sure
 5              they didn't get behind, making sure they were
 6              doing what they were supposed to be doing.
 7    Q         Okay.  There's that conversation.  Is there
 8              anything in writing?
 9    A         In regard to that?
10    Q         Yeah.
11    A         I think the only thing is the letter that then
12              goes to Mr. Kirkendall telling him there's
13              going to be a hearing.
14    Q         Do you draft up or author any letter?
15    A         Well, it comes from my office, yes.  I sign
16              off on it.
17    Q         Okay.  Who drafts it?
18    A         Typically, my assist -- executive assistant
19              does that, and she and I work together on
20              that.
21    Q         Now, you had mentioned a letter that would go
22              to Mr. Kirkendall telling him that there was
23              going to be a hearing.  I was asking about,
24              you know, is there, you know, a documentation
```

| | | |
|---|---|---|
| 1 | | that comes from Mr. McArtor to you as he's |
| 2 | | telling you the results of the hearing; that's |
| 3 | | what I was asking? |
| 4 | A | No.  That's just a -- he'll -- he relays the |
| 5 | | results or his recommendation, I should say, |
| 6 | | and shares any evidence he has from that |
| 7 | | hearing with me. |
| 8 | Q | And then you make a decision? |
| 9 | A | Correct. |
| 10 | Q | And so you made the decision in this instance |
| 11 | | to separate Mr. Kirkendall? |
| 12 | A | That's correct. |
| 13 | Q | And why did you do that? |
| 14 | A | Because of the situation in which he just |
| 15 | | completely disregarded the directive of his |
| 16 | | supervisor, the principal, to cover a class |
| 17 | | during a time in which that was an urgent need |
| 18 | | with the pandemic.  As we had spoken earlier, |
| 19 | | we had talked a lot about all the different |
| 20 | | strategies that we started taking on as a |
| 21 | | school system to help make sure our students |
| 22 | | were not falling -- or that were already |
| 23 | | falling behind, did not falling further |
| 24 | | behind.  So it literally was, everyone has to |

```
 1              assist in that matter.
 2    Q         Simple as that; he refused to follow
 3              instruction of the principal with regard to a
 4              particular class.  That's what the decision
 5              was based on, correct?
 6    A         Correct.
 7    Q         Was there any discussion around FMLA, the
 8              requirements of FMLA, how that, you know,
 9              jives with Mr. Kirkendall's responsibilities,
10              anything like that?
11  MS. AMLUNG:        And I would just OBJECT, to the
12                     extent that you talked with our
13                     office at any point in time, do not
14                     discuss that here.
15    Q         Do you want some help on that?  Okay.  So if
16              you had any conversations, let's start there.
17              In the process of making a decision to
18              terminate Mr. Kirkendall, did you have any
19              dialogue?  And I'm not looking for the
20              contents.  Did you have any dialogue with any
21              attorneys about the -- did you have any
22              dialogue with any attorneys close in time to
23              making the decision to terminate
24              Mr. Kirkendall?
```

```
 1   A         Close in time?

 2   Q         Uh-huh (AFFIRMATIVE).

 3   A         Regarding this particular case?  I mean, I --

 4             I --

 5   Q         Yeah, I think I can get at that.  Meaning did

 6             you have any dialogue with attorneys about

 7             Mr. Kirkendall and potentially separating him

 8             and get advice on that?

 9   MS. AMLUNG:      I'm going to OBJECT again, just

10                    because I think we're hedging into

11                    the --

12   MR. ALLISON:     Little --

13   MS. AMLUNG:      -- legal advise --

14   MR. ALLISON:     -- little too close?

15   MS. AMLUNG:      -- that I'm giving.  I mean, I can

16                    state that our office usually is

17                    involved with the termination of any

18                    contract.

19   MR. ALLISON:     Okay.

20   MS. AMLUNG:      But I'm not comfortable letting

21                    Mr. Turner explain anything further

22                    than that.

