UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON
CASE NO. 2:22-CV-00026-DLB-CJS

**MARIO KIRKENDALL**                                                          **PLAINTIFF**

**v.**

**BOONE COUNTY BOARD OF EDUCATION**                    **DEFENDANT**

---

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

Defendant, Boone County Board of Education ("the District"), by and through counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, and for its Reply in support of its Motion for Summary Judgment, states the following:

**I. THE DISTRICT IS ENTITLED TO ENTRY OF SUMMARY JUDGMENT ON KIRKENDALL'S FMLA CLAIM**

In his Response, Kirkendall argues that he has demonstrated a *prima facie* case of FMLA interference and retaliation. (R. 36, PageID 811 – 812) For the interference theory of liability, he argues that the District "discourage[ed] him from taking leave and ask[ed] him to perform various tasks while on leave. (*Id.* at PageID 812) And for the retaliation claim, he argues that the District "significantly altered his work schedule and duties, and when [Kirkendall] attempted to assert his FMLA entitlements, Defendant terminated [his] employment" in retaliation." (*Id.* at 816) Although he sweepingly asserts that he has pointed to "sufficient evidence" to support these claims, Kirkendall has not – and indeed, cannot – identify a shred of actual evidence in the record to that effect. In fact, Kirkendall's own testimony tells quite a different story. Thus, his claims fail.

1

### A.  KIRKENDALL'S FMLA RIGHTS REMAINED AT ALL TIMES INTACT

Kirkendall asserts that the District "discourage[ed] him from taking leave and ask[ed] him to perform various tasks while on leave, amounting to interference of his rights under the FMLA. (R. 36, PageID 812) In support of this contention, Kirkendall hangs his hat on a single, cherry-picked snippet from his deposition wherein he claimed that Principal Shafer asked him: "Can you instead change your schedule from instead of taking leave, come in early, right?" (R. 36, PageID 812 citing Kirkendall Depo. Tr. 324:3 – 7) But when read in context of the testimony, it is clear that even Kirkendall does not believe this to have been FMLA interference – indeed, this testimony occurred in response to a question of why he felt that someone at the District thought he was lazy based on his race, and then retaliated against him for said laziness with racially-motivated animus.[1] (*See* R. 26, PageID 307 – 308, 323:21 – 324:21) The testimony had *nothing* to do with his EFMLEA leave.

Kirkendall then moves on to allege that the District required him to "perform substantive work while he was on leave." (R. 36, PageID 813) First, sending Kirkendall a few emails (which he was not required to check) or texts inquiring about logins and contact information for vendors does not constitute "substantive work" and, instead, would have at best a *de minimus* effect on his leave.

But the fatal flaw in Kirkendall's interference claim comes from his own actions or, really, his own *in*actions that led to his transparent attempts to do minimal work so he could demand full day compensation. While he now claims that that he was on full leave and he did not want anyone contacting him, his actions tell a very different story. The record confirms

---

[1]  To be clear, even after Kirkendall stumbled through the slanderous testimony, he conceded that he couldn't point to any specific even or person who he felt wronged him or treated him unfair based on his race. (Kirkendall Depo. Tr. at 324:20-21)

2

that Kirkendall actively invited communication from the District and welcomed opportunities to work intermittently. He cannot have it both ways and sustain an interference claim against the District, because any "interference" with his ability to take uninterrupted leave was of his own making.

Under the "interference" theory of liability in FMLA claims, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]." 29 U.S.C. § 2615(a)(1). 29 C.F.R. § 825.220(b) further directs that "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." Contacting an employee while on leave does not automatically constitute interference. The Sixth Circuit has not clearly defined how much contact, or what sorts of tasks, are actionable interference with FMLA rights. *See Tilley v. Kalamazoo Cnty. Rd. Comm'n*, 654 F. App'x 675, 680 (6th Cir. 2016) ("Perhaps, under certain circumstances, multiple phone calls from an employer and demands to complete more than simple tasks could rise to the level such that an employee's FMLA leave becomes unjustifiably disrupted and thereby discouraged.") However, what the Sixth Circuit *has* clearly determined is that a plaintiff cannot claim interference for communications that he brought upon himself.

