**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

CIVIL ACTION NO. 22-26-DLB-CJS

MARIO KIRKENDALL                                                      **PLAINTIFF**

v.                              <u>**MEMORANDUM OPINION AND ORDER**</u>

BOONE COUNTY BOARD OF EDUCATION                            **DEFENDANT**

**\*\*\* \*\*\* \*\*\* \*\*\***

This matter is before the Court upon Defendant Boone County Board of Education's Motion for Summary Judgment.  (Doc. # 30).  Plaintiff Mario Kirkendall filed a Response (Doc. # 36), Defendant filed a Reply (Doc. # 37), and the Motion is now ripe for review.  For the following reasons, the Motion for Summary Judgment is **granted in part** and **denied in part**.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

This matter arises from a terminated employment relationship between Plaintiff, as employee, and Defendant, as employer.  (Doc. # 1 at ¶¶ 8 and 23).[1]  Plaintiff was a resident of Ohio during his employment with Defendant but currently resides in Georgia.  (*Id.* at ¶ 1).  Defendant administers public schools in Boone County, Kentucky including the Larry A. Ryle High School ("Ryle") in Union, Kentucky.  (*See id.* at ¶ 2).

---

[1]      The parties largely agree about the basic facts of the case.  For brevity and clarity, the Court will primarily refer to the Complaint (Doc. # 1) and the briefing on the Motion for Summary Judgment (Docs. # 30, 36, and 37) for the facts, except where necessary to elaborate on disagreements.

In August 2019, Defendant hired Plaintiff to be Ryle's Athletic Director.  (Doc. # 30 at 4).  Pursuant to a Limited Contract of Employment (the "Primary Contract"), Plaintiff was hired as a teacher,[2] and he separately executed an Employee Agreement for Extra Duty Assignment (the "Extra Duty Contract") pursuant to which he became Ryle's Athletic Director.  (*See* Doc. # 26 at 363, 366).  In addition to performing Athletic Director tasks, Plaintiff would supervise students during lunch periods, in school suspension programs, and study hall sessions.  (Doc. # 36 at 4).   Initially, Plaintiff's workday began at 9:50 a.m. (*Id.*).

In March 2020, the novel coronavirus known as COVID-19 first appeared in the United States and began spreading across the country.  (*See* Doc. # 30 at 5).   In response, Congress passed and the President signed into law the Emergency Family and Medical Leave Expansion Act ("EFMLEA") and the Emergency Paid Sick Leave Act ("EPSLA").  (*Id.*).  The EFMLEA and the EPSLA amended the Family and Medical Leave Act ("FMLA") to provide for additional leave for eligible employees whose childcare responsibilities were affected by COVID-19.  (*Id.*).  In summer 2020, Defendant emailed its employees to advise them of their expanded FMLA rights.  (*Id.*).

At around the beginning of the 2020-2021 school year, Plaintiff learned that his children's school would be closing due to the COVID-19 pandemic.  (Doc. # 36 at 4). Plaintiff requested and was granted leave which began on September 21, 2020.  (*Id.*). For the first two weeks, Plaintiff's leave was intermittent, but he eventually took continuous leave until December 4, 2020.  (*Id.*).  Plaintiff testified at his deposition that Matt Shafer, Ryle's Principal at the time, initially asked Plaintiff if he could rearrange his

---

[2]    Plaintiff holds a master's degree in educational leadership and administration and has a Kentucky teaching certificate.  (Doc. # 36 at 22).

schedule in lieu of taking leave.  (*See id.* at 5).  During Plaintiff's leave, Shafer occasionally contacted Plaintiff and requested that he perform certain tasks.  (*Id.*).  The parties disagree about the frequency and significance of these contacts and requests. (*See id.*; *see also* Doc. # 30 at 6).

Plaintiff claims that after returning from leave, "the conditions of his employment were significantly changed."  (Doc. # 36 at 2).  Plaintiff's start time was moved from 9:50 a.m. to 7:30 a.m.  (*Id.* at 5).  Additionally, Plaintiff was tasked with "teach[ing]" study skills courses as well as contacting and monitoring failing students.  (*Id.* at 6).  At his deposition, Plaintiff testified that while other faculty members were assigned between 5 and 7 students to monitor and contact, he was assigned 41 students.  (Doc. # 26 at 322). Additionally, Plaintiff alleges that Defendant began to scrutinize his job performance for the first time upon his return from leave.  (Doc. # 36 at 6).  The parties disagree about the cause and extent of these supposed changes in Plaintiff's conditions of employment. According to Plaintiff, his new responsibilities were outside the scope of his job description and were imposed in retaliation for his taking FMLA leave.  (*See id.* at 3-6, 14-18). According to Defendant, Plaintiff's new responsibilities were consistent with his Primary Contract and were imposed on all of Ryle's employees to help teach struggling students remotely during the COVID-19 pandemic.  (*See* Doc. # 30 at 6-7, 12-16).

After Plaintiff expressed his belief to Shafer that the new responsibilities constituted a substantial change in his employment duties, Shafer responded by noting that Plaintiff was first hired as a teacher pursuant to the Primary Contract.  (Doc. # 30 at 7).  When Ryle returned to in-person instruction on January 19, 2021, Plaintiff refused to administer the study skills course.  (*Id.* at 8; Doc. # 36 at 7).  In response, Plaintiff was

suspended with pay pending a hearing with Defendant's disciplinary office.  (Doc. # 30 at 8).  Defendant held a disciplinary hearing on January 27, 2021, and Plaintiff was terminated effective January 19, 2021.  (Doc. # 30 at 8; Doc. # 36 at 7).