23   MR. ALLISON:     Okay.

24   Q         Do you know if you had contact with the Adams
```

| | | |
|---|---|---|
| 1 | | Law firm close in time to Mr. Kirkendall's |
| 2 | | termination? |
| 3 | A | It's hard for me to -- I really don't recall. |
| 4 | | But I can tell you during that fall I was |
| 5 | | probably in touch with our attorneys on an |
| 6 | | almost every-other-day basis due to all the |
| 7 | | work going on with -- with the pandemic and |
| 8 | | all the different legal issues that were at |
| 9 | | hand with the pandemic. |
| 10 | Q | Okay.  So no specific memory of -- all right, |
| 11 | | okay.  So what I'm looking for is separate |
| 12 | | and apart from any communications you may have |
| 13 | | had with attorneys, was there dialogue about |
| 14 | | Mr. Kirkendall's leave, his -- what's |
| 15 | | permissible and not permissible in connection |
| 16 | | with his leave and terminating him and |
| 17 | | changing duties, anything like that? |
| 18 | A | I do not remember specifically. |
| 19 | Q | And then once you make the decision to |
| 20 | | terminate him, how is that -- what happens |
| 21 | | next?  Your admin drafts up a letter; is that |
| 22 | | -- |
| 23 | A | Correct. |
| 24 | Q | -- simple as that? |

| | | |
|---|---|---|
| 1 | A | Uh-huh (AFFIRMATIVE). |
| 2 | Q | And you direct what goes into that letter; is |
| 3 | | that -- |
| 4 | A | Yes.  And I sign off on that letter, yes. |
| 5 | Q | But who -- okay.  And do you know who took |
| 6 | | over for Mr. Kirkendall? |
| 7 | A | My memory is failing me right now. |
| 8 | Q | Do you know if it was Jon Erickson? |
| 9 | A | I -- that -- that name does ring a bell, yes. |
| 10 | | I think he may have done some athletic |
| 11 | | director work in the interim, if that's what |
| 12 | | you're asking. |
| 13 | Q | Do you know who the permanent hire was? |
| 14 | A | I do.  And my memory is failing me on the name |
| 15 | | right now.  I'm embarrassed. |
| 16 | Q | Was it Belcher? |
| 17 | A | Keaton Belcher, yes, that's correct. |
| 18 | Q | Okay.  And do you know if he's still the AD at |
| 19 | | Ryle? |
| 20 | A | He is not. |
| 21 | Q | Do you know why not? |
| 22 | A | I -- I know a few of the details. |
| 23 | Q | What do you know? |
| 24 | A | Well, there were -- the principal made a |

```
 1              decision to move in another direction with

 2              that employee.  I'm trying to remember.  It

 3              was a personal -- something of a personal

 4              nature.

 5   Q          Okay.  Did he do anything inappropriate?  Was

 6              there -- is there a conduct issue or -- or

 7              just a personal issue with Mr. Belcher that

 8              impacted --

 9   A          I'm not sure if it was both or not.  It may

10              have been.

11   Q          Do you know any specifics about what the

12              conduct issue may have been?

13   MS. AMLUNG:          I'm just going to caution Mr. Turner

14                        that there are certain things with

15                        personnel related actions that if

16                        there were -- if there was formal

17                        discipline, you can say there was

18                        formal discipline.  But other than

19                        that, the personnel board kind of is

20                        just going to prohibit you from

21                        talking about other employees,

22                        unless formal discipline that would

23                        be subject to the Open Records Act

24                        is at -- at issue here.  Okay.
```

```
 1    A         So I'm not sure of your question.

 2    MR. ALLISON:       Are you saying he can't --

 3    MS. AMLUNG:        So I'm saying that it's public

 4                       record, and he can disclose if

 5                       formal discipline was implemented

 6                       regardless of what that is.  So if

 7                       it's a formal private reprimand,

 8                       some kind of demotion, he can

 9                       disclose that.  But if it's -- if

10                       it's this -- this individual

11                       resigned for personal reasons, that

12                       would be a personnel-related

13                       discussion --

14    MR. ALLISON:       Oh.

15    MS. AMLUNG:        -- that he can't legally discuss.

16    MR. ALLISON:       Yeah, okay, yeah.  But he can -- if

17                       he knows something about conduct, he

18                       could discuss it.