In *Groening v. Glen Lake Cmty. Sch.,* the Sixth Circuit evaluated an FMLA interference claim brought by a superintendent after she attended a board meeting and occasionally communicated with district staff about work-related matters. 884 F.3d 626, 632 (6th Cir. 2018). Rejecting her interference claim, the Sixth Circuit noted that the board of education hired an interim superintendent to fill her role and did not *require* her to attend any board meeting during her recovery; her decision to engage with the school district while on leave

3

was her own prerogative. *Id.* While Kirkendall's situation is slightly different insofar as he was invited to work by Principal Shafer on various occasions, the overarching theme of voluntariness still prevails. The record is clear that Kirkendall took intermittent leave, advised his colleagues that he was available for questions, and left every contact at the District under the impression that he was willing (and wanted) to make periodic returns to work. He put himself in that position, and when he finally reached out to the District to complain in mid-to-late October, the communications stopped with no questions asked.

When Kirkendall applied for EFMLEA, he sought leave on an intermittent basis. (R. 26 at PageID 465) For the first few weeks of his EFMLEA leave, Kirkendall planned to physically come to the school a few days out of the week to serve as a transition period. (*Id.* at PageID 165, 90:9 – 16) Then, when he stopped physically coming into the school, he indicated to the interim AD that "if you need anything, let me know." (*Id.* at PageID166 – 167; 91:22 – 92:2) But importantly, there is no evidence in the record indicating that Kirkendall informed anyone at Ryle High School, including his supervisor, that he would be transitioning from *intermittent* leave to *continuous* leave on September 21 and did not wish to be contacted. In fact, in his email to the school coaches, he even noted that he would be "periodically checking in" on his own volition. (*Id.* at PageID 466) He told his supervisor that he would "work a few days when possible." (*See id.* at PageID 476) And, in a conversation with the Assistant HR Director, Kirkendall confirmed the understanding that he was on leave and not to be contacted "unless it was discussed . . . either through e-mail or, like phone call." (*Id.* at PageID 169, 94:20 – 21, 24 – 25) And to avoid any doubt, Kirkendall reduced his intentions to writing in an email to HR on September 14, 2020 advising that he would be starting EFMLEA leave on September 21 and "will contact [HR] regarding my intermittent days that I will be able to

4

come in." (09.14.2020 Email, BCSD-000278, attach as Ex. 1) Thus, to be clear, when Kirkendall began his EFMLEA leave, he unilaterally led his subordinate coaches, his supervisor, and the HR department *all* to believe he was still open to on intermittent leave and would be continuing to work periodically. And for at least the next three weeks, whenever he was contacted by his supervisor, he did nothing to change that understanding.

In the weeks that followed, Kirkendall testified that Principal Shafer would occasionally reach out to inquire if Kirkendall was coming in that week or ask if he could cover certain events. (*Id.* at PageID 170, 95:12 – 23) When Kirkendall would intermittently come in to perform his duties, he was compensated.[2] If Kirkendall wanted to take continuous leave with no contact from the District, all he needed to do was communicate as much. But he did not: "Q. Okay. And at any point, I mean, again, did you tell Mr. Shafer, I'm on leave, please don't talk to me? A. I didn't feel I needed to." (*Id.* at PageID 171 – 172, 96:5 – 97:1) To be clear, even though Principal Shafer was clearly under the impression that Kirkendall was on intermittent leave, Kirkendall did not feel the need to remedy the misunderstanding with a simple FYI.

Kirkendall allowed these sporadic communications to occur until October 15, at which time he reached out via email to Assistant HR Director Eric Ball. (R. 26, PageID 467) In that email, Kirkendall did *not* complain that he had been contacted; he instead reached out to Mr. Ball solely to inquire about his pay, which he felt was lower than it should have been. (*Id.* PageID 467 – 468) At this time, Mr. Ball again explained the EFMLEA reduced pay

---

[2] According to District records, Kirkendall took 10 days of EPSLA leave and 37 days of EFMLEA leave from the start of his intermittent leave on September 21, 2020, through his return on December 4, 2020. (R. 26, PageID 470) However, District certified staff had 50 total contracted workdays during that period. (*See* 2020-21 District Calendar (Amended), publicly available via the Kentucky School Boards Association, found at: https://portal.ksba.org/public/Meeting/Attachments/DisplayAttachment.aspx?AttachmentID=558882) From the Absence History record, there was no leave time entered or claimed on October 1, 5, and 6.