According to Plaintiff, he was the only African American employee in an administrative role at Ryle and the only African American athletic director within Boone County Schools.  (Doc. # 36 at 7).  Plaintiff claims that he was subjected to racially insensitive comments during his employment with Defendant.  (*Id.* at 8).  Following his termination, Defendant hired Keaton Belcher, a Caucasian male, as Ryle's Athletic Director.  (*Id.*).

Before filing his Complaint, Plaintiff filed charges with the U.S. Equal Employment Opportunity Commission (the "EEOC") and the EEOC issued Plaintiff a Notice of Right to Sue Letter.  (Doc. # 1 at ¶ 6; Doc. # 30 at 9).  On March 2, 2022, Plaintiff initiated this action by filing his Complaint.  (Doc. # 1).  Plaintiff asserts claims of (i) FMLA interference; (ii) FMLA retaliation; (iii) race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"); (iv) race discrimination under the Kentucky Civil Rights Act ("KCRA"); (v) retaliation under Title VII; (vi) retaliation under the KCRA; and (vii) breach of contract under Kentucky law.  (*Id.* at ¶¶ 25-57).  On December 4, 2023, Defendant filed the instant Motion for Summary Judgment.  Plaintiff filed a Response (Doc. # 36),[3]  Defendant filed a Reply (Doc. # 37), and the Motion is ripe for review.

---

[3]     In his Response, Plaintiff states that he "does not contest summary judgment with respect to [his] KCRA and Title VII retaliation claims."  (Doc. # 36 at 3 n.1).  The Court accordingly **grants** the Motion with respect to these claims without further analysis.

## II.   ANALYSIS

### A.   Standard of Review

Defendant has moved for summary judgment on Plaintiff's remaining claims.  (Doc. # 30).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016) (internal quotation marks and bracketing omitted).  In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (bracketing omitted).

"The moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  The movant may do so by "citing to particular parts or materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]"  Fed. R. Civ. P. 56(c)(1)(A).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  It

must produce evidence showing that a genuine factual issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### B.   Analysis

The Court will address Plaintiff's remaining claims of FMLA interference and retaliation, race discrimination under federal and Kentucky law, and breach of contract under Kentucky law in turn.

#### 1.   *Plaintiff's FMLA Claims*

Defendant has moved for summary judgment on Plaintiff's FMLA interference and retaliation claims. (Doc. # 30 at 10-17). Before addressing the substance of these claims, the Court must address a threshold issue. As discussed above, Plaintiff requested and was granted leave pursuant to the EFMLEA and the EPSLA which modified the FMLA, and not the FMLA itself. In the Motion, Defendant suggests that Plaintiff's remaining interference and retaliation claims should fail because he "did not take FMLA leave during the 2020-2021 year as alleged[.]" (Doc. # 30 at 11). The Court disagrees, as courts assess EFMLEA and EPSLA claims under the same framework as normal FMLA claims. *See Crider v. Lute Supply, Inc.*, No. 2:20-cv-81-WOB-EBA, 2022 WL 760874, at *6 (E.D.

Ky. Mar. 11, 2022) (citing *Atwood v. JCF Residences Mgmt., Co.*, Case No. 1:20-cv-00056, 2022 WL 185187, at *5, *8 (M.D. Tenn. Jan. 19, 2022)).  With this issue resolved, the Court will address Plaintiff's FMLA interference and retaliation claims.

### a.    FMLA Interference

Under the FMLA, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the Act]." 29 U.S.C. § 2615(a)(1).  To survive summary judgment on his FMLA interference claim, Plaintiff must show that: (1) he was an eligible employee; (2) Defendant was a covered employer; (3) Plaintiff was entitled to take leave; (4) Plaintiff gave Defendant notice of his intent to take leave; and (5) Defendant denied Plaintiff his FMLA benefits or interfered with his FMLA rights.  *See Groening v. Glen Lake Cmty. Schs.*, 884 F.3d 626, 631 (6th Cir. 2018).

Defendant does not dispute whether Plaintiff can establish the first four elements of his FMLA interference claim.  (*See* Doc. # 30 at 17).  Instead, Defendant argues that Plaintiff's claim fails because he cannot show that Defendant denied or interfered with FMLA benefits or rights to which Plaintiff was entitled.  (*Id.*).  In support, Defendant notes that Plaintiff was afforded leave from mid-September to December 4, 2020.   (*Id.*). According to Defendant, "[n]othing within the record remotely indicates that Defendant interfered with [Plaintiff's] ability to take FMLA leave[,]" and Defendant is accordingly "entitled to summary judgment on [Plaintiff's] FMLA interference claim."  (*Id.*).  In his Response, Plaintiff claims that Defendant interfered with his FMLA rights by (1) discouraging Plaintiff from taking leave; (2) contacting Plaintiff and asking him to perform work-related tasks while on leave; (3) "making significant changes to his duties following his return from leave[,]" and (4) "terminating his employment."  (Doc. # 36 at 11).

As the Sixth Circuit has noted, "interfering with the exercise of an employee's rights under the FMLA includes discouraging an employee from using FMLA leave."  *Arban v. West Pub. Corp.*, 345 F.3d 390, 402 (6th Cir. 2003) (quoting 29 C.F.R. § 825.220(b)) (internal quotation marks and bracketing omitted).  At his deposition, Plaintiff testified that Shafer initially responded to Plaintiff's request for leave by stating "this has never been done before" and requesting that Plaintiff "change [his] schedule instead of taking leave[.]" (Doc. # 26 at 323-34).  In its Reply, Defendant contests the significance of this testimony. (Doc. # 37 at 2).  Defendant submits that the testimony consists of "a single, cherry-picked snippet from [Plaintiff's] deposition" which, "when read in context[,]" relates to his race discrimination claims and not his FMLA interference claim.  (*Id.*).