19    MS. AMLUNG:        Sure.

20    MR. ALLISON:       Okay.

21    MS. AMLUNG:        Yes.  If it's a disciplinary-related

22                       issue, yes.

23    MR. ALLISON:       Okay.  I didn't understand the

24                       objection.
```

1    MS. AMLUNG:        Yes.  I apologize.

2    MR. ALLISON:        No, no, no.

3    Q        Do you know anything about any improper

4             conduct on Mr. Belcher's part that's connected

5             to him leaving the AD position?

6    A        I do not.

7    Q        Okay.  There's -- there was testimony in this

8             case that Matt Shafer would make reference to

9             continuing to talk to you after you became the

10            superintendent about Mr. Kirkendall, things of

11            that nature.  It sounds like that's

12            inconsistent with your memory.  In other

13            words, you don't remember having any dialogue

14            about Mr. Kirkendall in the fall of 2020; is

15            that correct?

16   A        I -- I really don't recall any specific

17            instances.

18   Q        Okay.

19   A        We're constantly speaking with all the

20            principals on a matter of different personnel

21            matters or issues that may be occurring at a

22            school.

23   MR. ALLISON:        Okay.  Bear with me.  I just want to

24                       go through some documents and see.

```
 1                        I don't have much left.
 2     Q        Okay.  You're not aware of any pay issue that
 3              came up with regard to Mr. Kirkendall, whether
 4              he was being paid appropriately while on
 5              leave?
 6     A        I do not recall any, no.
 7     Q        There was back and forth between
 8              Mr. Kirkendall and Mr. Shafer about his job
 9              duties in late 2020, early 2021.  Did you ever
10              see email exchanges in connection with
11              Mr. Kirkendall's job duties during that time
12              frame?
13     A        I don't remember.
14     Q        Okay.
15     A        I don't remember seeing any.
16     Q        And it sounds like that wasn't part of this
17              hearing and termination process.  Did you see
18              emails about -- back and forth with respect to
19              his job duties?
20     A        I don't recall seeing any.
21     Q        Okay.
22     A        There could have been, maybe.  I just don't
23              recall seeing any.
24     Q        And you didn't read over any to refresh your
```

| | | |
|---|---|---|
| 1 | | recollection and prepare for this deposition? |
| 2 | A | I did not. |
| 3 | Q | What is your understanding -- well, let me |
| 4 | | give you some context, and then I'll ask for |
| 5 | | your understanding.  If Mr. Shafer and |
| 6 | | Mr. Kirkendall were in a meeting, and at some |
| 7 | | point in the meeting Mr. Shafer determined |
| 8 | | that he was going to communicate to |
| 9 | | Mr. Kirkendall that he was suspended, prior to |
| 10 | | that communication, whose responsibility is |
| 11 | | it, if anybody's, to make sure that |
| 12 | | Mr. Kirkendall has access to representation? |
| 13 | A | Can you repeat your question?  I just want to |
| 14 | | make sure I understand it. |
| 15 | Q | Yeah.  So my understanding is that employees, |
| 16 | | if they're going to be subject to discipline, |
| 17 | | would have access to a representative.  Is |
| 18 | | that correct so far? |
| 19 | A | Yes.  Are you speaking of a formal hearing |
| 20 | | with a superintendent or -- |
| 21 | Q | No.  And that's what makes it more difficult. |
| 22 | | So my question is, if Mr. Shafer or |
| 23 | | Mr. Kirkendall are in a meeting that doesn't |
| 24 | | start as disciplinary, but then at some point |

```
 1              during that meeting -- doesn't even have to be

 2              an official meeting, but at some point during

 3              that meeting, Mr. Shafer determines, I'm going

 4              to now tell Mr. Kirkendall he's suspended.

 5              Does Mr. Shafer have a responsibility to make

 6              sure Mr. Kirkendall has access to

 7              representation prior to making that

 8              communication, or do you know?

 9   A          In -- in a very general sense, employees are

10              allowed to have representation in a meeting

11              that may be speaking about a disciplinary

12              matter.