5

structure and advised that, if he was taking full leave, he must notify Principal Shafer that he was going on continuous leave and provide him with all requisite passwords/information so that the interim AD could fulfill Kirkendall's job duties without needed to contact him. (*Id.* at PageID 179 – 180, 104:15 – 105:18) But Kirkendall could not be bothered to simply follow instructions and notify his supervisor of his change of leave status. (*See e.g. id.* at PageID 182, 107:6 – 14 ("Q: . . . In Mr. Ball's instruction to, you know, talk to Mr. Shafer about people leaving you be on leave, did you ever have that conversation with Mr. Shafer? / A: I can't remember if we had a phone conversation after this or not. I'm sorry. . . . I don't believe I e-mailed him about it."); *see also id.* at PageID 182, 107:20-25 ("Q: . . . did you ever have a conversation with Mr. Shafer after this October 15th e-mail specifically saying, hey, I'm on leave, can you ask Mr. Erickson to do this, or can you find someone else to this? / A: I don't believe we did."))

Indeed, even though he now argues this theory of liability in his Response, the crux of Kirkendall's claim has never actually been about interference of his right to take uninterrupted EFMLEA leave. His claim really boils down to his demand to receive a full day compensation for answering one or two texts or emails a day. (*Id.* at PageID 214 – 215, 139:17-140:23) His testimony clearly demonstrates that he was attempting to circumvent the EFMLEA pay cap by intermittently engaging with Principal Shafer so that he could turn around to HR and demand that he had been "working from home" even though he did not follow any of the proper protocols to obtain such privilege. In other words, Kirkendall is trying to have his cake and eat it too. On one hand, he actively instructed his colleagues to reach out with any questions and continued to allow his supervisor to believe he was at least open to an intermittent set up. Yet he now complains that the District "interfered" with his

6

FMLA rights, even though he alone had the power to transition to continuous leave with a short FYI to his supervisor that he was no longer open to an intermittent leave setup.

Because the web of confusion regarding the days on which Kirkendall intended to take intermittent versus uninterrupted leave was a direct result of Kirkendall's own actions and inactions, Kirkendall has failed to demonstrate that the District "denied his FMLA rights to which he was entitled." *Killian v. Yorozu Auto. Tenn. Inc.,* 454 F.3d 549, 556 (6th Cir. 2006). The record is clear that, if Kirkendall had wanted to take uninterrupted leave, all he needed to do was inform his supervisor. He chose not to do so, allowing the District to believe he was open to intermittent work opportunities. Thus, because any disturbance was of his own making and invitation, Kirkendall's interference claim fails as a matter of law.

    **B.    THE DISTRICT DID NOT CHANGE THE "RULES" AND "REQUIREMENTS" OF KIRKENDALL'S EMPLOYMENT**

In support of both his interference and retaliation theories of liability, Kirkendall argues that the District substantively changed his job upon return from EFMLEA leave. (R. 36, PageID 814 – 817) Specifically, he takes issue with the "start time of more than two hours earlier than before his leave despite Plaintiff having regular evening responsibilities," the requirement that he "manage 41 failing students," and his assignment to "instructional responsibilities with respect to multiple classes." (*Id.* PageID 815) Aside from the fact that these changes were not nearly as burdensome as Kirkendall disingenuously proffers as fully set out in the District's initial Motion for Summary Judgment (*see* R. 30, PageID 672 – 677), these changes are nonetheless permissible by law and contract.

As exhaustively explained in the District's Motion for Summary Judgment (*see generally* R. 30), Kirkendall primarily held a teaching contract with the District, and his Athletic Director duties were incorporated via a separate "extra duty" contract. In his role as

7

an Athletic Director with a teaching contract, it is clear that the District at all times retained the ability to ask Kirkendall to interact with or supervise non-athlete students. (*See* R. 26, PageID 438 – 443) In fact, prior to his leave, Kirkendall had been consistently tasked with supervising in school suspension without any issue or complaint. (R. 27, PageID 584 – 585, 79:8 – 80:5) But what's more, the Athletic Director job description clearly contemplates the potential for the assignment of non-athletic, teaching-related duties. (*Id.* at PageID 444) (listing "Participate in those functions and activities as described in the regular teacher job description" as a performance responsibility for every District Athletic Director).