Even so, Plaintiff *did* testify that Shafer discouraged him from taking leave.  The Court concludes that this testimony is sufficient for Plaintiff's FMLA interference claim to survive summary judgment, as the Court is required to view the evidence in Plaintiff's favor at this procedural posture.  *See Matsushita*, 475 U.S. at 587.  Thus, the Motion is **denied** as to Plaintiff's FMLA interference claim.  Having determined that the claim will go forward on Plaintiff's discouragement theory, the Court need not—and shall not—address his other interference theories at this juncture.

### b.    FMLA Retaliation

The FMLA prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by [the Act]."  29 U.S.C. § 2615(a)(2).  FMLA retaliation claims are generally assessed "under the familiar *McDonnell Douglas* burden-shifting framework."  *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012).  Under this framework,

> the employee has the initial burden of establishing his prima facie case; if he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual.

*Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014) (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 761-62 (6th Cir. 2012)).  To establish a prima facie case of FMLA retaliation, a plaintiff must show that: (1) he was engaged in a statutorily protected activity; (2) his employer knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection between the protected FMLA activity and the adverse employment action.  *Seeger*, 681 F.3d at 283.  "[T]o survive summary judgment, a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale."  *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012).

Defendant does not contest whether Plaintiff can establish the first two elements of his prima facie FMLA retaliation claim.  (*See* Doc. # 30 at 11-16).  Instead, Defendant challenges whether Plaintiff can show the third and fourth elements.  (*See id.*).  Defendant also submits that it had legitimate and non-discriminatory reasons for taking the actions Plaintiff identifies and that Plaintiff cannot show that these reasons were pretextual.  (*Id.* at 23-25).  In his Response, Plaintiff identifies two supposed adverse employment actions of Defendant.  (Doc. # 36 at 15-16).  First, Plaintiff claims that Defendant "significantly altered [Plaintiff's] work schedule and duties" upon his return from leave.  (*Id.* at 15).  Specifically, Plaintiff submits that Defendant advanced his start time from 9:50 a.m. to 7:30 a.m., required Plaintiff to "contact[ ] struggling students," and "assigned Plaintiff teaching responsibilities."  (*Id.* at 2).  Second, Plaintiff notes that Defendant terminated

Plaintiff's employment.  (*Id.* at 16).  According to Plaintiff, these actions were causally connected to him taking FMLA leave.  (*Id.* at 16-18).

### i.     *Plaintiff can show sufficient evidence of adverse employment actions at this stage*

An adverse employment action is "a materially adverse change in the terms and conditions of [a plaintiff's] employment."  *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010).  Such actions are "typically marked by a significant change in employment status, including hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id.* (internal quotation marks omitted).  An adverse employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir. 2000).  "The Sixth Circuit has consistently held that *de minimis* employment actions are not materially adverse and, thus, not actionable."  *Id.* at 462.  In alleging an adverse employment action, a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse."  *Crawford v. JP Morgan Chase & Co.*, 531 F. App'x 622, 627 (6th Cir. 2013) (quoting *Garner v. Cuyahoga Cnty. Juvenile Court*, 554 F.3d 624, 639 (6th Cir. 2009)).

Plaintiff's termination was unquestionably an adverse employment action.  *See Spees*, 617 F.3d at 391.  But whether the alterations to Plaintiff's work schedule and job duties were also adverse employment actions is less obvious.  For the reasons stated below, the Court concludes that the alteration to Plaintiff's work schedule was an adverse employment action, but the alteration to his job duties was not.

As discussed above, Plaintiff's daily start time was advanced from 9:50 a.m. to 7:30 a.m. upon his return from leave.  According to Plaintiff, this change in schedule was

significant because it increased his daily working hours and impacted his childcare responsibilities.  (Doc. # 36 at 5-6).  Plaintiff further submits that Defendant assigned him the responsibility of "contacting struggling students . . . [and] also assigned Plaintiff teaching responsibilities" upon his return from leave.  (Doc. # 36 at 2).  Specifically, Defendant required Plaintiff to administer three study skills classes and assigned Plaintiff 41 students to contact and monitor.  (Doc. # 26 at 191-92, 206-07).  Plaintiff's "main duty" regarding the study skills classes was to "help students with organization and keep them on track in [the] Edgenuity" online credit recovery program.  (*Id*. at 191-92; *see also* Doc. # 37 at 11).  At his deposition, Plaintiff testified that prior to taking leave he would monitor students during lunch periods and would "supervise [one] study hall period" each Wednesday, but that these roles did not involve "any teaching responsibilities at all." (Doc. # 26 at 52).  Plaintiff further testified that although he was assigned 41 students to contact, other staff members were only assigned between 5 and 7 students each.  (*Id*. at 322).

Before specifically addressing whether these alterations to Plaintiff's work schedule and job duties constituted an adverse employment action, the Court must address a threshold argument that Defendant makes.  As Defendant notes, Plaintiff was hired as a teacher pursuant to the Primary Contract and separately executed the Extra Duty Contract pursuant to which he became Ryle's Athletic Director.  Defendant further notes that the job descriptions for these positions provide that Plaintiff was responsible for "[p]erform[ing] other duties consistent with the position assigned as may be requested by [his] supervisor."  (Doc. # 26 Exhibits 5 and 7).  Additionally, Defendant flags Plaintiff's employee handbook which states, in pertinent part, that:

> [j]ob descriptions shall not be considered all-inclusive descriptions of the job but shall indicate the general parameters of the duties and responsibilities of the position. The immediate supervisor may, as needed, assign other reasonable duties to the employee.