13   Q          Uh-huh (AFFIRMATIVE).

14   A          And so, we do instruct our directors and our

15              principals to permit that when that's

16              requested.

17   Q          And should -- but prior to communicating

18              discipline like a suspension -- so let me just

19              set the stage again, and then just tell me

20              what you think you would have done.  If you're

21              in a meeting with Mr. Kirkendall, and the

22              meeting is not meant to be disciplinary when

23              it starts, but something happens or is said in

24              the meeting that you determine, I'm going to
```

```
 1              suspend Mr. Kirkendall, and I'm going to tell

 2              him right now that that's what I'm doing.  Do

 3              you tell him he can have a representative

 4              before you communicate that, or do you just

 5              communicate it and then....

 6    A    The best practice is simply to communicate

 7              that up front.

 8    Q    Communicate what, specifically?

 9    A    That you can have a representative for you.

10    Q    Prior to communicating that he's going to be

11              disciplined?

12    A    Correct.

13    Q    Okay.  My understanding was that school

14              districts were sometimes offering the

15              opportunity to use sick days to make an

16              individual's pay whole while they were using

17              FMLA or the specific type of leave that was

18              available in connection with Covid.  Do you

19              know -- maybe this is lower level than what

20              you were involved in, but do you know how

21              those decisions were made?

22    A    I'm not sure I know exactly -- understand

23              exactly what you're asking with what type of

24              leave.  Our Human Resources Department does
```

| | | |
|---|---|---|
| 1 | | most all that work.  If it falls beyond the |
| 2 | | bounds of our board policy, what's permitted |
| 3 | | by board policy, particularly that it comes to |
| 4 | | me. |
| 5 | Q | All right.  As superintendent, are you |
| 6 | | involved in the decisions of whether or not |
| 7 | | to, you know, offer the opportunity to use |
| 8 | | sick days or PTO to make an individual whole, |
| 9 | | in terms of pay, if they're on leave; does |
| 10 | | that come to your desk? |
| 11 | A | Typically, no. |
| 12 | Q | Okay.  That's my question.  Who is working at |
| 13 | | home, what duties they're performing at home, |
| 14 | | those decisions are made in the various -- the |
| 15 | | 27 different schools that you were |
| 16 | | superintendent over.  Do you have any role in |
| 17 | | making those determinations, or is that below |
| 18 | | your level? |
| 19 | A | Typically, it's below under a variety of |
| 20 | | strategies and things that we were working |
| 21 | | through during that fall. |
| 22 | Q | You were letting the principals and their |
| 23 | | subordinates handle that type of -- |
| 24 | A | Correct. |

```
1    Q         -- decision-making, correct?

2    A         Yes.

3    MR. ALLISON:         Can you hand him 34 and 35?

4    Q         Mr. Turner, you've been handed what was marked

5              Exhibit 34 and 35 to Mr. Kirkendall's

6              deposition.  Please take whatever time to

7              review those documents.  Then I'm going to ask

8              you some questions about each one.

9              (WITNESS REVIEWS DOCUMENTS).

10   A         Okay.

11   Q         All set, okay.  Now, Exhibit 35 is the

12             document you talked about earlier that your

13             admin would have typed up relaying

14             Mr. Kirkendall's separation, correct?

15   A         Correct.

16   Q         You can put that aside.  Exhibit 34, is that a

17             document you've ever seen before?

18   A         No.  Typically, these are not sent to me.

19   Q         That's fine.  You'll note that on the bottom

20             of the second page there's a reference to the

21             second followup -- it's -- I highlighted it on

22             my document so you can see where it is.  Well,

23             the bottom, all the way at the bottom.