But importantly, what Kirkendall repeatedly ignores is the fact that while he was out on leave, the Kentucky High School Athletic Association had suspended all high school athletics pursuant to the then-controlling gubernatorial executive order.[3] While he cries foul because the District asked him to assist with pandemic-related outreach (along with every non-teaching certified personnel at the school), Kirkendall ignores that, without those tasks, *he would not have had any duties to perform at school whatsoever*. In other words, the District would have been paying him for work not performed, which is a violation of the law. Ky. Const. § 3; KRS 160.291. Thus, even if Kirkendall was not willing to pitch in with his colleagues to assist with the pandemic-prompted "all hands on deck" approach to education, these tasks at least gave him something to do at work. And, it is of course plausible that Kirkendall may have been asked to conduct these tasks during regular school hours since there were no athletics occurring at the time for which Kirkendall would be required to come in and stay late. To be clear, Kirkendall was never asked to work additional hours upon his

---

[3] KENTUCKY HIGH SCHOOL ATHLETIC ASSOCIATION, *News Release: Board of Control Confirms Decision To Start Winter Sports Practice December 14* (Dec. 10, 2020) found at: https://khsaa.org/12-10-20-board-of-control-confirms-decision-to-start-winter-sports-practice-december-14/

8

return from leave – if anything, his expected work hours *decreased* (while his compensation remained the same) because athletics were suspended. *See Barnes v. Lantech*, No. 3:18-cv-00507, 2021 U.S. Dist. LEXIS 14256 (W.D. Ky. Jan. 26, 2021) (holding that an employee's FMLA retaliation claim failed because the change to his employment did not increase or alter the number of hours he worked). The alleged change in his start time to coincide with the school day was but a "mere inconvenience" to Kirkendall, and had no materially adverse impact on his employment. An adverse employment action is "a materially adverse change in the terms of employment." *White v. Burlington N. & Santa Fe R.R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004). Regardless, as soon as athletics resumed, Kirkendall went back to overseeing the school's athletic program.

"An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits, and working conditions, including privileges, perquisites and status." 29 C.F.R. § 825.215(a). At all times during his employment with the District, Kirkendall remained the Athletic Director at Ryle High School. Furthermore, the position "must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." *Id*. At all times relevant, Kirkendall was asked to perform duties within the scope of his teaching and extra duty contracts with the District; no one at Ryle High School amended his job description. "The requirement that an employee be restored to the same or equivalent job [] does not extend to *de minimis*, intangible, or unmeasurable aspects of the job." 29 C.F.R. § 825.215(f). Just because he did not "feel" the student-oriented tasks he was asked to complete were appropriate, does not mean they were out of bounds. Asking Kirkendall to come into school during regular school hours, supervise students while they worked quietly on their virtual

9

assignments, and reach out to struggling students had no impact whatsoever on Kirkendall's ability to perform athletic duties nor were they retaliatory.

Because the pandemic-related tasks Kirkendall was asked to complete in December 2020 fell within the job description of his position which existed even before he took EFMLEA leave, and because said pandemic-related tasks and schedule did not constitute a substantive change or adverse employment action, Kirkendall cannot make a *prima facie* showing of either FMLA interference or retaliation. Thus, the District is entitled to judgment as a matter of law.

### C. KIRKENDALL FAILED TO ESTABLISH A CAUSAL CONNECTION BETWEEN ANY DISTRICT ACTION AND A DISCRIMINATORY/RETALIATORY REASON

Finally, Kirkendall's FMLA claim fails as a matter of law because he has failed to identify sufficient evidence to suggest, let alone prove, causal connection between his leave and his termination. The Sixth Circuit has "held on many occasions that the violation of a wide variety of an employer's articulated policies constitutes a legitimate, nondiscriminatory reason for adverse employment actions." *Santiago v. Meyer Tool Inc.,* No. 22-3800, 2023 U.S. App. LEXIS 14469, at *11-12 (6th Cir. June 8, 2023). And "it is well-established that no formal policy at all is required for an employer to clear the low burden associated with this particular showing." *Id.* (citing *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 246 (6th Cir. 1997)) In pertinent part, the Sixth Circuit has explicitly upheld a termination premised on insubordination even in the face of a plaintiff's contention that she was fired based on her age. *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 327 (6th Cir. 2021).