(Doc. # 30 at 13).

According to Defendant, Plaintiff's employment contracts and his employee handbook should have made it clear that he "could be assigned duties consistent with both contracts for the entire time that he was employed by [Defendant]." (*Id.*). Although Defendant's argument is somewhat persuasive, the Court concludes that it is not dispositive to the issue at hand. As the Supreme Court has held, retaliatory discrimination claims based on the reassignment of duties may still be actionable where "both the former and present duties fall within the same job description." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70-71 (2006).

Having addressed the above argument, the Court will now consider whether the alterations to Plaintiff's work schedule and job duties constituted an adverse employment action. Plaintiff initially appears to argue that the fact that his job duties changed at all constituted an adverse employment action. (*See* Doc. # 36 at 15) ("If the responsibilities and material aspects of the position[s] are not equivalent, including status and duties, the employee has been denied a benefit under the FMLA, which is an adverse employment action.'). However, this argument stretches the FMLA rubber band beyond its breaking point. As the Sixth Circuit has made clear, a mere alteration of job responsibilities does not suffice as an adverse employment action. *Bowman*, 220 F.3d at 461.

Plaintiff argues that the assignment of the new responsibilities constituted a "reassignment with significantly different responsibilities[,]" and therefore a materially adverse employment action. (Doc. # 36 at 15 (quoting *Laster v. City of Kalamazoo*, 746

F.3d 714, 727 (6th Cir. 2014)).  The Court disagrees.  Before taking leave, Plaintiff was already tasked with completing duties outside of the scope of his role as Athletic Director. Indeed, Plaintiff would supervise students during lunch periods, in school suspension programs, and one weekly study hall session.  (*See* Doc. # 36 at 4).  Plaintiff does not adequately explain how being required to administer two more study hall sessions significantly altered his responsibilities.   Requiring Plaintiff to contact and monitor students and assist with Edgenuity is better characterized as an alteration of his job responsibilities rather than a reassignment with significantly different responsibilities.  To the extent Plaintiff generally complains that his workload increased upon his return from leave, this is insufficient to demonstrate an adverse employment action.  *See Ortiz v. Hershey Co.*, No. 11-3123-STA-tmp, 2013 WL 5538657, at *9 (W.D. Tenn. Oct. 7, 2013) ("Generally, an increased workload or 'alteration of job responsibilities' does not constitute a materially adverse employment action."); *see also Jones v. Donahoe*, Civil Action No. 3:10-CV-522-H, 2013 WL 4042039, at *3 (W.D. Ky. Aug. 8, 2013) ("The definition of a materially adverse employment action typically involves a decrease in responsibilities, job duties, or benefits.  A substantial increase in [workload] alone does not qualify as a materially adverse change.").

That said, Plaintiff alleges that his new schedule negatively impacted his childcare responsibilities.   (*See* Doc. # 36 at 5-6).  The Sixth Circuit has held that "[a]n inconvenience resulting from a less favorable schedule can render an employment action 'adverse' even if the employee's responsibilities and wages are left unchanged."  *Spees*, 617 F.3d at 392 (quoting *Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008)).  Although Plaintiff does not "describe in detail how the schedule change affected

[him]," such detail is not required "to support the conclusion that [he] suffered an adverse employment action."  *See Spees*, 617 F.3d at 392.  Upon review, Defendant does not appear to address this issue in its Motion or Reply.  (*See* Docs. # 30 and 37).

Based on the above, the Court concludes that the changes to Plaintiff's job responsibilities did not constitute an adverse employment action but the changes to his work schedule did.  Having already determined that Plaintiff's termination was an adverse employment action, the Court will now address whether Plaintiff has shown that these actions were causally related to his leave.

### ii.   *Plaintiff can show sufficient evidence of causation at this stage*

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action."  *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007).  The Sixth Circuit has noted that where an employer treats an employee differently after he asserts his FMLA rights, "a retaliatory motive may be inferred."  *Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 105-06 (6th Cir. 2005).  "Although temporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence, . . . [it] is relevant and may evince the employer's intent."  *Id.* at 106 (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000)).

As discussed above, Plaintiff testified that Shafer initially discouraged Plaintiff from taking FMLA leave.  (Doc. # 26 at 323-34).  Plaintiff also testified that Shafer began criticizing his job performance for the first time upon his return from leave.  (*Id.* at 170-71).  Shafer allegedly complained that Plaintiff was not "communicating effectively" with coaches on Ryle's staff.  (*Id.*).  Moreover, Plaintiff's schedule appears to have altered

14

shortly upon his return from leave and he was terminated only about a month after his leave ended.  Based on the above, the Court concludes that Plaintiff has shown sufficient evidence of causation and, therefore, has shown a prima facie claim of FMLA retaliation.

### iii.    Defendant can articulate non-discriminatory reasons for its actions and Plaintiff does not show pretext

Because Plaintiff has established a prima facie case of FMLA retaliation, the burden now shifts to Defendant to identify a non-discriminatory reason for its actions.  *See Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008).  At this stage, Defendant "bears only the burden of production; the burden of persuasion remains with [Plaintiff] at all times."  *Id.* (quoting *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 377-78 (6th Cir. 2002)).  If a defendant is able to proffer a non-discriminatory reason for its actions, a plaintiff must "demonstrate that a reasonable jury could find by a preponderance of the evidence that the defendant's stated reasons are pretextual." *Cantrell*, 145 F. App'x at 106 (internal quotation marks omitted).