24   A         Okay.
```

1   Q      It says it's the recommendation of Human

2          Resources that Kirkendall receive a public

3          reprimand for insubordination.  Do you see

4          that?

5   A      I do.

6   Q      And then be placed on probation; do you see

7          that?

8   A      Yes.

9   Q      And do you know what happened with that?  Is

10         that the first time you were even aware that

11         that recommendation was out there at some

12         point?

13  A      Yes.

14  Q      Okay.  And do you know what happened with

15         that?

16  A      With this recommendation?

17  Q      Uh-huh (AFFIRMATIVE).

18  A      Well, this is the -- my understanding is the

19         internal -- the first look at a situation with

20         Human Resources.

21  Q      Uh-huh (AFFIRMATIVE).

22  A      And so Human Resources looked into the matter,

23         prepared this report.  And then there's -- you

24         know, essentially, a conversation with Eric

```
 1              McArtor, who is over HR, in terms of
 2              potentially bringing an issue to the
 3              superintendent for a hearing.
 4    Q         Uh-huh (AFFIRMATIVE), okay.  But do you know
 5              what happened with that recommendation, what
 6              the discussion was around it?  It sounds like,
 7              no, that's not something that you were aware
 8              of?
 9    A         Not -- not between Mr. McArtor and the Human
10              Resources Director.
11    Q         Rigg?
12    A         Yes, Matt Rigg.  No, I'm not privy to their
13              conversation.
14    Q         Okay.  And you weren't aware that that
15              recommendation had been made at any point in
16              time, correct?
17    A         It would have been -- it would have been part
18              of a verbal conversation, potentially with Mr.
19              McArtor.
20    Q         But you don't recall that?
21    A         I do not.
22    MR. ALLISON:        Okay.  Let me just have a minute to
23              confer with my client about whether
24              he --
```

```
 1    MS. AMLUNG:           Sure.

 2    MR. ALLISON:          Okay.

 3            (A BREAK IS TAKEN)

 4    MR. ALLISON:          I do not have anymore questions for

 5                          you.  I may have some follow up

 6                          after your attorney asks you some

 7                          questions, but I am done.

 8    WITNESS:              Okay.

 9    MS. AMLUNG:           Actually, I decided not to ask

10                          any questions.

11    MR. ALLISON:          Okay.

12    MS. AMLUNG:           So if you have no other ones, speak

13                          now or forever hold your peace.

14    MR. ALLISON:          You know, then I will ask just one

15                          more.  Thank you.  No, I'm not going

16                          to ask any other questions.  Thank

17                          you for your time.

18    MS. AMLUNG:           Signature.

19

20                          _____

21                          MATTHEW TURNER

22                          * * * * * * * *

23          THEREUPON, the taking of the deposition of

24    MATTHEW TURNER was concluded at 10:40 A.M.
```

STATE OF KENTUCKY )
                 )
COUNTY OF FAYETTE )


          I, LISA E. HOINKE, the undersigned Notary
Public, in and for the State of Kentucky at Large,
certify that MATTHEW TURNER, the aforesaid deponent, was
by me first duly sworn to testify the truth, the whole
truth and nothing but the truth in the case Mario
Kirkendall, Plaintiff, vs. Boone County Board of
Education, Defendant, No. 2:22-CV-00026-DLB-CJS, now
pending in the United States District Court for the
Eastern District of Kentucky at Covington.

          That the foregoing deposition was taken down
in stenotype by me and the foregoing is a true record
of the testimony given by said witness; that upon
agreement of counsel, the witness will read and sign the
transcript.

          That the Plaintiff was represented by his
counsel, Hon. Jon B. Allison at the taking of said
deposition; that the Defendant was represented by its
counsel, Hon. Olivia Amlung; that Mario Kirkendall,
Sarah Froelich and Alexandria Anderson were also
present; that there were no other appearances.

That said deposition was taken on behalf of the Plaintiff pursuant to Notice and pursuant to the Federal Rules of Civil Procedure for the District Courts of the United States.

I do further certify that I am a disinterested person in the cause of action heretofore stated; not employed by any of the parties; and to the best of my knowledge, not related to any of the parties.

My commission expires:  June 18, 2027.

IN TESTIMONY WHEREOF, I have hereunder set my hand and seal of office on this the 1st day of September, 2023.


/s/ Lisa E. Hoinke
LISA E. HOINKE
NOTARY PUBLIC, ID KYNP72022
STATE-AT-LARGE, KENTUCKY