At the end of the fall 2020 semester, Principal Shafer advised Kirkendall that he need to oversee three "study skills classes" during fourth, fifth, and sixth periods upon the return from winter break. (R. 26, PageID 480 – 481) Because of the pandemic's effect on education,

10

which resulted in a significant amount of failing seniors, all administration had been asked to pitch in. Indeed, even Principal Shafer covered classes every day on top of his principal duties. (R. 27, PageID 592, 87:9 – 15) In fact, every administrator in the building and many of the support staff were frantically trying to do everything in their power to help their struggling students and their families – staff delivered school meals to students at home, took chromebooks to students out of the building, contacted struggling students just to check in, and provide an overall open line of communication for families to know they were not alone, and Ryle was there to support them with any barriers. (*Id.* at 569 – 570, 64:5 – 65:7)

But Kirkendall was not asked to cover classes for missing teachers and provide instruction, he was not asked to make house calls, and he was not asked to provide substantive instruction; instead, he was asked to call 40 students to check in and cover three "study skills classes." To be clear, these classes merely required him to "monitor" a handful of students who were student athletes working on the "Edgenuity" online credit recovery program. (R. 27, PageID 584, 79:8 – 18) Kirkendall could have even continued to work on athletic director tasks while monitoring the student athletes as they worked independently.

Kirkendall immediately pushed back on the assignment, notwithstanding the fact that supervision of these classes was consistent with his job description and nearly identical to the ISS supervision duties he had been charged with the previous school year. Each time Kirkendall expressed his disdain to Principal Shafer about the study skills classes, Principal Shafer informed Kirkendall that it was a part of his job description. Then, when it came time for Kirkendall to actually go to his study skills class on January 19, 2021, he refused. (R. 26, PageID 347, 272:8 – 11) After learning of Kirkendall's refusal, Principal Shafer "tried to level with him," reminding Kirkendall that he would have had lunch duty at this time anyway and

11

that the three students he was tasked to monitor were student athletes. (R. 27, PageID 615, 110:1 – 6) Kirkendall continued to refuse to report to his class, to which Principal Shafer cautioned that there would be consequences for his insubordination. (*Id.* at 110:7 – 23) Kirkendall *again* refused, and Principal Shafer suspended him pending a disciplinary hearing. (*Id*. at PageID 620, 115:15-20)

In his Response, Kirkendall disingenuously argues that he "made clear that he was not refusing to do his job" and that he instead "wanted to engage in that [FMLA] dialogue before changes to his employment were made." (R. 36, PageID 818) But the record tells a very different narrative, where Kirkendall flatly told *multiple* administrators he "would not be going" to the study skills class in direct contravention to his supervisor's directives. Indeed, the "dialogue" of which he claims to have been deprived was, in reality, ongoing for weeks prior to the January 19 suspension –with each discussion, the District explained that Kirkendall's duties were not being materially changed, because supervising students (whether it was in a study skills class, lunch duty, ISS or otherwise) is a part of his job description. And what's more, Kirkendall was repeatedly offered the opportunity go back to Ryle to perform these assigned supervisory duties without consequence – Kirkendall declined every single time. (*See e.g.,* R. 34, PageID 716 – 718, 22:3 – 24:21)

"The salient consideration is whether Defendants' stated reason [for termination] is discriminatory, or retaliatory." *Santiago, supra.* Terminating an employee for supervision is neither of those. *Pelcha, supra.* To overcome the stated reason and demonstrate pretext, a plaintiff must demonstrate that the stated reason (1) has no basis in fact, (2) did not actually motivate the termination, or (3) was insufficient to motivate whether termination. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). In this analysis, "the question is always whether

12

the employer made up its stated reason to conceal intentional discrimination." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009).