Defendant has satisfied its burden.  Regarding its decision to shift Plaintiff's start time from 9:50 a.m. to 7:30 a.m., Defendant submits that this was done so that Plaintiff would arrive at school the same time as Ryle's students.  (Doc. # 30 at 12).  As to its decision to terminate Plaintiff, Defendant submits that it was made based due to Plaintiff's "blatant insubordination of Principal Shafer's request to facilitate three small Study Skills classes."  (*Id.* at 16).  Defendant's stated reason for shifting Plaintiff's start time appears to be legitimate and non-discriminatory.  And "[t]he Sixth Circuit has repeatedly held that insubordination may constitute a legitimate, non-discriminatory reason for adverse

15

action." *Raadchelders v. Columbus State Cmty. Coll.*, 377 F.Supp.3d 844, 858 (S.D. Ohio 2019) (citing *Fullen v. City of Columbus*, 514 F. App'x 601, 606 (6th Cir. 2013)).

Thus, the burden shifts back to Plaintiff to show that Defendant's proffered reasons are pretextual. In opposing summary judgment, Plaintiff must produce sufficient evidence from which a jury could reasonably reject Defendant's explanations for its actions. *See Raadchelders*, 377 F.Supp.3d at 858 (citing *Mickey*, 516 F.3d at 526). To do so, a plaintiff must show either: (1) that the defendant's proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the adverse employment actions; or (3) that the reasons were insufficient to motivate the adverse employment actions. *Cantrell*, 145 F. App'x at 107.

In his Response, Plaintiff does not adequately address Defendant's proffered motive for changing his start time. Instead, Plaintiff merely asserts his belief that "[t]here seemed to be no logical reason for . . . the earlier start time." (Doc. # 36 at 19). This statement completely ignores Defendant's proffered reason. The Court accordingly concludes that Plaintiff has failed to show that Defendant's decision to alter his start time was pretextual.

As to Defendant's proffered reason for terminating him, Plaintiff first argues that "the same circumstances which established a causal connection between [ ] Plaintiff's protected activity and his termination also serves as sufficient evidence to establish pretext." (Doc. # 36 at 18). In support, Plaintiff cites the Sixth Circuit's decision in *Cantrell v. Nissan N. Am.*, 145 F. App'x 99 (6th Cir. 1998). (*Id.*). Upon review, however, the Sixth Circuit in *Cantrell* merely noted that the causation evidence *in that case* was sufficient to establish pretext; it did not establish a categorical rule that causation evidence is *always*

sufficient for this purpose.  *See Cantrell*, 145 F. App'x at 107-08 ("We hold that the same circumstances which established a causal connection between *Cantrell's* protected activity and her termination also serve as sufficient evidence [of pretext].") (emphasis added).  With this issue resolved, the Court will assess Plaintiff's evidence of pretext regarding his termination.

Plaintiff first argues that Defendant's proffered reason for terminating him "did not warrant termination."  (Doc. # 36 at 18).  According to Plaintiff, his alleged insubordination merely consisted of him "questioning changes to his job and asserting that they violated the FMLA."  (*Id.*).  The Court disagrees.  It is undisputed that Plaintiff refused to administer the additional study skills classes.  Assuming that Plaintiff was insubordinate, Defendant would be entitled to terminate Plaintiff under applicable state law.  *See* Ky. Rev. Stat. § 161.790(1)(a) ("The contract of a teacher . . . shall not be terminated except for any of the following causes: insubordination, including but not limited to . . . refusal to recognize or obey the authority of the . . . principal[.]").  The Court accordingly rejects this argument.

Plaintiff next argues that his alleged insubordination did not actually motivate Defendant's decision to terminate him.  (Doc. # 36 at 19).  To show that Defendant's proffered reason did not actually motivate the termination, Plaintiff "must show circumstances which tend to prove that an illegal motivation was *more* likely than that offered by [Defendant]."  *See Cantrell*, 145 F. App'x at 107 (emphasis in original and internal quotation marks omitted).  According to Plaintiff "there is substantial evidence that Defendant held a retaliatory motive."  (Doc. # 36 at 19).  In support, Plaintiff notes that (i) Shafer initially discouraged Plaintiff from taking leave; (ii) Defendant changed Plaintiff's schedule and job duties upon his return from leave; (iii) "[t]here seemed to be

no logical reason for some of the changes, including the earlier start time;" (iv) Defendant began scrutinizing Plaintiff's job performance upon his return from leave; and (v) "Defendant admits that it did not even consider the requirements of the FMLA when terminating Plaintiff." (*Id*.).

However, that there is *some* evidence that Defendant may have had a retaliatory motive is beside the point.   "To rebut the proffered rationale, the weight of the evidence offered by the Plaintiff must make it more likely than not that the explanation is pretextual." *Wingfield v. Escallate*, LLC, No. 5:12CV2620, 2014 WL 4925822, at *4 (N.D. Ohio Sept. 30, 2014) (citing *Jones v. St. Jude Medical S.C. Inc.*, 504 F. App'x 473, 477 (6th Cir. 2012)).   The Court concludes that Plaintiff has failed to make this showing.   Plaintiff testified that, during his disciplinary hearing, Defendant offered to merely reprimand him if he agreed to teach the study skills classes.  (Doc. # 26 at 294-95).  However, Plaintiff declined this offer and was terminated shortly thereafter.  (*Id*. at 295).  Upon review, Plaintiff does not appear to address this issue in his Response.  (*See* Doc. # 36).