Kirkendall cannot prevail under the first showing, where the Court simply inquires whether the proffered bases for his discharge actually happened – it did. *See Santiago, supra.* (citing *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994), overruled on other grounds by *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009). Kirkendall likewise cannot prevail under the second showing, because he has failed to point to any evidence whatsoever to show that his insubordination "did not actually motivate" the discharge. *See Manzer*, 29 F.3d at 1084. To the contrary, at his disciplinary hearing, Kirkendall was even offered the opportunity to go back to Ryle if he agreed to supervise the class. Finally, Kirkendall cannot prevail under the third showing. Although he broadly argues that his "conduct did not warrant termination" (R. 36, PageID 819), he is incorrect. First, Kentucky law clearly identifies insubordination as just cause to discipline (which includes termination) a certified employee such as Kirkendall. KRS 161.790. Second, as previously noted, the Sixth Circuit has explicitly acknowledged that insubordination is a valid reason and, without evidence to demonstrate a "shift" in rationales, no pretext is demonstrable. *Pelcha,* 988 F.3d at 327328 (6th Cir. 2021).

Because the record clearly (and indisputably) demonstrates that Kirkendall was fired for insubordination, the District is entitled to judgment on Kirkendall's FMLA claim.

## II. THE DEFENDANT IS ENTITLED TO ENTRY OF SUMMARY JUDGMENT ON KIRKENDALL'S RACE DISCRIMINATION CLAIM

The District clearly set out the fatal flaws in Kirkendall's race discrimination claim in its Motion for Summary Judgment. (*See* R. 30, PageID 678 – 686) Nothing argued in Kirkendall's Response has changed that analysis or remedied the deficiencies.

However, it is critical to underscore the fact that Kirkendall has, to this day, still been unable to identify a single piece of evidence other than his own speculations to support his claim that the District discriminated against him on the basis of his race. In his deposition, Kirkendall admitted that no person at Ryle High School had ever made race-related comments to him, nor did he ever have any discussions about his race while at Ryle High School. (R. 26, PageID 384, 309:4 – 9, 314:12 – 15) And with every complaint that Kirkendall alleges to have been "shrouded" in racial animus, Kirkendall is unable to point to any evidence other than his own feelings to support such allegations. (*See e.g., id.* at PageID 386, 311:6 – 9 ("Q: But what specifically makes you think that people were going around you because of your race? / A. I felt at the time it was"))

But most fatal to Kirkendall's disparate treatment claim is that he has failed to provide any evidence whatsoever of how he believes to have been treated differently: "But it seems that race had an issue with me coming back. I mean, I can't speak of it being directly put in front of me … I felt that, yeah, it was shrouded and maybe not blatant racism … again, you've asked the question has anyone else spoke or been spoken to like this, I don't know." (R. 26, PageID 384 – 385; 309:18 – 310:10). Indeed, even assuming *arguendo* that the off-hand comments from a co-worker and a community member upon which Kirkendall hangs his hat are true (they are not), he is still unable to meet the *prima facie* burden of demonstrating disparate treatment. *Smith v. Leggett Wire Co.,* 220 F.3d 752, 760 (6th Cir. 2000) ("Racial animus cannot be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed at [the plaintiff]"); *see also Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997).

Due to his complete lack of evidence to suggest racial animus and disparate treatment, the District is entitled to judgment on Kirkendall's race discrimination claims.

### III. COUNT VI SHOULD BE DISMISSED BECAUSE KIRKENDALL HAS FAILED TO PROVE HIS BREACH OF CONTRACT CLAIM

Kirkendall's contracts, and the job descriptions incorporated therein, are abundantly clear as to the responsibilities and expectations with which he was expected to comply. (R. 26, PageID 438 – 447) Kirkendall has failed to allege any task outside the bounds of those documents which he was asked to complete, or any breach on the District's behalf. Thus, the District is entitled to judgment as a matter of law.

### IV. CONCLUSION

For these reasons, the Defendant, Boone County Board of Education, respectfully requests that the Court grant judgment in its favor as a matter of law.

Respectfully submitted,

*/s/ Olivia F. Amlung*
Olivia F. Amlung, Esq. (#97449)
Mary Ann Stewart, Esq. (#82754)
ADAMS LAW, PLLC
40 West Pike Street
Covington, KY  41011
859.394.6200 | 859.392.7200 – Fax
oamlung@adamsattorneys.com
mstewart@adamsattorneys.com

*Attorneys for Defendant, Boone County Board of Education*

**CERTIFICATE OF SERVICE**

This is to certify that on this **4th** day of January, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Olivia F. Amlung*
Olivia F. Amlung, Esq.

15