Even when viewed in the light most favorable to Plaintiff, his admission that Defendant offered to merely reprimand him simply does not square with his claim that his termination was due to him taking FMLA leave.  Based on the above, the Court concludes that Plaintiff has failed to rebut Defendant's proffered reason for his termination.   The Court, having already concluded that Plaintiff failed to rebut Defendant's proffered reason for shifting his schedule, also concludes that, although Plaintiff has shown a prima facie case of FMLA retaliation, he has not shown pretext.   Thus, the Motion is **granted** as to Plaintiff's FMLA retaliation claim.

### 2. Race Discrimination Under Title VII and the KCRA

Defendant also moves for summary judgment on Plaintiff's claims of race discrimination under Title VII and the KCRA. (Doc. # 30 at 17-21). In pertinent part, Title VII prohibits an employer from discrimination against an employee because of his or her race. 42 U.S.C. § 2000e-2(a)(1). "Claims brought under the KCRA are to be analyzed in the same manner as a claim under Title VII, its federal counterpart." *Mesbah v. Univ. of Louisville*, Civil Action No. 3:22-CV-567-CHB, 2023 WL 6050232, at *5 (W.D. Ky. Sept. 15, 2023) (quoting *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005)) (internal quotation marks omitted). The Court will accordingly focus its analysis on Plaintiff's Title VII claim.

Like FMLA retaliation claims, Title VII claims are generally assessed under the *McDonnell Douglas* burden-shifting framework. *See May v. GMC Mansfield Metal Fabricating*, 61 F. App'x 171, 172 (6th Cir. 2003). To establish a prima facie case of race discrimination under Title VII, Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for his job and performed it satisfactorily; (3) despite this qualification and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside of his protected class or was treated less favorably than a similarly-situated individual outside of his protected class. *Laster*, 746 F.3d at 727.

### a. It is unclear whether Plaintiff can establish a prima facie case of race discrimination

Defendant does not contest whether Plaintiff can establish the first factor of his prima facie case. (*See* Doc. # 30 at 19). Although Defendant appears to dispute whether Plaintiff suffered an adverse employment action as required by element three, the Court concludes that Plaintiff's termination satisfies this element for the same reasons outlined

above.  *See supra*, § B.1.b.i.  And Plaintiff's termination is the adverse employment action he identifies in the context of his race discrimination claims.  (*See* Doc. # 36 at 21). Regarding the fourth element, Defendant claims that Plaintiff has failed to show "that he was treated differently from similarly situated members of an unprotected class[.]"  (Doc. # 30 at 21).  But even if Plaintiff has failed to make this showing, the Court concludes that he nevertheless has satisfied the fourth element.  To meet this element, Plaintiff must show that "*he was replaced by a person outside of the protected class **or** was treated less favorably than a similarly situated individual outside of his protected class.*"  *See Laster*, 746 F.3d at 727.  Plaintiff claims that after he was terminated, Defendant hired Keaton Belcher, a Caucasian male, as Ryle's Athletic Director.  (Doc. # 36 at 8). Defendant does not dispute this allegation.  (*See* Docs. # 30 and 37).  Based on the above, the Court concludes that Plaintiff has shown the first, third, and fourth elements of his prima facie case.

But whether Plaintiff has established the second element is less clear.  To show that he was qualified for his position, Plaintiff must demonstrate that he "was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative."  *Wilkins v. Eaton Corp.*, 790 F.2d 515, 521 (6th Cir. 1986).  According to Defendant, Plaintiff was not qualified for his position and failed to perform it satisfactorily.  (Doc. # 30 at 19-20).  In support, Defendant first notes that Plaintiff did not disclose to Defendant that his Ohio teaching license was suspended due to his involvement in an altercation with a student while working at a different school.  (*Id.*). Defendant claims that it would not have hired Plaintiff had this information been disclosed.

(*Id.*).  Defendant also claims that Plaintiff was not performing his job satisfactorily given

"his blatant insubordination of Principal Shafer's requests[.]"  (*Id.* at 20).

In his Response, Plaintiff explains his decision not to disclose his prior Ohio license

suspension to Defendant as follows:

> [When he applied to work for Defendant], Plaintiff was fully eligible to have
> his license reinstated, but decided not to pursue it as he was searching for
> employment in other states.  Plaintiff spoke with the Kentucky licensing
> board who confirmed that after he participated in training, the discipline
> would not be placed on his record.  Plaintiff successfully completed his
> training shortly [thereafter].  Because Plaintiff did not have any discipline on
> his record, he did not disclose the allegation [of the altercation with the
> student] on his application with Defendant.

(Doc. # 36 at 22 n.2) (internal record citations omitted).  Plaintiff also notes that he has a

master's degree in educational leadership and administration, holds a Kentucky teaching

certificate, had prior experience as an athletic director, and worked as Ryle's Athletic

Director for a year and a half prior to taking leave.  (*Id.* at 22).  Plaintiff does not appear

to address how (if at all) his alleged insubordination affects whether he was performing

his job satisfactorily.  (*See* Doc. # 36).

Although the issue of whether Plaintiff was qualified for his position and/or was

performing it satisfactorily is in dispute, the Court concludes that it need not decide the

issue to resolve the Motion.  This is because Plaintiff's race discrimination claims fail even

assuming that he has established a prima facie case.

   **b.**  **Even if Plaintiff can establish his prima facie case,
Defendant can articulate a non-discriminatory
reasons for its actions and Plaintiff does not  show
pretext**

If Plaintiff could establish his prima facie case, the burden would shift to Defendant

to proffer a legitimate, non-discriminatory reason that it terminated Plaintiff.  *Mickey*, 516

F.3d at 526.  As with Plaintiff's FMLA retaliation claim, Defendant claims that it terminated Plaintiff due to his alleged insubordination.  (Doc. # 30 at 23-25).  And as discussed in the context of Plaintiff's FMLA retaliation claim, the Court concludes that Defendant's proffered reason is legitimate and non-discriminatory.  *See supra*, § B.1.b.iii.  Defendant has accordingly satisfied its burden.

Thus, the burden shifts to Plaintiff to show that Defendant's proffered reason for his termination was pretextual.  *See Levine v. DeJoy*, 64 F.4th. 789, 798 (6th Cir. 2023).  In his Response, Plaintiff appears to argue that Defendant's proffered reason did not actually motivate its decision to terminate Plaintiff.  (*See* Doc. # 36 at 22-24).  Instead, Plaintiff argues that he was terminated due to his race.  (*Id.*).  In support, Plaintiff identifies the following alleged racially discriminatory comments he endured while employed by Defendant:

- Shafer once told Plaintiff in the presence of other staff that it looked like Shafer went to Sycamore, a high school with a predominantly Caucasian student body, and Plaintiff went to Princeton, a high school with a predominantly African American student body;

- Shafer once told Plaintiff that he should report to Assistant Principal Tony Pastura because Plaintiff was somehow Pastura's "boy;"

- Principal Matthew Turner once told Plaintiff that Turner learned how to "talk Black" to non-white students;

- Turner told Plaintiff that Plaintiff came across as "mean" after a Caucasian employee confronted Plaintiff about a position she wanted; and

- Plaintiff reported difficulty with a community member who volunteered at various athletic events but was told by Turner "to turn the other cheek."

(*Id.* at 8, 22-23).

Even if these allegations are true, Plaintiff has not shown sufficient evidence to rebut Defendant's proffered rationale for terminating him. "In determining whether discriminatory comments are circumstantial evidence of discrimination in a particular case, [courts in the Sixth Circuit] consider factors such as the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision." *Griffin*, 689 F.3d at 595 (citing *Ercegovich*, 154 F.3d at 354-57). Where a speaker was "in a position to influence the alleged decision[,]" his or her comments can qualify as evidence of discriminatory intent. *Griffin*, 689 F.3d at 595. But isolated and ambiguous comments, even if made by a relevant speaker, will not support a finding of discrimination. *Id.* at 596.

Each of the comments Plaintiff identifies were made by either Turner or Shafer. At his deposition, Turner testified that he was the only person with the authority to terminate employees within the school district. (Doc. # 35 at 54). And Shafer served as Ryle's Principal and attended Plaintiff's disciplinary hearing. (*See* Doc # 26 at 302-03). Thus, the Court concludes that Turner and Shafer were relevant speakers. Additionally, Shafer's statement that Plaintiff was Pastura's "boy" was made during Plaintiff's disciplinary hearing and shortly before his termination. (*See* Doc. # 26 at 302-03).

That said, the Court concludes that the statements at issue nevertheless do not support a finding of pretext. As an initial matter, the Court notes that most of the statements were not made proximate to Plaintiff's termination in January 2021. The comments that Plaintiff looked like he went to Princeton and that Turner learned how to "talk Black" were made in August 2020 and September 2019, respectively. (*See* Doc. # 26 at 300-06). It is unclear from the record when the remaining statements were made.

Plaintiff testified that the comment that he came off as "mean" was made on "December 3[rd]," but he did not identify a year.  (*See id.* at 306-08).  And Plaintiff did not specify the date on which Turner advised Plaintiff to "turn the other cheek."  (*See id.* at 330-31).  The Court will not speculate as to when these last two statements were made.

More important to the Court, however, is the nature and substance of the statements and whether they "evince a strong bias" against members Plaintiff's protected class.  *See Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 813 (6th Cir. 2020).  In making this inquiry, the Sixth Circuit has analyzed whether relevant statements contain "overtly negative comment[s]" or epithets against the relevant protected class.  *See id.*  Upon review, Shafer's statement that Plaintiff looked like he went to Princeton and Turner's statement regarding his ability to "talk Black" are the only statements which unambiguously reference Plaintiff's race.  Moreover, none of the statements contain any overtly negative comments or epithets.  At worst, the statements are ambiguous.  The Sixth Circuit has held that "isolated or ambiguous remarks are not evidence of pretext." *Plumb v. Potter*, 212 F. App'x 472, 481 (6th Cir. 2007) (citing *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025-26 (6th Cir. 1993)).

Moreover, and as discussed above, it is undisputed that Defendant offered to merely reprimand Plaintiff if he agreed to administer the study skills classes.  (Doc. # 26 at 294-95).  This offer does not square with Plaintiff's claim that he was terminated due to his race even when viewed in the light most favorable to Plaintiff.  Again, the inquiry here is whether Plaintiff has shown that his race was more likely the reason for his termination as opposed to his alleged insubordination.  *See Wingfield*, 2014 WL 4925822,

at *4.  For the reasons stated above, the Court concludes that Plaintiff has not met this burden.

The Court accordingly concludes that even if Plaintiff can establish a prima facie case of race discrimination, Defendant has proffered a legitimate and non-discriminatory reason for its decision to terminate Plaintiff and Plaintiff has not shown pretext.  Thus, the Motion is **granted** as to Plaintiff's Title VII and KCRA race discrimination claims.

### 3.      *Breach of Contract*

Defendant also moves for summary judgment on Plaintiff's breach of contract claim.  (Doc. # 30 at 25-27).  According to Plaintiff, Defendant breached its contract with Plaintiff "by changing [Plaintiff's] job duties and terminating Plaintiff's employment."  (Doc. # 1 at ¶ 55).  Although Plaintiff is not clear as to which contract Defendant's allegedly breached, the Court understands him to reference the Primary Contract and/or the Extra Duty Contract.

To prove breach of contract under Kentucky law, a plaintiff must prove: (1) existence of a contract; (2) breach of that contract; and (3) damages resulting from the breach.  *Cont'l Refin. Co., LLC v. Hartford Steam Boiler Inspection & Ins. Co.*, 350 F.Supp.3d 601, 607 n.3 (E.D. Ky. 2018) (citing *Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1,8 (Ky. Ct. App. 2009)).

Defendant does not dispute whether the Primary Contract and the Extra Duty Contract were valid agreements.  (Doc. # 30 at 25).  Defendant does, however, claim that Plaintiff has not established that Defendant breached the contracts.  (*Id.*).  According to Defendant, the "plain language" of both the Primary Contract and the Extra Duty Contract "states that [Plaintiff's] job duties could change subject to the reasonable requests of his

superior—Principal Shafer." (*Id.*).  Defendant also points to Plaintiff's employee handbook which, as discussed above, provides that "[j]ob descriptions shall not be considered all-inclusive descriptions of the job but shall indicate the general parameters of the duties and responsibilities of the position." (*Id.* at 25-26).  Defendant also flags certain deposition testimony in which Plaintiff acknowledged that he was hired as a teacher. (*Id.* at 26).  According to Defendant, this testimony "should indicate that [Plaintiff] was aware of what [his] role may have entailed." (*Id.*).

In his Response, Plaintiff claims that he was hired primarily to be Ryle's Athletic Director. (Doc. # 36 at 20).  He further points to deposition testimony in which Turner testified that the Athletic Director position was a full-time position and that he expected Plaintiff to spend all his time performing Athletic Director duties. (*Id.*).  According to Plaintiff, the understanding between the parties was that "Plaintiff's job duties were those of Athletic Director," and that he was "told that his teacher contract was a formality." (*Id.*).

Regardless, it is not clear to the Court that the "plain language" of the Primary Contract and the Extra Duty Contract supports Defendant's arguments.  In outlining Plaintiff's duties thereunder, the Primary Contract merely states as follows:

> 1.  The services to be performed by said teacher shall be such as are required by the Kentucky Revised Statutes, by the lawful rules and regulations of the State Board for Elementary and Secondary Education, and the lawful rules and regulation of the District.
>
> 2.  The duties to be performed are to commence on the first day required by the school calendar adopted or amended by the District and approved by the State Department of Education for the [applicable school year], for the number of days required by such calendar, to end no later than June 30 of the school year in such school or schools.

(Doc. # 26 at Exhibit 4).  Similarly, the Extra Duty Contract merely provides, in pertinent part, as follows:

26

>    3.  **<u>Compensation and Duties</u>**: The Employee is hereby retained in the
>    capacity of **HS ATHLETIC DIRECTOR (Job Code 6109)**[.] . . . The
>    Employee's duties shall be performed in accordance with the School Board
>    policy applicable thereto and subject to the terms, statutes and regulations.
>    The Employee shall be responsible to his/her immediate supervisor and
>    perform his/her duties responsibly and efficiently according to instructions.

(Doc. # 26 Exhibit 6) (emphasis in original).   Contrary to Defendant's assertions, these provisions do not plainly outline Plaintiff's job responsibilities or expressly allow Defendant to alter them.

As far as the Court can tell, Defendant's argument is based on the written job descriptions for Defendant's teacher and athletic director positions rather than the agreements themselves.   To be clear, the job descriptions provide that applicable employees are required to "[p]erform other duties consistent with the position assigned as may be requested by the supervisor."   (Doc. # 26 at Exhibits 5 and 7).   And the job description for athletic director states that applicable employees are required to "[p]articipate in those functions and activities as described in the regular teacher job description."   (Doc. # 26 at Exhibit 7).   However, it is not clear to the Court whether the job descriptions are part of the contracts.   Indeed, the job descriptions are not referenced in the contracts and are not signed by the parties, and they appear in the record as separate exhibits from the contracts.

Based on the above and in light of Defendant's arguments, the Court cannot determine at this juncture whether Defendant is entitled to judgment as a matter of law on Plaintiff's breach of contract claim.   Thus, the Motion is **denied** with respect to this claim.

III.    **CONCLUSION**

Accordingly, it is **ORDERED** that:

(1)    Defendant's Motion for Summary Judgment (Doc. # 30) is **GRANTED** as to Plaintiff's Title VII retaliation claim, KCRA retaliation claim, FMLA retaliation claim, Title VII race discrimination claim, and KCRA race discrimination claim;

(2)    Defendant's Motion for Summary Judgment (Doc. # 30) is **DENIED** as to Plaintiff's FMLA interference claim and Kentucky breach of contract claim; and

(3)    The parties shall file a Joint Status Report **within thirty (30) days from the date of this Order** indicating whether they would be amenable to pursuing mediation, either privately or court-facilitated, on Plaintiff's remaining claims.

This 6th day of March, 2024.

Signed By:

*David L. Bunning*    *DB*

**United States District Judge**

K:\DATA\ORDERS\Cov2022\22-26 MOO re MSJ.docx